UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :     CRIM. NO. 3:CR-16-194

       v.              :     (Judge      )

                           :

FUHAI LI,                  :

        Defendant       :

                           :

## INDICTMENT

**FILED
SCRANTON**

JUL 2 0 2016

PER _____

DEPUTY CLERK

THE GRAND JURY CHARGES:

### Introduction

At times material to this Indictment:

     1.     The defendant, FUHAI LI (LI), is a medical doctor. LI was a physician licensed by the Commonwealth of Pennsylvania and held a Pennsylvania medical license, as well as a Drug Enforcement Administration (DEA) registration number, and operated a practice, Neurology and Pain Management Center, within the Middle District of Pennsylvania. LI represented himself to be a specialist in neurology and pain management.

     2.     The Controlled Substances Act (the Act) governs the manufacture, distribution, and dispensing of controlled substances in the United States. Under the Act, there are five schedules of controlled substances – Schedules I, II, III, IV, and V. Controlled substances are scheduled into these levels based upon their potential for

abuse, among other things.   Abuse of Schedule II controlled substances may lead to severe psychological and/or physical dependence.

3.     Morphine, a Schedule II controlled substance, is an opioid pain medication.   Opioids are medications that relieve pain.   An opioid is sometimes called a narcotic.   Oxycodone is a narcotic analgesic (painkiller) that is similar to morphine and is classified as a Schedule II controlled substance, sometimes prescribed under the brand name Oxycontin®.   Oxycodone, generic for Oxycontin®, is used to treat severe pain, and, even if taken only in prescribed amounts, can cause physical and psychological dependence.

4.     Methadone is a synthetic opioid that contains methadone hydrochloride, a Schedule II controlled substance.   Methadone is roughly twice as potent as morphine in a single dose, but becomes much more potent than morphine with accumulation in the body.   In chronic users of high-dose opioids, methadone may be 10 times as potent as the morphine equivalent.

5.     Oxymorphone, a Schedule II controlled substance, is a powerful semi-synthetic opioid analgesic (painkiller).   Opana® and Opana ER® are brand names of the prescription drug oxymorphone.   Opana® and Opana ER® also carry warnings that use of the drug could lead to addiction, overdose, or death.   As with other opioids, these drugs are highly addictive.

6.     Fentanyl is a Schedule II narcotic (opioid) pain medicine that may become habit-forming.   Fentanyl is 70 -100 times as potent as morphine.   A fentanyl transdermal system (fentanyl patch) contains a high concentration of the

potent Schedule II opioid agonist, fentanyl.   Schedule II opioid substances which

include fentanyl, hydromorphone, methadone, morphine, oxycodone, and

oxymorphone have the highest potential for abuse and associated risk of fatal

overdose due to respiratory depression.

7.    Title 21, United States Code, Section 841(a) (1), provides that "[e]xcept

as authorized by this subchapter, it shall be unlawful for any person to knowingly or

intentionally … manufacture, distribute, or dispense, or possess with intent to

manufacture, distribute or dispense, a controlled substance."

8.    Title 21, United States Code, Section 802(10), provides that the term

"dispense" means to deliver a controlled substance to an ultimate user or research

subject by, or pursuant to the lawful order of, a practitioner, including the

prescribing and administering of a controlled substance and the packaging, labeling

or compounding necessary to prepare the substance for delivery.

9.   The term "distribute" means to deliver (other than by administering or

dispensing) a controlled substance or a listed chemical.   The term "distributor"

means a person who so delivers a controlled substance or a listed chemical.   (21

U.S.C. § 802(11)).

10.    The term "doctor shopping" refers to a practice of a patient requesting

care from multiple physicians without making efforts to coordinate care or informing

the physicians of the other prescribing physicians in order to divert the drugs to

others or feed their own addiction to certain prescription drugs by faking or

exaggerating the extent of their true condition, or both.

11.     Title 21, United States Code, Section 821, provides that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations relating to the registration and control of the manufacture, distribution and dispensing of controlled substances."

