IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | NO. 3:16-CR-194 |
| | : | |
| v. | : | (Judge Richard Caputo) |
| | : | |
| FUHAI LI, | : | |
| Defendant | : | |

# AMENDED BRIEF IN SUPPORT OF MOTION FOR JUDGEMENT OF ACQUITTAL

## FACTUAL RECORD

## A. THE INDICTMENT

The superseding indictment on October 17, 2017, charged the Defendant with various violations of federal law. Counts one (1) through twenty-three (23) charge violations of 21 USC 841 (a) (1) for the Defendant's distribution and dispensing of controlled substances outside the usual course of professional practice and not for a legitimate medical purpose (Note: Counts 18 and 21 were withdrawn by the government during trial).

Count twenty-four (24) charges a violation of 21 U.S.C. 841 (a) (1) for the Defendant's distribution and dispensing of a controlled substance resulting in serious bodily injury and death of a person.

Count twenty-five (25) charges a violation of 21 U.S.C. 861 (f) for the defendant's distribution and dispensing of a controlled substance to a pregnant individual.

Count twenty-six (26) and twenty-seven (27) charge violations of 21 U.S.C. 856 (a)(1) for the defendant's maintaining locations at 104 Bennett Avenue, Suite 1B, Milford, Pennsylvania, and 200 3rd Street, Milford, Pennsylvania, for the purpose of unlawfully distributing controlled substances.

Count twenty-eight (28) and twenty-nine (29) charge violations of 18 U.S.C. 1957 for the defendant's engaging in monetary transactions in property derived from a specified unlawful activity.

**B. PRETRIAL DAUBERT HEARING**

On May 1, 2018, a Daubert hearing was held regarding the government's expert report. Dr. Thomas testified the following:

**1. The legitimate medical purpose of opioids is for pain relief.**

"And in the case of opioids, there is a single legitimate medical purpose, which is pain relief in all of the cases that we reviewed here." (Daubert hearing. Page 30, line 8-10)

**2. He believed in and trusted what the patients said to him.**

"And individualization of care means that I must know what your responses are to the way in which I am treating you and I must change in response to what you, the individual patient, tell me about it..." (Daubert hearing. Page 32, line 1-4)

**3. The conclusion he reached in individual case that the controlled substance prescriptions were not for a legitimate medical purpose was his opinion only and was not based on relevant opioid treatment guidelines or Federation of State Medical Board model policies.**

Q: ..."I do not believe in reviewing your record review, reports, that you cite anything specific, any of the sources that you mentioned in your direct testimony, for support of a conclusion that you drew on a specific patient or a specific conclusion, is that correct?" (Daubert hearing page 36, line 7-10)

A: "I did not cite specific sources for the conclusions I drew on specific patients, that is correct." (Daubert hearing page 36, line 11-12)

**4. His criticism for treating several family members with opioids was his own opinion and was not based upon any medical literature source and it is not illegitimate to treat several family members with opioids.**

Q: "you also came to a conclusion, I think several times during the course of that report, that you were critical of Dr. Li's treating of family members, of people from the same family?" (Daubert hearing page 37, line 17-20)

A: "yes" (Daubert hearing page 37, line 21)

Q: "and you did not cite any authority for that?" (Daubert hearing page 37, line 22)

A: "Hum --" (Daubert hearing page 37, line 23)

Q: "Let me put it in this way: Do you have any authority for that? Do you remember any authority for that? (Daubert hearing page 37, line 24-25)

A: "The -- under those circumstances, my criticism for treating several family members with the same dosage of the same medication is not based upon a medical literature source..." (Daubert hearing page 38, line 1-3)


**5. Treating patients from distance was not illegitimate.**


Q: "and you also found fault with Dr. Li's treating patients who've traveled from New Jersey and other places that were distant, say a hundred miles from his office?" (Daubert hearing page 38, line 21-23)

A: "Yes"(Daubert hearing page 38, line 24)

Q: "Is that correct?" (Daubert hearing page 38, line 25)

A: "yes." (Daubert hearing page 39, line 1)

Q: "Is there anything in the literature that says a doctor is not supposed to treat patients who come from a distance?" (Daubert hearing page 39, line 2-3)

A: "The Federation State Medical Board's Model Policy 2013 mentions specifically that patients who are traveling from a distance for the provision solely of opioid analgesics must be carefully screened and should be viewed with suspicion."


(Daubert hearing page 39, line 4-7) (In fact, Dr. Li was not aware of that a few patients (Judith Smith, Jared Stemetzki, Richard Trembula and Joel Stemetzki) whose records were reviewed by Dr. Thomas traveled distance and 3 of the 4 patients (Judith Smith, Jared Stemetzki, Richard Trembula) were discharged in 2011 to 2012. Joel Stemetzki was seen between 2012 to 2015.)


Q: "and you did not cite any authority, nor do you have any authority today that says a doctor is in violation if he or she treats a patient that comes a long distance?" (Daubert hearing page 39, line 19-21)

A: "No. And in fact, I would not --" (Daubert hearing page 39, line 22)

Q: "You don't, is that correct?" (Daubert hearing page 39, line 23)

A: "Are you done?" (Daubert hearing page 39, line 24)

Q:"And answer to my questions was no, isn't that correct?" (Daubert hearing page 40, line 17)

A: "I 'm using the Federation of State Medical Boards as my primary guideline. It is a guideline, it is not a constricture. So no, it does not say that he cannot..." (Daubert hearing page 40, line 1820)

**6. MRI was not required by any guidelines or other authorities prior to prescribing opioids.**

Q: "and could you cite me something out of all the authority you gave that says a doctor, before he or she prescribes an opioid, must have an MRI?" (Daubert hearing page 42, line 12-14)

A: "I do not think I said that anywhere in my report and nor would I state that that's the case." (Daubert hearing page 42, line 15-16)

Q: "Let's put it this way: Do you have some authority that a doctor must have an MRI done he or she prescribes an opioid?" (Daubert hearing page 42, line 17-19)

A: "No" (Daubert hearing page 42, line 20)

## C. THE TRIAL

The trial in this matter commenced on May 2, 2018. The prosecution called 49 witnesses including six (6) DEA investigation agents, one (1) IRS agent, defendant's accountant, three (3) defendant's former employees, one (1) employee from Hometown Abstract Title company, one (1) employee from provident Financial Funding, twenty (20) former patients (including the husband of one deceased former patient), eight (8) pharmacists or pharmacy representatives, three (3) physicians, one (1) Toxicologist, one (1) paramedic, one (1) Coroner and one (1) Expert. The Government's Expert, Dr. Thomas was the only person who testified that the controlled substances prescribed by the defendant were not for a legitimate medical purpose and not within the usual course of professional practice, but he then contradicted himself as evidenced by his own testimony.

# ARGUMENT

Rule 29 requires the court to enter a judgment of acquittal where the government's evidence is insufficient to sustain a conviction. A guilty verdict may only survive "if, viewing the evidence in the light most favorable to the prosecution, the verdict is supported by substantial evidence." United States v. Morris, 575 Fed. Appx. 174, 176 (4th Cir, 2014) (citation and quotations omitted). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Baylor, 537 Fed. Appx. 149, 163 (4th Cir, 2013) (citation and quotations omitted).

