## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :
                   :     Criminal No. 3-CR-16-194
        v.              :
                   :     (Caputo, J.)
FUHAI LI,                 :
        Defendant       :

## GOVERNMENT'S RESPONSE TO DEFNDANT'S MOTION
## FOR JUDGMENT OF ACQUITTAL

## I.     INTRODUCTION

On October 17, 2017, a grand jury in the Middle District of
Pennsylvania returned a 32-count Superseding Indictment, charging
the defendant, Fuhai Li, with 23 counts of unlawful distribution and
dispensing of a controlled substance, in violation of 21 U.S.C. §841(a)(1),
one-count of unlawful distribution and dispensing of a controlled
substance resulting in death, in violation of 21 U.S.C. § 841(a)(1),
(b)(1)(C), one count of unlawful distribution and dispensing of a
controlled substance to a pregnant individual, in violation of 21 U.S.C.
§861(f), two counts of maintaining a drug-involved premises, in
violation of 21 U.S.C. §856(a)(1), two counts of money laundering, in
violation of 18 U.S.C. §1957, and three counts of tax evasion, in

1

violation of 26 U.S.C. §7201.  Each count in the Superseding Indictment

stemmed from the defendant's practice as a physician beginning in

August 2011 through January 2015.

On May 2, 2018 the parties commenced jury selection with the

assistance of written questionnaires and individual questioning by the

court and counsel.  On May 3, 2018, the parties presented opening

statements in the matter of the *United States v. Fuhai Li*.  At the

conclusion of the Government's case-in-chief on May 29, 2018, the

defense made an oral Motion for a Judgement of Acquittal pursuant to

Federal Rule of Criminal Procedure 29(a) as to all counts in the

Superseding Indictment, asserting that there was insufficient evidence

to show that the defendant committed any of the crimes with which he

was charged.  The defendant's motion was denied.  Thereafter, the

defense presented its case which included testimony from the

defendant.  On June 4, 2018, the jury returned a unanimous verdict

finding the defendant guilty on all counts in the Superseding

Indictment.[1]

---

[1]    Prior to resting its case on May 29, 2018, the Government
made a motion to withdraw Counts 18 (related to KM) and 21 (related
to KP).  The motion was granted by the court.

Now pending before the Court is the defendant's Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(a), challenging the sufficiency of the evidence, and Federal Rule of Criminal Procedure 33, requesting a new trial. The defendant's claims lack merit and should be denied.

## II. LEGAL DISCUSSION

Federal Rule of Criminal Procedure 29 provides that the district court, upon the motion of a defendant or upon its own motion, shall enter a judgment of acquittal if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In ruling on a Rule 29 motion, the district court must determine whether any rational trier of fact can find proof of the defendant's guilt beyond a reasonable doubt based upon the available evidence presented at trial. *United States v. Smith*, 294 F.3d 473, 478 (3d Cir.2002), *citing Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The Third Circuit has cautioned, however, that the district court "be ever vigilant in the context of…. [a Rule 29 motion] not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United*

*States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006). The Court must view the evidence as a whole, and in the light most favorable to the Government. *United States v. Hoffecker*, 530 F.3d 137, 146 (3d Cir. 2008). The Government is further entitled to "the benefit of inferences that may be drawn from the evidence[,] and the evidence may be considered probative even if it is circumstantial." *United States v. Patrick*, 985 F. Supp. 543, 548 (E.D. Pa. 1997), *citing United States v. Pecora*, 798 F.2d 614, 618 (3d Cir. 1986); *see also United States v. Griffith*, 17 F.3d 865, 872 (3d Cir. 1994).

The proponent of a Rule 29 motion, therefore, bears a heavy burden to prove that the evidence presented by the Government during trial is insufficient to support a verdict. *See United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990). In fact, the Third Circuit has held that acquittal on this basis should "be confined to cases where the prosecution failure is clear." *Smith*, 294 F.3d at 477; *United States v. Leon*, 739 F. 2d 885, 891 (3d Cir. 1984), *quoting Burks v. United States*, 437 U.S. 1, 17 (1978). "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore*, 910

F.2d 1084, 1129 (3d Cir. 1990).  Accordingly, "[a] verdict will be overruled only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Salmon*, 944 F.26 1106, 1113 (3d Cir. 1991); *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.1987).

Further, as a preliminary matter regarding Rule 33 motions, it appears from Third Circuit precedent that this court would be free to summarily reject all arguments advanced by the defendant in support of his motion because each stated challenge to the sufficiency of the evidence was presented to and rejected by the jury.  Courts in this jurisdiction routinely express unwillingness to grant Rule 33 motions for new trial where the arguments in support thereof were offered to the jury before the jury rendered its verdict.  *See, e.g., United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) ("The majority of Cooper's arguments amount to challenges to Mazzocchi's credibility and motives... We can entirely reject these arguments, as the jury was made aware – through cross-examination, closing arguments, and the jury instructions – of Mazzocchi's motivations, potential bias, and inconsistent testimony."); *United States v. McIntyre*, 612 F. App'x 77,

80 (3d Cir. 2015) ("McIntyre's argument that two of the witnesses had credibility problems is equally unavailing. Defense counsel explored those issues at trial, and how the jury resolved the questions counsel raised was a matter reserved to its judgment.").