12.     The Attorney General of the United States has exercised his rulemaking authority regarding the dispensing of controlled substances through the promulgation of 21 Code of Federal Regulations § 1306.04, governing the issuance of prescriptions, which provides, among other things, that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. Moreover, an order purporting to be a prescription issued not in the usual course of professional treatment is not a prescription within the meaning and intent of section 309 of the Act [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the law relating to controlled substances.

13.     The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16.92, defines the authority of physicians licensed by the Commonwealth of Pennsylvania to prescribe or dispense controlled substances.   Chapter 16.92 provides minimum standards that shall be followed when prescribing or dispensing controlled substances and include; (a) the taking and recording of an initial medical history, (b) reevaluations of the condition diagnosed and the controlled substance involved, (c) patient counseling, and maintenance of patients' medical records.

4

14    As a medical doctor, LI was authorized to prescribe and/or dispense to patients Schedule II controlled substances and to prescribe medicine to patients, including controlled substances, for legitimate medical purposes and in the usual course of professional practice.

### LI's Illegal Distribution of Controlled Substances

15.    On or about August 2010, LI established a medical practice in Milford, Pike County, Pennsylvania specializing in neurology and pain management.

16.    In order to earn profits from his medical practice, LI wrote and issued unlawful prescriptions to patients for drugs containing controlled substances without a legitimate medical purpose and outside the usual course of professional practice in exchange for a fee.

17.    LI required an immediate payment of $250 to $350 as a clinic visit fee for new patients.   Follow-up patient visits occurred monthly.   Follow-up patient visits were cursory in nature with little to no medical examination, and almost always resulted in a prescription for a Schedule II controlled substance.   LI charged follow-up patients a visitation fee of $150 to $200.   LI preferred cash payments.

18.    Contrary to accepted medical practice, LI prescribed controlled substances in high dosage amounts to patients at the first appointment without conducting a meaningful physical examination of such individuals to verify the claimed illness or condition, or after conducting only a limited physical examination, and without reviewing drug screen tests.

19.     In some instances, LI issued unlawful prescriptions for controlled substances to patients despite indications that such patients were abusing, misusing, and distributing the controlled substances he prescribed.   These indications included, but were not limited to, the following:   self-reports of addiction concerns, cash payments despite access to health insurance, urine screens positive for illicit street drugs, or negative drug screens which would indicate diversion and patient selling of the drugs.

20.     LI's medical records for patients receiving high doses and quantities of controlled substances reflect the performance of examinations that were either not performed, were unnecessary, or were inconsistent with the nature of the diagnosis subsequently offered.   In most cases, the performance of the tests led to no change in therapy and, thus, no patient benefit.   The tests merely created the appearance of legitimacy.

21.     LI rarely, if ever, referred patients for outside diagnostic testing or physical therapy as an alternative to taking controlled substances, and failed to advise his patients of alternatives to the dangerous and highly addictive medications he continuously prescribed.   Despite the lack of meaningful correlation to an ultimate diagnosis for any in office tests performed by LI, and despite the inconsistent testing and lack of follow-up for the results of the testing, each examination and/or test performed in his office generated substantial proceeds for LI's medical practice.

22.   LI prescribed excessive amounts of controlled substances to numerous patients either knowing, or in willful blindness, of the fact that those patients would subsequently distribute the controlled substances to others.   LI intentionally ignored "red flags" such as "doctor shopping" by patients who traveled unreasonably long distances to visit LI, and who LI knew were being treated by other physicians. As a result, those patients filled the unlawful prescriptions written by LI at various pharmacies, and thereafter distributed the controlled substances obtained from such pharmacies to other individuals in exchange for money.   Those patients used money obtained from redistributing the controlled substances to pay for additional office visits and unlawful prescriptions written by LI.

23.   LI continued to prescribe excessive amounts of controlled substances, knowing that such practice could result in overdoses, dependence, addiction, and, in some cases, death.

24.   It was LI's practice to choose to begin therapy with the oxycodone 30 mg tablet in the absence of sufficient documentation.   Oxycodone 30 mg tablets is the maximum dose for the immediate release formula and the most sought after by drug abusers.