Alternatively. "[u]pon the defendant's motion, the court may vacate the judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). While "a court should exercise its discretion to grant a new trial sparingly," it should do so "when the evidence weighs heavily against the verdict." United States V. Sprouse, 517 Fed Appx. 199, 204 (4th Cir. 2013). "When the motions attack the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence." United States v. Arrington, 757 F. 2nd 1484, 1485 (4th Cir, 1985). "[T]he court may consider the credibility of witness and need not view the evidence in the light most favorable to the government in determining whether to grant a new trial." United States v. Souder, 436 Fed. Appx. 280, 289 (4th Cir, 2011) (citation omitted). Unlike the standard for entering a judgment of acquittal, "the trial court may grant relief if is determines that the evidence-even if legally sufficient to convict weigh so heavily against the verdict that it would be unjust to enter judgment." Id. Thus, in Souder, the Fourth Circuit affirmed the district court's grant of a new trial when "the verdict was against the cumulative weight of the evidence[.]" Id. at 290 (Citation and quotations omitted); see also United States v. Campbell, 977 F.2d 854, 860 n.6 (4th Cir. 1992) (same). Assuming arguendo that sufficient evidence existed to

support Dr. Li's conviction, the court should nonetheless set aside the verdict and grant a new trial because it was against the cumulative weight of the evidence.

**1. The government has failed to prove beyond reasonable doubt that Dr. Li prescribed controlled substances to each patient in Counts 1-17, 19, 20, 22 and 23 knowingly and intentionally not for a legitimate medical purpose (namely not for purpose of controlling pain) and outside the usual course of professional practice (namely outside the usual course of pain management).**

A. Governing law

Counts 1-17, 19, 20, 22 and 23 in the superseding indictment charges that the Defendant unlawfully distributed and dispensed controlled substances. In order to establish the unlawful distribution and dispensing of controlled substances, the government must prove each of the following elements beyond reasonable doubt that (1) The defendant prescribed controlled substances to patients in Counts 1-17, 19, 20, 22 and 23; (2) The defendant prescribed controlled substances not for a legitimate medical purpose and outside the usual course of professional practice; (3) the defendant prescribed the controlled substances while knowing or intending that the prescriptions were not for a legitimate medical purpose and outside the usual course of professional practice; and (4) the controlled substance was substance identified in the superseding indictment.

B. Evidence at trial

(1). The medical record at trial in patients from all counts demonstrated the following facts:

a. There was medical history taking including pain history, pain level, previous diagnostic testing, previous non-opioid treatments such as non-opioid medication and physical therapy, previous opioid treatment, current opioid analgesic,

past medical history, past surgical history, family history, substance abuse history, psychiatric history, and review of systems.

b. An appropriate physical examination was performed and documented.

c. There was documented clinical diagnosis and medical necessity which was recognized and warranted for opioid treatment.

d. Diagnostic testing such as MRI or EMG/nerve conduction study was ordered when medically necessary based on clinical practice guidelines.

e. An agreement for treatment plan and controlled substances for pain was explained to and signed by patient, which specifies the treatment plan, treatment goal, potential opioid risks, side effects, driving vehicles and operating other machines, alcohol and other illicit drugs, responsibilities and legalities, one physician policy, one pharmacy policy, refill policy, follow-up appointment and monitoring (urine drug screen test and pill count), addiction specialist referral and consequence of violating this agreement.

f. The treatment plan including treatment goal (relieving pain and improving function) and other treatment options was documented.

g. The potential opioid risks and side effects were discussed with patient and were documented.

h. The risk of opioid abuse and addiction was assessed by using Opioid Risk Tool.

i. The opioid selection, initial dosing, and titration was individualized according to the patient's health status, previous exposure to opioid, attainment of therapeutic goal, pain severity etc.

j. Non-opioid treatments such as non-opioid medications and injections were added when necessary.

k. There was periodic follow-up monitoring of therapeutic efficacy, side effects, aberrant drug related behaviors and patient counseling about safe use of medication,

l. Urine drug screen tests were performed randomly and confirmatory drug tests were ordered when necessary.

m. The continuation of opioid treatment was determined by the therapeutic benefits vs. risks at each visit.

n. Opioid dose escalation or opioid rotation was based on medical necessity of adequate pain relief.

o. Opioid tapering or discontinuation was based on severity of inconsistent urine test results, aberrant drug-related behaviors or other information such as lack of efficacy, intolerable side effects or patient's request.

p. Referral to other specialists such as a physical therapist, substance abuse specialist etc. was done when necessary.

(2). The patients who testified at trial stated that either they had real pain and saw Dr. Li for pain relief or they lied about their pain to Dr. Li, in order to deceive Dr. Li for pain medication. The patients who lied about their pain never told Dr. Li that they were abusing or addicted to opioid pain medications at their history taking as documented in their medical record.

(3). No pharmacists testified that any patients in the superseding indictment filled or took opioid prescriptions not for the purpose of pain relief, and the prescriptions were within the usual course of professional practice. The Rite-Aid decided to stop filling Dr. Li's prescription after Janet

Hart (Director of government affair in Rite-Aid) was aware that Dr. Li was under investigation in 2013. Some local CVS pharmacies stopped filling Dr. Li's prescription after they were aware that Dr. Li was under investigation, although the corporation level of CVS headquarters did not believe that Dr. Li met their criteria to be blocked.

(4). No Drug Enforcement Agency (DEA) agent nor other government agents testified that there was any undercover evidence that Dr. Li did not examine patients during his appointment encounters, or that opioid prescriptions were issued not for pain relief, nor did any DEA or other government agents testify that there was any surveillance evidence that any patients in the superseding indictment were selling prescriptions or were abusing prescriptions.

(5). The Government's witnesses, Dr. Li's former employees (Sandy, Virginia and Samantha) testified that the office work hours were from 8:30am to 5:30pm and there were about 20 to 30 patients daily. The front desk staff performed the check-in's and check-out's and Dr. Li scheduled the follow-up visits. Dr. Li spent approximately 40 minutes for new patient appointments and 10 to 15 minutes for follow-up patient appointments. Sandy testified that she scheduled new patients and did not look at a map to check distances, and that our office is 10 minutes from the state of New York, and 10 minutes from the state of New jersey. Samantha testified that we needed medical records, and would not schedule patients without their medical record. When a new patient called, she stated that they would tell them to please send their medical records. Dr. Li checked and reviewed the medical record. She stated that they would have conversations with Dr. Li about the reasons not to schedule someone. They would keep the patient list for tracking and had an office list for bad patients that were listed as "do-not-schedule". The do-not-schedule list was large. Dr. Li performed physical examinations and documented a general exam, neurological exam and musculoskeletal exam. Dr. Li routinely engaged with patients asking them question, such as: Do you

drink? Does medication help? Do you take any illicit drugs? Do you have any improving function? If they had "dirty" urine, Dr. Li either discharged the patients or gave them a second chance.