Here, as seen in the aforementioned cases, the defense thoroughly examined the perceived deficiencies in the Government's evidence through cross-examination of witnesses and presentation of opening statements and closing arguments. This court observed and listened to defense counsel's efforts to underscore its arguments against the sufficiency of the evidence as it relates to all counts of the Superseding Indictment. This court, therefore, should be confident that at the time it rendered its verdict, the jury was aware of and had the opportunity to consider all of the arguments presently before the court in the instant motion. The record supports the conclusion that the jury rendered a guilty verdict after full consideration of the limitations of the evidence favorable to the prosecution, and that the interests of justice have been served.

Thus, taken as a whole, and viewed in the light most favorable to the Government, evidence of the defendant's guilt in this case was sufficient for a finding of guilt on each count of the Superseding Indictment and the defendant's motions should be denied.

a.  **There was sufficient evidence adduced by the Government to support a reasonable finding of guilt as to Counts 1 – 17, 19, 20, 22, 23 and 25 - Unlawful Distribution Counts (including unlawful distribution to a pregnant individual).**

The defendant claims that every distribution count should be dismissed.  In support of his motion, the defendant wrongly notes that the Government failed to present sufficient evidence from which a juror could conclude that the defendant's prescriptions were not for a legitimate medical purpose and were outside usual professional standards.  This is because the defendant misconstrues the evidence that was presented, and fails to mention significant other evidence that was presented throughout the trial.

Initially, for every single distribution count charged, the defendant's complete medical record for each particular patient identified in the individual counts was admitted into evidence at trial.[2]

_____

[2]  *See* Government Exhibits #s 1 (LD), 2 (RS), 3 (JS), 4 (JLS), 5 (RT), 6 (LB), 7 (TD), 8 (JMS), 9 (NT), 10 (AA), 11 (MA), 12 (SA), 14 (AV),

In addition, the Government presented the testimony of nineteen former patients, three former employees of the defendant, eight pharmacists, an expert on pain management, three additional physicians factually related to the case, the testimony of federal law enforcement agents and investigators from the Drug Enforcement Administration and its Diversion Division, and an Internal Revenue special agent.

The testimony of the nineteen former patients supported the individual counts involving the unlawful distribution of controlled substances, as well as the counts charging the defendant with maintaining drug-involved premises. Each of the nineteen patients provided the jury with a consistent pattern of the illegitimacy of the defendant's medical practice. Patient after patient described initial visits that were brief and physical examinations that could only be described as cursory. Several patients testified that the defendant, even at the first visit, never laid hands on them. Patient after patient testified that follow-up visits with the defendant lasted only long

_____

15 (CV), 16 (EC), 17 (SH), 19 (HM), 20 (KK), 22 (SW), 23 (JR), 29 (SM), and 43 (SRR). The Government withdrew Count 18 (KM) and Count 21 (KP) prior to resting its case-in-chief.

enough for the defendant to ask them a few questions about whether they were taking their pills, and to write them another prescription for powerful opioids. Several patients testified that there were visits when the defendant never even made eye contact with them as he simply wrote them another opioid prescription. Nevertheless, all patients testified that regardless of what they described as the lack of a doctor/patient relationship, they usually obtained whatever controlled substance prescription they wanted from the defendant.

All of the patients testified that the defendant falsified their medical records, especially pertaining to medical examinations they said were not performed. Several patients testified that they sought out the defendant because they knew he was willing to feed their addictions, while others testified that the defendant's illegitimate prescribing practices caused them to become addicted to opioids. All patients testified about the harm the defendant's illegitimate prescribing caused to their lives, including the birth of an opioid dependent baby and the death of SM.

Each of the nineteen patients who testified at trial were subjected to aggressive cross-examination by defense counsel, which included exposing criminal histories, addictions, and lies that addicts tell to seek pleasure and avoid the pain of withdrawal. The defense was not limited in any manner in attacking the credibility of the Government's witnesses. The jury saw and heard it all.

The Government also presented the testimony of eight pharmacists from various pharmacies including Rite Aid, Walgreens, CVS, the Medicine Shop, Walmart, and Alitons. Each pharmacist testified that they either completely refused to fill controlled substance prescriptions written by the defendant, or became extremely selective in filling any of the defendant's controlled substance prescriptions. The action taken by the pharmacists, as described in their testimony, was compelling for several reasons.

First, the testimony of the pharmacists corroborated the testimony of individual patients who testified that they often complained to the defendant about pharmacies rejecting his prescriptions. Rather than be alarmed by this, the jury learned that defendant simply directed those patients to another pharmacy, usually Alitons in Milford.

Second, each pharmacist testified about their own "corresponding responsibility" not to fill what appeared to them to be an unlawful prescription.[3] Thus, the jury was permitted to infer that the defendant's decision to ignore the warnings of other professionals was indicative of his own knowledge that he was operating outside the scope of professional practice. This evidence further served to rebut the defendant's assertion that he reasonably believed he was engaged in a proper medical practice, and was also evidence of the defendant's willful blindness.

Finally, the jury heard powerful evidence from the pharmacists as they testified about their reasons for rejecting the defendant's prescriptions. The reasons generally testified to by these professionals included, for example, the majority of patients presented with the same prescription (usually oxycodone); the majority of the patients received the maximum dose and a large quantity of a highly addictive and highly abused controlled substance (usually 120 to 180 oxycodone 30 milligrams); many travelled a long distance to either obtain prescriptions from the defendant and to have the prescriptions filled;

---

[3]    21 C.F.R. 1306.04(a).

many of the same family members were receiving the same prescription at the same time; several of the younger patients often travelled together in the same vehicle and all had the same prescription; on more than one occasion, a patient was observed sharing the controlled substance after having the prescription filled at a particular pharmacy; some of the patients appeared to be in no physical distress with no physical limitations but were prescribed the largest available dose and quantity of oxycodone; and many of the pharmacists were dissatisfied with the defendant's response when they called to question the defendant. As the pharmacists were taking what some of them described as unprecedented actions in this regard, the jury was permitted to infer the defendant's willful blindness to the concerns of professionals with corresponding legal responsibilities.