25.   Despite being notified by multiple area pharmacies that those pharmacies would no longer fill prescriptions written by him, LI continued to prescribe excessive amounts of controlled substances.   The alarms and "red flags" noticed and responded to by multiple local pharmacies were ignored by LI.

7

26.    LI distributed and dispensed, and caused to be distributed and dispensed, controlled substances that were not prescribed for a legitimate medical purpose, and not in the usual course of professional practice in one or more of the following manners:

a.)    inadequate verification of the patient's medical complaint;

b.)    cursory or no medical examinations by LI;

c.)    inadequate patient medical history and no follow-up verification;

d.)    incomplete or inadequate mental or physical examinations;

e.)    insufficient dialogue with the patients regarding treatment options and risks and benefits of such treatments;

f.)    treating patients with highly addictive controlled substances while failing to consider other treatment options;

g.)    failure to refer patients to specialist for treatments;

h.)    lack of, or inadequate diagnostic testing;

i.)    increasing the patients' dosages over time unnecessarily;

j.)    prescribing inappropriate combinations of drugs to patients;

k.)    allowing patients to suggest or direct the medications to be prescribed;

l.)    treating a large number of patients who resided either out of the state or long distances from his office with prescriptions for highly addictive controlled substances;

m.)    directing patients to particular pharmacies that were known to fill the prescriptions;

n.)     prescribing highly addictive controlled substances to patients with vague physical complaints where alternative treatment options would be indicated;

o.)     prescribing the maximum dose immediate release formula (30 mg tablets) without a long acting formulation;

p.)     failing to assess the risk of abuse by individual patients;

q.)     failing to monitor patients' responses to the medication; and

r.)     issuing prescriptions for highly addictive controlled substances for an inordinately high percentage of younger adult patients.

27.    LI obtained substantial income from the illegal distribution of controlled substances as described above.

## Counts 1 through 15

### 21 United States Code § 841(a)(1)
### (Unlawful Distribution and Dispensing of a Controlled Substance)

28.    The allegations contained in paragraphs 1 through 27 of this Indictment are incorporated herein.

29.    On or about the dates set forth below, in the Middle District of Pennsylvania and elsewhere, the defendant,

### FUHAI LI,

did knowingly and intentionally distribute and dispense, and caused to be distributed and dispensed, outside the usual course of professional practice and not for a legitimate medical purpose, the Schedule II controlled substances, as listed below, each of which constitutes a separate count of this Indictment:

9

| COUNT | APPROXIMATE DATES OF DISTRIBUTION | PATIENT | CONTROLLED SUBSTANCE |
|---|---|---|---|
| 1 | Feb. 9, 2011 through Jan. 27, 2015 | L.D. | Oxycodone, a/k/a "Oxycontin" |
| 2 | Jan. 9, 2013 through April 4, 2014 | R.S. | Oxycodone, a/k/a "Oxycontin" |
| 3 | Jan. 10, 2011 through Nov. 28, 2011 | J.S. | Oxycodone, a/k/a "Oxycontin" Methadone |
| 4 | Jan. 31, 2011 through June 20, 2012 | J.L.S. | Oxycodone, a/k/a "Oxycontin" Opana |
| 5 | March 15, 2011 through Sept. 25, 2012 | R.T. | Oxycodone, a/k/a "Oxycontin" Oxymorphone, a/k/a/ "Opana" |
| 6 | March 22, 2012 through Aug. 9, 2012 | L.B. | Oxycodone, a/k/a "Oxycontin" |
| 7 | Jan. 21, 2011 through Jan. 9, 2013 | T.D. | Oxycodone, a/k/a "Oxycontin" |
| 8 | Jan. 27, 2012 through Jan. 15, 2015 | J.M.S. | Oxycodone, a/k/a "Oxycontin" Oxymorphone, a/k/a "Opana" |
| 9 | Dec. 9, 2010 through Jan. 14, 2015 | N.T. | Oxycodone, a/k/a "Oxycontin" Methadone, Oxymorphone, a/k/a "Opana" |
| 10 | Oct. 5, 2011 through Dec. 5, 2012 | A.A. | Oxycodone, a/k/a "Oxycontin" |
| 11 | Nov. 1, 2010 through May 10, 2012 | M.A. | Oxycodone, a/k/a "Oxycontin" Methadone |
| 12 | Oct. 28, 2010 through Nov. 11, 2011 | S.A. | Oxycodone, a/k/a "Oxycontin" |
| 13 | Jan. 13, 2011 through May 11, 2012 | S.R.R. | Oxycodone, a/k/a "Oxycontin" |
| 14 | Aug. 10, 2011 through Jan. 5, 2015 | A.F.V. | Oxycodone, a/k/a "Oxycontin" |
| 15 | Jan. 18, 2011 through March 22, 2013 | C.V. | Oxycodone, a/k/a "Oxycontin" |