(6). The government's expert, Dr. Thomas testified that the opioid prescriptions were not for a legitimate medical purpose and not within the usual course of professional practice because of no prior medical record, no structural imaging study, no pathological diagnosis, normal physical examination, young age, high-dose, distance travel, inconsistent urine screens, some aberrant drug related behaviors (such as running out medication early, reports of stolen prescriptions, etc.), doctor shopping, which contradicts his own statement that legitimate medical purpose of opioid treatment was for pain relief. He never testified that prior medical record, structural imaging study, abnormal pathological diagnosis, and abnormal physical examinations are required prior to opioid treatment by any laws, regulations, guidelines or model policies in order for a opioid prescription to be for a legitimate medical purpose and within the usual course of professional practice. He never testified that any clinical practice guidelines or model policies state that it is not for a legitimate medical purpose and not within usual course of professional practice to prescribe opioids to pain patients who were young, for the purpose of controlling pain, patients who required high-dose for pain relief, who travel distance to see physician for pain relief or who had inconsistent urine screens or some aberrant drug-related behaviors. In his testimony, Dr. Thomas never provided any evidence of "doctor shopping" or any evidence that Dr. Li knew that patients were seeing multiple physicians for same pain medications, but continued to prescribe opioids to patients. Dr. Thomas further testified that the conclusion he reached that opioid prescriptions were not for a legitimate medical purpose and not within the usual course of professional practice was his opinion only, and was not based on any clinical practice guidelines or opioid treatment model policies. In addition, Dr. Thomas's testimony contained numerous errors and untruthful statements in many cases listed as examples as follows:

In the testimony of Ms. Lindsay Dwyer: Dr. Thomas testified that on October 27, 2013, patient went to Pocono Medical Center (PMC) to obtain medication due to fictitious disorder. In fact, patient was admitted to PMC due to asthma exacerbation and abdominal pain as testified by Dr. Patel. She requested IV morphine for pain control and she never requested Oxycodone based on the hospital record as testified by Dr. Li.

In the testimony of Ms. Rachael Scarpa: When Dr. Thomas was asked the urine test on April 17, 2013 by US assistant Attorney, he testified that he reviewed the urine test results. However, he stated in his report of July 6, 2016 that "it is also noteworthy that while treating Ms. Scarpa, Dr. Li did not perform a single urine drug screen." How could he review urine test results if there was no single urine test screen? He contradicted himself. In fact, Dr. Li did several urine drug screens for Ms. Rachael Scarpa during her treatment with Dr. Li, indicating that Dr. Thomas did his report without reviewing the complete medical record.

In the testimony of Mr. Jared Stemetzki: Dr. Thomas Testified that Jared Stemetzki was prescribed the same dosage as his brother Joel. In fact, as documented in his medical record, he was prescribed Oxycodone 30mg every 4 hours and Oxycontin 80mg every 12 hours. However, his brother Joel was prescribed Oxycodone 30mg every 4 hours as documented in Joel's medical record.

In the testimony of Mr. Richard Trembula: A: "He told Dr. Li that an MRI on August 5th, 2009 demonstrated bulging disc at the level of L4-5 and L5-S1." (Page 181, line 20-23) In fact, as Mr. Trembula testified that he brought in his MRI ordered by Dr. Hogan, Dr. Li reviewed the MRI and documented in his medical

record as "There was a lumbar MRI on August 5, 2009, which demonstrated disc bulging at the level of L4-5 and L5-S1" at the initial visit of March 15, 2011.

In the testimony of Mr. Lucas Brown: Dr. Thomas testified that the patient stated that he did not want to take Oxycodone anymore, indicating that he was addicted. In fact, there are so many reasons that patient did not want to take Oxycodone anymore, such as side effects, no therapeutic efficacy, pain improved, or simply patient just did not want it.

In the testimony of Ms. Tamika Davis: Dr. Thomas testified that "He continued to label her problem as polyneuropathy even though we had a negative EMG that says that's not the case (Page 109, line 24 and page 110, line 1). In fact, Small fiber polyneuropathy can have completely normal EMG/nerve conduction study which Dr. Thomas has no knowledge about.

In the testimony of Ms. Nicole Tintle: Dr. Thomas testified that on January 6, 2011, Oxycodone was increased from 120 to 130 tablets when pain was stable. In fact, the Oxycodone was increased from 120 to 130 tablets because it did not last 6 hours anymore due to tolerance despite the pain was stable.

Dr. Thomas testified that on March 14, 2014, methadone 10mg twice daily was started without legitimate medical purpose. In fact, methadone was added for better pain control as her pain score was still 6/10 with oxycodone was documented in her medical record.

In the testimony of Mr. Anthony Abuiso:

Q: "Okay. Did you make note of anything regarding the drug screen on October 8, 2012?"

A: "The drug screen performed on October 8th, 2012, positive for Oxycodone and unspecified Benzodiazepines, which meant the patient was illicitly taking Benzodiazepines for non-medical use."

In fact, The urine sample on October 8, 2012 was sent out for a confirmatory test which was negative for Benzodiazepines, which was consistent. Thus, this was no evidence of illicitly taking benzodiazepines for non-medical use.

In the testimony of Mrs. Stephanie Abuiso:

Q: "do you see any -- as you look at that, do you see any MRIs or other structural studies for Stephanie Abuiso?"
A: "None".

In fact, there was a lumbar MRI study which was reviewed and documented in her medical record as "MRI lumbar spine demonstrated disc herniation at the level of L5-S1 with narrowing of neural foramina on the left side" at her initial visit of October 28, 2010.

In the testimony of Amber Vanluvender:

A: "she also reported that she was under the care of another physician and the initial diagnosis that Dr. Li offered was fibromyalgia (page 179 line 17-19)."

 In fact, the initial diagnosis was actually, polyneuropathy as documented in her medical record on August 10, 2011.

Q: "What was the opinion?" (Page 180, line 15)
A: "prescribing did not occur in the usual course of professional practice for any legitimate medical purpose." (Page 180, line 16-17).

However, in the report of Dr. Thomas on July 6, 2012, his conclusion regarding opioid prescription for Ms Amber Vanluvender was "its medical legitimacy is questionable."

In the testimony of Ms. Shaun Hicks:

A: "Before we go there --we already had a problem. Ms. Hicks has gotten opioids from Dr. Li on November 10, 2010. He is seeing her on December 6, 2010, and she had the interim gotten a prescription for an opioid from another physician."

(Dr. Thomas's testimony day 2, page 135, line 20-23). In fact, as indicated in her medical record, she was advised to wean off her oxycodone which was from her previous physician. No opioid was prescribed by Dr. Li on November 10, 2010.

In the testimony of Ms. Heidi Messer: Dr. Thomas testified that acute detox program NEVER gave methadone. In fact, Ms Heidi Messer went to Bon Secour Community Hospital detox program where she was treated with methadone for withdrawal after her Oxycodone was stolen as she testified.

In the testimony of Ms. Karen Koeppel:

A: " In 35 years I've never seen anyone on a high dose opioid for a treatment of carpal tunnel syndrome."