The Government called Dr. Stephen Thomas who testified as an expert in the medical discipline of pain management. Dr. Thomas testified as to the medical legitimacy of the prescriptions written by the defendant which correspond to the unlawful drug distribution counts 1 through 17, 19, 20, 22 through 25, and counts 26 through 27 (maintaining drug-involved premises).

After being qualified as an expert, Dr. Thomas spent the first few hours of his testimony providing the jury with an elementary understanding of pain management and explaining overarching medical standards against which to compare the defendant's prescribing practices. For example, Dr. Thomas explained that in the practice of pain management, it is imperative that physicians collect a comprehensive medical history from all new patients; that it cannot be medically legitimate for a doctor to provide patients with prescription renewals for opioid medications on their first office visit; and that it is the role of the physician to investigate when patients' urine tests present evidence of abuse or diversion. Dr. Thomas discussed societal concerns regarding opioid addiction and death, and testified that a doctor who prescribes these types of controlled substances must be aware of these concerns and take them into consideration when issuing prescriptions. Dr. Thomas testified that when prescribing dangerous and highly addictive opioids, the general accepted standard of practice is to start low and go slow.

In preparation for trial, Dr. Thomas testified that he thoroughly reviewed each of the patient files that included unlawfully prescribed prescriptions corresponding to a charged count in the Superseding Indictment, as well as several additional files corresponding to counts involving maintaining drug-involved premises. Dr. Thomas ultimately concluded that in each charged patient file he reviewed, he found evidence of medically illegitimate prescribing practices – instances where the defendant acted in contravention to established standards within the medical community. To illustrate this assertion, Dr. Thomas spent the better part of four days meticulously analyzing the details of thirty-seven patient files, including those individually charged in each specific count of the Superseding Indictment.

For each of the thirty-seven patient files, Dr. Thomas addressed the adequacy of the medical history collected at the start of the doctor-patient relationship, the type of pain generally associated with the patient's claimed injury or ailment, the propriety of the prescriptions written by the defendant, the sufficiency and/or incredibility of the defendant's charting and notes, any evidence of abuse or diversion, obvious evidence of abuse and/or diversion ignored by the defendant,

and the ways in which Dr. Thomas determined the defendant's prescribing practices fell below the threshold of medical legitimacy. Dr. Thomas specifically addressed nearly all diagnostic tests, if any, that were contained in each patient file, what conclusions he drew from the tests or lack of tests, and whether the defendant's diagnosis supported the prescriptions written by the defendant. Dr. Thomas was repeatedly asked whether specific urine tests performed on specific dates were evidence of drug abuse and/or diversion, to which Dr. Thomas offered an opinion.

Dr. Thomas testified that the thirty-seven patient files highlighted common themes of the defendant's medically illegitimate prescribing practices, and that each of the thirty-seven patient files could be categorized into one or all of various medically deficient prescribing practices. Specifically, Dr. Thomas testified that each patient file contained evidence, inter alia, that: (1) patients were, almost without fail, prescribed the highest dosage of the most highly abused and addictive opioid medication at the initial visit, which was never medically legitimate, (2) the defendant failed to attempt to establish that there was any medically legitimate reason to prescribe an opioid

medication at all to the patients, (3) patients were prescribed opioid medication despite evidence of drug abuse and diagnosed addiction disorders, (4) patient were prescribed opioids despite evidence of drug diversion, (5) patients were issued bridging prescriptions after being discharged for abusing or diverting the drugs the defendant prescribed, (6) the defendant prescribed dangerous and highly addictive oxycodone 30 milligrams to an obviously pregnant patient throughout the last several months of her pregnancy, (7) the defendant engaged in sexual activity and other sexually inappropriate conduct with patients for whom he was prescribing controlled substances,[4] and/or (8) the defendant repeatedly and consistently increased the quantity of the highest dosage available in the most abused form of oxycodone regardless of whether the patient was stable, worse, or vocalized

---

[4] At least three patients testified about inappropriate sexual conduct/contact with the defendant while he was prescribing controlled substances to them. One patient, NT, testified that she was involved in a four-year sexual relationship with the defendant while she was a patient. Another patient, JS, testified about the defendant's attempt to initiate sexual contact with her by kissing her on the lips and inserting his tongue into her mouth. Another, AV, testified about having to nearly completely undress and expose her breasts behind closed doors with the defendant while he performed trigger point injections to her lower back.

instances of abuse.

For each of the thirty-seven patient files reviewed by Dr. Thomas, he was specifically asked whether he had an opinion as to the medical legitimacy of the prescriptions written by the defendant for each patient. Dr. Thomas specifically stated that in his opinion, the prescriptions written by the defendant for all of the thirty-seven patients were not medically legitimate, and were not written in the usual course of professional practice.