In violation of Title 21, United States Code, §§ 841(a)(1), and 841(b)(1)(C).

THE GRAND JURY FURTHER CHARGES:

## Count 16

### 21 United States Code § 841(a)(1)
### (Unlawful Distribution and Dispensing of a Controlled Substance)

30. The allegations contained in paragraphs 1 through 27 of this Indictment are incorporated herein.

31. On or about October 5, 2011, within the Middle District of Pennsylvania, the defendant,

### FUHAI LI,

did knowingly and intentionally distribute and dispense, and caused to be distributed and dispensed, outside the usual course of professional practice and not for a legitimate medical purpose, a controlled substance containing oxycodone, a Schedule II controlled substance, and serious bodily injury and death of a person known to the grand jury resulted from the use of the controlled substance distributed by the defendant.

In violation of Title 21, United States Code, §§ 841(a)(1) and 841(b)(1)(C).

THE GRAND JURY FURTHER CHARGES:

## Count 17

### 21 United States Code § 861(f)
### (Unlawful Distribution and Dispensing of a
### Controlled Substance to a Pregnant Individual)

32.   The allegations contained in paragraphs 1 through 27 of this Indictment are incorporated herein.

33.   On or about May 1, 2014, within the Middle District of Pennsylvania, the defendant,

## FUHAI LI,

did knowingly and intentionally distribute and dispense, and caused to be distributed and dispensed, outside the usual course of professional practice and not for a legitimate medical purpose, a controlled substance containing oxycodone, a Schedule II controlled substance, to a pregnant individual, said acts being proscribed by 21 U.S.C. § 861(f) and § 841(a)(1).

In violation of Title 21, United States Code, § 861(f) and § 841(a)(1).

THE GRAND JURY FURTHER CHARGES:

## Count 18

### 21 United States Code § 856(a)(1)
### (Maintaining Drug-Involved Premises)

34.   The allegations contained in paragraphs 1 through 27 of this Indictment are incorporated herein.

35.   From on or about August 2011, and continuing through August 2013, in the Middle District of Pennsylvania, the defendant,

### FUHAI LI,

knowingly and intentionally opened and maintained a place known as the Neurology and Pain Management Center, located at 104 Bennett Avenue, Suite 1B, Milford, Pike County, Pennsylvania, for the purposes of distributing Schedule II controlled substances outside the usual course of professional practice and without legitimate medical purpose.

In violation of Title 21, United States Code, § 856(a)(1).

THE GRAND JURY FURTHER CHARGES:

## Count 19

### 21 United States Code § 856(a)(1)
### (Maintaining Drug-Involved Premises)

36.   The allegations contained in paragraphs 1 through 27 of this Indictment are incorporated herein.

37.   From on or about August 2013, and continuing through January 2015, in the Middle District of Pennsylvania, the defendant

## FUHAI LI,

knowingly and intentionally, opened and maintained a place known as the Neurology and Pain Management Center, located at 200 3rd Street, Milford, Pike County, Pennsylvania, for the purposes of distributing Schedule II controlled substances outside the usual course of professional practice and without legitimate medical purpose.

In violation of Title 21, United States Code, § 856(a)(1).