(Dr. Thomas testimony day 2, page 31, line 21-23). In fact, Oxycodone was prescribed for moderate to severe chronic neck and low back pain as documented in her medical record. The medical record never indicated that Oxycodone was prescribed for carpal tunnel syndrome despite that she carried diagnosis of carpal tunnel syndrome.

Q: "in terms of -- he documented poisoning by opiate and related narcotics. What does that mean?"

A: "It is in my experience one that I have only used in instance in the emergency department where patients had come in and been overdosed. Poisoning is poisoning. I am not sure why it's used in this circumstance, but it would suggest Dr. Li is aware this may not be in the patient's best medical interest as usually is not." (Dr. Thomas testimony day 2, page 35 line 15-23).

In fact, as documented in her medical record, urine test billing code G0434 was used for office urine drug screen which must be supported by ICD-9 diagnosis code V 58.69-Encounter for long tern use and 965.09-poisoning by opiates. This is required by some insurance carriers such as Medicare, Tricare, Aetna and some other insurance carriers.

In the testimony of Ms. Suzanne Watson:

A:" The patient told Dr. Li that she had MRI which demonstrated disc herniation at the level of L4-5 and L5-S1. As part of the history, that study did not appear in the record that I have reviewed." (Dr. Thomas testimony day 2, page 49, line 5-7).

A: "Because the MRIs and the history is not part of the objective findings." (Dr. Thomas testimony Day 2, page 50 line 24-25)

In fact, MRI CD was reviewed by Dr. Li and the result was documented in the medical record as:

"There was a lumbar MRI on 02/24/2011 which demonstrates disc herniation at the level of L4-5 and L5-Slwith spinal stenosis at her initial visit of 3-24-2011."

Dr. Thomas further testified that urine drug screen test at the initial visit was positive which was illicit drug use. In fact, the positive oxycodone was due to cross reaction of hydrocodone she was prescribed by her previous orthopedic physician. Dr. Thomas in fact admitted in the testimony of Lucas Brown that urine drug screen can be oxycodone positive when hydrocodone was taken due to cross reaction. In the current case, the urine sample was sent out for confirmatory test which confirmed hydrocodone only.

In the testimony of Mr. John Rouse: Dr. Thomas testified that

"poisoning is a problem. That diagnosis was used only when patient used excessive opioid and overdose in ER. Poisoning is not a practice of medicine."

In fact, as documented in his medical record, urine test billing code G0434 was used for office urine drug screen which must be supported by ICD-9 diagnosis code V 58.69-Encounter for long tern use and 965.09-poisoning by opiates. This is required by some insurance carriers such as Medicare, Tricare, Aetna and some other insurance carriers.

(7). The defendant's expert, Dr. Warfield, a distinguished professor from Harvard Medical School testified that legitimate medical purpose of opioid prescriptions was for pain relief. She further testified that patients can fake their symptoms and signs to deceive physicians for pain indications. The inconsistent urine screen or aberrant drug-related behaviors that are very common in patients with chronic pain, were not evidence that opioid prescriptions were not for a legitimate medical purpose. She further testified that prior medical record, imaging diagnostic test such as MRI, or physical examinations at follow-up visits were not required for opioid prescription. Imaging diagnostic test such as MRI and physical examination do not confirm or deny pain. Many physicians do not want to treat chronic pain patients as they are afraid of disciplinary board sanction or going to jail. Finally, she testified that all opioid prescriptions Dr. Li prescribed to patients were for a legitimate medical purpose and within the usual course of professional practice.

(8). Dr. Li testified that as a physician, he was trained to listen to and trust his patients unless there were reasons not to. He put patient care first and he followed the guidelines regarding legitimate medical purpose of opioid treatment for chronic pain and within the usual course of professional practice when clinical decisions were made, and the government has never disputed that Dr. Li followed following guidelines for chronic pain treatment with opioids:

A. Legitimate medical purpose of opioid treatment:

i. According to FSMB Model Policy (2004): "The board will consider prescribing, ordering, dispensing or administering controlled substances for pain to be for a legitimate medical purpose if it is based on sound clinical judgment. All such prescribing must be based on clear documentation of unrelieved pain." (Model policy for the use of controlled substances for the treatment of pain by FSMB 2004, page 4)

ii. Patient selection for opioid treatment: According to Opioid Treatment Guidelines by American Pain Society and American Academy of Pain Medicine: "Recommendation for patient selection and risk stratification: Clinicians may consider a trial of chronic opioid treatment as an option if chronic non-cancer pain is moderate or severe pain, pain is having adverse impact on function or quality of life and potential therapeutic benefits outweigh or are likely to outweigh potential risks" (Clinical guideline for the use of chronic opioid therapy in chronic non-cancer pain. Journal of Pain 2009;109:115)

iii. According to FSMB Model Policy (2013): "The board will consider the use of opioids for pain management to be for a legitimate medical purpose if it is based on sound clinical judgment and current best clinical practice, is appropriately documented, and is of demonstrable benefit to the patient." (FSMB model policy for the use of opioid analgesics in the treatment of chronic pain by FSMB 2013, page 5)

B. Within the usual course of professional practice

i. According to FSMB Model Policy (2004): "To be within the usual course of professional practice, a legitimate physician-patient relationship must exist and the prescribing should be based on a diagnosis and documentation of unrelieved pain." (Model policy for the use of controlled substances for the treatment of pain by FSMB 2004, page 4-5)

ii. According to FSMB Model Policy (2013): "To be within the usual course of professional practice, a legitimate physician-patient relationship must exist and the prescribing and administration of the medications should be appropriate to the identified diagnosis, should be accompanied by careful follow-up monitoring of the patient's response to treatment as well as his or her safe use of the prescribed medication, and should demonstrate that the therapy has been adjusted as needed. There should be documentation of appropriate referrals as necessary."(Model policy for the use of opioid analgesics in the treatment of chronic pain by FSMB 20 13, page 5). Dr. Li further testified that lumbar MRI testing was medically necessary only if there is a progressive or severe neurological deficit or there is a suspicion of serious underlying diseases such as infection, cancer, compression fracture, caudal equina syndrome or ankylosing spondylitis based on MRI guideline. Dr. Li also testified that the ICD-9 diagnosis code of disc displacement for billing (722.10) includes disc bulging, disc herniation, disc protrusion, disc excursion, internal disc disruption or simply discogenic pain. Therefore, any disc-related low back pain carries the same ICD-9 diagnosis code of disc displacement regardless of there is any disc herniation or not. Dr. Li testified that 458 patients were discharged from his practice due to various reasons; More than 200 patients were not scheduled by his clinic. More than 200 were not prescribed schedule II controlled substances; Approximately 2.9% of his patient were young adults; Approximately 270 MRI or other diagnostic imaging tests were ordered; Approximately 135 patients were referred to physical therapy or other treatment modalities such as back brace, TENS unit, etc.

(9). There was no any evidence at trial indicating that opioids are prohibited from prescribing to even opioid addicts, for the purpose of pain relief.