With respect to RS and Count 25 of the Superseding Indictment, it is difficult to understand what about the Government's evidence the defendant finds to be insufficient to support a reasonable finding of guilt as to count 25. The testimony at trial unequivocally proved that despite being told by two of his office staff that RS was pregnant, one warning occurring a month prior to the final visit and one occurring on the day of the final visit; despite his own medical record that reflected a more than 40-pound weight gain in about eight months; and despite his own claim that he performed a complete physical and musculoskeletal examination on RS just 11 days prior to her giving birth, that included checking her heart with a stethoscope, the defendant took the position

that RS was just getting fat.  The jury observed and listened to the

defendant's explanation for prescribing 120 oxycodone 30 milligram

pills to RS when she was just days away from giving birth.   The jury

observed and heard from two former medical assistants of the

defendant who testified that they pleaded with the defendant to test RS

for pregnancy because both testified that it was clearly obvious that RS

was pregnant.[5]  The jury observed that the defendant's medical file for

RS contained no mention of RS's pregnancy, despite the defendant

having receiving warnings about her pregnancy, along with suggestions

that he should rethink his oxycodone prescriptions for RS.  The jury

learned that as was his usual practice, the defendant ignored the

warnings.  Approximately 11 days later, on May 12, 2014, RS gave birth

to a full term opioid dependent baby.

The jury also heard from Dr. Manual de Castro, a neonatologist

from the Bon Secours Community Hospital in Port Jervis, New York,

who testified in detail about RS's newborn who spent the first ten days

of his life withdrawing from opioid dependency.

---

[5]   One of the defendant's former medical assistants testified that
shortly after the incident involving RS on May 1, 2014, she terminated
her employment with the defendant because she was angry and upset.

The jury had ample legally sufficient evidence to find the defendant guilty of unlawfully prescribing oxycodone to RS, a pregnant individual, as alleged in count 25 of the Superseding Indictment.

**b.      There was sufficient evidence adduced by the Government to support a reasonable finding of guilt as to Count 24 - Unlawful Distribution resulting in the death of SM.**

Count 24 of the Superseding Indictment charged the defendant with having unlawfully distributed a controlled substance – specifically, oxycodone – the use of which resulted in the death of SM.  SM died from an overdose of oxycodone less than two days after receiving a prescription from the defendant for 120 oxycodone 15 milligrams pills. Blood samples obtained the day SM arrived at the emergency room of the Wayne Memorial Hospital confirmed the lethal dose of oxycodone in SM's system at the time of her death.

Pursuant to 21 U.S.C. § 841(a)(1), (b)(1)(C), unlawful distribution resulting in death requires proof of the following four elements: (1) the defendant distributed or dispensed a mixture or substance containing a controlled substance; (2) the distribution was knowing and intentional; (3) the defendant distributed/dispensed the controlled substance outside of the course of professional practice and not for a legitimate medical

purpose; and (4) death resulted from the use of the controlled substance. (Third Circuit Model Jury Instructions 6.21.841B; Modern Federal Jury Instructions Criminal 56.02). "To find that death or serious bodily injury resulted from the use of the substance…the government must prove beyond a reasonable doubt that the [death] would not have resulted had the victim not used the controlled substance[s] *distributed by [Defendant]*." (Third Circuit Model Jury Instructions 6.21.841B) (emphasis added).

The medical file of SM was introduced into evidence and marked as Government Exhibit 29. The Government established that SM had an initial visit with the defendant on October 5, 2011. On that day, the defendant wrote SM a prescription for 120 Oxycodone 15 milligram pills. The prescription was introduced through William Maack and marked as Government Exhibit 93.2. The Government introduced evidence that the prescription was filled that same day at Stephens Pharmacy in Hawley, Pennsylvania. (*See* Government Exhibit 93.3, also introduced through William Maack.) The prescription was filled on October 5, 2011, less than two days prior to SM's death.

William Maack's testimony included details about the office visit SM had with the defendant on October 5, 2011.  In particular, Mr Maack described the swiftness and cursory nature of the defendant's interaction with SM at that visit.  Mr. Maack testified that upon leaving the defendant's office that morning, he and SM went directly to Stephen's Pharmacy and filled the prescription written by the defendant.  He testified that he observed SM immediately consume one of the oxycodone 15 milligram pills from the pill bottle that held the pills provided by the defendant's prescription.  Thereafter, Mr. Maack testified that throughout the remainder of the day, October 5, 2011, he observed SM consume two additional oxycodone pills from the prescription provided to her by the defendant.

The testimony of Mr. Maack also included details about the following day, October 6, 2011, including the fact that SM never left the house that day.  He described what occurred the last few hours he spent with SM in the evening of October 6, 2011.  Mr. Maack testified that SM was full of energy and somewhat euphoric as she performed chores all around the house late into the night.  According to Mr. Maack, SM did not get into bed until approximately two o-clock in the morning on

October 7, 2011.

Mr. Maack then described the morning of October 7, 2011. At approximately 4:30 a.m. as he awoke to go to the bathroom, he noticed that SM was snoring in a different way but did not think much of it. A few hours later at approximately 6:15 a.m., he awoke and quickly noticed that something was wrong with SM. Her body was hanging nearly off the bed. She was cold and clammy to the touch and unresponsive. Mr. Maack immediately started to perform CPR and directed one of his children to call 911. Emergency personnel arrived and took over resuscitation efforts as they transported SM by ambulance to the Wayne Memorial Hospital. (*See* Government Exhibit 96, the EMS Report.)

Mr. Maack testified that after SM was taken by ambulance from the home, he grabbed the oxycodone pill bottle and took it with him to the hospital. He stated he did so because it was the only new medication SM was prescribed and he wanted to show hospital personnel what he believed could be the cause of her unresponsive condition. Mr. Maack testified that he handed off the oxycodone pill bottle to an emergency room nurse who informed him that 42 pills were

missing from the bottle that contained the oxycodone prescribed to SM by the defendant less than two days prior.