THE GRAND JURY FURTHER CHARGES:

## Counts 20 through 21

### 18 United States Code § 1957
(Engaging in Monetary Transactions in Property
Derived from Specified Unlawful Activity)

38.   The allegations contained in paragraphs 1 through 27 of this Indictment are incorporated herein.

39.   On or about the dates set forth below, in the Middle District of Pennsylvania and elsewhere, the defendant

### FUHAI LI,

did knowingly engage and attempt to engage, aided and abetted by others, and did willfully cause or attempt to cause, a monetary transaction by, through or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, knowing that such property was derived from a specified unlawful activity, that is, the knowing and intentional distribution and possession with intent to distribute and dispense, and aiding and abetting the distribution and dispensing of, outside the usual course of professional practice and not for a legitimate medical purpose, Schedule II controlled substances, in violation of Title 21, U.S.C. § 841(a)(1).   Fuhai Li engaged in the following financial transactions, each of which constitutes a separate count of this Indictment:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 20 | Nov. 19, 2012 | LI caused a PNC bank official to wire transfer $385,572.05 to Provident Funding to pay the mortgage balance on his property located at 146 Rising Meadow Way, East Stroudsburg, PA (f/k/a 15 Rising Meadow Way) |
| 21 | Aug. 29, 2013 | A check in the amount of $158,699.30 (Ref. # 010004 002985763697) for the purchase of 200 3rd Street, Milford, PA, and deposited into a Wells Fargo checking account on August 29, 2013 by Hometown Abstract. |

In violation of 18 United States Code, §§ 1957 and 2.

THE GRAND JURY FURTHER CHARGES:

### Counts 22 through 24

26 United States Code § 7201
(Tax Evasion)

### Introduction

40.   The allegations contained in paragraphs 1 through 27 of this Indictment are incorporated herein.

41.   LI routinely accepted cash payments from his patients and did not deposit the cash into his bank accounts.   Rather, LI stored the cash in his residences.

42.   In January 2015, agents from the Drug Enforcement Administration (DEA) executed search warrants at LI's residences and seized in excess of $1,000,000 in cash.

43.   In order to conceal the cash from the Internal Revenue Service (IRS) and evade income taxes that were due and owing the United States, LI kept two sets of books and records recording the receipts from his medical practice.   One included the cash payments, the other did not.   Prior to filing his federal income tax returns, LI failed to tell the accountant who prepared those returns that he accepted substantial amounts of cash from his patients and only gave him the set of books and records that did not include the cash payments.   This resulted in false income tax returns being filed in 2011, 2012, and 2013, which substantially underreported LI's income and the tax due and owing for each year.

44.   LI attempted to evade or defeat a tax or the payment thereof for the years 2011, 2012, and 2013 as follows:

| Year | Total Income Per Return | Unreported Income | Corrected Taxable Income | Total Corrected Tax Liability | Tax Per Return | Tax Due and Owing |
|------|------|------|------|------|------|------|
| 2011 | $614,513 | $226,363.77 | $840,877 | $264,162 | $184,836 | $ 79,326 |
| 2012 | $542,566 | $340,847.57 | $883,414 | $278,310 | $164,231 | $114,079 |
| 2013 | $534,331 | $265,769.11 | $803,343 | $265,744 | $158,471 | $107,273 |
| | | | | | Total | $300,678 |

## Count 22

### 26 United States Code § 7201
### (Tax Evasion)

45.    On or about March 15, 2012, in the Middle District of Pennsylvania, the defendant,

### FUHAI LI,

did willfully attempt to evade and defeat a large part of the tax due and owing by him to the United States of America for the calendar year 2011, by preparing and causing to be prepared, and by signing and causing to be signed, a false and fraudulent Form 1040, Federal Income Tax Return for the calendar year 2011 which was filed with the Internal Revenue Service.   In that return, the defendant substantially and materially understated his taxable income for 2011.   The defendant's actions resulted in the underpayment of his individual income tax liability totaling approximately $79,326 for the calendar year 2011.

In violation of Title 26, United States Code, Section 7201.