(10). Some aberrant drug related behaviors (such as running out opioid medication early due to taking an extra pill for pain relief because of tolerance, report of lost or stolen medication, borrowing pain medication from other family members or friends) or inconsistent urine drug screen results occurred in some patients, which were very common in patients with chronic pain for opioid treatment, and required a clinical judgment of treating physician as indicated by opioid treatment guidelines (Clinical guideline for the use of chronic opioid therapy in chronic non-cancer pain. 2009, page 115. Journal of Pain). Those were not evidence that opioid prescriptions were not for a legitimate medical purpose or not within the usual course of professional practice. Even a physician makes all efforts to adhere to the standard of care outlined by the best clinical practice guidelines, negligence or departure from the standard of care may still occur. In addition, different treating physicians may have different opinions or clinical judgments under certain circumstances, the government's expert, Dr. Thomas might not agree with the defendant's response to some mild aberrant drug-related behaviors or occasionally inconsistent urine test results, or he might believe there was negligence in that matter, but that disputed opinion or different clinical judgment or negligence does not easily reach the threshold of malpractice, let alone crime. "The standard for criminal liability under 841 (a) requires more than proof of a doctor's intentional failure to adhere to the standard of care." United States v. Feingold, 454 F.3d 1001, 1011 (9th Cir. 2006). A criminal conviction "requires more" than a showing of malpractice. United States v. Tran Trong Cuong, 18 F. 3d 1132, 1137 (4th Cir. 1994). Instead, "a practitioner becomes a criminal not when he is a bad or negligent physician, but when he ceases to be a physician at all." United States v. Feingold, 454 F.3d 1011 (9th Cir. 2006).

C. Conclusion

The government has failed to provide sufficient evidence beyond reasonable doubt that the controlled substances prescribed by the defendant in Counts 1-17, 19, 20, 22 and 23 were not for a

legitimate medical purpose and outside the usual course of professional practice and that the defendant did so knowingly and intentionally. Therefore, the court must enter a judgment of acquittal for Dr. Li on Counts 1-17, 19, 20, 22 and 23 in the superseding indictment.

**2. The government has failed to prove beyond reasonable doubt that Dr. Li prescribed Oxycodone to Ms. Suzanne Maack knowingly and intentionally not for a legitimate medical purpose (not for a pain relief) and outside the usual course of professional practice and that the use of Oxycodone was a but-for-cause of the death or injury (Count 24).**

A. Governing law

Count 24 in the superseding indictment charges that the Defendant unlawfully distributed and dispensed Oxycodone resulting in death of Ms. Suzanne Maack on October 5, 2011. In order to establish the unlawful distribution and dispensing of Oxycodone resulting in death, the government must prove beyond reasonable doubt that (1) Oxycodone was prescribed to Ms. Suzanne Maack by the defendant; (2) Oxycodone was prescribed not for a legitimate medical purpose and outside the usual course of professional practice; (3) the defendant did so knowingly and intentionally; (4) Ms. Suzanne Maack used the Oxycodone prescribed by the defendant; and (5) the death or serious bodily injury resulted from the use of Oxycodone. To find that death or serious bodily injury resulted from the use of Oxycodone, the government must prove beyond a reasonable doubt that the use of Oxycodone was a but-for-cause of the death or injury.

B. Evidence at trial

(1). The medical record at trial demonstrated that Suzanne Maack saw Dr. Li on October 5, 2011 with complaint of severe (8/10) low back pain and numbness and tingling in her legs. Her primary care doctor had prescribed Vicodin 5/500mg which did not help

her. She had lumbar MRI before which showed a disc herniation. She also had left knee pain and had undergone knee surgery. Physical exam showed deceased sensation in the stocking and glove distribution, an antalgic gait, focal tenderness in the paraspinal area of the lower lumbar spine on both sides, positive straight leg raise test and focal tenderness on the medial aspect of her knee. She was diagnosed with low back pain secondary to disc displacement, lumbar radicular pain, knee pain, chronic pain syndrome and polyneuropathy. She signed an agreement of controlled substances for pain. A treatment plan (including treatment goal and other treatment options) was documented. The potential opioid risks and side effects were documented. The risk of opioid abuse and addiction was assessed, and the risk profile was medium. Urine drug screen was positive for benzodiazepine, oxycodone and opiates which was expected and consistent with the prescribed medications due to cross reaction. Dr. Li prescribed oxycodone 15mg 4 times per day. Detailed information about the controlled substance prescriptions such as dose, frequency, route, refill etc. was documented in the medical record. There was no follow-up afterward.

(2). Ms. Suzanne Maack's husband, William Maack testified at trial that Suzanne Maack had back pain which was treated with surgery and pain in her knee after ATV accident. She saw her primary care physician Dr. Lombardi for pain medication. As the pain progressed, Dr. Lombardi referred her to pain management. Mr. Maack stated that he called and scheduled her to see Dr. Li. She told Dr. Li that she had extreme pain in her knee. Dr. Li had her stand up and he looked at her eyes. Dr. Li asked her to stand and bend over and raise one leg. He stated that Dr. Li used a pinprick and asked her to lower pants. She was in extreme pain. They went to the Stephen's pharmacy and Mr. Maack filled the prescription for her. He stated that he gave her one tablet and that they continued to drive home. She took second pill at 5:30pm, and third pill at 9:30 to 10:00pm. She felt much better and she

was moving a lot better than before. The medication was working. She moved around, cleaning. At about 2:00am, she went to bed. About 4:20am to 4:30am when he went to bathroom, she was snoring and she was regular. At 6:15am, he stated that he grabbed her and she was cold and had no pulse. The ambulance came in and rushed her to Wayne Memorial hospital. He stated that he grabbed her pain pills and went to Wayne Memorial and gave the bottle to the nurse. She said there were 40 pills missing. Mr. Maack stated that he really did not know that any were missing, dropping. He said that he went home and could not find anything there. Under cross examination, Mr. Maack testified that he went back to home and he could not find the 40 missing pills. "This was I told the state trooper." He further testified that Dr. Li examined her and prescribed pain medication. she took one tablet every 6 hours and medication helped her. She was able to move around better. She was not abusing medication.

(3). The government expert Dr. Thomas testified Oxycodone prescribed to Ms. Suzanne Maack was not for a legitimate medical purpose and not within usual course of professional practice because of unexpected positive oxycodone urine test and significant psychiatric history which contradicted his own statement that the legitimate medical purpose of opioid was for pain relief. The positive oxycodone was expected result due to cross reaction with hydrocodone. In fact, Dr. Thomas admitted in the testimony of Lucas Brown that urine drug screen can be oxycodone positive when hydrocodone was taken due to cross reaction. The significant psychiatric history was not contraindication of Oxycodone prescription for pain relief based on opioid treatment guideline (2009). Dr. Thomas further testified that she had suicidal ideation without any evidence. In fact, her medical record documented clearly that she had no suicidal ideation despite that she had bipolar and

depression which was controlled by medications prescribed by her psychiatrist as testified by her husband.

(4). The government witness, Dr. O'Broyle testified that patient was diagnosed with respiratory arrest secondary to narcotic overdose.