Mr. Maack was cross-examined by defense counsel and initially asked about an interview he had with Trooper Travis of the Pennsylvania State Police several days after SM's death. Mr. Maack was specifically asked whether he found more pills when he returned home from the hospital that day, to which Mr. Maack stated that he had not.

The jury also learned that all efforts to resuscitate and save the life of SM failed. The Government presented the testimony of Dr. Louis O'Boyle who stated that SM arrived at Wayne Memorial Hospital in full arrest, meaning that she had no pulse or heartbeat and was still receiving CPR. SM's Wayne Memorial Hospital records were marked as Government Exhibit 27 and introduced through Dr. O'Boyle. The jury heard that as Dr. O'Boyle worked to assess SM's condition, he became aware of the 42 oxycodone pills missing from the bottle that contained the prescription for oxycodone. Dr. O'Boyle opined that 42 oxycodone pills was enough to make someone stop breathing. Dr. O'Boyle explained to the jury how he performed a complete head-to-toe

examination of SM as he continued to obtain more information about her condition and assessed her as critically ill from respiratory arrest at that time. Dr. O'Boyle explained to the jury that various tests were performed on SM including a cardiogram, which he reviewed and opined that SM's heart was strong and was found to have no heart abnormalities at all. Dr. O'Boyle testified about the blood drawn from SM immediately upon her arrival at the emergency room, as well as the urine tests performed. He explained that the urine screen showed the presence of high levels of oxycodone.

Dr. O'Boyle explained how he continued to perform neurological assessments of SM for a period of approximately 23 hours until his official pronouncement of death on October 8, 2011. Finally, Dr. O'Boyle testified that he signed SM's death certificate, admitted into evidence as Government Exhibit 94, and noted SM's cause of death to be respiratory arrest secondary to a narcotic overdose. Dr. O'Boyle specifically testified that the cause of death for SM was from narcotic overdose.

The Government also presented the testimony of Carol Leinert, the Coroner in Wayne County at the time of SM's death. Ms. Leinert

prepared the Coroner's report admitted into evidence as Government Exhibit 97. Ms. Leinert first explained her duties and responsibilities as a coroner for Wayne County. She then specifically testified about the investigation she engaged in to determine the cause of SM's death. She explained that her investigation included speaking to Dr. O'Boyle to obtain a medical opinion as to SM's cause of death, a review of SM's medical records from Wayne Memorial Hospital, conversations with the Pennsylvania State Police Officer who also investigated the incident, as well as conferring with Dr. Gary Ross, the Wayne County pathologist. Ms. Leinert further testified that in furtherance of her investigation, she directed the laboratory at Wayne Memorial Hospital to transfer SM's first drawn blood upon her admission to Wayne Memorial to the Northern Tier Research laboratory for further testing.

The Government then presented the testimony of Forensic Toxicologist, Michael Coyer. Dr. Coyer identified himself as the laboratory director of Northern Tier Research laboratory located in Dunmore, Pennsylvania, and provided the jury with a summary of his educational and professional background. He explained to the jury the duties and responsibilities he carries out every day, including the

analysis of blood and/or urine looking for the presence of controlled substances. The toxicology report Dr. Coyer prepared after scientifically analyzing SM's blood (serum) was admitted into evidence and marked as Government Exhibit 95.

Dr. Coyer first explained to the jury the nature of the scientific testing he performed on SM's serum sample and explained the significance of testing serum versus whole blood. In summary, Dr. Coyer testified that the particular opiate and level of opiates in SM's blood (serum) was oxycodone at 215 nanograms per milliliter, as well as 15 nanograms of oxymorphone, which is a metabolite of oxycodone. Dr. Coyer went on to explain to the jury that he tested a serum sample from SM's blood. Dr. Coyer opined that SM consumed a fatal dose of oxycodone.

Finally, Dr. Thomas testified that in forming an opinion regarding the cause of SM's death, he reviewed many sources of information including the defendant's medical record for the first and only visit SM had with him on October 5, 2011. From those records, Dr. Thomas specifically noted that the result of an EMG performed by the defendant on SM was normal, and that the results of an in-house urine screen

performed by the defendant for SM was not normal but, in fact, was positive for a narcotic that SM had not been legally prescribed. Dr. Thomas testified that the defendant ignored both a normal EMG and an inconsistent urine test before prescribing 120 oxycodone 15 milligram pills to SM at that first visit.

Dr. Thomas also testified that he reviewed the medical records of SM's primary care physician, Dr. Filomena Lombardi, which had been provided to the defendant prior to SM's office visit and were part of the defendant's patient file for SM. Regarding those records, Dr. Thomas noted that Dr. Lombardi's records evidenced a complicated psychiatric history seemingly disregarded by the defendant at that first visit, including a prior suicide attempt by SM. Dr. Thomas specifically noted various psychiatric medications lawfully prescribed to SM by her psychiatrist who was treating her for chronic bi-polar disorder and severe depression. Also significant to Dr. Thomas was the fact that SM had not been prescribed oxycodone in the past, despite a complicated physical history as well.

Dr. Thomas further testified that in forming his opinion regarding the death of SM, he reviewed the Wayne Memorial Hospital records

from SM's emergency admission, the Pennsylvania State Police report, the Wayne County coroner's report of Susan Leinert, as well as the prior testimony of William Maack, Dr. Louis O'Boyle, and Dr. Michael Coyer. All of these various sources of information were relied upon by Dr. Thomas.