<u>Count 23</u>

26 United States Code § 7201
(Tax Evasion)

46.     On or about February 18, 2012, in the Middle District of Pennsylvania, the defendant,

FUHAI LI,

did willfully attempt to evade and defeat a large part of the tax due and owing by him to the United States of America for the calendar year 2012, by preparing and causing to be prepared, and by signing and causing to be signed, a false and fraudulent Form 1040, Federal Income Tax Return for the calendar year 2012 which was filed with the Internal Revenue Service.   In that return, the defendant substantially and materially understated his taxable income for 2012.   The defendant's actions resulted in the underpayment of his individual income tax liability totaling approximately $114,079 for the calendar year 2012.

In violation of Title 26, United States Code, Section 7201.

19

## Count 24

### 26 United States Code § 7201
### (Tax Evasion)

47.    On or about March 2, 2014, in the Middle District of Pennsylvania, the

defendant,

### FUHAI LI,

did willfully attempt to evade and defeat a large part of the tax due and owing by him

to the United States of America for the calendar year 2013, by preparing and causing

to be prepared, and by signing and causing to be signed, a false and fraudulent Form

1040, Federal Income Tax Return for the calendar year 2013 which was filed with the

Internal Revenue Service.   In that return, the defendant substantially and

materially understated his taxable income for 2013.   The defendant's actions

resulted in the underpayment of his individual income tax liability totaling

approximately $107,273 for the calendar year 2013.

In violation of Title 26, United States Code, Section 7201.

## FORFEITURE ALLEGATION

**THE GRAND JURY FURTHER CHARGES AND FINDS PROBABLE CAUSE:**

48. The allegations contained in paragraphs 1 through 47 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853 and Title 18, United States Code, Section 982(a)(1).

49. Pursuant to Title 21, United States Code, Section 853 and Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 21, United States Code, Sections 841 and/or 856 and Title 18, United States Code, Section 1957, the defendant, FUHIA LI, shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses.

The property to be forfeited includes, but is not limited to, the following:

a.     United States currency in the amount of approximately $930,300.00, seized from 4005 Milford Landing Drive, Milford, Pennsylvania;

b.     United States currency in the amount of approximately $100,660.00, seized from 146 Rising Meadow Way (f/k/a 15 Rising Meadow Way), East Stroudsburg, Pennsylvania;

c.      United States currency in the amount of approximately $916,124.90,
seized from PNC Bank, account number xxxxxx2719 in the name of Hong Hu and
Fuhai Li;

d.      United States currency in the amount of approximately $21,283.71,
seized from PNC Bank, account number xxxxx3267, in the name of Hong Hu and
Fuhai Li;

e.      United States currency in the amount of approximately $4,786.04,
seized from PNC Bank, account number xxxxxx3131, in the name of Neurology and
Pain Management Center, PC;

f.      United States currency in the amount of approximately $25,511.63,
seized from PNC Bank, account number xxxxxx3457, in the name of Neurology and
Pain Management Center, PC;

g.      United States currency in the amount of approximately $37,366.73,
seized from PNC Bank, account number xxxxxx3909, in the name of a juvenile with
Hong Hu as custodian;

h.      United States currency in the amount of approximately $68,373.08,
seized from Wells Fargo Bank, account number xxxxxx4252, in the name of Hong Hu
and Fuhai Li;

i.      Real property located at 200 3rd Street, Milford, Pike County,
Pennsylvania;

j.      Real property located at 4005 Milford Landing Drive, Milford, Pike
County, Pennsylvania;

k.     Real property located at 146 Rising Meadow Way (f/k/a 15 Rising Meadow Way), East Stroudsburg, Monroe County, Pennsylvania;

and all interest and proceeds traceable thereto, in that such sum in the aggregate is property which was involved in the aforestated offenses and is traceable to such property in violation of Title 21, United States Code, Sections 841(a) and 856.

50.     If any of the property described above, as a result of any act or omission of the defendant:

     a.     cannot be located upon the exercise of due diligence;

     b.     has been transferred or sold to, or deposited with, a third party;

     c.     has been placed beyond the jurisdiction of the court;

     d.     has been substantially diminished in value; or

     e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL



PETER J. SMITH
UNITED STATES ATTORNEY

DATE: _7-19-16_

By: MICHELLE OLSHEFSKI
ASSISTANT U.S. ATTORNEY