(5). The government witness, Dr. Coyer testified that the level of Zolpidem was not known due to insufficient sample. He did not know if the serum sample was from heart or arm and the concentration level could be different due to sampling from different location, and that it is possible Oxycodone level 212ng/ml could be normal. In fact, the same lab report by Dr. Coyer indicates that postmortem (lethal) level of Oxycodone was 400ng/ml to 700ng/ml. Therefore, there is no evidence beyond reasonable doubt that Oxycodone was the but-for cause of Suzanne Maack's death.

(6). The government witness, Carol Linert (Coroner) testified that there was no autopsy due to organ donation.

(7). The defendant witness James Travis testified that he interviewed Suzanne Maack's husband William Maack on 10-11-2011 who reported to him that Mr. Maack found the missing pain medication which was in different bottle and he burned all of them.

(8). The defendant's expert, Dr. Warfield testified that Oxycodone was issued for a legitimate medical purpose and within the usual course of professional practice.

(9). The defendant testified that all prescriptions of controlled substances in his practice were issued based on best available clinical practice guidelines and the government has never disputed at trial that the defendant followed the clinical practice guidelines by federation of state medical board model policy (2004 and 2013) and by opioid treatment guidelines (2009).

C. Conclusion

The government has failed to provide sufficient evidence beyond reasonable doubt that Oxycodone prescribed by the defendant was not for a legitimate medical purpose and outside the usual course of professional practice and that the defendant did so knowingly and intentionally. Furthermore, the government has failed to provide sufficient evidence beyond reasonable doubt that Oxycodone was the but-for cause of Mrs. Suzanne Maack's death because:

(a). The information provided by her husband was not consistent with Oxycodone overdose. The peak of Oxycodone level is within 30 to 60 minutes after oral ingestion of Oxycodone. Therefore, Oxycodone overdose occurs within 30 to 60 minutes after oxycodone is taken. Yet according to her husband, Suzanne Maack went to bed at 2:00am, was found snoring at about 4:20 to 4:30am when he woke up to go to bathroom and was found not breathing at about 6:30am;

(b). There was no Oxycodone pill missing based on James Travis's testimony;

(c). Dr. Coyer testified that he was not sure that the serum sample was from heart or from arm and Oxycodone level of 212ng/ml could be normal, the postmortem level of Oxycodone was 400ng/ml to 700ng/ml, and the level of Zolpidum was undetermined due to insufficient sample to quantitate it; Thus, we do not know if Zolpidum was the cause of death;

(d). Carol Linert (Coroner) testified that there was no autopsy. Therefore, we did not know if the respiratory arrest was secondary to narcotic overdose or something else such as intracranial bleeding or acute myocardial infarct. Suzanne Maack's medical record indicates that she had high risk of intracranial bleeding or cerebral infarct and cardiac infarct due to history of high blood pressure, high triglyceride level, and family history of heart attach of both parents. Accordingly, the court must enter a judgment of acquittal for Dr. Li on Count 24 in the superseding indictment.

**3. The government has failed to prove beyond reasonable doubt that Dr. Li prescribed Oxycodone to Rachael Scarpa knowingly and intentionally not for a legitimate medical purpose (not for the purpose of controlling pain) and outside the usual course of professional practice (outside of usual course of pain management (Count 25).**

A. Governing law

Count twenty-five (25) in the superseding indictment charges that the Defendant unlawfully distributed and dispensed controlled substance Oxycodone to a pregnant woman Rachael Scarpa. In order to establish the unlawful distribution and dispensing of Oxycodone, the government must prove beyond reasonable doubt that (1) the Oxycodone was prescribed to Rachael Scarpa by the defendant; (2) the Oxycodone was prescribed not for a legitimate medical purpose and outside the usual course of professional practice; (3) the defendant did so knowingly and intentionally; (4) the controlled substance was the substance identified in Count 25 of the superseding indictment; and (5) at the time of the distribution of the controlled substance to Rachel on or about May 1, 2014, Dr. Li knew or should have known that Rachael Scarpa was a pregnant individual.

B. Evidence at trial

(1). The medical records at trial demonstrated that Rachel Scarpa was first seen by Dr Li on January 9, 2013 complaining of neck pain, low back pain and knee pain after a motor vehicle accident in 2008. Pain level was 6-7/10. She had a lumbar MRI previously which was unremarkable, and she also had a cervical MRI study. Her primary care doctor had been prescribing oxycodone 20mg 4 times per day. Her history included attention deficit disorder. She had tried physical therapy and non-steroidal anti-inflammatory medications. Physical exam revealed a sensory loss at C5-6 and L4-5, positive straight leg raising on the left and tenderness of the cervical and lumbar spines. She was diagnosed with neck pain secondary to disc displacement, cervical radicular pain, lumbar

radicular pain, myalgia and myositis and traumatic arthropathy of knee. She signed an agreement of controlled substances for pain. A treatment plan (including treatment goal and other treatment options) was documented. The potential opioid risks and side effects were documented. The risk of opioid abuse and addiction was assessed, and ORT score was 3. Urine drug screen was positive for the drug she said she was taking. Oxycodone 30mg 4 times per day for 15 days was prescribed. EMG/nerve conduction studies showed left carpal tunnel syndrome, nerve root irritation at the lower cervical and lower lumbar spine on the left side. She had follow-up monthly monitoring of therapeutic efficacy (reducing pain and improving functional activities), medication side effects, and aberrant drug-related behaviors and patient counseling about the safe use of opioid analgesic. She continued to be treated monthly and her dose of oxycodone continued to be titrated up and down between 120 and 160 tablets per month. Detailed information about the controlled substance prescriptions such as dose, frequency, route, refill etc. was documented in the medical record. She was also treated with trigger point injection and occipital nerve block. Her pain level was 7-8/10 without medication and 2-4/10 with medication, and she was able to be functional with opioid treatment. Several urine drug screens were performed and were consistent except for questionable marijuana on one occasion. She continued to be treated until May 21, 2014 when Dr. Li received a call from a pharmacy regarding doctor shopping. She was discharged from Dr. Li's practice.

(2). Rachael Scarpa testified at trial that she was referred by her primary care physician Dr. Garrison to Dr. Li for pain management. Oxycodone prescribed by Dr. Li helped her pain and her pain was better under Dr. Li's care. She lied about her being pregnant when she was questioned by saying that "she just gained weight after she discontinued Adderall" as she was afraid of miscarriage if Oxycodone was discontinued.

(3). Former employee Virginia McCracken testified that Rachael Scarpa denied being pregnant when she was asked and she told Dr. Li that Rachael appeared pregnant.

(4). Dr. Decastro testified that it was not unusual for pregnant women to continue opioids for pain relief during their pregnancy.

(5). The Government expert, Dr. Thomas testified that Oxycodone prescribed to Rachael Scarpa was not for a legitimate medical purpose and not within usual course of professional practice because of normal structural imaging study and failure to diagnose pregnancy which contradicted his own statement that the legitimate medical purpose of opioid was for pain relief. Failure to diagnose pregnancy was a negligence at most rather than crime. Furthermore, patient denied be pregnant when she was asked. Dr. Thomas did not provide any evidence or testified at trial that it was not for legitimate medical purpose to prescribed opioid to a pregnant woman, for the purpose of controlling pain. In fact, as government witness Dr. Decastro testified that it was not unusual for pregnant women to continue opioids for pain relief during their pregnancy.