Dr. Thomas first testified that in his expert opinion, the prescription for oxycodone written by the defendant for SM on October 5, 2011 was not for a legitimate medical purpose and was outside the scope of professional practice, in light of all the unique circumstances that accompanied SM when she presented to the defendant's practice at that initial visit, including her complicated physical and psychiatric history. Regarding SM's death, Dr. Thomas opined that "but for" the unlawful prescription written by the defendant for SM on October 5, 2011, SM would not have died.[6]

All of the above evidence presented by the Government regarding the death of SM was tested by the defense through cross-examination, closing arguments, and the court's jury instructions. The jury was well

---

[6] In *Burrage v. United States,* the Supreme Court held that "but for" causation is necessary to prove a violation of 21 U.S.C. §841(a)(1),(b)(1)(C)(drug delivery resulting in death).

aware of the same arguments at trial that the defendant now argues in the instant motion, including motivations, potential bias, inconsistent testimony, or the lack of evidence.

Moreover and contrary to what the defendant asserts in his motion, defense expert Carol Warfield never specifically addressed SM individually as a patient, or the prescription for oxycodone written for her by the defendant on October 5, 2011. While it is true that Dr. Warfield generally opined that everything the defendant did with every patient file at issue was medically appropriate, she never discussed the details surrounding the legitimacy of the oxycodone prescription written for SM that day by the defendant, or the circumstances surrounding SM's death. It is likely that it was a defense strategy not to ask Dr. Warfield specific questions about specific patients.[7]

The jury was permitted to rely on circumstantial evidence based on reasonable inferences drawn from actions, statements, and witness testimony. An inquiry into the legal sufficiency of the evidence

---

[7]     In the Government's view, it would have been difficult for Dr. Warfield to offer credible explanations to the excessive amount of opioid prescriptions written by the defendant for his patients, if addressed individually.

presented to the jury "does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 473 U.S. 307, 318-319 (1979).

After full deliberation, the jury found the defendant guilty on Count 24 of the Superseding Indictment. There was ample legally sufficient evidence to support the jury's verdict on this count.

**c.**   **There was sufficient evidence adduced by the Government to support a reasonable finding of guilt as to Counts 26 – 27 Maintaining Drug-Involved Premises.**

The jury found the defendant guilty of maintaining drug-involved premises at his office located at 104 Bennett Avenue in Milford, and at his office located at 200 3rd Street in Milford, in violation of 21 U.S.C. § 856(a). The jury was instructed that in order to establish a violation of 21 U.S.C. § 856(a), the Government must have proven that the defendant knowingly rented, used, or maintained any place, that is, his medical office(s), for the purpose of distributing a controlled substance. The jury was further instructed that the Government need only prove

that drug activity was a significant or important reason why the defendant maintained the place, and that the Government was not required to prove that the drug activity was the defendant's only purpose in maintaining the place, although that would have obviously satisfied this element.

As stated above, the Government presented a number of the defendant's former patients. All of the patients who testified obtained opioid prescriptions at one or both locations identified in the Superseding Indictment. A number of the patients testified that they received their monthly prescriptions (and sometimes more frequently) for oxycodone, usually 30 milligrams, from the defendant only after paying a cash fee. The jury learned that most of the patients visited the defendant monthly or bi-monthly over a period of several years. The category of patients ranged from those who sought prescriptions for the purpose of satisfying their addiction, those who sought prescriptions in order to resell the pills on the street, and those with genuine pain who became addicted at the hands of the defendant.

Many patients testified that the defendant never cautioned them about the inherent dangers associated with opioids. Many patients

explained how quickly they became addicted and how they started abusing the opioids as well as other drugs. Some testified that they started to use heroin in order to receive the same high they received from the oxycodone pills, since the two drugs provide the same pharmacological "high," though heroin was much cheaper. Many patients testified that they came to the defendant's office because it was well known that the defendant would prescribe whatever they wanted.

The Government also introduced thousands of hard copies of opioid prescriptions written by the defendant during the time charged in the Superseding Indictment. Diversion Investigator (DI) James Hischar testified about the boxes of opioid prescriptions seized from the defendant's medical practice during the execution of search warrants in January of 2015. The thousands of opioid prescriptions were admitted into evidence through DI Hischar and marked as Government Exhibits 32.1 – 32.4 (hard copies of prescriptions seized from defendant's office 2nd floor), and Exhibit 33 (hard copies of prescriptions seized from defendant's office). The thousands of opioid prescriptions were segregated by day for the entire three and a half years charged. DI

Hischar displayed several days of the prescriptions to the jury as examples of the defendant's practice to excessively prescribe opioids.

The Government presented Prescription Drug Monitoring Program (PDMP) data from Pennsylvania, New York, and New Jersey. The relevance and purpose of the data was explained to the jury by DI Hischar and introduced into evidence on a DVD marked as Government Exhibit 56. The PDMP data was highly probative for a number of reasons in terms of establishing the defendant's guilt on all of the crimes charged, including Counts 26 and 27, maintaining drug-involved premises. First, the PDMP data clearly evidenced the excessive quantities of prescriptions written by the defendant during the time charged. The number of prescriptions was exceptionally voluminous and was detailed in massive spreadsheets. One Government witness testified that the PDMP spreadsheet exceeded 27,000 lines. Second, the data demonstrated the one-size-fits-all kind of prescribing engaged in by the defendant. Third, the data evidenced the defendant's prevailing choice to prescribe the highest available dosage of the most widely desired and abused opioid, oxycodone.