(6). The defendant's expert, Dr. Warfield testified that all oxycodone prescriptions were issued for a legitimate medical purpose (pain relief) and within the usual course of professional practice.

(7). The defendant testified that all prescriptions of controlled substances in his practice were issued based on best available clinical practice guidelines and the government has never disputed that the defendant followed the clinical practice guidelines by federation of state medical board model policy (2004 and 2013) and by opioid treatment guidelines (2009). Dr. Li further testified that Dr. Li asked Rachael about her being pregnant and she denied it by saying that "she just gained weight after she discontinued Adderall". Dr. Li also testified that he had patients who informed him about their pregnancy, Dr. Li would explain the pros and cons about continuing and discontinuing opioid for pain treatment during pregnancy. Some patients decided to wean off medication while some decided to continue opioid medication for pain relief. Patients who decided to continue opioid

were advised to inform their OB/GY physicians for better preparing possible neonatal withdrawal syndrome.

C. Conclusion

In conclusion, the government has failed to provide sufficient evidence beyond reasonable doubt that the Oxycodone prescribed by the defendant for Ms. Rachael Scarpa was not for a legitimate medical purpose and not within the usual course of professional practice and that the defendant did so knowingly and intentionally. Accordingly, the court must enter a judgment of acquittal for Dr. Li on Count twenty-five (25) in the superseding indictment.

**3. The government has failed to prove beyond reasonable doubt that Dr. Li maintained the office of Neurology and Pain Management Center (104 Bennett Avenue, Suite 1B and 200 3rd Street, Milford, Pike County, PA), for the purpose of prescribing controlled substances knowingly not for a legitimate medical purpose (namely not for the purpose of controlling pain and outside the usual course of professional practice (namely outside of usual course of pain management (Count 26 and Count 27).**

A. Governing law

Count twenty-six (26) and twenty-seven (27) in the superseding indictment charges that the Defendant maintained the office of Neurology and Pain Management Center, for the purpose of unlawfully distributing and dispensing controlled substances. In order to establish that the Defendant unlawfully maintained a drug involved premises, the government must prove each of the following elements beyond reasonable doubt that (1) the defendant permanently or temporarily maintained or leased or used the place described in the superseding indictment; (2) the Defendant maintained that place for the purpose of distributing or dispensing controlled substances not for a

legitimate medical purpose and outside the usual course of professional practice; (3) the defendant acted knowingly.

B. Evidence at trial

Evidence at trial as indicated in Counts 1-17, 19, 20, 22-25 demonstrated that all controlled substance prescriptions were for a legitimate medical purpose and within the usual course of professional practice and the government has failed to provide sufficient evidence that the Defendant prescribed controlled substances in the office of Neurology and Pain Management Center knowingly and intentionally not for a legitimate medical purpose and outside the usual course of professional practice.

C. Conclusion

The government has failed to provide sufficient evidence beyond reasonable doubt that the defendant maintained the places described in the superseding indictment, for the purpose of distributing or dispensing controlled substances not for a legitimate medical purpose and outside the usual course of professional practice and that the defendant acted knowingly. Accordingly, the court must enter a judgment of acquittal for Dr. Li on Count twenty-six (26) and twenty-seven (27) in the superseding indictment.

**4. The government has failed to prove beyond reasonable doubt that Dr. Li knowingly engaged in monetary transaction in property derived from specified unlawful activity. (Count 28 and Count 29).**

A. Governing law

Counts twenty-eight (28) and twenty-nine (29) in the superseding indictment charge that the Defendant knowingly engaged in monetary transaction in property derived from specified unlawful activity. In order to establish that the Defendant knowingly engaged in monetary transaction in property derived from specified unlawful activity, the government must prove each of the following elements beyond reasonable doubt that (1) the Defendant knowingly engaged in or attempted to engage in a monetary transaction; (2) the Defendant knew the transaction involved property or founds that were the proceeds of some criminal activity; (3) the property had a value of more than $10,000; (4) the property was in fact proceeds of unlawful distribution and dispensing of controlled substances, in violation of 21 U.S.C. 841(a)(1) as alleged in Counts 1-17, 19, 20, 22-24 of the superseding indictment; and (5) the transaction took place in the United States.

B. Evidence at trial

Evidence at trial as indicated in Counts 1-17, 19, 20, 22-24 demonstrated that all controlled substance prescriptions were for a legitimate medical purpose and within the usual course of professional practice and the government has failed to provide sufficient evidence that the Defendant prescribed controlled substances knowingly and intentionally not for a legitimate medical purpose and outside the usual course of professional practice. Therefore, the monetary transaction in property the defendant engaged was derived from lawful activity.

C. Conclusion

The government has failed to provide sufficient evidence beyond reasonable doubt that the defendant knowingly engaged in monetary transaction in property derived from specified unlawful activity. In fact, it was derived from lawful activity. Accordingly, the court must enter a judgment of acquittal for Dr. Li on Count twenty-eight (28) and twenty-nine (29) in the superseding indictment.

**5. Evidence contrary to some patients who testified at trial**

(1). Judith Smith (Count 3) testified that Dr. Li kissed her, which was not true as testified by Dr. Li. She did not report such act to any authority until she testified so at trial. She testified she lied to Dr. Li and would say anything in order to get pain medication. In fact, she was one of the several co-conspirators involving drug dealing in New Jersey and Dr. Li was listed as her one of seven physician victims. She contradicted herself many times at her testimony. For example, she testified there was no physical exam, but the same time she testified Dr. Li check range of motion. She testified that at her second visit, Dr. Li said hello and then wrote a prescription, but she also testified she was in the exam room for 10 minutes. Saying hello and writing prescriptions would not take 10 minutes. She also stated that she told Dr. Li that she went to Methadone clinic. In fact, one time after her urine test showed positive methadone, she told Dr. Li that she borrowed methadone from her mother due to worsening pain as documented in her medical record, and she would be discharged immediately if she told Dr. Li that she went to Methadone clinic without good explanation. She was discharged from Dr. Li's practice when she was found looking around in Dr. Li's private office without permission. It is obvious that her credibility was in big issue and her testimony was not reliable.

(2). Jared Stemetzki (Count 4) testified that he lied to Dr. Li for pain pills. He used his brother's lumbar X-ray to deceive Dr. Li. He stated that his follow-up visit was about 5 minutes long, which contradicted to the former employees' testimony that the follow-up visit was about 10 to 15 minutes. Under cross examination, when he was asked if lying to Dr. Li was dishonest and using insurance to pay Dr. Li for pain pills was dishonest, he replied "I paid my service, they should pay my service." He was discharged from Dr. Li's practice when his urine test was positive for

cocaine and marijuana. He was charged with conspiracy of drug dealing and Dr. Li was one of 7 physician victims of his conspiracy.