The PDMP was also used at trial to generate bar charts which demonstrably showed the jury the degree to which the defendant operated outside the usual course of professional practice. The bar charts were introduced into evidence by DEA analyst Erin Radabaugh and marked as Government Exhibit 102 (bar charts for the years 2011 (August through December), 2012, 2013, 2014, and 2015 (January). In addition, Government Exhibit 103 was a pie chart that showed the jury that for the time charged in the Superseding Indictment, the defendant "*wrote a total of 26,985 Schedule II Controlled Substance prescriptions. Of all Schedule II Controlled Substance Prescriptions for the timeframe, 99.37% were written for Opioids including OxyContin 80 mg, and OxyContin 40 mg, Oxycodone 30 mg, Oxycodone 20 mg, Roxicodone, Endocet, Percocet and Methadone. The remaining .63%, or 171 prescriptions, were written for stimulants such as Adderall and Ritalin.*" Government Exhibit 103.

In addition, the Government presented additional compelling data from the Automatic Reports and Consolidated Ordering System (ARCOS). Nancy Jackson from the DEA Diversion Division testified and explained to the jury what ARCOS data is, its purpose, and how it

is collected and maintained. The jury learned that ARCOS is a data collection system in which manufacturers and distributors report their controlled substances transactions to the Drug Enforcement Administration (DEA). This information is collected and compiled by DEA in accordance with law for determining quota, distribution trends, internal audits, and other analyses. Manufacturers and distributors report to ARCOS. Distributors of controlled substances are required to report all sales of Schedule II controlled substances and Schedule III narcotic controlled substances to ARCOS based on a monthly or quarterly schedule. Government Exhibit 57 was admitted through DI Jackson and contained ARCOS data for various pharmacies beginning in January 2010 through March 2015.

Similar to the PDMP data, DI Jackson was able to generate graphs using the ARCOS data to show the correlation between the testimony of pharmacists and the drop in the opioid drugs each particular pharmacy purchased from their distributors. The graphs were admitted into evidence and marked as Government Exhibit 85. The graphs corroborated the testimony of each pharmacist who testified about refusing to fill the defendant's prescriptions for controlled

substances and the time at which the rejections began. The graphs generated from the ARCOS data dramatically demonstrated how one doctor, the defendant, was responsible for most of the volume of oxycodone 30 milligrams dispensed by area pharmacies. Once area pharmacies started to reject the defendant's prescriptions, the lines on the graphs plummeted. The jury was able to infer the excessive nature of the defendant prescribing habits by the data depicted in graph form.

Further, in terms of evidence establishing that the defendant was using his medical offices for the purpose of drug dealing, the more than one million dollars in cash seized from the defendant's residences demonstrated that the defendant was motivated by money and not medicine. The cash was shown to the jury by way of Government Exhibit 30.32 (photograph). The jury also learned through the testimony of Special Agent Carmine Pellegrino and various tax exhibits admitted into evidence, the defendant cheated the United States Government because he intentionally did not report more than one million dollars in business proceeds for tax purposes.

Finally, Dr. Thomas testified that the defendant had no legitimate medical purpose for prescribing the variety and amount of opioids he

did for these patients, and that the prescriptions written by the defendant for these opioids were outside the usual course of professional practice.

Based on all of the above, the Government put forth legally sufficient evidence before the jury from which they could clearly find the defendant guilty of Counts 26 and 27 of the Superseding Indictment, Maintaining Drug-Involved Premises.

**d.      There was sufficient evidence adduced by the Government to support a reasonable finding of guilt as to Counts 28 – 29 Engaging in Monetary Transactions from Criminally Derived Proceeds (Money Laundering).**

To prove a violation of 18 United States Code §1957 (Money Laundering) the Government proved to the jury that the defendant knowingly engaged in a monetary transaction that was of a value greater than $10,000; that the monetary transaction involved criminally derived property from specified unlawful activity (unlawful distribution of controlled substances); that the defendant knew that the monetary transaction involved criminally derived property; and that the monetary transaction took place within the United States.  The Government produced ample legally sufficient evidence for the jury to find the defendant guilty of Counts 28 and 29.

First, it is undisputed that the defendant knowingly engaged in the specified monetary transactions of more than $10,000 as identified in Counts 28 and 29 of the Superseding Indictment.

The Government presented the testimony of DEA Analyst Joseph Morales who confirmed that the defendant received hundreds of thousands of dollars in income from his medical practice over the period of time charged in the Superseding Indictment. It was undisputed at trial that the income that flowed through the defendant's many bank accounts was derived from his medical practice. The Government sufficiently established at trial that the defendant's medical practice operated primarily as a drug house (i.e., a pill mill). The Government was able to prove that the defendant consistently prescribed schedule II controlled substances without a legitimate medical purpose and outside the course of appropriate professional practice over the period of time charged in the Superseding Indictment. The Government incorporates each and every argument set forth heretofore in further support of the legally sufficient evidence presented to the jury on Counts 28 and 29 – that the proceeds used by the defendant to engage in the two monetary transactions identified in Counts 28 and 29 were criminally derived

from the unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1).

"Criminally derived property" is any property constituting, or derived from proceeds obtained from a criminal offense. 18 U.S.C. § 1957(f)(2). The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity. 18 U.S.C. § 1956(c)(7)(F)(9). "Specified unlawful activity" is any of the number of offenses listed in 18 U.S.C. § 1956(c)(7). It includes the unlawful distribution of controlled substances.[8] Accordingly, the money laundering charges required proof at trial of unlawful distribution of controlled substances. The Government provided that proof to the jury.