(3). Richard Trembula (Count 5) testified that he was charged with prescription fraud, forgery and conspiracy in New Jersey. In fact, Dr. Li was one of 7 physician victims of his conspiracy. He testified that he lied about his low back pain for pain pill. He would say anything to get pills except for going to mother's funeral. In fact, one time he rescheduled his appointment and he came in early as he had to go to his mother's funeral as documented in his medical record. He contradicted himself about his office visit. For instance, he stated that the follow-up visit appointment was about 8 minutes and that Dr. Li said hello and there was no eye contact. Obviously, it would not take about 8 minutes to just say hello. He testified that he asked for Xanax from Dr. Li. In fact, his record demonstrated that Dr. Li never prescribed Xanax to him and his Xanax was prescribed by his primary care physician.

(4). Lucas Brown (Count 6) testified that he had shoulder dislocation and was prescribed Lorcet 10/325mg by Dr. Persicia, and then by Dr. Johnson. He was referred to see pain management. He knew a couple of people who saw Dr. Li and he was an easy target. He stated that the first visit was 5 to 10 minutes and he had not gotten a physical exam which was contradicted to the government's witness (Sandy Foster, former employee) who testified that the new patient office visit was about 40 minutes. He further testified that the follow-up was about 5 to 10 minutes, Dr. Li asked him "how did you feel?" and "that's it". He contradicted himself and it would not take 5 to 10 minutes if Dr. Li just asked "how did you feel? That's it". He testified that he told Dr. Li that he had an addiction, and Dr. Li told him to wean off. In fact, he told Dr. Li that he did not want to take Oxycodone anymore as documented in his medical record on July 12, 2012 and he never told Dr. Li that he had addiction problem. He was prescribed Tramadol for pain. As Dr. Li testified that he was restarted Oxycodone 10mg on July 18, 2012 as Tramadol did not help his pain. Under cross

examination, he testified that he walked in to Dr. Li's office as a drug addict, but he never told Dr. Li the truth.

(5). Tamika Davis (Count 7) testified that she lied to Dr. Li, but the medication helped her pain. Dr. Li scheduled her every 2 months to save her money after Dr. Li stopped taking her insurance (Medicaid).

(6). Nicole Tintle testified on May 11, 2018 she became addicted to pain pill, and Ryan Clarkson advised her to see Dr. Li, lying to Dr. Li that she saw Dr. in New Jersey, but she had no back pain. Dr. Li did ask her for MRI. She testified that Dr. Li examined her back. At the second visit of January 6, 2011, she stated that Dr. Li changed her schedule to 6pm and that she bent over and let Dr. Li have sex. She further testified that she had oral sex or intercourse at almost every visit, and she then switched her appointment to morning. She stated that Dr. Li warned her to not drink at all. She stated that she became addicted and intoxicated to alcohol. She worked in the gentleman's club. At one time, she reported to Dr. Li's office that her purse, including medication, was stolen. She stated that is was a complete lie about purse stolen and she lied to get police report for her stolen prescription. She was discharged by Dr. Li due to a drug-related charge. Under cross-examination, she stated that she lied to the police officer and she also stated that Dr. Li had sex with her at her follow-up appointment. She did not remember if the door was locked. She sold and shared medication. She signed a contract, but did not remember what was in the document. When asked by defense counsel when being cross examined why she needed a police report if she could just call Dr. Li to have sex and ask him to give her a prescription, (if you had sex with Dr. Li before), she could not give an answer.

Dr. Li testified that he did not have any sexual contact with Ms. Nicole Tintle at any time, and that any sexual contact alleged by Ms. Tintle was a lie and was retaliation after she was

discharged by Dr. Li. Dr. Li testified that she had never been scheduled after 6:00 p.m. as documented in her medical record and shown in the time log in her medical record. She was checked in and checked out by the front office receptionist as demonstrated by the time log. She made full payment for her visits as demonstrated by her account in the electronic medical record software, and her latest visit was checked out at 5:18 p.m. by Sandy Foster. In fact, Dr. Li always scheduled patient's follow-up visits. Dr. Li did not need to call Ms. Tintle and change her schedule to after 6:00 p.m. and could simply have scheduled her to after 6:00 p.m. if he had wanted to have sex with her - if her story of having sex with Dr. Li was, in fact, true. As Dr. Li and his other employees testified, the exam room where Dr. Li saw patients was always cracked open and the employees could knock on the door at any time to inform Dr. Li of urine test results, phone calls from other physicians, or pharmacists. In fact, Dr. Li's medical assistant in the nurse's station was just a few feet away and could hear what Dr. Li said to patients, as Dr. Li's former employees, the government's witnesses, Virginia McCracken and Samantha testified. Dr. Li was always very busy in the office as his patients were scheduled for every 15 minutes. There were no employees testifying that Dr. Li could possibly have sexual contact with any women including Ms. Nicole Tintle during office hours, and there was no evidence to corroborate the story that Ms. Tintle gave.

(7). Mr. Anthony Abuiso (Count 10) testified that he worked in construction and had a lot of low back pain. He talked to his wife who recommended that he see a pain doctor. He told Dr. Li that he was on Oxycodone 30mg, which was not true. He stated that his urine test was positive for Oxycodone. He also stated that his physical exam was approximately 5 minutes long. His wife sold some of his medication and he took some for his habit. When his back hurt more, he took more medication for pain relief. He started selling pills to pay rent and bills. On December 3, 2012, he was discharged by Dr. Li's office due to altering his prescriptions. Under cross-examination, he testified that Dr. Li was an easy target and he lied to Dr. Li. He was prepared by his wife and he planned to

go to Dr. Li for Oxycodone, seeking pain relief. He got in and deceived Dr. Li. He never told Dr. Li that he sold opioid prescriptions or that he was addicted.

(8). Mrs. Stephanie Abuiso (Count 12) testified that she had pain and she went to see Dr. Li for pain and for her drug habit. She told Dr. Li a partial lie and Dr. Li was an easy target.

(9). Ms. Christy Vanluvender (Count 15) testified that Dr. Li was an easy target. She was in pain when she saw Dr. Li. Third time after Dr. Li prescribed medication, she abused drug, but she did not tell Dr. Li as she was afraid that Dr. Li cut her off. She never asked for physical therapy. She stated that Dr. Li prescribed Xanax which helped her. She stated that she deceived Dr. Li for two years.

(10). Ms. Heidi Messer (Count 19) testified she took more than Dr. Li prescribed for pain as her tolerance went up. After her son stole her pills, she asked for more from Dr. Li's office, who could not do anything for her, and she then checked in for detox in Bon Secours hospital. She was prescribed methadone to wean down. She returned to Dr. Li 4 to 5 days later, and Dr. Li put her on Methadone 10mg 120 tablets, which helped her pain. She needed to take more due to tolerance. She might tell or might not have told Dr. Li that she was out of control.


## CONCLUSION

Wherefore, after consideration of Defendant's motion and accompanying memorandum, this Court should either enter a judgement of acquittal or in the alternative Order a new trial.



Respectfully submitted:

**/s/ William Ruzzo**
William Ruzzo, Esquire

Pennsylvania Attorney I.D. #75865
590 Rutter Avenue
Wilkes Barre PA 18704
Telephone:  (570) 288-7799
Facsimile:   (570) 288-7798

Dated:   June 19, 2018