Furthermore, the money laundering statute does not require that an offense charged under 18 U.S.C. § 1957 be committed only with "tainted funds." It was sufficient for the Government to show that the monetary transactions identified in Counts 28 and 29 of the Superseding Indictment were funded in whole or in part by tainted

---

[8]    18 U.S.C. § 1956(c)(7)(B)(i) and 1961(1).

monies or ill-gotten gains. The Government did not have to prove that all of the funds involved in each monetary transaction be the proceeds of a specified unlawful activity. It was sufficient for the Government to prove that at least part of the property represents such proceeds.

In *United States v. Sokolow*, 91 F.3d 396 (3d Cir. 1996), the Third Circuit addressed the proof required where an accused engages in a transaction by drawing funds from a pool of money that contains funds both criminally and legitimately derived. The Court held that 18 U.S.C. § 1957 does not require the Government to "trace the funds constituting criminal proceeds when they are commingled with funds obtained from legitimate sources." *Id.* at 409 (citing *United States v. Moore*, 27 F.3d 969, 976-77 (4th Cir. 1994) ("Money is fungible, and when funds obtained from unlawful activity have been combined with funds from lawful activity into a single asset, the illicitly acquired funds and the legitimately acquired funds cannot be distinguished from each other....."). That the overall pool of assets might also contain funds from legitimate sources is therefore irrelevant. *See United States v. Wittig*, 2006 WL 851473, 16-17 (D.Kan. 2006) (it is not necessary to show that all of the money involved in the money laundering offenses was SUA

proceeds); *United States v. Bortnick*, 2005 WL 1693924, 24 (E.D. Pa. 2005) (following *Sokolow*; it is sufficient to show more than $10,000 in SUA proceeds was commingled with other money; no specific tracing required); *United States v. Farrington*, 2000 WL 1751996, 3 (D.V.I. 2000) ($17,000 withdrawn from account was SUA proceeds even though only $20,000 of $36,000 in account at time of withdrawal was SUA proceeds; following *Sokolow*; strict tracing not required), aff'd, 58 Fed. Appx. 919 (3d Cir. 2003); *United States v. Mooney*, 401 F.3d 940, 946 (8th Cir. 2005) ("the Government need not trace each dollar to a criminal source to prove a violation of 18 U.S.C. § 1957"); *United States v. One 1987 Mercedes Benz 300E*, 820 F.Supp. 248 (E.D.Va. 1993) (purchase of car with check drawn on account into which extortion proceeds had previously been deposited was involved in money laundering transaction); *United State v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992) (in the context of a withdrawal, the Government is not required to prove that no untainted funds were commingled with the unlawful proceeds for § 1957 purposes).

Testimony throughout the trial established that nearly all of the money found in the defendant's bank accounts was derived from his medical practice, Neurology and Pain Management. DEA Analyst Morales testified that he analyzed each of the defendant's bank accounts and the money in the accounts was derived from the defendant's medical practice. On cross-examination, Analyst Morales confirmed that all of the money from the defendant's accounts was solely based on his medical practice.

Analyst Morales also confirmed that the defendant used the unlawful proceeds from his bank accounts on two separate occasions to purchase properties. The time, date and location of the properties was confirmed through the testimony of Provident Funding and Hometown Abstract employees. The documents related to the financial transactions were admitted into evidence and marked as Government Exhibits 89 (Hometown Abstract) and 90 (Provident Funding). The properties were located at 146 Rising Meadow Way in East Stroudsburg, Pennsylvania and 200 3rd Street in Milford, Pennsylvania.

Based on all of the above, the Government presented legally sufficient evidence at trial from which the jury could reasonably conclude that the defendant was guilty on Counts 28 and 29 of the Superseding Indictment. [9]

## III. <u>CONCLUSION</u>

The defendant's disagreements with the jury's verdict does not equate with legal error. "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore*, 910

---

[9] It is noted that the defendant has not specifically challenged the legal sufficiency of the Government's evidence on Counts 30 through 32 of the Superseding Indictment, violations of 26 U.S.C. § 7201 – Tax Evasion. Regarding these counts, the Government presented the testimony of multiple witnesses to establish that the defendant evaded paying taxes from 2011-2013 on more than one million dollars in cash. DEA Special Agent William Davis testified that more than one million dollars in cash was recovered from the defendant's residences. IRS Special Agent Carmine Pellegrino testified that the defendant failed to report any of the cash as income in the years 2011, 2012, and 2013. The Government established that the defendant maintained two sets of books and only turned over his Quickbook records to his accountant for tax purposes, which did not include the defendant's cash receipts. The Government presented the testimony of the defendant's accountant, Hua Miao, who told the jury that the defendant did not inform him of cash receipts until after the DEA executed search warrants and recovered the cash.

F.2d at 1129.

The Government presented the jury with more than ample evidence, viewed in the light most favorable to the Government, to find the defendant guilty on all charges under deliberation. The Government respectfully requests that the court deny the defendant's motion for judgment of acquittal.

Respectfully submitted,

DAVID J. FREED
United States Attorney


By:   /s/ Michelle L. Olshefski
MICHELLE L. OLSHEFSKI
Assistant U.S. Attorney

Dated: July 2, 2018

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | NO. 3:16-CR-194 |
| | : | |
| v. | : | (JUDGE CAPUTO) |
| | : | |
| FUHAI LI, | : | (ELECTRONICALLY FILED) |
| Defendant | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 2nd day of July, 2018, I caused the foregoing "**Government's Response to Defendant's Motion for Judgment of Acquittal**" to be served upon Michael Weinstein, Esquire and William Ruzzo, Esquire, counsel of record for the defendant, and that Attorneys Weinstein and Ruzzo are filing users under the ECF system.

/s/ Michelle L. Olshefski
Michelle L. Olshefski
Assistant U.S. Attorney