1

```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA :
                        :
                        :
                        :
     vs                 :    3:16-CR-194
                        :
                        :
                        :
FUHAI LI                :
                        :
                        :
```

    BEFORE:        THE HONORABLE A. RICHARD CAPUTO

    PLACE:         COURTROOM NO. 3

    PROCEEDINGS:   JURY TRIAL

    DATE:          THURSDAY, MAY 3, 2018


APPEARANCES:

For the United States:

MICHELLE OLSHEFSKI, ESQ.
FRANCIS SEMPA, ESQ.
EVAN GOTLOB, ESQ.
U.S ATTORNEY'S OFFICE
P.O. BOX 309
235 NORTH WASHINGTON AVENUE
SCRANTON, PA 18501

For the Defendant:

MICHAEL E. WEINSTEIN, ESQ.
THE KENWORTHY BUILDING
410 BROAD STREET
MILFORD, PA 18337

WILLIAM RUZZO, ESQ.
590 RUTTER AVE
KINGSTON, PA 18704

2

1

2                        <u>INDEX TO WITNESSES</u>

3    FOR GOVERNMENT:    DIRECT   CROSS   REDIRECT   RECROSS

4    JAMES HISCHAR       69      137
     (Q)                 50       64
5

6                         <u>EXHIBIT INDEX</u>

7

     GOVERNMENT EXHIBITS                     IDENTIFIED     ADMITTED
8
     G-55 - DEA REGISTRATION                    77            77
9    G-28 - WALGREEN'S REJECTED SCRIPTS         83            83
     G-56 - PMP DATA - DVD                      92            93
10   G-37 - GOOGLE MAP                          98            99
     G-30.1-30.3 - PROPERTY PHOTOS             107           107
11   G-31 - COMPUTER SERVER                    111           112
     G-1-23 -PATIENT FILES                     113           119
12   G-29 - MAACK PATIENT FILE                 117           119
     G-37-44 - PATIENT FILES                   117           119
13   G-46-54 - PATIENT FILES                   117           119
     G-26 - BILLING RECORDS                    119           120
14   G-30.4-30.31   SEARCH WARRANT PHOTOS      120           121
     G-32.1-32.4 - SCRIPTS                     125           126
15   G-35 - CASH RECEIPT BOOK                  126           127
     G-33 - SCRIPTS                            126           127
16

17

18

19

20

21

22

23

24

25

3

1          THE COURT:  Good morning, members of the jury.  We

2    are going to begin today, and the first order of business is

3    I'm going to give you some preliminary instructions which will

4    help guide you as you perform your duties as jurors.  I will

5    tell you the topic, and then I'll tell you -- give you the

6    instruction.

7          The first topic is the role of the jury.  Now that

8    you have been sworn, I'm going to tell you what your role is in

9    this case.  Under our system of justice, the role of the jury

10   is to find the facts of the case based on the evidence

11   presented here in trial.  You must decide the facts only from

12   the evidence presented to you during this trial.  From the

13   evidence you will hear and see in court you will decide what

14   the facts are and apply to those facts the law that I give you

15   in my final instructions.  This is how you will reach your

16   verdict.

17          Whatever your verdict is, it must be unanimous.  All

18   of you will have to agree on it, or there will be no verdict.

19   In the jury room, you will discuss the case among yourselves,

20   but ultimately each of you will have to make up his or her own

21   mind.  Therefore, each of you has a responsibility which you

22   cannot avoid, and you should do so -- use your best judgment

23   throughout the trial to fulfill this responsibility.  I play no

24   part in finding the facts.  You should not take anything I may

25   say or do during the course of this trial as indicating what I

4

1  think of the evidence or about what your verdict ought to be.

2       My role is simply to make whatever legal decisions

3  have to be made during the course of the trial and to explain

4  to you the legal principles that must guide you in your

5  decisions.  You must apply my instructions about the law.  Each

6  of the instructions is important.  You must not substitute your

7  own idea or notion or opinion about what the law is or ought to

8  be.

9       You must follow the law as I give it to you whether

10  you agree with it or not.  Perform your duties fairly and

11  impartially.  Do not allow sympathy, prejudice, fear or public

12  opinion to influence you.  You should also not be influenced by

13  any person's race, color, religion, national ancestry or

14  gender.

15       Now, your conduct as jurors.  First, keep an open

16  mind.  Do not make up your mind about the verdict until you

17  have heard all the evidence and I have given you final

18  instructions about the law at the end of the trial and you have

19  discussed the case with your fellow jurors during your

20  deliberations.

21       Second, do not discuss the case among yourselves

22  until the end of the trial when you retire to the jury room to

23  deliberate.  You need to allow each juror the opportunity to

24  keep an open mind throughout the entire trial.  During the

25  trial you may talk to your fellow jurors about anything else of

1    a personal nature or common interest but not about the case.

2            Third, during the trial you should not speak to any

3    of the parties, lawyers or witnesses involved in the case not

4    even to pass the time of day.  If a lawyer does see you in a

5    public area or public domain and they don't say anything to

6    you, they're not being rude.  They're just trying to avoid any

7    appearance of impropriety or improper contact.  Fourth, do not

8    talk with anyone else or listen to others talk about the case

9    until after the trial is over and you have been discharged as a

10   juror.

11           It's important not only you do justice in this case

12   but that you give the appearance of doing justice.  If anyone

13   should try to talk to you about the case during the trial,

14   please report it to me through my courtroom deputy immediately.

15   Do not discuss that situation if it exists with a fellow juror.

16   Fifth, do not discuss the case with anyone outside the

17   courtroom or at home including family and friends.

18           Of course, you can tell your family and friends

19   you've been selected as a juror in the case, and you may tell

20   them how long the trial is expected to last.  You should also

21   tell them the judge instructed you not to talk to any -- any

22   more about the case and that they should not talk to you about

23   it.  The reason for this is that sometimes someone else's

24   thoughts can influence you.

25           Your thinking should be influenced only by what you

6

1  see and hear and learn in this courtroom.  Sixth, until the

2  trial is over and your verdict is announced, don't watch or

3  listen to any television or radio, newspaper programs about the

4  case or read any news or internet stories or articles about the

5  case or about anyone involved in it.  Seventh, do not use your

6  computer, cellar phone or any other electronic device while in

7  the courtroom or during deliberations.

8         These devices may be used during your breaks and

9  recesses for personal use but not used to obtain or disclose

10 information about the case.  You may not communicate with

11 anyone about the case on your cell phone or through any other

12 electronic means.  I can't name them all because by the time do

13 there will probably be five new ones.  So you get the message.

14 Also, you shouldn't use social media or anything else of that

15 nature.

16        The idea is that you should say nothing to anybody

17 about this case, talk to anybody about this case because what

18 you're to do is try to keep an open mind about it and only your

19 mind should be filled with what occurs in this courtroom, not

20 outside or anywhere else.  Eighth, do not do any research or

21 make any investigation on your own about any matters relating

22 to this case or this type of case.  This means, for example,

23 you must not visit -- strike that.  You must not consult with

24 any reference works, dictionaries or search the internet for

25 additional information or use your computer or any electronic

1  device to obtain information about this case or this type of

2  case or the parties in the case or anyone else involved in the

3  case.

4        You must decide this case based only on the evidence

5  presented in this courtroom and my instructions about the law.

6  It will be improper for you to try to supplement that

7  information on your own.  Lastly, you should not concern

8  yourself or -- with or consider the possible punishment that

9  might be imposed should you return a verdict of guilty.

10        I will talk to you about sidebar conferences.  During

11  the course of this trial, it may be necessary to talk to the

12  lawyers at what is called a sidebar conference.  They all come

13  over here to the side, and we will discuss something that's out

14  of your hearing, and you will hear an obnoxious static noise.

15  The idea is to muffle what we are saying so you can't hear it.

16  The reason for your not hearing it is not trying to keep

17  secrets from you, but I am making a ruling on a matter of law

18  they asked me to make.

19        That doesn't concern you, and that's why it's done on

20  the side.  I'm sure you would be -- probably be curious about

21  what we're discussing, and that's what we're discussing whether

22  a particular piece of evidence should be admitted or not

23  admitted under the rules of evidence, this sort of thing.

24  These matters are not within the province of the jury.  They

25  are within my province.  Your province is fact finding.  My

1   province is what's the law.  So that's the reason for the

2   sidebar conferences.

3         I'll try to keep the number to a minimum.  However, I

4   normally grant requests for sidebars.  If I should not grant a

5   request for sidebar, you should not take that to mean anything

6   other than I just didn't think it was necessary at that time.

7   Don't consider my granting or denying a request as suggesting I

8   have an opinion about the case or what your verdict ought to

9   be.

10        I always tell the jury that I don't allow note

11   taking.  Note taking is sometimes allowed in trials.  I don't

12   allow it.  The reason I don't allow it is because it's most

13   important that you pay attention to the witness on the witness

14   stand.  You'll note when I give you instructions on

15   credibility, one of the things I tell you is to observe the

16   demeanor of the witness, what is the witness' manner while

17   testifying.

18        Often times it helps you to determine whether to

19   believe or not believe a witness.  If you're taking notes, you

20   may miss that.  Secondly, sometimes people think just because

21   somebody wrote something down it has more legitimacy than your

22   collective memories.  You'll have to rely on your collective

23   memories as to what was said by a witness from the standpoint

24   of the evidence because it's most important that you all pay

25   attention to the witness and also observe the witness'

1  demeanor.

2          Likewise, I don't allow questions by jurors.  We have

3  a system.  It's called an adversarial system whereby the

4  lawyers are trained and -- in the type of questions that may be

5  asked, type of questions which may not be asked.  They are

6  trained to elicit that information in that fashion.  So I don't

7  allow jurors to ask questions because if I did, I'd have to

8  screen them, and all too often it's -- it turns out to be more

9  trouble than the effectiveness of the exercise.  So you're not

10 to -- you will not be permitted to ask questions.

11         Description of what is going to happen, the trial

12 proceedings.  First, the lawyers will have an opportunity to

13 make opening statements to you.  The government may make an

14 opening statement at the beginning of the case, and the

15 defendant's lawyers may make an opening statement after the

16 prosecution's statement.  But the defendant doesn't have to and

17 may postpone the making of an opening statement until after the

18 government finishes presenting it evidence.  Moreover, the

19 defendant is not required to make any opening statement.  But I

20 caution you that opening statements are simply an outline to

21 help you to understand what each party expects the evidence to

22 show.

23         What is said in opening statements is not evidence.

24 Second, after opening statements, the government will introduce

25 the evidence it thinks proves the charges stated in the

1  indictment.  The government will present witnesses, and the

2  defendant's lawyers may cross-examine those witnesses.  The

3  government may also offer documents and other exhibits into

4  evidence.  Third, after the government has presented its

5  evidence, the defendant may present evidence, but he is not

6  required to do so.  As I will tell you many times during this

7  trial, the government always has the burden or obligation to

8  prove each and every element of the offenses charged beyond a

9  reasonable doubt.

10         The defendant is presumed to be innocent of the

11 charges.  The law never imposes on a defendant in a criminal

12 case the burden of proving his or her innocence by calling any

13 witnesses, producing any exhibits or introducing any evidence.

14         Fourth, after all of the evidence has been presented,

15 the lawyers will have an opportunity to present closing

16 arguments or summations.  Closing arguments are designed to

17 present to you the parties' theories about what the evidence

18 has shown and what conclusions may be drawn from the evidence.

19 What is said in closing arguments is not evidence, just as what

20 is said in opening statements is not evidence.

21         Fifth, after you heard closing arguments, I will give

22 you orally final instructions concerning the law that you must

23 apply to the evidence presented during the trial.  As I am

24 doing now, I may also give you instructions on certain aspects

25 of the law throughout the trial as well as at the end of the

1   trial.  Sixth, after my final instructions on the law, you will

2   retire to consider your verdict.  Your deliberations are

3   secret.  You will not be required to explain your verdict to

4   anyone.  Your verdict must be unanimous.  All of you must agree

5   on it.  You must keep an open mind during the course of this

6   trial.  Don't make up your mind about any of the questions in

7   the case until you have heard each piece of evidence and all of

8   the law which you must apply to that evidence, in other words,

9   until you begin your deliberations.

10          I'm going to talk to you briefly about evidence, what

11  it is, what is not evidence.  As I will say many, many times,

12  you must make your decisions based only on the evidence you see

13  and hear in this courtroom.  Don't let rumors, suspicions,

14  innuendos or anything else you may hear outside of court

15  influence your decision in any way.  The evidence from which

16  you are to find the facts consists of the following:  The

17  testimony of witnesses.  The witness will come up here, sit in

18  the witness chair.  That's -- and give testimony under oath.

19  Second, documents or other things that are received into

20  evidence; third, any fact or testimony -- any fact or testimony

21  that is stipulated, namely, formally agreed to by the parties.

22          The following things are not evidence:  First, the

23  statements and arguments of the lawyers for the parties is not

24  evidence; second, any questions asked by the lawyers and

25  questions that I may ask are not evidence.  You must not assume

1  that a fact is true just because one of the lawyers or I ask a

2  question about it.  It is the witness' answers that are

3  evidence.  Of course, you may need to consider the question to

4  know what a witness means by the witness' answer.  For example,

5  if a witness answers yes to a question, you have to consider

6  the question to understand what the witness is saying or

7  testifying to.  Third, objections by lawyers including

8  objections in which the lawyers state facts, not evidence.  Any

9  testimony that I strike or tell you to disregard are not

10  evidence.  Anything that you may see or hear about this case

11  outside of the courtroom is not evidence.

12         You should use your common sense in weighing the

13  evidence.  Consider it in light of your everyday experience

14  with people and events and give it whatever weight you believe

15  it deserves.  If your experience and common sense tell you that

16  certain evidence reasonably leads to a conclusion, you may

17  reach that conclusion.  The rules of evidence control what can

18  be received into evidence.  When a lawyer asks a question or

19  offers an exhibit into evidence and the lawyer on the other

20  side thinks it is not permitted by the rules of evidence, that

21  lawyer may object.

22         Any objection simply means that the lawyer is asking

23  me to decide whether the evidence should be allowed under the

24  rules.  Lawyers have a responsibility to their clients to make

25  objections when they think evidence being offered is improper

1  under the rules of evidence.  You should not be influenced by

2  the fact that an objection is made.  You should also not be

3  influenced by my rulings or objections on the -- to the

4  evidence.  If I overrule the objection, the question may be

5  answered or the exhibit may be received as evidence, and you

6  should treat that testimony or exhibit like any other.  I may

7  allow evidence, testimony or exhibits, only for a limited

8  purpose.  If I do that, I will instruct you to consider the

9  evidence only for that limited purpose, and you must, of

10 course, follow that instruction.  If I sustain an objection,

11 meaning I will say sustained, the question will not be answered

12 or the exhibit will not be received in evidence.  And whenever

13 I sustain an objection, you must disregard the question or the

14 exhibit entirely.

15        Don't think about or guess what the witness might

16 have said in answer to the question.  Do not think about or

17 guess what the exhibit might have shown.  Sometimes a witness

18 may have already answered before the lawyer objects or before I

19 rule on the objection.  If that happens and I sustain the

20 objection, you should disregard the answer that was given, and

21 I will so instruct you.  Also I may order that some testimony

22 or other evidence be stricken or removed from the record.

23        Should I do that, I will instruct you to disregard

24 it.  That means when you are deciding the case, you must not

25 consider or be influenced in any way by that testimony or other

1  evidence that I told to you disregard.  Although the lawyers

2  may call your attention to certain facts or factual conclusions

3  they think are important, what the lawyers say is not evidence.

4  It's not binding on you.  It's your own recollection and

5  interpretation of the evidence that controls your decision.

6          Also don't assume from anything that I do or say

7  during this trial that I have an opinion about the evidence or

8  about the issues in this case or about what your verdict should

9  be.

10          Direct and circumstantial evidence.  There are two

11  types of evidence that may be used at trial.  Direct evidence

12  and circumstantial evidence.  You may use both types of

13  evidence in reaching your verdict.  Direct evidence is simply

14  evidence which if believed directly proves a fact.  An example

15  of direct evidence occurs when a witness testifies about

16  something the witness knows from his or her senses, something

17  the witness has seen, touched, heard or smelled.

18          Circumstantial evidence is evidence which if believed

19  indirectly proves a fact.  It is evidence that proves one or

20  more facts from which you can find or infer the existence of

21  some other facts.  Any inference -- an inference rather is

22  simply a deduction or conclusion that reason, experience and

23  common sense lead to you make from the evidence.  An inference

24  is not a suspicion or guess.  It's a reasoned, logical decision

25  to find that an disputed fact exists on the basis of another

1  fact.  For example, an example of direct evidence is, if

2  someone walked in, sat on the witness stand, was sworn and

3  said, it's raining outside and you believed that witness, you

4  would have direct testimony that it was raining outside.  An

5  example of circumstantial evidence would be, for example, if

6  someone walked into the courtroom wearing a wet raincoat and

7  carrying a wet umbrella, that would be circumstantial evidence

8  from which you could conclude it was raining.

9          Sometimes different inferences may be drawn from the

10 same set of facts.  The government may ask you to draw one

11 inference, and the defense may ask you to draw another.  You

12 and you alone must decide what inferences you will draw based

13 on the evidence.  You should consider all of the evidence that

14 is presented at this trial, direct and circumstantial.  The law

15 makes no distinction between the weight that you should give to

16 either direct or circumstantial evidence.  It is for to you

17 decide how much weight to give to any evidence.

18         Credibility of witnesses.  In deciding on what the

19 facts are, you must decide what testimony you believe and what

20 testimony you do not believe.  You are the sole judges of the

21 credibility of the witnesses.  Credibility refers to whether

22 the witness is worthy of belief.  Is the witness truthful?  Is

23 the witness' testimony accurate?  You may believe everything a

24 witness says, part of what a witness says or none of what a

25 witness says.  It's entirely up to you.  You may decide whether

1   to believe a witness based on his or her behavior and manner of

2   testifying, the explanations the witness gives and all of the

3   other evidence in the case just as you would in any important

4   matter where you were trying to decide if a person is truthful,

5   straightforward and accurate in his or her recollection.

6          In deciding on the question of credibility, remember

7   to use your common sense, your good judgment and your

8   experience.  In deciding what to believe, you may consider a

9   number of factors such as -- they are not exclusive.  These are

10  just some suggestions.  First, the opportunity and ability of

11  the witness to see or hear or know the things about which the

12  witness testified; second, the quality of the witness'

13  knowledge, understanding and memory; third, the witness'

14  appearance, behavior and manner while testifying; fourth,

15  whether the witness has an interest in the outcome of the case

16  or any motive, bias or prejudice; fifth, any relation the

17  witness may have with a party in the case and any effect that

18  the verdict may have on the witness; sixth, whether the witness

19  said or wrote anything before trial that is different from the

20  witness' testimony here in court; seventh, whether the witness'

21  testimony is consistent or inconsistent with other evidence

22  that you believe; eighth, any other factors that bear on

23  whether a witness ought to be believed.

24          I always tell jurors in judging credibility you

25  should use all of the tests for truthfulness that you would use

1  in a matter of importance to you in your everyday life.

2  Inconsistencies or discrepancies in a witness' testimony or

3  between the testimony of different witnesses may or may not

4  cause you to disbelieve that witness' testimony.  Two or more

5  persons witnessing an event may simply see or hear it

6  differently.  Mistaken recollection like failure to recall is a

7  common human experience.  In weighing the effect of an

8  inconsistency, you should consider whether it is a matter of

9  importance or an insignificant detail.

10         You should also consider whether the inconsistency is

11  innocent or intentional.  You are not required to accept the

12  testimony even if that testimony is not contradicted and the

13  witness is not impeached.  You may decide that the testimony is

14  not worthy of belief because of the witness' bearing, demeanor

15  or manner or because of the inherent improbability of the

16  testimony or for other reasons that are satisfactory or

17  sufficient to you.

18         After you make your own judgment about believability

19  of a witness, you can then attach to that witness' testimony

20  the importance or weight that you think it deserves.  The

21  weight of evidence to prove a fact does not necessarily depend

22  on the number of witnesses who testified.  What is more

23  important than the number is how believable the witnesses are

24  and how much weight you think their testimony deserves.

25         Now, nature of indictment.  The government has

1  charged the defendant, Dr. Li, with violating federal law,

2  specifically with; one, knowingly and intentionally

3  distributing schedule two controlled substances outside the

4  usual course of professional practice and not for a legitimate

5  medical purpose in violation of a federal statute; second,

6  knowingly and intentionally distributing schedule two

7  controlled substances outside the usual course of professional

8  practice and not for a legitimate medical purpose which

9  resulted in serious bodily injury and death in violation of a

10  federal statute; third, knowingly and intentionally

11  distributing schedule two controlled substances outside the

12  course of professional practice and not for a legitimate

13  medical purpose to a pregnant individual in violation of a

14  federal statute; fourth, knowingly and intentionally

15  maintaining a place for the purposes of distributing schedule

16  two controlled substances outside the usual course of

17  professional practice and without legitimate medical purpose in

18  violation of a federal statute; fifth, knowingly and wilfully

19  engaging in monetary transactions and property derived from

20  specified unlawful activity in violation of a federal statute;

21  and, sixth, wilfully evading a large part of the tax due and

22  owed by him to the United States of America in the years 2011,

23  2012 and 2013 in violation of a federal statute.

24           These are the -- these charges against Dr. Li are

25  contained in the indictment.  An indictment is just a formal

1    way of specifying the exact crimes a defendant is accused of

2    committing.  An indictment is simply a description of the

3    charges against Dr. Li.  It is an accusation only.  An

4    indictment is not evidence of anything.  You should not give it

5    any weight -- any weight to the fact that Dr. Li has been

6    indicted in making your decision in this case.  I'm going to

7    instruct you for guidance now on the elements of the offenses

8    charged.  I just mentioned all of the offenses.  I'm now going

9    to tell you what the elements of them are.

10          The defendant, Dr. Li, is charged in counts one

11   through 23 of the indictment with committing the offense of

12   distribution and dispensing of a schedule two controlled

13   substance, which is a violation of federal law.  I will give

14   you a brief summary of these elements, each of which the

15   government must prove beyond a reasonable doubt in order to

16   convict Dr. Li of the particular offense charged.

17          The elements of distribution and dispensing of a

18   schedule two controlled substance in this case are:  First, Dr.

19   Li distributed and dispensed or caused to be distributed or

20   dispensed a mixture or substance containing a controlled

21   substance; second, Dr. Li distributed and dispensed or caused

22   to be distributed or dispensed the controlled substance outside

23   the usual course of professional practice and not for a

24   legitimate medical purpose; third, Dr. Li distributed,

25   dispensed or caused to be distributed or dispensed the

20

1  controlled substance while knowing or intending that the

2  distribution was outside the usual course of professional

3  practice and not for a legitimate medical purpose; and, fourth,

4  the controlled substance was one of the substance -- substances

5  identified in the superseding indictment.

6        Dr. Li is also charged with the offense of

7  distributing -- distribution rather and dispensing of a

8  schedule two controlled substance which resulted in serious

9  bodily harm -- bodily injury and death.  The elements of this

10 offense are as follows:  First, Dr. Li knowingly and

11 intentionally intended to distribute a controlled substance;

12 second, the controlled substance was either Oxycodone,

13 Oxymorphone, Methadone, Hydromorphone, Valium, Fentanyl,

14 Percocet, Adderall or Ativan; third, Dr. Li's distribution of

15 the controlled substance was outside the usual course of

16 professional practice; fourth, that death or serious bodily

17 injury resulted from the use of the controlled substance.

18        To find that death or serious bodily injury resulted

19 from the use of the substance, you must find that the

20 government proved beyond a reasonable doubt that the use of the

21 substance was a but for cause of the death or injury meaning

22 that the government must prove beyond a reasonable doubt that

23 the death or serious bodily injury would not have resulted had

24 the victim not used the controlled substance distributed by Dr.

25 Li.  Additionally, Dr. Li is also charged with committing the

1  offense of distribution and dispensing of a schedule two

2  controlled substance to a pregnant individual.  The elements of

3  this offense are:  First, Dr. Li knowingly or intentionally

4  intended to distribute a controlled substance.  Second, the

5  controlled substance was one named in the indictment such as

6  Oxycodone, Oxymorphine -- or Oxymorphone, Methadone,

7  Hydromorphone, Valium, Fentanyl, Percocet, Adderall or Ativan;

8  third, Dr. Li's distribution of the controlled substance was

9  outside the usual course of professional practice and not for a

10  legitimate medical purpose; fourth, the controlled substance

11  was provided or distributed to a pregnant individual.

12        Dr. Li is also charged with the offense -- with

13  committing the offense of maintaining a drug involved premises.

14  The elements of this offense are, first, Dr. Li knowingly

15  opened and maintained a place known as the neurological --

16  Neurology and Pain Management Center and, second, Dr. Li did so

17  for the purpose of distributing the controlled substances

18  charged or outlined in the indictment.

19        Dr. Li is also charged with the offense of engaging

20  in the monetary transaction, property deprived from specified

21  unlawful activity.  The elements of this offense are:  Dr. Li

22  knowingly engaged in a monetary transaction; second, the

23  monetary transaction was a property of a value greater than

24  $10,000 derived from the unlawful distribution of schedule two

25  controlled substances; third, Dr. Li then knew that the

1   monetary transaction involved proceeds of a criminal offense;

2   fourth, that the monetary transaction took place in the United

3   States; and, fifth, that the monetary transaction in some way

4   or degree affected interstate commerce.  Lastly, Dr. Li is

5   charged with the offense of tax evasion.  The elements of that

6   offense are, first, Dr. Li has a substantial income tax

7   deficiency; second, Dr. Li made an affirmative attempt to evade

8   or defeat the assessment or payment of the income tax and that

9   Dr. Li acted wilfully.

10         What I have just outlined or told you is only a

11   preliminary outline of the elements of the offense charged --

12   offenses charged.  At the end of the trial, I will give you

13   final instructions on the elements of the offenses charged as

14   well as other matters of law.  These final instructions will be

15   more detailed, and they will guide you in reaching your verdict

16   in the case.

17         I'm going to instruct you now on the presumption of

18   innocence, burden of proof and reasonable doubt.  The

19   defendant, Dr. Li, has pleaded not guilty to the offenses

20   charged.  He is presumed to be innocent.  He starts the trial

21   with a clean slate with no evidence against him.  The

22   presumption of innocence stays with Dr. Li unless and until the

23   government presents evidence that overcomes the presumption of

24   innocence by convincing you that Dr. Li is guilty of the

25   offenses charged beyond a reasonable doubt.

1          The presumption of innocence requires that you find

2    Dr. Li not guilty unless you are satisfied that the government

3    has proved guilt beyond a reasonable doubt.  The presumption of

4    innocence means Dr. Li has no burden or obligation to present

5    any evidence at all to prove that he is not guilty.  The burden

6    or obligation of proof is on the government to prove that he is

7    guilty, and that burden stays with the government throughout

8    the trial.

9          In order for you to find Dr. Li guilty of any offense

10   charged, the government must convince you that he is guilty of

11   that offense beyond a reasonable doubt.  This means that the

12   government must prove each -- every element of the particular

13   offense charged beyond a reasonable doubt.  The defendant may

14   not be convicted based on suspicion or conjecture but only on

15   evidence proving guilt beyond a reasonable doubt.  Proof beyond

16   a reasonable doubt does not mean proof beyond all possible

17   doubt or to a mathematical certainty.

18         Possible doubts are doubts based on conjecture or

19   speculation are not reasonable doubts.  A reasonable doubt is a

20   fair doubt based on reason, logic, common sense or experience.

21   A reasonable doubt means a doubt that would cause an ordinary,

22   reasonable person to hesitate to act in matters of importance

23   in his or her own life.  It may arise from the evidence.  It

24   may arise from the lack of evidence, or it may arise from the

25   nature of the evidence.  If after hearing all of the evidence

24

1  you are convinced that the government has proved Dr. Li guilty

2  beyond a reasonable doubt, you should return a verdict of

3  guilty.  However, if have a reasonable doubt as to any element

4  of any offense, you then must return a verdict of not guilty as

5  to that particular offense.

6          Separate consideration, separate defendant charged

7  with multiple offenses.  Dr. Li is charged here with several

8  offenses.  Each offense is charged in a separate count of the

9  indictment.  The number of offenses charged is not evidence of

10  guilt.  This should not influence your decision in any way.

11  You must separately consider the evidence that relates to each

12  offense charged, and you must return a separate verdict for

13  each offense.  For each offense charged, you must decide

14  whether the government has proved beyond a reasonable doubt

15  that Dr. Li is guilty of that particular offense.  A decision

16  on one offense, whether guilty or not guilty, should not

17  influence your decision on any of the other offenses charged.

18          Each offense should be and must be considered by you

19  separately.  Anything from counsel?

20          MS. OLSHEFSKI:  No, Your Honor.

21          MR. WEINSTEIN:  No, sir.

22          THE COURT:  Ready to proceed?

23          MS. OLSHEFSKI:  Yes, Your Honor.

24          THE COURT:  Fine.

25          MS. OLSHEFSKI:  Good morning.  The evidence --

25

1          MR. RUZZO:  Can we approach, Your Honor?

2          THE COURT:  Sure.

3          (The following discussion occurred at sidebar:)

4          MR. WEINSTEIN:  Judge, we don't know who the folks

5    are in the audience.  We ask anybody who will be a witness be

6    sequestered.

7          MS. OLSHEFSKI:  DEA agents and investigators.  There

8    are case agents, and they have a right to be here.

9          MR. WEINSTEIN:  I think --

10         THE COURT:  Wait.  Witnesses?

11         MS. OLSHEFSKI:  Yes, Your Honor.

12         THE COURT:  Case agents, your client.

13         MR. WEINSTEIN:  These folks are individual witnesses,

14   all who have testified previously during the -- all testified

15   to the grand jury.  They can't sit and listen to the testimony

16   of the fellow agents whoever they are and -- and tailor their

17   testimony.

18         THE COURT:  I don't have a problem if the lead agent

19   sits at counsel table and assists during the trial.  This is a

20   big case.  They are all agents?

21         MS. OLSHEFSKI:  Yes, Your Honor.

22         THE COURT:  One agent for each?

23         MS. OLSHEFSKI:  Just so the record is clear, agent

24   from the DEA -- agent from the DEA side of the case and a

25   diversion investigator from the diversion side of the case.

1          THE COURT:  You can have one agent from each agency

2   as your client.  If there's more than one because of -- that's

3   fine, okay.

4          MS. OLSHEFSKI:  Thank you, Your Honor.

5          (The discussion at sidebar concluded.)

6          MS. OLSHEFSKI:  May I proceed, Your Honor?

7          THE COURT:  Yes, you may.

8          MS. OLSHEFSKI:  Thank you, Your Honor.  Ladies and

9   gentlemen, the evidence in this case is going to change

10  whatever stereotype you have in your mind about what a drug

11  dealer looks like because you're going to learn that drug

12  dealers come in all shapes and sizes and from all walks of

13  life.  You're going to learn some drug dealers are well

14  educated.  Some drugs dealers have advanced degrees.  Some drug

15  dealers are actually doctors.

16         The defendant, Dr. Fuhai Li, under the guise of

17  running a medical practice became a drug dealer.  You're going

18  to see that he concealed his drug dealing behind awards hanging

19  on a wall and degrees hanging on a wall, a white coat as well

20  as the trust that society typically affords to doctors.

21         Make no mistake about it, ladies and gentlemen,

22  despite taking an oath to do no harm, the evidence in this case

23  is going to show that Dr. Fuhai Li caused a great deal of harm

24  and he violated that oath.  You're going to learn that he took

25  his patients' money, he put it in his pocket and he sent them

1  on their way with a drug he knew was dangerous and deadly and

2  he did it for greed.  He did it for money, and at least one

3  patient he did it for the additional perks of sexual contact.

4  So let me reintroduce you to the members of the prosecution

5  team who represent the United States of America in this case.

6        This is my colleague, assistant U.S. attorney Francis

7  Sempa.  Back here at this table is assistant U.S. attorney Evan

8  Gotlob.  Sitting in the back row is special agent Carmine

9  Pellegrino from the IRS.  Sitting in the back of the room is

10 special agent William Davis of the DEA, and also sitting in the

11 back is diversion investigator James Hischar.  Also assisting

12 in this case is diversion investigator Louis Callavini, and

13 also on the diversion side house of the house is Denise

14 Williamson.  Sitting at the table right here is an employee of

15 the U.S. Attorney's Office, Sierra Morano.  She will operate

16 the technology for us in the courtroom.

17       This is our opportunity, ladies and gentlemen, to

18 outline for you what you will see and hear and learn in this

19 case from the United States in the -- in relation to the

20 indictment and charges that have been brought against Dr. Fuhai

21 Li.  All we ask from you is to do one thing.  Please use your

22 common sense and your everyday life experience you bring with

23 you in this courtroom.  Sometimes people think that they have

24 to think differently just because you're in a court of law, but

25 nothing could be further from the truth.

1          You've all been chosen to sit on this jury because
2     you all have life experience and common sense.  And this is
3     where real life plays out.  What happens out on the street ends
4     up in courts of law like this.  So that's all we ask of you is
5     use your common sense and everyday life experience as you
6     listen to the evidence and determine what the facts are in this
7     case.
8          As you've already heard, it will be your job to
9     determine what the facts are and where the truth lies and also
10    when you have the opportunity to apply the law that the judge
11    provides you with at the end of the case to the facts and
12    render a fair and impartial verdict.  The power to do that is
13    yours and yours alone.  It's a very important power.  You will
14    hear a lot about opioids in this case, and in this particular a
15    very powerful opioid called Oxycodone.  Oxycodone a pain
16    medication that is more powerful and more addictive than
17    Morphine.  It will be explained to you from witnesses in this
18    way.
19         Imagine everything that could make you feel good,
20    physically and emotionally, and synthesize all of that pleasure
21    and multiply it by a hundred.  Then cram it all into a little
22    pill.  That's Oxycodone.  It is one of the more irresistible
23    opioids or drugs in the 6,000 year history of dope.  Witnesses
24    will tell you it is a highly sought after drug on the street
25    and for personal use because of these pleasure inducing

1  qualities, especially the Oxycodone 30 milligram.

2          It is the highest dosage of Oxycodone in the fast

3  acting short release form of Oxycodone.  It is desired by

4  addicts.  You will learn that that particular drug was

5  originally intended only for cancer patients, in fact, dying

6  cancer patients when the risk of addiction didn't matter.

7          Witnesses will tell you that when they take an

8  Oxycodone the euphoria and the warmth they feel settle into

9  their bodies is like heaven.  That's because you will learn

10  that Oxycodone is basically heroin, only synthetic, and it's

11  FDA approved.  For those reasons Oxycodone is a dangerous

12  opioid.  It's highly addictive quickly and profoundly.  You

13  will learn that addiction happens fast and then it's all about

14  that little pill.  Because of all of this, a prescribing of

15  opioids requires an extreme caution be exercised before it is

16  dispensed at any level.

17          Most significantly, ladies and gentlemen, if not

18  dispensed for a legitimate medical purpose and within accepted

19  professional standards, it can be extremely dangerous.  And

20  deadly and, in fact, for at least one patient in this case it

21  was deadly.  If not dispensed for a legitimate medical purpose

22  and within accepted professional standards, it is a crime.

23  Make no mistake about it.  It is a crime.  That's why we're all

24  here.  You're going to learn that drugs are put into schedules

25  depending upon how dangerous and how serious they are.  Opioids

1  -- Oxycodone is an opioid -- are schedule two controlled

2  substances, and they are considered dangerous and highly

3  addictive, but they do serve a medical purpose.  Because these

4  drugs are controlled substances, that means that you or I can't

5  prescribe them.  But they can be prescribed by doctors

6  registered with the DEA, Drug Enforcement Administration.  What

7  allows a legitimate doctor to prescribe opioids is a DEA

8  registration.

9            A DEA registration allows doctors to prescribe

10  controlled substances in the course of a professional practice.

11  However, that registration has limitations because these are

12  still dangerous controlled substances.  A doctor who has a DEA

13  registration can only prescribe controlled substances within

14  accepted standards of the medical profession and for legitimate

15  medical purposes.

16            It is not an -- it is an objective standard, and it

17  does not cater to idiosyncrasies of any particular doctor.  It

18  is an objective standard.  You'll learn that a doctor deviates

19  from generally accepted standards of the medical profession

20  when he knows that a patient does not need or should not be

21  receiving that controlled substance but does so anyway for

22  reasons like money or sex.  If that's the case and the

23  deviates, then he is liable under the law just like any other

24  drug dealer on the street.  Only a valid prescription separates

25  the two.

1          So you're going to learn a lot about certain

2     standards to which medical professionals are held.  And the

3     reasons for these standards that you will learn about is to

4     make sure that a physician is actually treating a medical

5     condition and not just feeding addictions and not causing harm.

6     You'll learn that at a minimum a doctor must conduct a

7     meaningful evaluation of a patient including learning the

8     patient's medical history and psychiatric history if any

9     exists, performing a meaningful physical examination, develop

10    an individualized diagnosis such that you are not practicing a

11    one-size-fits-all kind of medicine.

12         If you're going to prescribe these powerful highly

13    addictive opioids, then at a minimum the profession requires

14    that you verify an injury or perform some kind of diagnostic

15    tests like MRIs or CT scans or ultrasounds that provide

16    evidence of an injury or the lack of evidence of an injury.

17    You can trust what the patient tells you, but you must verify

18    -- you must take steps to verify because we're dealing with

19    opioids.  And doctors have been well aware, you will learn, of

20    the criminal patient for decades.

21         You'll learn a doctor has a professional duty to at

22    least attempt to verify and treat a patient in a way that

23    honestly attacks a source of pain if there's pain.  Doctors

24    have a professional duty to develop a treatment and plan that

25    offers alternatives to these powerful and highly addictive

1  opioids.  You will learn doctors do not have to be right, but

2  doctors have to be reasonable and act within the scope of

3  professional practice and for legitimate medical purposes.  You

4  will learn that it is unreasonable and outside the scope of

5  professional practice for a doctor to see a patient for five

6  minutes, take their money and send them on their way with a

7  dangerous drug and then claim no responsibility for what

8  happens after that.

9        We're going to show you that is precisely what the

10  defendant did in this case.  We are going to show you the

11  defendant cultivated his patients just like a drug dealer on

12  the street.  We are going to show you for some of his patients

13  the defendant simply continued to feed an addiction that he

14  knew about and that addiction that he kept feeding month after

15  month kept those patients coming back month after month to get

16  that prescription, to get that drug.  And every time they came

17  back, that meant money in the pocket of the defendant.

18        We're also going to show you that there was a part of

19  the defendant's practice that were comprised of legitimate

20  patients who were legitimately seeking help for pain and he

21  turned them into addicts and then those patients kept coming

22  back month after month after month, and for every contact they

23  paid the defendant, and a lot of them paid in cash.  Many

24  witnesses will tell you that early on in their relationship

25  with the defendant if there was any pain it wasn't about their

1  pain anymore, it was about their addiction and that the

2  defendant knew it.

3        Some witnesses will tell you that the defendant

4  dangled their prescription like a carrot, pay up or you don't

5  get your drugs this month.  The evidence will show you that the

6  defendant kept everything in-house such that he was the only

7  one who profited from his patient's addictions.  You will learn

8  that many professionals took action with respect to the

9  defendant's practice that reflected their concerns about the

10 defendant's pattern of prescribing.

11       These professionals included doctors, pharmacists, an

12 entire pharmacy chain that shut down the defendant and refused

13 to fill his prescriptions.  These professionals conveyed their

14 concerns to the defendant.  Patients will tell you that they

15 repeatedly told the defendant, I can't find a pharmacy that

16 will fill your prescriptions.  Instead of being alarmed, what

17 you'll see is that the defendant simply directed them to

18 another pharmacy that had just moved into the area next to the

19 defendant's office, and you'll note -- what you will learn is

20 that that pharmacy and their Oxycodone sales spiked at the time

21 when every other pharmacy was shutting him down.

22       When these concerns were conveyed to the defendant,

23 he would claim -- you will hear he would claim those others

24 don't know what they're talking about or he would trivialize

25 those concerns.  Witnesses will tell you that the defendant

1  liked to remind people that he was the doctor and he knew best

2  and then he would just continue on in the same manner.

3  Witnesses will describe the defendant's office like a revolving

4  door.

5         After an initial visit of about 15 minutes, most

6  office visits after that lasted about five minutes long enough

7  for the defendant to recite what you will learn is his mantra,

8  how are you doing, are you taking your pills, what's your pain

9  level, here's your script, see you next month.  Time and time

10 again, the defendant performed only cursory exams, mostly no

11 exams at all.  Yet he sent his patients out the door month

12 after month with these dangerous and highly addictive opioids.

13 You'll see that from the very first visit, new patients, the

14 defendant usually prescribed the highest dosage of Oxycodone

15 30 milligrams with little to no medical indication to do so.

16        The defendant had his clients -- his patients submit

17 to urine screens only to ignore the results of the urine

18 screens, but those screens in a pain management practice where

19 the defendant served two purposes, it generated a lot of cash

20 for him, and it gave his practice the appearance of legitimacy.

21 You'll hear a lot about EMGs the defendant performed for which

22 he also received a lot of money, but he rarely if ever acted

23 consistent with the results.  He did a lot of tests that went

24 nowhere.

25        However, the tests served the defendant's pocketbook

35

1   but not the patients.  It was not the defendant's practice to

2   make any referrals outside his office.  Everything in-house

3   where he only profited.  We're going to show you, ladies and

4   gentlemen, that the defendant was intentionally blind to

5   patients who claimed that they were addicted or just wanted to

6   get off of the opioids.

7        You'll see from time to time the defendant recognized

8   his patients' concerns about addiction but always would return

9   to the high dose opioids.  While this is true, you'll learn

10  that the defendant discharged an addicted patient from time to

11  time, he intended to do so only when a particular patient's

12  drug abuse exposed him outside the office.  And he rarely

13  dismissed cash paying patients.  When he did discharge

14  patients, he discharged them to the street, not to a rehab.

15       The evidence will show that the defendant was

16  motivated by greed, pure greed, money to the detriment of his

17  patients.  You will see the defendant was a drug dealer and not

18  a doctor.  By way of a little background, this case -- the

19  defendant came to the attention of law enforcement in or around

20  March of 2013.  And he came to the attention of law enforcement

21  as a result of someone inside his office who came forward and

22  expressed concerns about things she was observing and things

23  that she was seeing, hearing, smelling.  She's going to come

24  into this courtroom, and she's going to tell you about those

25  observations and those concerns that she had and how she

1  struggled with whether or not she should come forward but she

2  did.  She's going to tell you about some of the things that she

3  just could not keep within her.  She's going to say that the

4  defendant seemed to become more interested in the size of his

5  practice than in rendering legitimate medical care.

6      The defendant was prescribing highly addictive and

7  dangerous opioids in excessive amounts to very young people who

8  showed no signs of needing the drugs and who sometimes traveled

9  hundreds of miles to get the drugs.  Patients were testing hot

10  for street drugs, but the defendant offered -- often ignored

11  that other drug abuse.  The defendant you will see was

12  intentionally blind to that other drug abuse.  Patients were

13  arriving in groups, young people arriving in groups and sharing

14  pills in the parking lots of pharmacies.

15      The defendant was made aware of this, and the

16  defendant didn't seem to care.  This person I'm talking about

17  and another employee will tell you they argued with the

18  defendant, you are turning them into addicts.  The defendant

19  didn't seem to care.  Patients' visits were lasting only long

20  enough for the defendant to write a prescription usually

21  predominantly Oxycodone, prominently Oxycodone 30 milligrams.

22      And the defendant appeared to be disregarding

23  safeguards put in place to prevent abuse and diversion of this

24  very powerful opioid.  Upon receiving this information, the

25  Drug Enforcement Administration started checking their own

1   databases, and others were expressing the concerns about the

2   defendant's excessive prescribing habits.  The DEA learned

3   early on while these concerns were continually expressed to the

4   defendant he disregarded them and continued to prescribe these

5   opioids for no legitimate medical purpose and to people he knew

6   did not need the drugs.

7          So you're going to hear about the DEA investigation

8   which will show you that the defendant was in the business of

9   handing out prescriptions for money and on occasion for sex.

10  You will see that the defendant made a lot of money from his

11  crimes.  The evidence will show you -- you will hear the

12  evidence from a variety of sources.  One of those sources will

13  be a DEA agent who will describe the red flags, if you will, of

14  a doctor operating outside the scope of professional practice.

15         You will learn about the diversion side of the house

16  for the Drug Enforcement Administration that is particularly

17  focused on prescription pills rather than street drugs like

18  cocaine and meth.  You will hear testimony from law enforcement

19  officers who actually conducted searches of the defendant's

20  medical practice and his two residences, and that search

21  occurred -- those searches occurred in January of 2015 which

22  put the defendant out of business in terms of his ability to

23  write prescriptions but as a result sent his already addicted

24  patients to the street looking for pills and looking for

25  heroin.

1     These patients will tell you they tried to find

2  another doctor but no one -- it was hard -- no doctor would see

3  them after knowing the defendant had been their doctor and had

4  been prescribing in that manner.  You will hear about the items

5  seized from the defendant's office and his residences including

6  the more than $1 million in cash concealed in shoe boxes under

7  his bed and in his closet -- more than $1 million in cash in

8  various denominations.  You will hear from the doctor involved

9  in the birth of an opioid addicted baby and from witnesses who

10  will tell you that they pleaded with the defendant not to write

11  that last prescription to the eight-and-a-half-month pregnant

12  mother who gave birth 11 days later to the opioid addicted

13  baby.

14     The evidence will show you that the defendant ignored

15  these pleas and took the position that the woman was not

16  pregnant, she was only getting fat.  And that young woman

17  walked out of the defendant's office that day 11 days prior to

18  giving birth with a prescription for 120 Oxycodone 30

19  milligrams and the defendant didn't seem to care.  You'll hear

20  from the physician who pronounced one of the defendant's

21  victims dead.  You will hear from the victim's husband who will

22  tell you he stood with a folder in his hand that contained

23  information about his wife's complex physical and psychiatric

24  history and asked the defendant if he wanted to look at it in

25  order to understand his wife and understand why she was there.

1 The victim's husband will tell you that the defendant simply
2 waved him off and said next time.  Susan Maack walked out of
3 the defendant's office that day like most patients did with a
4 prescription for 120 Oxycodone pills -- 120 of them after a
5 cursory exam that lasted about 15 minutes.  You'll see there
6 was no next time for Susan because within about 40 hours of
7 getting that prescription filled, that very powerful opioid
8 from the defendant, Susan Maack was dead from an overdose.

9        She overdosed and died from the opioids prescribed to
10 her by the defendant on October 5, 2011.  And we will show you
11 they were prescribed outside the scope of professional practice
12 with no medical legitimacy.  You will also hear from several of
13 the defendant's former patients who will describe for you a
14 variety of harms the defendant's drug dealing brought upon them
15 as evidence of the defendant operating outside the scope of
16 professional practice.

17        Some of them will describe how the defendant never
18 touched them to examine them before immediately writing a
19 prescription for Oxycodone.  Some of them will tell you about
20 inappropriate touching and sex.  Some will talk about how easy
21 it was to get whatever pill you wanted from the defendant as
22 long as you paid.  Some will describe the relationship with the
23 defendant as a business relationship where simply he was their
24 drug source.  You will also hear from an expert in the field of
25 anesthesiology and pain management, Dr. Stephen Thomas.  You

1  will see from Dr. Thomas he's not afraid to call out one of his

2  own.  He'll tell you that in his opinion the defendant's

3  medical practice operated like a drug house and the amount of

4  narcotics he prescribed was striking and without medical

5  legitimacy.

6           Dr. Thomas will tell you and educate you that while

7  there are appropriate uses for opioids like Oxycodone,

8  appropriate distribution of these types of drugs requires

9  appropriate care and supervision and that prescribing these

10  types of drugs at any level, at any dose, requires that a

11  doctor diagnose and treat actual medical conditions.  Dr.

12  Thomas will tell you that if a doctor chooses to treat a

13  legitimate medical condition with an opioid, then one must

14  start low and go slow.

15           To the contrary in this case you will see that the

16  defendant turned this basic tenant, this basic model on its

17  head.  You will see that the defendant, as I said, prescribed

18  immediately -- almost immediately any patient that walked into

19  his office an opioid and a very high dose opioid.

20           Finally, ladies and gentlemen, you will hear from a

21  special agent with the Internal Revenue Service, and you will

22  see that not only did the defendant cheat his patients out of

23  legitimate medical care, he also cheated the United States

24  because you will see that just like a drug dealer, the

25  defendant hid his cash under his bed and not in a bank.  He

1   didn't report that cash to the IRS just like a drug dealer.  So

2   that's why we're here, ladies and gentlemen.  That's an

3   overview of why we're here and why we will be here for the next

4   couple weeks.  You have been selected to carry out a very

5   important duty in our criminal justice system.  We thank you in

6   advance for your service.

7              After you see and heard all the evidence in this

8   case, the government will have another opportunity to stand

9   before you to discuss that evidence.  And at that time, we will

10  be asking you to render the only verdict consistent with the

11  evidence, and that is that the defendant is guilty on all

12  counts.  Thank you.

13             THE COURT:  Thank you, counsel.

14             MR. WEINSTEIN:  May it please the Court, government

15  counsel, ladies and gentlemen of the jury.  After a long day of

16  selecting the jury yesterday, we are here today beginning this

17  trial.  The government just told you what it is they intend to

18  prove.  Without going back over the three pillars of justice,

19  it is their burden to prove each and every word that the

20  assistant U.S. attorney just told you.  Initially I will ask

21  you to hold the government to that burden.

22             Ladies and gentlemen, we are here today defending

23  this case because Dr. Li is guilty of nothing that relates to

24  the federal drug laws.  What this case is, is a runaway train.

25  It began by a phone call and a visit to the Pike County,

42

1  Pennsylvania District Attorney's Office by a disgruntled

2  employee.  Then it just ran and got out of control.  We'll go

3  briefly into some of the issues that were raised by the

4  government.

5          I just want to tell you a little bit about Fuhai Li.

6  You will get to know him today.  You are going to get to know

7  him and his family throughout this trial.  You're also going to

8  hear from him.  So when I asked you to keep your minds open

9  until the entire case was in, I want you to hear from Dr. Li.

10  I want you to decide whether or not the man you listened to did

11  the unthinkable things that were presented by the government

12  today.

13          We will prove to you, show you, Dr. Li was born in

14  1965 in China.  He graduated from Luzhou Medical College in

15  China in July of 1986.  From September of 1986 through July of

16  1992, he was in the radiology -- I want to get it right --

17  Radiology College of China -- I'm sorry.  He was in the

18  radiology residency program and post graduate study program for

19  a master's degree in radiology as well as the West China -- as

20  well as at the West China Medical Center.  He went through his

21  education in China.  He went through his education in China and

22  ultimately became a lecturer in radiology.

23          There will be a lot of talk about MRIs.  You will

24  hear about Dr. Li's knowledge about MRIs.  He was an attending

25  radiologist at West China Medical Center.  After 1994 to 1996,

1  he specialized in neuroradiology.  March of 1996, he came to

2  the University of Massachusetts for stroke research, stroke MRI

3  research.  And he was awarded the National Institute of Health

4  Research Fellowship.  He's published well over 30 publications

5  in prestigious journals regarding stroke, neurology, Annals of

6  Neurology and in the American Journal of Neurology.  He's

7  promoted to research assistant professor at U. Mass.

8             From July 2002 until June of 2003, he was in the

9  internal medicine -- residential medicine -- internal medicine

10 residency program at Saint Vincent Medical Center in

11 Bridgeport, Connecticut, affiliated with Columbia University.

12            From July 2003 until June of 2006 he was in the

13 neurology residency program at Duke University.  He was an

14 attending neurologist concentrating on pain management.  He is

15 certified by the American Board of Psychiatry and Neurology,

16 American Board of Pain Medicine and United Council For

17 Neurological Neuroimaging.  He set up a practice in Milford,

18 Pennsylvania called Neurology and Pain Management.  But, in

19 fact, it was primarily pain management.  I want to tell you a

20 little bit about his practice, about his office.  You'll hear

21 it from him, and you are going to hear it from apparently some

22 agents and some former employees.  His normal daily schedule

23 was approximately 25 patients.  They were designated for 15

24 minutes each.

25            By the way, I heard a comment that some patient was

1  there five minutes.  There was a computer system in that
2  office, which the government has.  That computer system
3  generated a check-in time and check-out time for every single
4  patient, every single one of the roughly 1,800 patients that
5  Dr. Li had.  You will see check-in and check-out time.  You'll
6  see -- I looked at it -- and I didn't see anyone five minutes.
7  You'll be able to see that.
8        He started in his office at 8:30 in the morning,
9  finished around five, went home and did further work.  By the
10  way, he is married.  You may have seen his wife here.  He has
11  two daughters.  He does live in Milford, Pennsylvania.  He did
12  not charge by prescription.  He charged by his service.
13  Fifteen percent -- 15 percent of his patients were self-pay.
14  They didn't have insurance, but 58 percent of his patients were
15  insured.  He dealt with over a hundred insurance carriers in
16  getting payment -- getting paid for his service.  Roughly his
17  fees were -- for initial office visit -- insurance payment was
18  $85 to $300, depending on insurance, and for self-pay patients
19  it was $200.
20        There were follow-up visits.  They were anywhere from
21  $57 to $200 depending on insurance, and self-pay patients were
22  a hundred dollars.  You will hear that the mantra for this
23  practice that Dr. Li followed were in three steps, No. 1,
24  patient care.  Patient care was of primary importance to Dr.
25  Li.  No. 2, he trusted his patients.  Now, I understand this is

1  a very tenuous type of practice.  But he listened to his

2  patients when they came to him.  We'll talk about safeguards as

3  we go a little further.  And by the way, when one goes to a

4  doctor and says, I don't feel well, that prospective patient

5  expects the doctor to trust -- to trust what he says is wrong

6  with him is what he came there to be treated for.  And Dr. Li

7  trusted his patients.  And most importantly or at least equally

8  important, he followed the critical guidelines that are laid

9  out for this practice for the nature of this practice.

10         These are guidelines that are prepared and

11  disseminated by this Federation of State Medical Boards, opioid

12  treatment guidelines for the American Pain Society and the

13  Academy of Pain Medicine.  What you're going to hear as it

14  relates to every one of these patients is exactly the guideline

15  that Dr. Li followed in their treatment.

16         Now, the assistant U.S. attorney talked about this

17  being a drug deal dealing operation, that he abandoned his role

18  as a doctor and replaced it with the role of drug dealer.  I

19  want to remind you with those allegations, with those charges,

20  this is a criminal case, this is not a malpractice case.  This

21  is not a case where perhaps you might find that Dr. Li didn't

22  do a good job, but that's for another forum.  That's for a

23  civil forum with a much lower standard than a criminal case.

24         There's an issue here of money.  There's an issue

25  here where the government says that this entire practice was

46

1  set up to make money, to addict people and then make money,

2  keep them addicted and just make money.  You will find Dr. Li

3  discharged many patients when he found abuse.  You will expect

4  him to do that.  You wouldn't expect him to do it if he was

5  only out for money.  Why discharge an addicted patient?

6  They're the ones who the government says is going to make you

7  rich.

8            You will find he discharged many patients.  You will

9  find that he not only discharged patients, he didn't take

10 patients who called that seemed to be inappropriate.  When I

11 say call, call for an appointment.  Why?  Why would he do that

12 if he was a drug dealer?  Drug dealers don't ask you for a

13 history when you want to purchase drugs.  They don't give you a

14 physical examination when you want to purchase drugs.  They

15 just sell you the drugs.  When you see the time charts for

16 patients -- and you will -- you'll see that every patient was

17 seen appropriately.

18           Certainly a longer visit for the first visit and then

19 for subsequent visits shorter, and he schedules his patients

20 for 15 minutes each.  Now, look back there.  There are all

21 these investigators here.  The Drug Enforcement Administration,

22 they are following this runaway train that started as a result

23 of a phone call from a disgruntled employee, and they do this

24 undercover investigation.  He hands out prescriptions for

25 money, folks.  That's what you were just told.  You're going to

1  see that in this entire operation not one -- not one -- zero
2  undercover agents went into that office and said, I would like
3  a prescription handed out because I am going to give you money.
4  Not one undercover investigator.  If Dr. Li was so liberal
5  handing out prescriptions, how easy would it have been?  How
6  easy would it have been for an undercover agent to go in
7  wearing a wire -- everybody watches television -- hey, doc,
8  here's a couple hundred, how many prescriptions can I get.  How
9  many pills can I get, not a one.

10        We're going to see a parade of, I believe, 24 cases,
11  unfortunately one -- Mrs. Maack -- the assistant U.S. attorney
12  said passed away.  You will see 23 -- or I guess 23 patients.
13  You will see the -- listen to the disgruntled employee.  Yes,
14  Susan Maack came to Dr. Li after having overdosed the week
15  before from opioids -- I'm sorry -- from heroin.  She signed
16  herself out of the hospital, went home, went to see Dr. Li.
17  She got a prescription for Oxycodone 30.

18        A day or two later -- I believe it's a day or two
19  later her husband found her snoring respirations, meaning she
20  was not alert, and he reported that 40 of the pills were
21  missing from the prescription bottle that Dr. Li -- that was a
22  result of Dr. Li's prescription.

23        However, during the investigation, because it was an
24  overdose death by the Pennsylvania State Police, he reported --
25  we will be able to show you this -- that no pills were missing.

1  Her husband had made a mistake.  The pills were moved to

2  another bottle.  And that's the information that the government

3  has laid out clearly in a Pennsylvania State Police report.

4          But this train is now running full speed without an

5  engineer.  Folks, two expert witnesses are going to testify

6  here.  The government has called -- and we will call -- Dr.

7  Stephen Thomas.  Stephen Thomas by his record is an

8  anesthesiologist with a very low history of testifying against

9  doctors for the attorney generals, district attorneys and

10  various other police agencies.  The defense will call Dr. Carol

11  Warfield, a professor in pain management at Harvard University,

12  Harvard Medical School.

13          You know, the expert world -- we will leave it to you

14  guys.  Listen to the experts.  The judge is going to tell you,

15  you judge their credibility the same way you would judge the

16  credibility of any lay witness but because they're experts you

17  are allowed to listen to their opinions, and you are allowed to

18  make your decision based on those opinions and, of course, the

19  findings of the doctors.

20          Finally, you will hear from Dr. Li.  You will get a

21  chance to see the kind of man he is, compassionate man, a man

22  who loves the medical profession, who has spent more than half

23  of his life in training and in practice.  You will hear from

24  some of the other 1,800 patients who would have no life were it

25  not for Dr. Li.  Now, clearly this case has two phases to it,

1  the second phase being the IRS phase, and I -- I would be the

2  first one to tell you that a million dollars in cash -- cash

3  money raises a flag that we all have to look at, just have to.

4  And I'm going to ask you to wait.  That's it.  Don't prejudge

5  that.  Dr. Li has filed an amended tax return because that

6  money was not declared, and you can draw whatever conclusions

7  you have to from that.  You will hear from Dr. Li about that.

8  But he did file an amended tax return.  Lord knows the

9  government has taken enough money from Dr. Li to more than pay

10 for his taxes.

11          So, folks, all of us -- all lawyers say -- especially

12 lawyers who go second say, please wait until all of the

13 evidence is in.  I said it many times, but this is really

14 important because this load of evidence and the cross

15 examination of witnesses is going to be critical, critical in

16 your decision.  So I want to thank you on behalf of Dr. Li and

17 his family and Mr. Ruzzo and myself and thank you for your time

18 and attention.  I am sure whatever decisions you make will be

19 the right ones.  Thank you.

20          THE COURT:  Thank you, counsel.  Call your first

21 witness.

22          MS. OLSHEFSKI:  May we approach, Your Honor?

23          (A discussion was held off the record at sidebar.

24          MS. OLSHEFSKI:  Your Honor, the government calls

25 diversion agent James Hischar.

50

1        JAMES HISCHAR, called as a witness, being duly sworn,

2   testified as follows:

3        MS. OLSHEFSKI:  May I proceed, Your Honor?

4        THE COURT:  You may.

5   DIRECT EXAMINATION

6   ON QUALIFICATIONS

7   BY MS. OLSHEFSKI:

8   Q.   Good morning.

9   A.   Good morning.

10  Q.   Please introduce yourself to the members of the jury.

11  A.   My name is James Hischar.  I'm a diversion investigator

12  with the Drug Enforcement Administration.

13  Q.   Okay.  Agent Hischar, are you operating at the present

14  time in any supervisory capacity?

15  A.   Yes, currently I am the supervisor of the diversion group

16  in Charleston, West Virginia.

17  Q.   How long have you been in that position?

18  A.   Since July last year, so nine months maybe.

19  Q.   Okay.  And the individuals that you supervise, what do

20  they do?

21  A.   They conduct investigations related to diversion of

22  pharmaceuticals.

23  Q.   Prior to being a supervisor of those types of individuals,

24  were you engaged in diversion investigations yourself?

25  A.   Yes, I was diversion investigator assigned to the Scranton

51

1  DEA office for about seven years.

2  Q.   So let's start by you telling the members of the jury how

3  long you've been in law enforcement.

4  A.   Thirty-three years.  1985 I started with the Pennsylvania

5  State Police.  I was a trooper for a little over 25 years.  The

6  first four or so were on the road in uniform.  The next 20 plus

7  were working narcotics undercover.  The last six and a half of

8  those 20 were assigned to DEA full-time as a task force

9  officer.

10  Q.   Okay.  Let's go back to you training as a Pennsylvania

11  State Police officer.  What did that training consist of?

12  A.   Six months in the academy at Hershey which involved

13  learning traffic laws, criminal laws, constitutional law,

14  physical fitness, firearms, swimming -- just a wide variety of

15  things.

16  Q.   And then --

17  A.   How to ride a horse.

18  Q.   Okay.  And then once you became a Pennsylvania State

19  Police officer, I think you said for four years you were in

20  patrol?

21  A.   Yes.

22  Q.   So what did you do for those four years as a patrol

23  officer with the state police?

24  A.   Responded to complaints, traffic accident investigations,

25  criminal investigations.  You did everything when you were on

52

1    the road.

2    Q.    Okay.  And after four years you moved into a different

3    position?

4    A.    Yes, I applied for a position in the narcotics unit and

5    started that in April of 1990.

6    Q.    Did you receive additional training once you transitioned

7    to a narcotics agent?

8    A.    Yes, initially there was -- I can't remember now -- I

9    think two weeks of training.  But throughout my career in

10   narcotics, it was always different trainings on interdiction

11   and methods and motives and of money laundering, smugglers'

12   routes, updates, intelligence on how drug dealers were

13   operating, what the trends were.

14   Q.    How many years did you do that with the police before

15   becoming a task force officer?

16   A.    Fourteen probably.  It's about six and a half full-time

17   task force, but I started working -- DEA did not have a task

18   force in Scranton.  I probably started working with DEA in the

19   U.S. Attorney's Office in about 1995 and in 2000 -- no, 2002

20   DEA expanded, and 2004 I was assigned there full-time.

21   Q.    So give us a sense of what you did day in and day out as a

22   narcotics investigator.

23   A.    I did undercover buys.  You make a lot of arrests, do a

24   lot of search warrants.  You put together conspiracies with

25   groups.  When I went to DEA, it focused more on the higher

1  level dealers.  We would try to link cases here in northeastern

2  Pennsylvania to cases around the world.  You try to follow it

3  up -- it many times would lead to Mexico.  But most of our

4  suppliers here were New York.  So we were tied to New York City

5  cases.  We will work with New York.  New York may already be up

6  on people in Mexico.  It was a lot more involved.  It took a

7  lot longer.

8  Q.   So that -- for the most part you were dealing with street

9  drug dealers, street drugs -- would that be fair to say --

10 during those years?

11 A.   Yes.

12 Q.   What kinds of drugs were you focused -- illicit narcotics

13 were you focused on in that position?

14 A.   Well, started out in the 90s, crack cocaine was big.  That

15 was the majority of your case was cocaine, crack cocaine.

16 Later it became heroin.  And I wasn't aware of the

17 pharmaceutical side of the investigations until I changed jobs.

18 Q.   And so at some point you went to the other side of the

19 house?

20 A.   Yes.

21 Q.   Okay.  So if you can just explain to the members of the

22 jury what the diversion is and how it differs from the DEA

23 criminal investigations.

24 A.   DEA has two sides.  The -- the street drug side doing

25 cocaine, heroin, methamphetamine, those type of designations,

1  which was I was involved in for a long time.  They have a

2  smaller side that regulates the pharmaceutical industry,

3  anything that involves the importation, exportation,

4  manufacture, distribution, dispensing, prescribing, pharmacies,

5  the whole legitimate controlled substance side that -- the

6  pharmaceutical side.

7  Q.   That would be diversion?

8  A.   That's the diversion side.

9  Q.   Okay.  So would that include the selling of prescription

10  pills on the street?  Is that diversion?

11  A.   We -- not really.  We focus on DEA registrants, people

12  registered with the DEA.  Their registration fees pay our

13  salary.  So we are limited to working pharmaceuticals now.  If

14  they had been -- we will work a street sale to try to track

15  that to the legitimate source it came from, the registrant it

16  came from, whether it was diverted out of a manufacturer's

17  warehouse, distributor's warehouse, back to a pharmacy.  Your

18  typical street sale of a pill would fall more to the other

19  side.

20  Q.   So you talked about the DEA registrants.  Who are the DEA

21  registrants?

22  A.   Anyone with -- as I ran through the list, import, export,

23  manufacturing, distribution of a pharmaceutical controlled

24  substance.

25  Q.   When you went to the other side of the house, that is

1  diversion, did you receive additional training?

2  A.    Yes.

3  Q.    Explain to us what that complaining consisted of.

4  A.    Thirteen weeks at the DEA Academy in Quantico, Virginia,

5  and there we were taught the code of federal regulations

6  concerning pharmaceutical narcotics and the regulatory statutes

7  and the criminal statutes and how to apply both, how they

8  intertwine with each other, again going over constitutional

9  law, methods of diversion, things that I wasn't aware of

10 before, a lot of expert speakers, lecturers, doctors,

11 pharmacists, dentists, on how these pills -- legitimate

12 pharmaceuticals are being diverted.

13 Q.    At the core of that training, was your focus on DEA

14 registrants?

15 A.    Yes.

16 Q.    Were you as part of your training educated or schooled on

17 what I will call red flags of those who -- those registrants

18 who are involved in diverting?

19 A.    Yes.

20 Q.    Can you give us an idea of what -- what those red flags

21 are and what you were -- what you learned?

22 A.    There's numerous red flags that kind of apply to different

23 registrants, whether it be a pharmacy, whether it be a doctor,

24 distributor.  In the case of doctors, you have surveillance --

25 a lot of people coming and going, and you have the number of

1    prescriptions they are writing, the dosages, the high dosage,

2    high quantity prescription, and they will explain those --

3    typically the doctor will start with a low dose, and it will

4    increase until a patient has relieved their pain.  So they had

5    us look at charts and graphs and data where a doctor who starts

6    high and stays high and rarely prescribes a low dose is

7    typically what you would see, that being a big flag, the number

8    of young patients, distance the patients are traveling in

9    relation to the area they are in.  If you have someone that

10   lives in a city where there's a thousand doctors and they are

11   traveling a hundred miles to see a doctor, it's odd.  It's

12   suspicious.  It's a flag.

13        You put all these flags together to sort of determine

14   whether you want to look further.  Many times one flag can be

15   explained, but when you have numerous flags there's usually a

16   problem.

17   Q.   When you see red flags such as that, would that from time

18   to time be the basis to take a -- take it a step further to

19   look closer --

20   A.   Yes.

21   Q.   -- at a particular doctor or pharmacist?

22   A.   Yes.  We were trained to look for red flags.  The whole

23   gist of training is how to spot people who are diverting

24   pharmaceuticals, look for these red flags.

25   Q.   Did you receive specific training on what is called

1  trinity prescribing?

2  A.    Yes.

3  Q.    Is trinity prescribing one of the red flags that was part

4  of your training?

5  A.    Yes.

6  Q.    Explain to the members of the jury what trinity

7  prescribing is.

8  A.    On the street the lowest euphoric -- or ultimate high is

9  obtained when a person ingests an opiate, a benzodiazepine and

10 a muscle relaxant.  They call it trinity, holy trinity.  So one

11 of the things we look for when the doctor is prescribing is if

12 he's prescribing these drugs together, opioid such as an

13 Oxycodone, a Benzodiazapine such as Xanax and a muscle relaxer

14 such as Soma or Lorzone.

15 Q.    As a diversion investigator for the years that you

16 indicated you were, did you engage in investigations involving

17 doctors and pharmacies?

18 A.    Yes.

19 Q.    Can you give us an approximate number of times that you

20 participated in those types of investigations?

21 A.    We do constantly do regulatory inspections, and between

22 the typical regulatory inspections -- many times what we are

23 looking is looking for those red flags -- probably 200 or so --

24 and criminal investigations based on complaints, backgrounds

25 that are done on companies when they apply for registrations.

58

1    It's busy.

2    Q.    The investigations that you're talking about as a

3    diversion investigator, where do they take place?

4    A.    Well, originally when I was in Scranton, we covered -- I

5    was there myself two years.  I got a partner for the remainder

6    of the time, and we covered -- we had 19 counties, and then

7    they shifted two to Philadelphia.  So then right now Scranton

8    is responsible for 17 counties in northeast P.A.

9    Q.    And during those investigations, did you use various

10   investigative tools or techniques to assist you in those

11   investigations?

12   A.    Yes.

13   Q.    So have you -- have you used surveillance as a tool to

14   investigate diversion?

15   A.    Yes.

16   Q.    Give us an example of what that would include.

17   A.    Sitting outside of a doctor's office or pharmacy and

18   watching the number of people coming and going, watching the

19   parking lots seeing if groups -- if they are arriving in

20   groups, if they're young, if -- once they come out they are

21   sharing pills, they are selling prescriptions, confirm a lot of

22   things.  I mean, as you sit there, you'll see the typical

23   person and how they transact business, and when you see that

24   thing that's out of ordinary.  That's what you're looking for

25   and a lot of it.

1  Q.    During those investigations, did you use informants to

2  assist you in your investigations?

3  A.    Yes.

4  Q.    How would you use an informant?

5  A.    To debrief informants for a variety of reasons, some of

6  them to participate actively by doing things under our

7  direction. Some of them provide intelligence information.  Some

8  purely give us what is going on on the street, trend

9  information, what's being diverted, what's hot, what's not

10 sought after, why.  You learn a lot -- in training you learn a

11 lot from the street.

12 Q.    During those investigations, did you -- was it important

13 to you to conduct interviews of your targets?

14 A.    Interviewing the target?

15 Q.    Yes.

16 A.    Sometimes depending on the case.  If you had enough other

17 information, there wasn't a real need to go directly to the

18 target.  Sometimes you did go directly to the target and

19 interview them.

20 Q.    And also the -- you talked about pharmacies.  As part of

21 your diversion investigations in the past, have you had the

22 opportunity to interview pharmacists?

23 A.    Yes.

24 Q.    And have you engaged in search warrants?  Have you written

25 search warrants and executed search warrants during those

60

1 diversion investigations?

2 A.    Yes.

3 Q.    Have you obtained and analyzed data related to diversion

4 in the various databases that would be relevant to diversion

5 cases?

6 A.    Yes.

7 Q.    Can you give us an idea just generally of the kind of data

8 that you're used to looking at?

9 A.    We monitor -- the diversion side of DEA monitors every

10 pharmaceutical drug that's made, imported, manufactured, and we

11 -- whatever comes in as it goes through that process from being

12 imported, manufactured, distributed down to the pharmacy -- and

13 the only time it goes outside of that regulated circle is when

14 it is dispensed to the patient.  We don't follow that.  It's in

15 order to keep tight restraints on these drugs.  So we have

16 several databases.  The two most widely used in the

17 investigation is a DEA database called ARCOS.  Distributors,

18 manufacturers have to report all their sales.  So if a

19 manufacturer distributor is supplying a pharmacy and they send

20 them ten bottles of a hundred tabs of Oxycodone 30 milligram,

21 they report it into our database.  So I can look on a computer

22 what pharmacies are purchasing, look for red flags on a

23 pharmacy.  Take an area by zip code.  Wilkes-Barre is 18702.  I

24 can run that zip code or 18702 to broaden it and look at

25 patterns, look for flags.  If you have one pharmacy that is

1  ordering tons of Oxycodone when the rest of the same

2  geographical area are very low, a red flag to look a little

3  further at that pharmacy, maybe to do surveillance, maybe to

4  talk to patients coming out.  Another database we use is run by

5  the state in Pennsylvania, and it's called Pennsylvania

6  Prescription Monitoring Program.

7       That -- the pharmacies are required to report the sale to

8  the patient of controlled drugs.  It used to be only be

9  schedule two.  Now it's all scheduled controlled drugs.  And

10  using that -- use that more often to look at a doctor but

11  sometimes also at a pharmacy.  And that comes in a spreadsheet,

12  and it's easy to sort.  So if we are looking for patterns and

13  red flags, we can sort that spreadsheet by drug or by age of

14  patient, by zip code of a patient.  So we can see people coming

15  from out of the area, distance they are traveling.  We can see

16  a lot of young patients.

17       We can see a lot of one drug, a lot of the maximum

18  strength drug.  Like I said before, the pattern normally is to

19  -- the analogy used by one of the experts is start low, go

20  slow.  So the majority would be prescribed the low milligram,

21  and that slope should go down.  There should be very few people

22  on the highest dose, most of the people in the lower, and some

23  fit in the middle.  So we will pattern that where if we're

24  looking at a doctor, what strengths is he using, how does that

25  slope go, is it going the wrong way where everybody is on a

1  high dose and nobody is on a low dose.  It's very uncommon for

2  that to happen.

3  Q.    Okay.  You indicated that you have engaged in search

4  warrant.  Have you written affidavits?

5  A.    Yes.

6  Q.    Approximately how many times?

7  A.    Thirty-three -- well, yeah, probably 30 years' worth, a

8  couple hundred maybe.

9  Q.    Okay.  Have any -- so you have a good idea of the kind of

10  items that you're searching for when you're executing search

11  warrants in drug and diversion cases?

12  A.    Yes.

13  Q.    Can you give the members of the jury a sense of your

14  experience with executing those warrants and what you would

15  typically find?

16  A.    When you prepare a search warrant, you have to have

17  probable cause for what you're searching for.  You have to be

18  able to tell a judge that's signing it why you expect to find

19  it.  Any drug case we're putting down the drug, the drug

20  involved, we're putting down cash proceeds derived from the

21  sale of the drug, we're putting down records, documents, O.

22  sheets -- if we are doing a business -- diversion and more

23  business oriented, we are putting computer data, computer

24  images, servers.  We image servers, and that would be the

25  record of all of the transactions.

1  Q.    Okay.  You testified that you debriefed a variety of

2  people including doctors, pharmacists.  I believe you said that

3  you -- let me ask you, have you had the opportunity to gain

4  knowledge from people on the street who were dealing in these

5  kinds of drugs?

6  A.    Yes.

7  Q.    Okay.  So you interviewed people you arrest?

8  A.    Yes.

9  Q.    And have you interviewed and debriefed people who

10 illegally use prescription pills?

11 A.    Yes.

12 Q.    Have you interviewed and debriefed individuals who

13 illegally sell prescription pills?

14 A.    Yes.

15 Q.    And as a result of those interviews, have you gained

16 additional insight into how the -- how diversion and those

17 sales of prescription pills occur on the street?

18 A.    Yes.

19 Q.    Have you gained additional insight into any kind of

20 pattern of behavior of those types of defendants dealing with

21 prescription pills?

22 A.    Yes.

23 Q.    You -- have you acted from time to time as an instructor

24 or a teacher for your peers?

25 A.    Yes, I have.

1  Q.   Can you give us a sense of how that has happened and when?

2  A.   I did a couple big cases and was asked by the DEA academy

3  to do presentations on how the case was done, how we

4  investigated it, the tools we used, methods we used and how we

5  were successful.

6  Q.   The audience to whom you gave those presentations, who was

7  the audience?

8  A.   The people in the diversion investigation school.

9  Q.   And, agent Hischar, to you continue to receive education

10  on the subject of diversion in your current capacity?

11  A.   Yes.

12  Q.   Have you testified previously as an expert witness in drug

13  trafficking and drug cases?

14  A.   Yes.

15  Q.   Have you done -- where have you done that?

16  A.   Several county courts and federal court.

17         MS. OLSHEFSKI:  Your Honor, at this time, the

18  government moves to have diversion investigator James Hischar

19  designated as an expert in drug and diversion investigations.

20         THE COURT:  Any voir dire?

21         MR. RUZZO:  A few questions, Your Honor.

22  CROSS EXAMINATION

23  ON QUALIFICATIONS

24  BY MR. RUZZO:

25  Q.   Agent, do you have any medical training?

65

1  A.   No.

2  Q.   Do you have any training as a pharmacist?

3  A.   No.

4  Q.   Any training in statistics?

5  A.   Well, actually to answer all of your questions I said no,

6  I've been in lectures by pharmacists and doctors in how to

7  analyze --

8  Q.   Have you majored in statistics in college?

9  A.   No.

10  Q.   Have you taken any courses in college as a statistician?

11  A.   No.

12        MR. RUZZO:  Within those limitations, I will agree

13  he's an expert investigator drug agent.  But as for him to give

14  opinions about statistics or medicine or medical standards, I'm

15  going to object to anything in that line, Your Honor.

16        THE COURT:  I'm not clear on what you're -- what

17  you're attempting to limit us to.

18        MR. RUZZO:  Providing he doesn't testify as someone

19  trained in pharmacy, someone trained in medicine or statistics

20  --

21        THE COURT:  All right.

22        MR. RUZZO:  I will agree he's a very experienced

23  investigator.

24        THE COURT:  Come to sidebar.

25        (The following discussion occurred at sidebar:)

1            THE COURT:  First of all, why is this an expert?

2            MS. OLSHEFSKI:  He's an expert because he's going to

3    talk about -- diversion is not a subject that is not commonly

4    known, and he can offer insight to the jury.

5            MR. RUZZO:  If it's commonly known, you don't need an

6    expert.

7            MS. OLSHEFSKI:  I said not commonly known.  He can

8    talk about the red flags he's been educated on.  Then he's

9    going to talk about what he saw in this case because he was the

10   lead investigator in this case.

11           THE COURT:  Okay.  All right.  What kind -- no

12   problem with the qualification these red flags and following

13   that.  But are you trying to elicit opinions from him?

14           MS. OLSHEFSKI:  No, not opinions.  He's going to talk

15   about what he would typically see in a diversion case and what

16   he saw here.  So to the extent that there would be an objection

17   to his qualifications to testify about that, I think, you know,

18   it -- it's not unusual to have a law enforcement officer

19   trained in drug trafficking or diversion to testify as an

20   expert.  I am not going to ask him to render an opinion --

21           THE COURT:  I understand the expertise here.  Frankly

22   he's a law enforcement officer who uses certain tools to do

23   what he does just like a policeman does.  You don't bring a

24   policeman here to talk about the force continuum as an expert.

25   It's police training.  He's DEA trained.  I don't get the

1    expert part.  You're not going to have him testify to any

2    opinions?  He can certainly testify about what he did -- you

3    know, what the factors he considers are and so forth.  I don't

4    get it.

5             MS. OLSHEFSKI:  He's also trained, Your Honor -- and

6    I can go back and further question him on his qualifications.

7    He's trained in the drug laws and the identification of certain

8    drugs and Oxycodone and the dosages available on the street and

9    as well as the most desired drugs.

10            THE COURT:  Again, I don't have any problem with

11   that.  That's what he does.  He works for the DEA.

12            MR. RUZZO:  I have no problem saying these drugs are

13   available on the street.

14            MS. OLSHEFSKI:  He's going to testify his experience

15   this is what addicts want.

16            THE COURT:  There's one thing that's troubling this

17   idea of a pattern, he's seeing this pattern over and over and,

18   therefore, this is the same pattern.  Is this going to come up?

19            MS. OLSHEFSKI:  It's the red flags he's been trained.

20            THE COURT:  Red flags are fine.  No problem with

21   that.  Okay.  I don't see any need for me to make a ruling.  I

22   think we will let the man testify.  If you have an objection,

23   object.  At the conclusion of the case, you can ask for an

24   instruction this man was qualified to talk about certain things

25   -- maybe I will approve it, maybe I won't.  It depends on what

1 he testifies, okay.

2         MS. OLSHEFSKI:  One more thing.  The government filed

3 its notice, his ability to speak to the modus operandi.  The

4 case law in our notice to allow an agent such as this to

5 testify as an expert, not to render opinions, but it's an

6 elevation of his status because of his experience and

7 expertise.

8         THE COURT:  I have a problem with that.  I don't

9 think you can ask a policeman on the witness stand, 15 armed

10 robberies, tell me about the typical armed robbery, does this

11 guy fit into the typical armed robbery scenario.  I'm troubled

12 by that.

13         MS. OLSHEFSKI:  It's not unusual in a lot of case law

14 where a DEA agent or other law enforcement officer who has

15 developed an expertise in the modus operandi of drug dealers,

16 tools of the trade, how they operate, to testify because they

17 have expertise in that area.  That's what our --

18         THE COURT:  We are going to break for lunch.  After

19 lunch, give me the case that says that that's the authority.

20 Okay.  Thank you.

21         (The discussion at sidebar concluded.)

22         THE COURT:  All right, members of the jury.  We are

23 going to break for lunch now.  We will come back at an hour and

24 ten minutes.  Let's come back 25 of.  It will be 2, okay.

25 Enjoy your lunch.  Remember not to discuss the case among

1  yourselves or with anyone else.  If anyone tries to speak to

2  you about it, bring it to my attention immediately.  Enjoy your

3  lunch.  We will see you back here at 25 of.

4            (A lunch recess was taken.)

5            THE COURT:  Come to sidebar.

6            (The following discussion occurred at sidebar:)

7            THE COURT:  All right.  I asked Ms. Olshefski to give

8  me authority for the proposition.  Actually she had already

9  filed a notice of intent, and I have all the authority in it.

10 I had not seen it.  It's clear modus operandi evidence, tools

11 of the trade, red flag, all that thing is permitted in the

12 Third Circuit.  So --

13           MR. WEINSTEIN:  It is what it is.

14           THE COURT:  You can proceed as requested.  You

15 examine your witness.  I don't think there's necessity to

16 qualify him as an expert.  You go ahead with your testimony.

17 If you have any objections during the course of it, make them,

18 and I will rule on it.

19           MS. OLSHEFSKI:  Thank you, Judge.

20           (The discussion at sidebar concluded.)

21           MS. OLSHEFSKI:  May I proceed, Your Honor?

22           THE COURT:  You may.

23           JAMES HISCHAR resumed the witness stand.

24 DIRECT EXAMINATION

25 BY MS. OLSHEFSKI:

70

1  Q.    Good afternoon.

2  A.    Good afternoon.

3  Q.    When we concluded before the break, we were talking about

4  your training and experience.  I just want to ask one or two

5  additional questions on that.  Have you received special

6  training and education in the identification of narcotics?

7  A.    Yes.

8  Q.    And have you relied upon that education and training

9  throughout your career?

10  A.    Yes.

11  Q.    And also have you been schooled on the drug laws, both

12  state and federal?

13  A.    Yes, I have.

14  Q.    Have you been schooled on the schedule of drugs?

15  A.    Yes.

16  Q.    And the -- and the rationale behind scheduling drugs?

17  A.    Yes.

18  Q.    Have you relied upon that knowledge as you engaged in your

19  investigation?

20  A.    Yes, I have.

21  Q.    So explain to the members of the jury what -- when we say

22  controlled substances, what are controlled substances and how

23  are they classified?

24  A.    When a substance has a potential for abuse, it's evaluated

25  by FDA, and there's a process that bounces between DEA and FDA

1  where they consider placing it into a schedule, and that is

2  based on whether it has a medical use and the potential for

3  abuse and addiction.  And they classify them from schedule one

4  to a schedule five, five being the highest -- or one being the

5  highest, five being the lowest.

6      All schedule one drugs have no medical use.  That's why

7  they are put into schedule one.  For example, heroin is

8  schedule one.  It has no medical use, and it has a very high

9  potential for abuse and addiction.  As you go down two through

10 five having the abuse, but they then qualify them by the

11 potential for abuse and addiction.  So a schedule two drug is a

12 drug with a medical use legitimate, but it has a very high

13 potential for addiction and abuse.  And it keeps getting lower

14 and lower where a schedule five has a medical use but has a

15 lower potential for abuse or addiction.

16 Q.    When you talk about Oxycodone, what schedule is Oxycodone?

17 A.    Schedule two.

18 Q.    So is there a legal as well as an illegal market for

19 prescription pills?

20 A.    Yes.

21 Q.    Explain what you mean by that to the jury.

22 A.    A lot of the illegal substances have qualities that relate

23 to the legal substances.  Heroin is in a class.  There's no

24 medical use specifically for heroin, but there are synthetics

25 of that that come from the poppy plant, opioids such as

1  Oxycodone that have a medical use.  So -- can you repeat the

2  question one more time?  I forgot where I was going.

3  Q.  Specifically focused on prescription pills, is there both

4  a legal as well as an illegal market for prescription pills?

5  A.  Yes.  Okay.  So the opioids that are prescription and are

6  legal have as much of a market as the illegal ones.  The

7  illegal ones should be harder to get, but in today's society

8  they're not.  And the legal ones with medical use, they have

9  the same qualities.  They cause the same effects.  So there's a

10  black market from pharmaceuticals that have a medical use.

11  Q.  Specifically focused on Oxycodone, have you become

12  familiar with the dosages that Oxycodone is available in?

13  A.  Yes.

14  Q.  And what are they?

15  A.  Oxycodone is an immediate release formulation, and it's

16  available.  It's a generic.  Oxycodone is a generic name.  The

17  brand name it came from was OxyContin -- be careful not to be

18  confused -- OxyContin was redesigned to be an extended release.

19  So there's different strengths available in OxyContin as

20  related to Oxycodone.  Oxycodone is available in 5, 10, 15, 20

21  and 30 milligram.

22  Q.  So you mentioned there's a distinction between those two

23  drugs, OxyContin and Oxycodone, in terms of release.  Explain

24  to the members of the jury what that difference is.

25  A.  OxyContin is an extended release tablet.  It's not as

73

1  sought after on the street because they can't break the

2  formulation into an immediate high -- into an immediate release

3  where they ingest, like, the best part of the pill.  It's time

4  released.  So although there is a market for it, it's not like

5  the immediate release.  That is available in strengths up to 80

6  milligrams.

7  Q.    Immediate release, what is the highest strength available

8  for the immediate release?

9  A.    30 milligrams.

10  Q.    Based upon your training and experience, is it the 30

11  milligram that is demanded on the street?

12  A.    Absolutely.

13  Q.    We talked about your knowledge of trinity prescribing.

14  And you identified certain drugs based upon your training and

15  experience that are associated with trinity prescribing.  Is

16  there a market for trinity prescribing drugs on the street?

17  A.    Yes.

18  Q.    Explain.

19  A.    Value.  Xanax or Benzodiazepines, the street users like to

20  combine with the opiate so they have a street value.  Alone

21  it's lesser, but together it -- it's best used together, same

22  thing with the Soma, which is a muscle relaxer.

23  Q.    If these particular drugs -- these particular pills --

24  prescription pills have -- there's a market for them on the

25  street, do they also have a street value?

74

1  A.    Yes.

2  Q.    And specifically talking about the Oxycodone 30 milligram,

3  do you know what the street value is?

4  A.    Depending on the area, but in general the value runs

5  between 50 cents and one dollar per milligram.  So depending on

6  where you are, how many you're buying, a few variables, 30

7  milligram Oxycodone will go for anywhere from about 15 to 30

8  dollars per pill.

9  Q.    We talked about DEA registrants.  I want to ask you about

10 the term DEA registration.  What does that mean?

11 A.    Anyone who engages in the business involving

12 pharmaceuticals from companies that manufacture them down to

13 doctors and pharmacies have to be registered with DEA in order

14 to handle controlled substances.

15 Q.    And is there a difference between a DEA registration and a

16 license to practice medicine?

17 A.    Yes.

18 Q.    What is that difference?

19 A.    The states regulate the medical licensing, and they have

20 their own boards and processes to approve someone who applies

21 for a state license.  In order to get a DEA registration as a

22 doctor or pharmacist, one of the first things that an applicant

23 would have to prove to us is they were properly and currently

24 licensed in the state in which they practice.

25 Q.    So if someone is already licensed as a medical doctor in a

1  state, what additional steps do they have to take to receive a

2  DEA registration?

3  A.    There's -- in the registration unit, they do a quick

4  background check through DEA to make sure they haven't had any

5  issues with us in the past.  They verified they are currently

6  licensed with the state.  And the license that is issued with

7  corporations and larger manufacturers, importers, exporters, we

8  actually go out and inspect facilities, run backgrounds on

9  corporate officers.  We do a lot more.  But with doctors and

10 pharmacists, it's fairly simple.

11 Q.    So if the doctor has a DEA registration, does that mean

12 that they are permitted to write all schedule drugs?

13 A.    Not necessarily.  Most of the time doctors apply for

14 registration -- there's blocks on the registration for what

15 schedules you would like.  And they -- most doctors check two

16 to five, all the medically used pharmaceutical controlled

17 substances.  If we find a doctor, for instance, that had an

18 addiction problem with an opioid, we may limit him.  We may

19 uncheck schedule two and only allow him to operate on -- with

20 three to fives.

21 Q.    Is there an additional special certification that the DEA

22 requires in the event a doctor wants to treat an addiction?

23 A.    Yes.

24 Q.    With a prescription?

25 A.    With Buprenorphine -- Suboxone is the brand name --

1  doctors can do special training in order to treat addiction at

2  their office.  They have to attend the training and they run

3  that through CSAT, an application, and once CSAT approves it,

4  they notify DEA and we put an X. identifier on their license

5  which allows them to treat opoid addicted people from their

6  office with Buprenorphine.

7  Q.   And any other drugs?

8  A.   No, it's strictly -- well, there's about three -- every

9  company is trying to come out with more.  There is

10 Buprenorphine and Naloxone, Subutex.  I don't want to get into

11 the medical differences why they use them.  But there's reasons

12 why they would use one over another and -- but it's -- it's

13 specific to those drugs.

14 Q.   Regarding this particular defendant, did you have the

15 opportunity to review the DEA registration files to determine

16 whether or not this particular defendant at one time had DEA

17 registration?

18 A.   Yes.

19 Q.   And from your review of those files, did he have a DEA

20 registration to prescribe schedule drugs?

21 A.   Yes.

22 Q.   And did he have that special certification to use

23 narcotics to treat addiction?

24 A.   No, he did not.

25          MS. OLSHEFSKI:  May I approach, Your Honor?

77

1          THE COURT:  You may.

2    BY MS. OLSHEFSKI:

3    Q.    Agent Hischar, I am showing a document marked as

4    Government's Exhibit 55.  Can you please take a look at that

5    tell us if you recognize it?

6    A.    Yes, this is our DEA headquarters certificate of

7    registration which is signed and notarized by the associate

8    chief of the registration program, and it certifies that Dr. Li

9    did hold a DEA registration.

10          MS. OLSHEFSKI:  Your Honor, I move for admission of

11   exhibit 55.

12          MR. WEINSTEIN:  No objection.

13          THE COURT:  Admitted.

14          MS. OLSHEFSKI:  May we publish that, please?

15          MR. WEINSTEIN:  No objection.

16          THE COURT:  You may.

17   BY MS. OLSHEFSKI:

18   Q.    Agent Hischar, do you see that in front of you on the

19   screen?

20   A.    No -- there it is.  Yes.

21   Q.    So this certification of registration history, does it --

22   does it indicate a DEA registration number that was assigned to

23   the defendant?

24   A.    Yes.

25   Q.    And what is that number?

78

1  A.    BL9760794.

2  Q.    Does this document indicate when the defendant obtained

3  his DEA registration?

4  A.    May 23rd, 2006.

5  Q.    At that time at what address was the defendant associated?

6  A.    230 Independence Road, East Stroudsburg, PA.

7  Q.    Does this indicate what schedule of drugs he was permitted

8  to write prescriptions for?

9  A.    Yes, 2, 2N, which I may have to explain, 3, 3N, 4 and 5.

10 Q.    You may explain.

11 A.    The N.s are -- 2N is a non-narcotic.  They are schedule

12 two drugs that are non-narcotic, but they put an "N" after it

13 like amphetamine.

14 Q.    Are DEA registrations -- or doctors or anyone who has

15 obtained a registration, are they required to get it renewed?

16 A.    Yes.

17 Q.    And did this defendant renew his registration?

18 A.    I believe so.  It's every three years, so if he was

19 initially registered in 2006 he, I'm sure, had done several

20 renewals.

21 Q.    The last renewal would be when?

22 A.    April 7th, 2014.  That's the last time he updated it.

23 It's an address change.  The one below is an address change.

24 It doesn't mean it was renewed then.

25 Q.    Does this document indicate when that registration was

79

1  surrendered?

2  A.    Yes, this registration was surrendered for cause and

3  retired from DEA computer system on January 30th, 2015.

4  Q.    Thank you.  I want to talk to you about prescriptions and

5  what valid prescription is.  Are you familiar based upon your

6  training and experience what a valid prescription is under the

7  law?

8  A.    Yes.

9  Q.    And does the controlled substance law actually define what

10  a valid prescription is?

11  A.    Yes, it does.

12  Q.    How does -- and where -- what is the controlled substance

13  law for -- under federal law?  What title is it?

14  A.    Title 21.

15  Q.    And generally what is the subject matter of Title 21?

16  A.    It's the Controlled Substance Act.

17  Q.    How does Title 21 define a valid prescription?

18  A.    As a written for a legitimate medical purpose in the usual

19  course of professional practice.

20  Q.    And as a diversion investigator, are you guided by that

21  definition?

22  A.    Yes.

23  Q.    Getting back to this case, you were the lead diversion

24  investigator in this case?

25  A.    Yes.

80

1   Q.   Do you see Fuhai Li in the courtroom?

2   A.   Yes.

3   Q.   Can you identify him?

4   A.   He's seated on the -- my left side next to counsel with

5   the --

6           MR. RUZZO:  We stipulate, Your Honor.  We will

7   stipulate to the ID.

8           THE COURT:  All right.

9   BY MS. OLSHEFSKI:

10  Q.   Tell the members of the jury when your investigation

11  began.

12  A.   March 5th, 2013.

13  Q.   Where were you assigned at that time?

14  A.   Scranton resident office.

15  Q.   Tell the members of the jury how this case came to your

16  attention.

17  A.   I was contacted by a person who wanted to speak to DEA

18  regarding Dr. Li's prescribing.  I met that person, and we

19  reviewed what he was doing, how he was prescribing.  It raised

20  a lot of red flags.

21          MR. RUZZO:  Objection.  It's hearsay.

22          MS. OLSHEFSKI:  I don't believe he testified to

23  anything that was --

24          THE COURT:  I didn't hear any hearsay.

25          MR. RUZZO:  Some lady said something.  That's

1    hearsay.

2            THE COURT:  I didn't hear about a lady.  He met with

3    somebody.

4            MR. RUZZO:  Somebody.

5            THE COURT:  Well, I didn't hear anything that was

6    objectionable.

7    BY MS. OLSHEFSKI:

8    Q.    Agent Hischar, when the defendant came to your attention

9    by the source you just indicated, had you known the name Fuhai

10   Li before?

11   A.    Yes.

12   Q.    How do you know that name?

13   A.    From pharmacies refusing to fill his prescriptions.

14   Q.    How did you know pharmacies were refusing to fill his

15   prescriptions?

16   A.    One chain in particular would fax us refusal forms and

17   they would -- they had -- the form has blocks according to good

18   faith dispensing rules, and they would have the pharmacist

19   check off why it didn't fit into their good faith dispensing.

20   The pharmacist would fill that sheet out to justify his

21   refusal, and they would fax us a copy.

22   Q.    And when you say us, who are you talking about?

23   A.    DEA.

24   Q.    Okay.  As the diversion investigator in Scranton, did

25   those rejections come to you?

1  A.    Yes, they did.

2  Q.    When they did, what did you do with them?

3  A.    I created a filing system by doctor, and it was another

4  way to track red flags.  If I got one refusal from one doctor

5  in -- at the time 19 counties, it didn't really raise a big red

6  flag.  In this case with Dr. Li there were -- prior to March

7  5th -- at least 16 refusals from one pharmacy, one chain

8  pharmacy.  They were the only ones that notified us directly.

9  There were 16 refusals to fill his prescriptions.

10  Q.    Did you at some point consult that file and retrieve those

11  rejections when you started your investigation?

12  A.    Yes.

13  Q.    And is it fair to say that the investigation -- how long

14  did the investigation take approximately?

15  A.    It took close to two years because it wasn't the only

16  thing we were doing.  We were doing so many other things.  The

17  refusals kept coming, I believe -- I believe close to 40 total,

18  and, like I said, that was just one -- one chain.

19  Q.    Okay.

20          MS. OLSHEFSKI:  May I approach, Your Honor?

21          THE COURT:  Of course.

22  BY MS. OLSHEFSKI:

23  Q.    Agent Hischar, I am showing you a document.  It's

24  Government's Exhibit 28.  Take a look at that document

25  comprised of several pages and tell us if you recognize it.

83

1  A.   Yes, these are the faxes from Walgreen's where they

2  refused to fill the prescriptions.  The form I referred to

3  accompanied a few of them and not all of them -- a lot of the

4  ones in the front just have the prescription and a short

5  written note.  The form they fill out for the good faith in

6  dispensing is on the back.

7          MS. OLSHEFSKI:  Your Honor, at this time I will move

8  for admission of Government's Exhibit No. 28.

9          THE COURT:  Any objection?

10          MR. RUZZO:  No objection, Your Honor.

11          THE COURT:  Admitted.

12  BY MS. OLSHEFSKI:

13  Q.   Okay.  Agent Hischar, you indicated that when you first

14  went to that file to retrieve these what you recall to be

15  rejected scripts as the investigation continued, more came in?

16  A.   Yes.

17  Q.   So did you review these documents before you came into

18  court to testify?

19  A.   Yes.

20  Q.   And approximately how many scripts continued to come in

21  total?

22  A.   I think there were 36 notifications, but some had several

23  prescriptions with them.  So there were about 40.

24  Q.   Okay.

25          MS. OLSHEFSKI:  May we publish Government's Exhibit

84

1  28, please?

2  BY MS. OLSHEFSKI:

3  Q.    So you indicated these were faxed to the DEA in Scranton,

4  correct?

5  A.    Yes.

6  Q.    Were -- were there notes -- notations on the fax cover

7  sheets?

8  A.    Yes.

9  Q.    Can you tell us whether or not there was a dominant reason

10  why these scripts were rejected?

11  A.    Well, predominantly it was -- it did not meet our good

12  faith dispensing policy, there were several other notations

13  about patients, there were notations about the doctor that they

14  keep getting them from the same doctor.

15  Q.    Is there a date range, if you recall, for these scripts?

16  A.    I don't recall a specific date range.

17  Q.    I'll show you the physical exhibit again.

18  A.    I believe it was sometime in 2012.  I saw June of '12.

19  Q.    What was the latest one?

20  A.    I see -- December of '13 may be the latest one.

21  Q.    Okay.  As you flip through those pages, again

22  predominantly what is the drug written for that's being

23  rejected?

24  A.    Oxycodone.  I think it was maybe one or two that had

25  additional drugs with it.

85

1 Q.    Okay.

2 A.    Primarily Oxycodone.

3 Q.    Thank you.  So, now, you mentioned the -- a source came

4 forward and you wanted to meet with that source.  So you did

5 meet with that source?

6 A.    Yes, March 5th.

7 Q.    Is that accurate?  So who was that source?

8 A.    Her name is Samantha Oliveri.  She worked for Dr. Li in

9 his office as a medical assistant.

10 Q.    And did you meet with her?

11 A.    Yes.

12 Q.    Approximately when was the first meeting with Samantha?

13 A.    March 5th, 2013.

14 Q.    At that time, was Samantha still working for the

15 defendant?

16 A.    Yes.

17 Q.    And after meeting that first time with Samantha, did you

18 continue to meet with her?

19 A.    Yes, I did.

20 Q.    What was the purpose of -- generally the purpose of the

21 additional meetings?

22 A.    Obtaining more information.  As she would provide

23 information, I would go back and try to verify what I was being

24 told through analyzing that prescription monitoring program

25 data by looking at the pharmacies that were filling the

1  prescriptions, those numbers, looking at the patients that she

2  told me were arrested, the number of criminal patients that

3  they had, I ran criminal histories on people.

4          MR. RUZZO:  Objection.

5          THE COURT:  Sustained.  The jury should disregard

6  that last testimony.

7  BY MS. OLSHEFSKI:

8  Q.   At some point, did you decide to identify Samantha as an

9  official source of information for the DEA and in particular

10  the case that you were working?

11  A.   Yes.

12  Q.   When did that occur?

13  A.   Probably about a month after my initial meeting with her.

14  Q.   And from time to time in your position as an investigator

15  whether it be before you were a diversion agent or as a

16  diversion investigation agent, have you paid informants or

17  sources of information for their time and expenses?

18  A.   I have before and after the -- usually it's an agent that

19  would actually pay them.  So myself or agent Davis would go

20  together and pay them for their time and expense.

21  Q.   Can you give us a sense of the time period that Samantha

22  was your source of information in this case?

23  A.   About a year and a half -- a year, year and a half.

24  Q.   For most of that period of time or during that period of

25  time was -- did she continue to be an employee of the

87

1  defendant?

2  A.    Yes.

3  Q.    From time to time -- without telling us what was said --

4  from time to time, would you receive calls from Samantha with

5  additional information?

6  A.    Yes.

7  Q.    Would the additional information -- did it ever refer or

8  reference a real time information?

9  A.    Yes.

10 Q.    Approximately how many times over that year and a half did

11 you actually physically meet with Samantha?

12 A.    Six maybe.

13 Q.    Okay.  Approximately?

14 A.    During that time, yeah, I would say about there.

15 Q.    Is it unusual to use a source of information such as

16 someone like Samantha in these types cases?

17 A.    No.

18 Q.    Is it helpful to use someone as a source of information to

19 further an investigation?

20 A.    Absolutely.

21 Q.    Was Samantha helpful in this case?

22 A.    Very helpful.

23 Q.    Did you or do you know whether or not Samantha received a

24 benefit, monetary benefit for the -- for her time and effort in

25 this case?

88

1  A.    Like I said, in order to pay someone for giving us

2  information, we have to go through some DEA paperwork,

3  establish them and because of accounting and everything so we

4  -- about a month after and two or three meetings with her,

5  phone calls, time, we told her -- I don't know if we told her

6  -- we never told her we were going to pay her -- told her we

7  were going to give her money for her time and expenses.  So I

8  think initially myself and agent Davis gave her, like, $500.

9  Q.    Did she receive additional payments after that if you

10  know?

11  A.    Well, after that and during the course of the

12  investigation I met her with my supervisor, Eric Stange, and I

13  gave her $300.  And then after the investigation was done, a

14  while after that, I asked for -- to pay her basically a reward

15  of $2,500, which was approved by DEA, and it was after the case

16  was done and we weren't using her anymore.

17  Q.    Was that after the execution of the search warrants in

18  this case?

19  A.    Yes.

20  Q.    You did mention a little bit earlier the prescription drug

21  monitoring program.  Do you recall?

22  A.    Yes.

23  Q.    I just want to ask you a few more questions about that

24  program.  Can you just explain a little bit more -- you talked

25  about it being data that pharmacies are required to report.  Is

1  that accurate?

2  A.    That's accurate.

3  Q.    Explain to us what they are required to report.

4  A.    At the time Pennsylvania only reported dispensing of

5  schedule two.  It is now all the schedules, two through five.

6  The pharmacy -- normally their computer software is set up to,

7  like, exclude all the other medications they dispense to

8  segregate those that are controlled substances.  And it

9  automatically dumps it into a computer database maintained, I

10  believe, by the Department of Health and the P. A. Attorney

11  General's Office -- I am not sure exactly because they -- the

12  new law -- the Department of Health holds the three to five,

13  the attorney general has access to the two, but I am not sure

14  if they maintain it or if they get it from the Department of

15  Health.  I just know the authorities.  I don't know who

16  maintains it, but the State of Pennsylvania maintains it.

17  Q.    Are pharmacies required to do that under the law?

18  A.    Yes.

19  Q.    And when I say do that, report that information?

20  A.    Yes.

21  Q.    What -- they are reporting exactly what?

22  A.    The prescription that they issued to a patient if it's a

23  controlled substance.

24  Q.    So the -- I will refer to it as PMP data, prescription

25  monitoring program data.  If you go to -- are you just seeing

1  the drug, or are you seeing more?

2  A.    No, you are able to see the patient name, the date of the

3  prescription that's written, date it was filled, the doctor who

4  wrote it, the pharmacy who filled it, the name of the

5  medication, the strength and the quantity.

6  Q.    Okay.  Does the PMP data also indicate the duration of

7  time that a particular drug or -- that's being prescribed for a

8  particular patient?

9  A.    Yes, how many day supply.

10  Q.    And as a diversion investigator, are you able to secure

11  that data in order to use it for your investigation?

12  A.    Yes.

13  Q.    In fact, how important is PMP data to a diversion

14  investigator?

15  A.    Very.  It's a very, very important tool.

16  Q.    And have you used it in your duties as a diversion

17  investigator?

18  A.    All the time.

19  Q.    Did you take steps in this case to secure PMP data?

20  A.    Yes.

21  Q.    And specifically relevant to the defendant, Fuhai Li?

22  A.    Yes.

23  Q.    So you indicate you're talking about Pennsylvania.  But

24  does New York have a similar kind of prescription monitoring

25  program?

1   A.   Yes, almost every -- I think every state now has it.

2   Q.   Okay.  So when you took the steps to secure this data in

3   this case, did you seek data from other states besides

4   Pennsylvania?

5   A.   Yes.

6   Q.   What other states?

7   A.   New Jersey and New York because where Milford is located

8   in the tri-state area.

9   Q.   Once those records -- how do they come to you when you --

10  when you reach out to these states to get this data, how does

11  that data come to you?

12  A.   Pennsylvania -- they normally just e-mail me a spreadsheet

13  with all of the data.  New York, New Jersey I believe sent CDs.

14  Q.   The CDs, were they in some spreadsheet format?

15  A.   Yes.

16  Q.   How voluminous is this data typically?

17  A.   Very.  It -- depending on the doctor -- I mean, depends on

18  the doctor.  If you do -- we can query -- ask for a pharmacy

19  profile if we are looking at a pharmacy.  We can ask for a

20  doctor profile.  And the way they run it if we ask for a

21  doctor, it will give you every prescription from every pharmacy

22  in Pennsylvania, say, that was dumped into their system where

23  the prescription was written by a particular doctor.  If we are

24  doing a pharmacy case, we will do a pharmacy profile.

25       If we have complaints or information about a doctor

92

1  shopper or a patient is seeing multiple doctors and filling

2  multiple prescriptions, we will do a patient profile.  That way

3  we can -- we look at one patient and we see that -- the one

4  case, I believe, the guy saw 92 different doctors and went to

5  over well over a hundred pharmacies -- just the way we work

6  individual cases, different ways to query those spreadsheets.

7  Q.    In this case when you reached out to Pennsylvania, New

8  York and New Jersey, did you only reach out for data regarding

9  prescriptions written by the defendant?

10  A.    Yes.

11            MS. OLSHEFSKI:  May I approach, Your Honor?

12            THE COURT:  Sure.

13  BY MS. OLSHEFSKI:

14  Q.    Agent Hischar, this is a DVD marked as Government's

15  Exhibit 56.  Can you please take a look at that and tell us if

16  you recognize it?

17  A.    Yes.

18  Q.    How do you recognize it?

19  A.    Because my initials are on it.  It says PMP data.  This is

20  a compilation all of Pennsylvania, New York and New Jersey

21  monitoring program of prescriptions for Dr. Li together on one

22  disk.

23  Q.    Is it in spreadsheet format?

24  A.    Yes.

25  Q.    With lines?

93

1  A.   Yes.

2  Q.   Prior to coming to court today, did you open it and look

3  at it?

4  A.   Yes.

5  Q.   How many -- any estimates how many lines we are talking

6  about in that data?

7  A.   I think over 29,000.

8          MS. OLSHEFSKI:  Your Honor, I move for admission of

9  Government's Exhibit 56.

10         THE COURT:  Any objection?

11         MR. RUZZO:  No, Your Honor.

12         THE COURT:  Admitted.

13 BY MS. OLSHEFSKI:

14 Q.   So you use this PMP data in the manner you just described.

15 Are you able to sort through the spreadsheets to query

16 different things that you're interested in such as age,

17 location?

18 A.   Yes.

19 Q.   Did you do that in this case?

20 A.   Yes.

21 Q.   Did you -- let me just back up.  The date range for this

22 data on this DVD is what?

23 A.   Well, I initialed it.  My first query was March 5th of

24 2013, but I think I queried two years prior data, so it was

25 2011.  And as the case kept going, I kept making additional

1  queries, so it should include data from around January 2011 to

2  January 2015 roughly -- or November 2015, December.  That's

3  about when I got the search warrant ready.

4  Q.    Did you manipulate the spreadsheets and do sorts that you

5  talked about the with the data that's on Government's Exhibit

6  56?

7  A.    Yes.

8  Q.    So were you interested in sorting that PMP data by age?

9  A.    Yes.  That was one of the --

10 Q.    Is the age of a patient receiving high dose opioids an

11 area of interest for you as a diversion investigator?

12 A.    Yes, it's one of the red flags.

13 Q.    When you queried the PMP data for the prescriptions

14 written by the defendant by age, did anything catch your

15 attention?

16 A.    Yes, there were a number of young patients that were

17 getting maximum strength in high quantities of Oxycodone.

18 Q.    And the duration of time that those people -- those young

19 people were receiving these high doses, did you make note of

20 that?

21 A.    Yes, there were some getting them for years, which is

22 uncommon.

23 Q.    Did you make note of the primary drug that is being

24 distributed by the defendant according to the PMP?

25 A.    Yes, the Oxycodone.

1  Q.    Did you make note of the predominant dose of Oxycodone?

2  A.    Yes, Oxycodone 30 milligram.

3  Q.    In addition to the dose, was -- did you take note of the

4  quantities of that dose per prescription?

5  A.    Yes, high quantities.

6  Q.    And what do you consider -- when you say high, what are

7  you talking about?

8  A.    Most prescriptions I looked at in the past -- not

9  necessarily Oxycodone, but just about everything is written for

10 30, 60 or 90 just because there's 30 days in a month normally

11 and if it's one a day, it's 30 to a day, three a day.  When you

12 start getting up over 90, it starts to appear out of place, not

13 that it's uncommon to have a few people in the 120 range, but

14 it's very uncommon, very unlikely to have everybody in a 120,

15 150.  I saw amounts as high as 480 doses of Methadone.

16 Q.    You talked about the obligation by law of pharmacies to

17 report this information to Pennsylvania and to New York and New

18 Jersey.  In your investigation, did you learn that one

19 particular pharmacy failed to report?

20 A.    Yes.

21 Q.    And what pharmacy was that?

22 A.    Aliton's.

23 Q.    How did you find that out, and what did you find out?

24 A.    When I was adding numbers and sorting spreadsheets, I

25 checked with our other system ARCOS to see what the

1  distributors were sending to local pharmacies, how much -- how

2  many pills they were sending.  And when I queried this Aliton's

3  pharmacy, it only came up with 13,000 pills, and it didn't seem

4  right.  I did additional checks and found that the distributor

5  had not reported to ARCOS on some of the pills, and then action

6  was taken against them.  I did a pharmacy profile through the

7  PMP on Aliton's.  They had dispensed, I think, over 200,000

8  pills, and they had only reported 200,000.  And as I went

9  through the date ranges, there were ten months of data missing

10  from that where Aliton's did not report to the PMP.

11  Q.   So in effect, the data that is included on Government's

12  Exhibit 56 is ten months shy of Aliton's data?

13  A.   Yes.

14  Q.   For the defendant's prescriptions?

15  A.   Yes.  Well, for all prescriptions.

16  Q.   For all prescriptions, okay.  Thank you.  One of the red

17  flags you talked about was distance, the distance patients

18  travel to the defendant's or any physician office.  As you were

19  sorting through the PMP data in this case, was there anything

20  about the distance that caught your attention?

21  A.   Yes, there were addresses in Connecticut, New Jersey, New

22  York, I think South Carolina.  There were a few multi-states in

23  there.  New Jersey and New York would be typical because where

24  he's located.  I looked further at the addresses.  Some were

25  New York City.  New Jersey -- there was a group of young

97

1  individuals from central New Jersey down in the Trenton,

2  Hamilton, Ewing, down in that area.

3  Q.   Those individuals that you identified, did you at some

4  point determine that -- did you -- were you able to determine

5  the frequency with which they traveled to the defendant's

6  office from New Jersey?

7  A.   Yes.

8  Q.   With what frequency?

9  A.   At least monthly.  Some were every two weeks.  Some were

10  every month.  They were all getting high quantities of

11  Oxycodone 30 milligram.

12  Q.   In order to advance your investigation, did you -- did you

13  query a particular address to see what the distance was for a

14  particular patient?

15  A.   Yes.

16  Q.   What patient was that?

17  A.   I believe that was Jared Stemetzki.

18  Q.   Where did Jared Stemetzki reside?

19  A.   I think it was Robeling, New Jersey.

20  Q.   Did you print out a Google map in order to demonstrate the

21  distance in miles and travel time from New Jersey?

22  A.   Yes.

23          MS. OLSHEFSKI:  May I approach, Your Honor?

24          THE COURT:  You don't have to ask.

25          MS. OLSHEFSKI:  Thank you.

98

1  BY MS. OLSHEFSKI:

2  Q.    I am showing you Government's Exhibit 37.  Do you

3  recognize that?

4  A.    Yes.

5  Q.    And what is that?

6  A.    That's a Google map printout of the directions basically

7  from Roebling, New Jersey to Milford, Pennsylvania.

8  Q.    You indicated that was an address or location where Jared

9  Stemetzki resided.

10  A.    Yes.

11  Q.    During the course of your investigation, did you learn

12  that Jared had a brother?

13  A.    Yes.

14  Q.    And what is Jared's brother's name?

15  A.    Joel Stemetzki.

16  Q.    Where did Joel Stemetzki live at the time -- well, was

17  Joel Stemetzki a patient of the defendant?

18  A.    Yes, he was also a patient.

19  Q.    Where did he reside at the time that he was a patient of

20  the defendant?

21  A.    In that area.  I can't remember the names of all of the

22  towns.

23  Q.    So does that map indicate Roebling, New Jersey?

24  A.    Yes, this is from Roebling.

25  Q.    Does it indicate the distance in miles from Roebling, New

1  Jersey to Milford, Pennsylvania?

2  A.    Yes.

3  Q.    How many miles?

4  A.    The quickest route is 119 miles, and the shortest route is

5  107.7 miles.

6  Q.    Does that also --

7           MS. OLSHEFSKI:  Well, I move for admission of

8  Government's Exhibit 37.

9           THE COURT:  Any objection?

10          MR. RUZZO:  No.

11          THE COURT:  Admitted.

12          MS. OLSHEFSKI:  May we publish this, please?

13  BY MS. OLSHEFSKI:

14  Q.    You have that in front of you.  And so now the jury can

15  actually look at it as you're describing it.  What is the --

16  does this map indicate the travel time that it would take to

17  travel from Roebling, New Jersey to Milford, Pennsylvania?

18  A.    Yes, one way quickest quest route is 2 hours, 13 minutes.

19  Q.    One way?

20  A.    One way.

21  Q.    Okay.  And I note on the note map -- I see Allentown, New

22  York and -- did you have an opportunity to try to determine how

23  many doctors would -- if you Google pain management, were you

24  able to determine how many pain management doctors would be

25  along that route?

1  A.    I did a Google search.  Basically the biggest city in the

2  Roebling area and in -- there were many patients from that area

3  around Trenton -- small town -- Roebling, Hamilton, Ewing, West

4  Trenton -- so I used Trenton as a base and Googled pain

5  management, and I came up with over a thousand hits.  Trenton

6  is fairly close to Philadelphia, Bucks County, very populus

7  area, one with a lot of doctors.  It was over a thousand hits

8  on pain management doctors for Trenton.  It didn't go as far as

9  New York.  It basically included Trenton down to probably

10  around Philadelphia.

11  Q.    Okay.  Thank you.  You talked about Jared Stemetzki and

12  Joel Stemetzki as being from that area.  Did you come to learn

13  that other of Dr. Li's patients were also from around that

14  area?

15  A.    Yes.

16  Q.    From the PMP data, were you interested in whether or not a

17  patient used one or more -- one or more pharmacies to fill

18  their scripts?

19  A.    Yes.

20  Q.    Why were you interested in that?

21  A.    Well, several reasons.  They -- a person getting these

22  high amounts and pharmacists' suspicions and refusals, patients

23  would have to go to different pharmacies to fill the

24  prescriptions until they found one that would actually fill

25  them.

1  Q.    And did you make note of that in the PMP data you

2  received?

3  A.    Yes, there were many pharmacies used.

4  Q.    Getting back to the trinity prescribing, is the PMP data

5  -- does it provide you with evidence of trinity prescribing to

6  one patient?

7  A.    New York and New Jersey did, but at this -- the time of

8  this investigation because the Benzodiazapine and the muscle

9  relaxer were schedule four, they weren't schedule two,

10 Pennsylvania didn't record that.  So one of the ways I found a

11 lot of the trinity prescribing information was to subpoena Rite

12 Aid Corporation and get their original documents in -- right

13 from Rite Aid which listed all of the schedule three, four and

14 five.

15 Q.    Did you see that combination frequently?

16 A.    Yes.

17 Q.    I just want to talk about ARCOS again.  Explain to the

18 members of the jury -- you were talking about PMP, which was

19 pharmacies recording.  Explain to us is -- what ARCOS is and

20 who runs ARCOS.

21 A.    DEA runs ARCOS.  And like I explained before,

22 manufacturers report to ARCOS.  Distributors report to ARCOS.

23 It goes down to the pharmacy level, and it stops, who is

24 dispensed, who was not recorded, the states are doing with that

25 with PMP.  But I can see how much a pharmacy has ordered.  The

1  most common query I would make is what is a pharmacy ordering.

2  So I looked at the pharmacies in the area.  And Dr. Li opened

3  his practice August of 2010.  And I looked at several

4  pharmacies located near his office and saw a spike in the

5  Oxycodone orders almost tripling in every case.

6  Q.   Okay.  Can you identify some of the pharmacies that --

7  pharmacy chains that you queried?

8  A.   Rite Aid, Wal-Mart, Medicine Shoppe, later on Aliton's.

9  Q.   And did you take steps to retrieve that ARCOS data similar

10  to the PMP data?

11  A.   Yes.

12  Q.   Now, did -- as your investigation continued over the time

13  period that you indicated, did you interview various witnesses?

14  A.   Yes.

15  Q.   Did you interview pharmacists?

16  A.   Yes.

17  Q.   And did you use the PMP data to identify the defendant's

18  patients?

19  A.   Yes.

20  Q.   And did you reach out and interview some of those

21  patients?

22  A.   Yes, many.

23  Q.   And when I say you, do you have other law enforcement

24  officers working with you to assist you?

25  A.   Yes, myself and investigator Calavini and agent Bill

1  Davis.

2  Q.    And during this -- your investigation, did you consult

3  with any medical professionals for review of any of the

4  documentation you were receiving or for any education on what

5  you were receiving?

6  A.    Yes, I spoke to Dr. Stephen Thomas.  We spoke about the

7  case.  I asked him if he would review what I had so far with

8  the pharmacy spikes in the area, the PMP data, the trinity

9  prescribing, and he agreed to look at it and render his expert

10  opinion on what was occurring.

11  Q.    Okay.  Did you receive initially some kind of preliminary

12  report from Dr. Thomas?

13  A.    Yes.

14  Q.    And then additional reports followed?

15  A.    Yes.

16  Q.    At the same time that the diversion investigation is

17  moving forward, at some point is there a financial side to this

18  investigation?

19  A.    Yes, most drug cases we are looking at finances.  The

20  whole reason to get involved in selling drugs is to make money.

21  So we started doing a financial investigation to try to find

22  out where all this money was going.

23  Q.    What did you do to secure information?

24  A.    Subpoenaed banks, bank records, statements, and I also

25  enlisted the help -- in Philadelphia we have a financial unit.

104

1  That is all they do is assist in investigations by looking at

2  finances.

3  Q.    Did you do -- did you secure information about the

4  defendant's bank accounts?

5  A.    Yes.

6  Q.    Do you recall how many bank accounts the -- that you --

7  that you actually sought to retrieve information for?

8  A.    I believe it was six.

9  Q.    Were you interested in any of the properties the defendant

10  owned at this time?

11  A.    Yes.

12  Q.    Did you take steps to secure documentation related to

13  those properties?

14  A.    Yes.

15  Q.    What was your interest in doing that?

16  A.    To look at the money laundering aspect of the case and see

17  if people spend the money they make, to see if he was buying

18  the properties, how he was paying for them, whether he was

19  paying cash.  So I obtained documents from the courthouses the

20  deeds, two houses and a business and a mortgage information and

21  found that they were all paid off.

22  Q.    Did you also learn the manner in which they were paid off

23  or purchased?

24  A.    Yes, there were -- one or two were paid straight up cash.

25  The house in East Stroudsburg, there was a large wire transfer.

105

1    I believe it was over $350,000 in one wire transfer to pay off

2    the mortgage on that.

3    Q.    Okay.  You secured the documents related to those

4    properties?

5    A.    Yes.

6    Q.    Now, as the investigation continued, are you constantly

7    monitoring those bank accounts?

8    A.    Yes.

9    Q.    Was there any particular reason why you were doing that in

10   this case?

11   A.    Well, the financial unit did most of that.  My interest

12   was because of information about a lot of cash payers, which

13   was another red flag is I was interested to see if there were

14   cash deposits being made into any of the bank accounts and

15   found there was not much, not that a -- the amounts that we

16   believe he was taking in.

17   Q.    I want to direct your attention now to January of 2015.

18   Did you seek and obtain a search warrant relevant to this case

19   in January of 2015?

20   A.    Yes.

21   Q.    What locations were targeted for those warrants?

22   A.    His practice at 200 Third Street in Milford, residence in

23   Milford and residence in East Stroudsburg.

24   Q.    Three locations?

25   A.    Yes.

1  Q.    What date in January were those search warrants executed?

2  A.    January 29th, 2015.

3  Q.    Did you participate in those -- the execution of those

4  search warrants?

5  A.    Yes.

6  Q.    Were the search warrants at those locations executed

7  simultaneously?

8  A.    Yes.

9  Q.    Just so we're clear, the three properties, which one is

10 the defendant's medical practice?

11 A.    200 Third Street, Milford.

12 Q.    And the -- you already mentioned a house in East

13 Stroudsburg?

14 A.    Yes.

15 Q.    Was that one of the targets for the search warrant?

16 A.    Yes.

17 Q.    And what was the third one?

18 A.    It was a town home that Dr. Li owned in Milford.

19 Q.    In order to obtain search warrants for properties such as

20 that, are you required -- or is your practice to attach

21 photographs of the properties that you're seeking to search?

22 A.    Yes, we have to list the description of the property, and

23 we always attach a photo so there's no mistaking which house

24 you're searching.

25 Q.    Did you do that in this case?

107

1  A.    Yes, I did.

2  Q.    I am showing you Government's Exhibit 30.1, 30.2 and 30.3.

3  Can you identify those exhibits?

4  A.    30.1 is the house in East Stroudsburg, 146 -- I think --

5  Rising Meadow Lane.  30.2 is his practice, 200 Third Street,

6  and 30.3 is the town home in Milford Landing.

7          MS. OLSHEFSKI:  Your Honor, I move for admission of

8  exhibits 30.1, 30.2 and 30.3.

9          MR. RUZZO:  No objection, Your Honor.

10          THE COURT:  Admitted.

11  BY MS. OLSHEFSKI:

12  Q.    During the course of your investigation, did you learn

13  where the defendant resided during the week, weekdays?

14  A.    Yes.

15  Q.    What did you learn?

16  A.    I learned that he resided during the week in the Milford

17  town home nearest to his practice and he utilized this home in

18  East Stroudsburg normally on the weekends.

19  Q.    Okay.  So on the screen in front of you is Government's

20  Exhibit 30.1.  Please identify to the jurors what they are

21  looking at.

22  A.    That is the -- what I consider the weekend home of Dr. Li

23  in an exclusive development in East Stroudsburg, Marshall's

24  Creek, that area, East Stroudsburg mailing address.

25  Q.    Was that location searched on January 29th, 2015?

1  A.    Yes.

2  Q.    Go to the next one, please.  What are the members of the

3  jury looking at now?

4  A.    That is the medical practice, 200 Third Street, remodeled

5  cedar shake shingle home that was turned into a medical

6  practice.

7  Q.    Is that the property that was searched on -- as the

8  defendant's medical practice January 29th, 2015?

9  A.    Yes, it is.

10  Q.    And please go to 30.3.  What are we looking at there?

11  A.    That's the town home in Milford.  I believe it's 4005

12  Milford Landing Way.

13  Q.    And, again, this is a residence you described where the

14  defendant resided during the week?

15  A.    Yes.

16  Q.    And this is a residence that was searched?

17  A.    Yes, it is.

18  Q.    Okay.  Thank you.  At the time that you sought and

19  obtained a search warrant -- search warrants for these

20  locations, did you know whether or not the defendant maintained

21  paper or electronic medical files?

22  A.    We believed it was electronic medical files.

23  Q.    So knowing that going into execute those -- were you

24  interested in obtaining medical records?

25  A.    Yes.

1  Q.    So did you have to take steps to secure electronic medical

2  records?

3  A.    Yes.   In order not to interrupt a business if they have --

4  using computers -- and in a doctor's case electronic medical

5  records, and everything is contained on the computers. We have

6  a digital forensic laboratory in Virginia.   They send teams out

7  to image these computers on site.   So we only have to shut the

8  business down for a minimum amount of time until an imaging can

9  be done of that computer or server.   If the search warrant

10 specifically asks to search for data contained on all

11 electronic devices, tablets, computers, servers, so a team was

12 sent from Virginia to image all computers we found in all three

13 locations.

14 Q.    In addition to knowing that the defendant maintained

15 electronic medical records electronically, did you know the

16 name of the program he used?

17 A.    Yes, eClinical.

18 Q.    eClinical, does it have medical records in addition to

19 something else?

20 A.    Yes, multi-function software.   It's designed for doctors'

21 offices, contains medical records with all kind of tabs.   You

22 have tabs for urine drug screen, toxicology.   You have tabs and

23 files to put test results, diagnostics, prior medical records.

24 There's all kind of folders in it.   It also as a billing tab to

25 keep track of what patients paid, how much they owe.

1  Q.    So when you have a situation where you have people from --

2  a team from DEA coming to a location to image electronics, at

3  some point did you obtain an image of what they seized?

4  A.    Yes, they imaged the computers and his server on January

5  29th.  We take those images.  We put them into evidence.  We

6  ship them to Virginia, and they -- I don't understand all the

7  technical terms -- stand it up in the lab and then they created

8  a copy for me to work off of.

9  Q.    Is it a mirror image?

10 A.    It's a mirror image of exactly what he has.  So when I use

11 my work copy and start the computer up, it gets out of your

12 typical Windows screen, and I am looking at the screen Dr. Li

13 would see with all of his programs, anything he had on his

14 computer.  It's virtually like sitting at his computer.  So

15 everything that was on the computer I can get, look at or get

16 to.

17 Q.    So you said that in addition to -- this team imaged all

18 electronics --

19 A.    Yes.

20 Q.    -- that were at the locations that were searched, correct?

21 A.    Yes.

22 Q.    Do you -- do you know whether or not in addition to

23 eClinical the defendant at his medical office had another

24 bookkeeping software program?

25 A.    Yes, I believe it was on a laptop that was upstairs to his

111

1   practice.   There was a copy -- or there was a program of one of

2   the computers with Quick Books.

3   Q.   So when you were provided with your working copy from the

4   DEA as you described, did that -- were you also provided with

5   the Quick Books that were seized on January 29, 2015?

6   A.   Yes, a copy of everything that was on the computers at

7   that time.

8   Q.   When were you provided with it, was it provided -- how was

9   it provided to you?

10   A.   It was a copy of a hard drive.

11   Q.   I'm showing you Government's Exhibit 31.  Do you recognize

12   Government's Exhibit 31?

13   A.   Yes.

14   Q.   What is that?

15   A.   A one terabyte CD, portable hard drive, and it contains

16   the exhibits -- our exhibits 19, 28, 29, 30, 31.  They were all

17   the computers that were located at all residences.  So it's a

18   mirror image of all the computers are on this portable hard

19   drive.

20   Q.   So Government's Exhibit 31 contains a mirror image of the

21   defendant's eClinical?

22   A.   Yes.

23   Q.   And the Quick Books program seized from the laptop that

24   you indicated was upstairs in the office --

25   A.   Yes.

112

1  Q.    -- that's also included on this hard drive?

2  A.    Yes, it is.

3  Q.    Okay.

4          MS. OLSHEFSKI:  Your Honor, I move for admission of

5  Government's Exhibit 31.

6          MR. RUZZO:  No objection.

7          THE COURT:  No objection?

8          MR. WEINSTEIN:  No objection, Your Honor.

9          THE COURT:  Admitted.

10 BY MS. OLSHEFSKI:

11 Q.    Just to be clear, this -- the billing -- the billing and

12 receipts of eClinical that you talked about was part of

13 eClinical, that's included on here as well, correct?

14 A.    Yes.

15 Q.    Okay.  So at some point, agent Hischar, we have this

16 electronic image.  But did it become necessary to physically

17 print out certain patient files that you were interested in

18 having hard copies for?

19 A.    Yes.

20 Q.    And did you do that?

21 A.    Yes.

22 Q.    Do you have an approximate number of files that were

23 printed out for purposes of this trial?

24 A.    Approximately 40.

25          MS. OLSHEFSKI:  Your Honor, at this moment I need to

113

 1  have some boxes brought forward.

 2              THE COURT:  That's fine.

 3              MS. OLSHEFSKI:  Your Honor, may I ask the witness to

 4  step down to identify additional exhibits?

 5              THE COURT:  Sure.

 6  BY MS. OLSHEFSKI:

 7  Q.   Agent Hischar, do you recognize what's in the three boxes

 8  that are in front of you generally?

 9  A.   Yes.

10  Q.   Okay.  Do you see Government's Exhibit No. 1?

11  A.   Yes.

12  Q.   What is Government's Exhibit No. 1?

13  A.   Printed out patient file for Lindsay Dwyer.

14  Q.   Next -- so we are clear, this is the medical record that

15  was retrieved from the defendant's?

16  A.   Electronic file.

17  Q.   Just the printed version?

18  A.   Yes.

19  Q.   Okay.  What is -- do you see Government's Exhibit No. 2?

20  A.   Yes.

21  Q.   What is it?

22  A.   The medical file of Rachel Scarpa.

23  Q.   Keep your voice up, please.  Do you see Government's

24  Exhibit No. 3?

25  A.   Yes.

114

1   Q.   What is it?

2   A.   The medical file of Judy Smith.

3   Q.   Government's Exhibit No. 4?

4   A.   The medical file of Jared Stemetzki.

5   Q.   Okay.  Government's Exhibit No. 5?

6   A.   Medical file of Richard Trembula.

7   Q.   Government's Exhibit No. 6?

8   A.   Medical file of Lucas Brown.

9   Q.   Government's Exhibit No. 7?

10  A.   Medical file of Tameka Davis.

11  Q.   Government's Exhibit No. 8.

12  A.   Medical file of Joel Stemetzki.

13  Q.   Government's Exhibit No. 9.

14  A.   The medical file of Nicole Tintel.

15  Q.   Government's Exhibit No. 10?

16  A.   Medical file of Anthony Abuiso.

17  Q.   Government's Exhibit No. 11?

18  A.   The medical file of Michael Abuiso.

19  Q.   Government's Exhibit No. 12.

20  A.   Medical file of Stephanie Abuiso.

21  Q.   Government's Exhibit 14?

22  A.   Medical file of Amber Vanluvender.

23  Q.   Government's Exhibit No. 15?

24  A.   Medical file of Christy Vanluvender.

25  Q.   Government's Exhibit No. 16?

1   A.   Medical file of Eric Correa.

2   Q.   Government's Exhibit 17?

3   A.   Medical file of Shawn Hicks.

4   Q.   Government's Exhibit 18.

5   A.   Medical file of Kevin Merick.

6   Q.   Government's Exhibit 19.

7   A.   Medical file of Heidi Messer.

8   Q.   Government's Exhibit 20.

9   A.   Medical file of Karen Koeppel.

10  Q.   Government's Exhibit 21.

11  A.   Medical file of Kenneth Phillips.

12  Q.   Government's Exhibit 22.

13  A.   Medical file of Suzanne Watson.

14  Q.   Government's Exhibit 23?

15  A.   Medical file of John Rouse.

16  Q.   Government's Exhibit 29.

17  A.   Medical file of Susan Maack.

18  Q.   Government's Exhibit 38.

19  A.   Medical file of Clinton Roselli.

20  Q.   Government's Exhibit 39.

21  A.   Medical file of Carrie Reinhart.

22  Q.   Government's Exhibit 40.

23  A.   Medical file of Brian Gilson.

24  Q.   Government's Exhibit 41.

25  A.   Medical file of Kelly Christopher.

1   Q.   Is it Kelly Christopher or --

2   A.   Christopher Kelly, sorry.

3   Q.   Government's Exhibit 42.

4   A.   The medical file of Samantha Barnes.

5   Q.   Government's Exhibit 43.

6   A.   Medical file of Stephen Ruffino.

7   Q.   Government's Exhibit 44.

8   A.   Medical file of Eric Acevado.

9   Q.   Government's Exhibit 46?

10  A.   Medical file of Dawn Beyers.

11  Q.   Government's Exhibit 47?

12  A.   Medical file of Joseph Beyers.

13  Q.   Government's Exhibit 48.

14  A.   Medical file of Anthony Beltran.

15  Q.   Government's Exhibit 49.

16  A.   Medical file of Robert Mason.

17  Q.   Government's Exhibit 50.

18  A.   Medical file of Scott Vanwhy.

19  Q.   Government's Exhibit 51.

20  A.   Medical file of Stephen Vanwhy.

21  Q.   Government's Exhibit 52.

22  A.   Medical file of Ryan Clarkson.

23  Q.   And Government's Exhibit 53.

24  A.   Medical file of Patricia Clarkson.

25  Q.   And Government's Exhibit 54?

117

1  A.    Medical file of Donovan Clarkson.

2          MS. OLSHEFSKI:  Your Honor, at this time I move for

3  admission of Government's Exhibit 1 through 23 with the

4  exception of 13 as well as --

5          THE COURT:  13 been named?

6          MS. OLSHEFSKI:  It has not.

7          THE COURT:  Okay.  What number -- what number is 12?

8  Is that Stephanie somebody?

9          MS. OLSHEFSKI:  Stephanie Abuiso.

10          THE COURT:  How about 14?  Is that amber?

11          MS. OLSHEFSKI:  Yes.

12          THE COURT:  Okay.  So --

13          MS. OLSHEFSKI:  That would go to Government's Exhibit

14  23 ending with John Rouse.  And then Government's Exhibit --

15          THE COURT:  Then you go to 29?

16          MS. OLSHEFSKI:  Yes.  I move for admission of 29.

17  And then I move for admission of 37, 38, 39, 40, 41, 42, 43, 44

18  -- 45 is blank.  So then I would move for admission of 46, 47,

19  48, 49, 50, 51, 52, 53 and 54.

20          THE COURT:  So when you say 45 is not -- who is 46?

21          MS. OLSHEFSKI:  46 is Dawn Beyers.  So there's an

22  open slot for 45.

23          THE COURT:  I think I have one more than I should.  I

24  have names here.  I want to be sure of this.  I have 39 as

25  Terry someone.

118

1          MS. OLSHEFSKI:  Carrie Reinhart.

2          THE COURT:  Carrie.  40 is Brian someone.

3          MS. OLSHEFSKI:  Gilson.

4          THE COURT:  41 is Christopher Kelly?

5          MS. OLSHEFSKI:  Yes.

6          THE COURT:  42 is someone Barnes?

7          MS. OLSHEFSKI:  Samantha Barnes.

8          THE COURT:  43 is Stephanie?

9          MS. OLSHEFSKI:  Stephen Ruffino.

10         THE COURT:  Sorry.  44 is --

11         MS. OLSHEFSKI:  Eric Acevedo.

12         THE COURT:  Okay.  45 is zero?

13         MS. OLSHEFSKI:  Yes.

14         THE COURT:  46 is Brier?

15         MS. OLSHEFSKI:  Beyers.

16         THE COURT:  47 is Joseph someone?

17         THE WITNESS:  Joseph Beyers.

18         THE COURT:  49?

19         MS. OLSHEFSKI:  48 is Anthony Beltran.  49 --

20         THE COURT:  Robert someone?

21         MS. OLSHEFSKI:  Robert Mason.

22         THE COURT:  Right.  50 is Scott someone?

23         MS. OLSHEFSKI:  Scott Vanwhy.

24         THE COURT:  Right.

25         MS. OLSHEFSKI:  51 is Stephen Vanwhy.

119

1           THE COURT:  Right.

2           MS. OLSHEFSKI:  52 is Ryan Clarkson.

3           THE COURT:  Right.

4           MS. OLSHEFSKI:  53 is Patricia Clarkson, and 54 is

5    Donovan Clarkson.

6           THE COURT:  No objection to any of these?

7           MR. RUZZO:  No.  No objection.

8           THE COURT:  They'll be admitted.

9           MS. OLSHEFSKI:  Thank you, Your Honor.

10   BY MS. OLSHEFSKI:

11   Q.    In addition to printing out hard copies for the patients

12   that you just identified, did you also print out separate

13   billing records for those patients?

14   A.    Yes, billing records printed for all the patients.

15   Q.    Okay.  I am showing you Government's Exhibit 26.  Can you

16   please take a look at that and tell us if you recognize that?

17   A.    Yes, these are the billing records for the patients.

18   Q.    Does that exhibit have a cover sheet that identifies

19   names?

20   A.    Yes.

21   Q.    Can you please read the names into the record?

22   A.    Okay.  Anthony Abuiso, Michael Abuiso, Stephanie Abuiso,

23   Samantha Barnes, Anthony Beltran, Dawn Beyers, Joseph Beyers,

24   Lucas Brown, Donovan Clarkson, Patricia Clarkson, Eric Correa,

25   Tameka Davis, Lindsay Dwyer, Brian Gilson, Shawn Hicks, Karen

1  Keoppel, Susan Maack, Kevin Merick, Robert Mason, Heidi Messer,

2  Kenneth Phillips, Carrie Reinhart, John Rouse, Stephen Ruffino,

3  Rachel Scarpa, Judy Smith, Jared Stemetzki, Joel Stemetzki,

4  Nicole Tintel, Richard Trembula, Amber Vanluvender, Christy

5  Vanluvender, Scott Vanwhy, Stephen Vanwhy and Suzanne Watson.

6  Q.   Is there a corresponding billing record for each of the

7  patients that you identified?

8  A.   Yes.

9  Q.   Okay.  Thank you.

10       MS. OLSHEFSKI:  Your Honor, I move for admission of

11  Government's Exhibit 26.

12       THE COURT:  Any objection?

13       MR. WEINSTEIN:  No.

14       THE COURT:  Admitted.

15  BY MS. OLSHEFSKI:

16  Q.   Agent Hischar, when you indicated you were part of the

17  searches executed that day, were you assigned a particular

18  location?

19  A.   Yes, I was at the medical office.

20  Q.   Did you or do you know whether or not anyone took pictures

21  during the execution of that warrant at the medical office?

22  A.   Yes.

23  Q.   I'm showing you exhibits that are marked as Government's

24  -- all exhibit 30 beginning with 30.4.  Please take a look at

25  those exhibits and just generally tell us if you recognize what

1   those exhibits are.

2   A.   These are all pictures of the medical office.

3   Q.   Taken during the execution of the search warrant?

4   A.   Yes.

5        MS. OLSHEFSKI:  I move for admission of Government's

6   Exhibit 30.4 through 30.31.

7        MR. RUZZO:  No objection.

8        THE COURT:  Admitted.

9   BY MS. OLSHEFSKI:

10  Q.   Publish starting with 30.4.  As we move through these

11  photographs, agent Hischar, can you please describe for the

12  jury what they are looking at beginning with 30.4?

13  A.   That's Dr. Li's office.

14  Q.   Okay.  Go ahead.  Next one, please?

15  A.   That's the front window -- come in the front door.  That's

16  where you check in with the receptionist.

17  Q.   30.6?

18  A.   Immediately to the right when you come in the front door

19  is the door to -- into Dr. Li's office.

20  Q.   And 30.7?

21  A.   Dr. Li's office again.

22  Q.   30.8?

23  A.   Self-explanatory, Dr. Li's desk.

24  Q.   30.9.

25  A.   That's the back door out of his office leading back to the

122

1   exam rooms.

2   Q.    30.10?

3   A.    Procedure room.

4   Q.    30.11?

5   A.    Inside the procedure room.

6   Q.    30.12.

7   A.    Exam room.

8   Q.    30.13.

9   A.    Inside the exam room.

10  Q.    30.14?

11  A.    It's the same or another exam room -- looks identical.

12  Q.    30.15?

13  A.    Another procedure room where EMGs or EEGs are performed.

14  Q.    30.16.

15  A.    That's the EEG/EMG room.

16  Q.    30.17?

17  A.    Same room.

18  Q.    30.18.

19  A.    Nurse's station.

20  Q.    30.19?

21  A.    Some pamphlets on OxyContin in the nurses' station.  There

22  was no nurse -- so just basically a sink.

23  Q.    30.20.

24  A.    That is the stairway leading to the second floor.

25  Q.    30.21?

1  A.    It's just kind of storage room on the second floor.

2  Q.    30.22.

3  A.    From the outside leading from the parking lot to the front

4  door of the office.

5  Q.    Okay.  30.23.

6  A.    Again, the check-in window and then part of the waiting

7  room.

8  Q.    30.24?

9  A.    That's back upstairs again, storage room, boxes containing

10  copies of prescriptions.

11  Q.    30.25.

12  A.    That was right at the top of the staircase, kind of like a

13  toy box with paperwork inside of it.

14  Q.    Did you come to learn what was -- what that paperwork was?

15  A.    There were -- I see some express mail, Fed Ex.  I think we

16  found some MRI discs in there.

17  Q.    Okay.  And this is upstairs at the top of the stairs?

18  A.    Second floor, uh-huh.

19  Q.    30.26.

20  A.    That I believe is where Dr. Li's wife worked doing

21  billing.

22  Q.    30 --

23  A.    Second floor.

24  Q.    30.27.

25  A.    File cabinet on the second floor.

124

1   Q.   30.28?

2   A.   Just files in the cabinet.

3   Q.   30.28.

4   A.   That depicts files that were made up, drug related charges

5   when people were arrested, they had newspaper clippings and

6   things from patients that were arrested for drugs.

7   Q.   30.30, just another picture of that?

8   A.   Yes.

9   Q.   Okay.  30.31.

10  A.   That's the garage at the medical practice.

11  Q.   Thank you.  So, agent Hischar, as you were describing one

12  of those photographs in the second floor you said there were

13  boxes of prescriptions?

14  A.   Yes.

15  Q.   Were those prescriptions seized from the defendant's

16  office?

17  A.   Yes.

18  Q.   And did you bring them into court here today?

19  A.   Yes.

20         MS. OLSHEFSKI:  Your Honor, I need a moment to move

21  some boxes forward.

22         THE COURT:  Sure.

23         MS. OLSHEFSKI:  May I ask the witness to come

24  forward?

25         THE COURT:  Of course.

125

1  BY MS. OLSHEFSKI:

2  Q.    Agent Hischar, I am going to direct your attention to

3  Government's Exhibit 32.1.  Could you please take a look inside

4  of Government's Exhibit 32.1?  And generally what is inside?

5  A.    They are duplicate copies of prescriptions that are

6  written.

7  Q.    Is there a date range for the prescriptions for that --

8  contained this that box?

9  A.    Yes, the time frame in this box July 15, 2011 to July 6,

10  2012.

11  Q.    Did you seize that box from the defendant's office?

12  A.    Well, the boxes that are in there, yes.

13  Q.    Okay.  They were placed inside these evidence boxes?

14  A.    Yes.

15  Q.    Now, I am going to direct your attention to 32.2.  Please

16  take a look inside and tell us what's inside of 32.2.

17  A.    Same thing, duplicate copies of prescriptions.

18  Q.    Is there a date range for 32.2?

19  A.    That's July 9th, 2012 to March 8th, 2013.

20  Q.    So I'm going to direct your attention now to 32.3.  Can

21  you please look inside and tell us what's inside?

22  A.    Duplicate prescriptions dated between March 11, 2013 and

23  January 21, 2014.

24  Q.    Okay.  And 32.4, what is contained inside of that box?

25  A.    Duplicate prescriptions dated January 22nd, 2014 to July

126

1  15th, 2014.

2  Q.    And I'm going to direct your attention to Government's

3  Exhibit 33.   What is included in that box?

4  A.    More duplicate prescriptions dated July 16, 2014 to

5  January 28, 2015.

6  Q.    Okay.   Is there an additional notation on exhibit 33 as to

7  where those prescriptions were seized from?

8  A.    Yes, they were Dr. Li's office.   The other ones were

9  upstairs.

10  Q.    As long as you are here, Government's Exhibit 35, can you

11  look inside of Government's Exhibit 35 and identify its

12  contents?

13  A.    Yes, they are cash receipt books.   They were found in the

14  front reception area.

15        MS. OLSHEFSKI:   So, Your Honor, I just want to maybe

16  pull out a day of prescriptions to show them to the jury if

17  that's -- maybe one for each year?

18        THE COURT:   You haven't move for admission.

19        MS. OLSHEFSKI:   I'm sorry.   I move for admission of

20  Government's Exhibits 32.1, 32.2, 32.3 and 32.4.

21        MR. RUZZO:   They are all documents that came from his

22  office?

23        MS. OLSHEFSKI:   Yes.

24        MR. RUZZO:   No objection to any of those documents.

25        MS. OLSHEFSKI:   That would include Government's

127

Exhibit 33 and Government's Exhibit 35.

             MR. RUZZO:  Yes.

             MS. OLSHEFSKI:  Okay.

             THE COURT:  They'll be admitted.

             MS. OLSHEFSKI:  Thank you, Your Honor.

BY MS. OLSHEFSKI:

Q.   Let's start with the date range that you identified as 7/15/11 to 7/6 of '12.  Do you know how those prescriptions are segregated in the box?  Are they month, by week, by day?

A.   By day.

Q.   So identify what day you pulled out.

A.   November 28th, 2011.

Q.   Okay.  And just so the record is clear, those are prescriptions all dated the same day?

A.   Yes.  Well, the one on the back is October.  It's an original.  That was probably voided.

Q.   Okay.  So can you give us -- explain -- maybe just show them to the members of the jury just so they can see what they look like and what the prescriptions are written for.

A.   Well, this would be the original, and they are a two-copy prescription.  So he kept the carbon copy.

Q.   Again, what is the date you're looking at?

A.   November 28th, 2011.

Q.   Okay.  And --

A.   These are all one day.

128

1  Q.    What are those prescriptions written for?

2  A.    Read them?

3  Q.    I mean, generally what is the -- identify them.

4  A.    They are prescriptions for medication that would be filled

5  by a pharmacy.

6  Q.    To individual patients?

7  A.    Yes.

8  Q.    What's the drug that is being administered or dispensed?

9  A.    The first one is Oxycodone 30 milligram.

10  Q.    Okay.

11  A.    Second one, Oxycodone 30 milligram, 120, then 240.  These

12  are the same person on the same day, 120 and 240.  There's

13  another one for the same person, same day for Zoloft; same

14  person, same day, Soma; same person, same day, Xanax.  So

15  there's three, four, five for one person.

16        A different person, Oxycodone 30 milligram, 150; same

17  person, Oxycodone 30 milligram, 150; different person who

18  happens to be the mother of the first person, Oxycodone 30,

19  120; same person, Oxycodone, 30 milligram, 60; new person,

20  Oxycodone 30 milligram, 120; same person, Oxycodone 30

21  milligram, 120; different person, Oxy 30, 75; different person,

22  Oxy 30, 180 count; same person, Oxy 30, 180; different person,

23  Opana 40 milligram extended release, 90, and that same person,

24  Opana 40 milligram extended release, 90; same person, Opana

25  immediate release, 150, 10 milligram -- looks like IR -- but --

1  Q.   Keep your voice up.

2  A.   I am not sure if it's legible or not -- same person for

3  Opana, 150 count.  Opana is a narcotic -- same person, same

4  day, Opana 10 milligram, 150; same person, Opana 10 milligram,

5  150; different person, Percocet 10 milligram, 10/325 -- 10 is

6  milligrams of Oxycodone, and 325 is 325 milligrams of

7  Acetaminophen, which is Tylenol where there is a slash of

8  Percocet is Oxy with Tylenol.  A different person, Oxycodone 15

9  milligram, 180; different person, Oxycodone 15 milligram, 180;

10 different person, Oxycodone 30 milligram, 125; same person M.S.

11 Contin 60 milligram, 50; different person, Methadone 10

12 milligram, 120; same person getting Oxycodone 30 milligram,

13 120; same person, Oxycodone 30 milligram, 120; same person

14 Methadone 10 milligram, 120; different person, Oxycodone 15

15 milligram, 150; same person, Oxycodone 15 milligram --

16         MR. RUZZO:  Your Honor, may I interrupt for a second?

17 I am not clear what those -- what those are.

18         MS. OLSHEFSKI:  They are the -- they are the

19 defendant's prescriptions.

20         MR. RUZZO:  I might be amiss.  I apologize.  Are they

21 prescriptions for the same person?

22         MS. OLSHEFSKI:  It's the same day, one day.  He's

23 reading one day of the defendant's prescribing.

24         MR. RUZZO:  Different people?

25         MS. OLSHEFSKI:  Yes.

1          MR. RUZZO:  A day?  You're going over days basically?

2          MS. OLSHEFSKI:  Just one day.

3          MR. RUZZO:  Fine.  Thank you.

4          THE WITNESS:  Oxycodone 30 milligram, 120; same

5    person, Oxycodone 30 milligram, 120; different person,

6    Oxycodone 30 milligram, 120; different person, Oxycodone 30

7    milligram, 120; different person, Oxycodone 30 milligram, 120.

8    I missed the same person of somebody two back, Oxycodone 30

9    milligram, 120, that was two -- same guy, M.S. Contin, 60

10   milligram --or 60 tabs, 60 milligram; same person M.S. Contin,

11   60 milligrams, 60 tabs; different person, Fentanyl patch 75

12   microgram, 15 patches; same person, Fentanyl patch, 75

13   milligram -- or micro gram, 15 patches; same person, Oxycodone

14   15 milligram, 120; same person, Oxycodone 15 milligram, 120;

15   same person -- I don't know what it is -- OxyContin, 40

16   milligram extended release 60 tabs; same person Oxycodone --

17   OxyContin 40 milligram extended release, 60; same person,

18   Oxycodone 30 milligram, 120; same person, OxyContin 40

19   milligram extended release, 60; new person, Oxy 30 milligram,

20   120; same person, Oxycodone 30 milligram, 120; same person,

21   OxyContin 80 milligram, which is the extended release, 60; new

22   person, Oxycodone 30 milligram, 120; same person, Oxycodone 30

23   milligram, 120; new one, Oxycodone 30 milligram, 75; same

24   person, Percocet three -- or 10/325, 10 milligrams Oxycodone,

25   325 of Tylenol, 75 tabs; new person, Oxycodone 30 milligram,

1  125; same person, OxyContin 40 milligram, 50; same person,

2  Adderall 30 milligram, 50; new person, Vicodin 10 milligram

3  slash 650, 10 milligrams of Hydrocodone, which is Vicodin with

4  Tylenol, 45; same person, Vicodin 10/650, 90; different -- new

5  patient, Oxycodone 30 milligram, 90; same person, Oxycodone 30

6  milligram, 45; new patient, Oxycodone 15 milligram, 90; same

7  person, OxyContin 40 milligram, 90; new patient, Oxycodone 15

8  milligram, 120 tabs; that same person, Oxycodone 15 milligram,

9  120; new patient, Oxycodone 15 milligram, 180; same person,

10 Oxycodone 15 milligram, 180; new one, Percocet, 10/325, 200

11 tabs; same person, Percocet, 10/325, 200; same person,

12 Oxycodone 30 milligrams, 60; new patient, Oxycodone 30

13 milligram, 125.  This goes back to continuation of the one

14 before, Oxycodone 30 milligram, 60 tabs.

15 BY MS. OLSHEFSKI:

16 Q.   Those prescriptions that you just identified from -- they

17 were all dated the same day?

18 A.   November 28th, 2011.

19 Q.   Okay.  Is it fair to say that these boxes all contain

20 similar prescriptions divided by --

21       MR. RUZZO:  Excuse me, Your Honor.  Before he puts

22 them away, can we have a look at them?

23       MS. OLSHEFSKI:  Sure.

24 BY MS. OLSHEFSKI:

25 Q.   The remaining of those boxes, the prescriptions are

1  divided in the same way by day.  Is that accurate?

2  A.    Pretty much.  I found 11/28, and I found four on the back

3  end that were dated 12/1.

4  Q.    For most part they are divided by day?

5  A.    By the day.

6  Q.    Thank you.  You can just stay there for one moment,

7  please.  You identified Methadone.  Is Methadone an opioid?

8  A.    Yes.

9  Q.    You identified Hydrocodone.  Is Hydrocodone an opioid?

10  A.    Yes.

11  Q.    You also identified Opana.  Is Opana an opioid?

12  A.    Yes.

13  Q.    And the Percocet and Vicodin, they both contain an opioid?

14  A.    Yes.

15  Q.    In addition to the prescriptions, you identified cash

16  receipt books, correct?

17  A.    Yes.

18  Q.    That's in Government's Exhibit No. 35.

19  A.    Yes, I believe so.

20  Q.    Can you just pull one out and maybe just --

21        MS. OLSHEFSKI:  Your Honor, may we hand it to the

22  jury so they can look at a cash receipt book?

23        THE COURT:  Sure.  It's in evidence.

24  BY MS. OLSHEFSKI:

25  Q.    Is there a date range on the one you handed?

133

1  A.    I didn't read it.  There probably is.

2  Q.    So the jury is looking at a cash receipt book that is

3  dated October 31st, 2012 through November 16th, 2012.  While

4  they are passing around that cash receipt, can you also just

5  pull a date out of the additional boxes of prescriptions and

6  pass those along to the jury, please?  Just one day out of

7  every time period.

8              THE COURT:  Good time to take a break?

9              MS. OLSHEFSKI:  Yes, Your Honor.

10             THE COURT:  Members of the jury, we will take 15

11  minutes.  We will come back five minutes to four.  Do not

12  discuss the case with yourselves or anyone else.  If anyone

13  tries to talk to you about it, bring it to my attention.  See

14  you in 15 minutes.

15             (A brief recess was taken.)

16             MS. OLSHEFSKI:  May I proceed, Your Honor?

17             THE COURT:  Yes, you may.

18  BY MS. OLSHEFSKI:

19  Q.    Agent Hischar, we were finishing with the items seized

20  from the defendant's medical practice.  Do you seize or did any

21  of your colleagues seize any cash from the defendant's medical

22  office that day?

23  A.    No.

24  Q.    And on that day did you have the opportunity to sit down

25  and speak with the defendant?

134

1  A.   Yes, I did.

2  Q.   Where did that interview take place?

3  A.   In the kitchen area of his office.

4  Q.   Okay.  Did you ask the defendant about the approach that

5  he takes to treating patients with medications?

6  A.   Yes, I did.

7  Q.   And what did he say?

8  A.   He said he evaluates prior records, he gets -- takes a

9  history, he takes vital signs.  Going further when he decides

10 on a treatment, he starts with Ibuprofen, anti-inflammatory

11 type medications, and gradually moves up in the chain

12 so-to-speak of narcotics, the Hydrocodone, Percocet, Oxycodone.

13 Q.   Did you ask him, and did he tell you how he approaches new

14 patients?

15 A.   I don't follow that question.

16 Q.   Did he indicate to you what he does in terms of a physical

17 examination and a history when he sees a new patient?

18 A.   Yes, that he reviews any prior medical records, that he

19 conducts a physical examination including vital signs, that he

20 does a thorough physical examination on the patient.

21 Q.   Okay.  Did you -- did the subject of MRIs come up during

22 that conversation?

23 A.   Yes.

24 Q.   What did the defendant have to say about MRIs?

25 A.   He said he likes them, he doesn't always require them,

1  that he sometimes orders them.  And then he said something

2  about sometimes their insurance won't pay for them.  But he

3  said he predominantly he likes to review the MRIs.

4  Q.    In terms of patients coming in who have prior medical

5  history, did he indicate to you whether or not that patient

6  providing those prior records is important to him?

7  A.    Yes.

8  Q.    What did he say?

9  A.    That he uses those prior medical records to determine what

10  he's going -- what course of action he's going to take, what

11  he's going to prescribe, what they were on already, whether it

12  worked for them.

13  Q.    Did you talk to the defendant about drug screens and

14  having -- a patient having hot urines?

15  A.    Yes.

16  Q.    What did the defendant say about that?

17  A.    He said he likes to give people second chances for hot

18  urine tests for, say, cocaine and marijuana but if they test

19  positive for heroin he would not give them a second chance, he

20  would discharge them.

21  Q.    Did the defendant tell you what he charges for urine

22  screens?

23  A.    Yes, $45.

24  Q.    Did you talk to the defendant about pharmacies rejecting

25  his prescriptions?

1   A.   Yes.

2   Q.   What did the defendant say about that?

3   A.   I brought up the fact that Rite Aid corporate cut him off

4   and would no longer fill his prescriptions.  He explained that

5   the local Rite Aid caught one of his patients shooting up or

6   snorting the medication in their bathroom and that they must

7   have reported it to corporate and that's why corporate cut him

8   off.

9   Q.   Did you talk to him about patient complaints about

10  pharmacies that would not fill his prescriptions?

11  A.   Yes.

12  Q.   Did he tell you what he would do in response to those

13  complaints?

14  A.   Well, he told me he was sending people to Aliton's, that

15  the pharmacies didn't like him.

16  Q.   Did you ask the defendant about Lindsay Dwyer?

17  A.   Yes.

18  Q.   What did the defendant say about Lindsay Dwyer?

19  A.   He recalled a conversation he had with a doctor but he

20  didn't recall the specifics, which I knew.  He told me that she

21  had recently tested hot for cocaine and he was going to

22  discharge her.

23  Q.   Did the defendant acknowledge an incident involving

24  Lindsay Dwyer at the Pocono Medical Center?

25  A.   Yes, that might be for it, but he didn't recall the

137

1  specifics of this conversation with the doctor from Pocono

2  Medical Center.

3        MS. OLSHEFSKI:  Your Honor, I have no further

4  questions for agent Hischar.

5        THE COURT:  All right.  Cross-examine.

6        MR. RUZZO:  Thank you, Your Honor.

7  CROSS EXAMINATION

8  BY MR. RUZZO:

9  Q.   Agent Hischar, as you may have imagined, I have a few

10  questions for you of your investigation and some about your

11  testimony.  It doesn't surprise you, right?  First of all, you

12  testified to some red flags, what you thought were red flags?

13  A.   Yes, sir.

14  Q.   And these red flags -- among the red flags were pharmacies

15  raising -- bringing your attention to Dr. Li?

16  A.   Correct.

17  Q.   By either refusing to fill his prescription or alerting

18  you about the amount of his prescription.  Do you recall that

19  testimony?

20  A.   Yes.

21  Q.   Okay.  Now, if a pharmacy -- if I am a doctor and I have

22  been writing a lot of prescriptions on a certain drug and they

23  refuse to fill my prescriptions, that doesn't indicate that I'm

24  not taking the proper procedure in my office, does it?

25  A.   Not in one instance.

1  Q.   All that indicates, does it not, is this pharmacy's

2  opinion that the doctor has gone beyond their stats.  They were

3  never in a -- in the doctor's office when the exam was

4  performed for failed to be performed, were they?

5  A.   If they are relying on their corresponding liability, they

6  have equal responsibility with the doctor in filling the

7  prescription as the doctor has in writing it under the law.  So

8  they have to use just as much caution before they fill that

9  prescription and believing it's legitimately issued for a

10 legitimate medical purpose.

11 Q.   Agent, I asked you if they were in the doctor's office and

12 observed his examination or lack thereof.

13 A.   No.

14 Q.   And most of the pharmacists are not physicians, are they?

15 A.   I don't know.

16 Q.   So -- their red flag is based on amount of drugs

17 prescribed?

18 A.   No, they have several factors that they indicate on their

19 refusal form.

20 Q.   The factors are based on the amount prescribed, are they

21 not?

22 A.   Not in and of itself.  That is one of the blocks they

23 check.  They've checked distance that the patient lives from

24 the doctor, the pharmacy, the amount prescribed, the dosage,

25 the combination.

139

1  Q.   My question, first, they were never in the office and,

2  second, they are not physicians?

3  A.   Right.  I answered those.

4  Q.   And so another red flag was distance, correct?

5  A.   Yes.

6  Q.   And again, if I am a hypothetical doctor and of a person

7  comes from Alabama to my office and I examine the person, take

8  the history and do everything else the guidelines say I am

9  supposed to do and I prescribe accordingly, is that okay?

10 A.   Yes.

11 Q.   And if my patient pays me cash -- is cash illegal in this

12 country?

13 A.   Yes, sir.

14 Q.   I can pay cash, can I?

15 A.   Sure.

16 Q.   And providing to doctor --

17         THE COURT:  Just a minute.  Was your question, cash

18 still legal in this country?

19         MR. RUZZO:  I said is cash illegal.

20         THE COURT:  He said yes.  So I think you want -- I

21 don't think that was the intended answer to --

22         MR. RUZZO:  Thank you.  I have to ask him if it's

23 okay.

24         THE COURT:  Just make it clear.

25 BY MR. RUZZO:

140

1  Q.   Well, let's clear that up.  Cash is still legal, isn't it?

2  A.   Yes, it is.

3  Q.   And by the way, Dr. Li among the things that you seized

4  from his office were a bunch of receipts?

5  A.   Yes.

6  Q.   Do you know drug dealers that give receipts?

7  A.   They usually keep O. sheets.

8  Q.   They give the customer a receipt?  I've gone to the corner

9  to buy some heroin, do I get a receipt for that?

10  A.   No, but someone who wants to make it appear legitimate

11  would.  You're talking about a business versus a street dealer.

12  Q.   Well, let's agree Dr. Li gave a bunch of receipts in cash

13  -- you seized many cash receipts from his office; isn't that

14  true?

15  A.   Yes.

16  Q.   And you say that people from the same family, that's

17  another red flag, correct, treating people from the same

18  family?

19  A.   In addition -- in addition to that, they are getting the

20  same medications.

21  Q.   If two or three people in my family have the same pain

22  tolerance and the same pain when they tell the doctor and their

23  doctor does everything right with a history and physical and

24  all intended tests and it is within a legitimate medical

25  practice, there's nothing wrong with that, is there?

141

1  A.   I didn't say there was something wrong.  I said it was a

2  red flag.

3  Q.   It's a red flag?

4  A.   Right.  It's unusual.  It's highly unusual.

5  Q.   I didn't ask you that question.  I asked you if it was

6  okay.

7  A.   Yes.

8  Q.   And it is a red flag.  I've already agreed with you on

9  that.

10  A.   Okay.

11  Q.   You're the expert.  You say it's a red flag.  I say, so

12  what, it's a red flag.  And by the way, the informant -- I

13  trust you're aware because you did a thorough search of all of

14  the records and all, Samantha, she continued to be treated by

15  Dr. Li, didn't she?

16  A.   Yes, she made me aware of that for headaches.

17  Q.   Her whole family was there, three or four members of her

18  family?

19  A.   I think her father may have gone for something.

20  Q.   At least three people in her family, maybe four.

21  A.   She works for the doctor.

22  Q.   And she sent her own family to Dr. Li.  Didn't that raise

23  a red flag?

24  A.   Not being treated with -- they weren't being treated with

25  Oxycodone 30 milligram.

142

1  Q.    Is it a red flag, or isn't it?

2  A.    Well --

3            MS. OLSHEFSKI:  Your Honor --

4            THE COURT:  Let him answer the question before you

5  ask the next one.

6            MR. RUZZO:  He wasn't answering the question.

7            THE COURT:  Please move on.

8  BY MR. RUZZO:

9  Q.    Does that raise a red flag with you --

10  A.    No.

11  Q.    -- of your informant's credibility?

12  A.    No.

13  Q.    Did it raise a red flag with you that they were all in the

14  same family and they were being treated by Dr. Li?

15  A.    Like I said, I was aware of her.  She told me.  And I

16  think she told me her grandfather may have been seen by Dr. Li.

17  That's what I was aware of.

18  Q.    I'm not going ask you to go through the whole records.

19  But the records reflect that there were more than two people in

20  her family, three people.  And --

21            MS. OLSHEFSKI:  Your Honor, I am going to object to

22  that statement.  It wasn't a question.  I will ask that -- he

23  refrain from doing that.

24            THE COURT:  The jury should disregard the statements

25  by counsel about the -- what's in the record unless he asks a

143

1  question.

2          MR. RUZZO:  Your Honor, I am not going to ask him --

3          THE COURT:  That's fine.

4  BY MR. RUZZO:

5  Q.   But there was more than Samantha, there was at least more

6  than one person in her family.  You remember that, don't you?

7  A.   As I said, I think she told me her grandfather was seen

8  once, but I didn't see it in the record, and that's all I am

9  aware of.

10 Q.   And she was a paid informant of yours, correct?

11 A.   She was paid for time and expense, yes.

12 Q.   That's a paid informant, isn't it, agent?

13 A.   Well, I would consider a paid informant one who we

14 negotiate information for payment.  She had already given the

15 information.  She didn't ask for payment.  She didn't seek

16 payment.  Because I asked her to go out of her way in coming to

17 Scranton and meeting with us after hours and using her cell

18 phone and using her time, her gas, her car, I offered to pay

19 her.

20 Q.   And, agent, if she didn't give you any information, would

21 you given her the 3,300?

22 A.   No.

23 Q.   You would not?

24 A.   I would have no reason to.  I would have no justification.

25 Q.   She was a paid informant?

144

1  A.    She provided information, and I later paid her, yes.

2  Q.    Thank you.

3  A.    I am telling you different categories how we categorize

4  informants.   There's a lot of different categories.

5  Q.    An informant is someone that provides information?

6  A.    She didn't provide the information for payment.   I paid

7  her for her time and expense after she gave the information.   I

8  never promised to pay her.

9  Q.    I understand that.   That's understood.   And you

10  interviewed a number of people in this investigation and a

11  number of Dr. Li's patients, correct?

12  A.    Correct.

13  Q.    And some of them were drug users and some of them were

14  addicts, became addicts, correct?

15  A.    That's correct.

16  Q.    And some of your people that you gleaned some information

17  from not only were getting narcotics from Dr. Li, they were

18  getting them from other doctors?

19  A.    At the same time?

20  Q.    They had gotten them from other doctors, and they were

21  addicts.   I think you mentioned a woman who was in a conspiracy

22  in New Jersey that was involved in getting narcotics, opioids

23  from five doctors.   You were notified by Jersey law

24  enforcement?

25  A.    Yes.

1  Q.    And if memory serves me correct -- I will try to refresh

2  your memory.   It was a woman who was involved in a conspiracy

3  in Jersey that had gotten OxyContin or other narcotics from

4  four or five doctors in New Jersey.

5  A.    I don't know how many doctors in New Jersey.   I know there

6  was at least one.

7  Q.    Your testimony or your -- you never were informed by New

8  Jersey that this woman was involved in a conspiracy in Jersey

9  for five -- involving five other doctors?

10  A.    I was involved with a conspiracy with 11 other people in

11  New Jersey.

12  Q.    That's correct.

13  A.    Most of which were currently -- had just been seen by Dr.

14  Li.   I don't know how many doctors were involved in New Jersey.

15  I know it was at least one, maybe two.   I don't think it was

16  five, but I don't specifically recall.   It was a case that was

17  over in New Jersey.

18  Q.    No matter how many it was, they were able to fool at least

19  another doctor or another couple doctors?

20  A.    Well, that doctor was arrested in New Jersey.

21  Q.    Well, as I said, they fooled that doctor.

22  A.    He was a bad doctor.   I don't know whether they fooled him

23  or whether they just walked in and he wrote a prescription.   I

24  don't know.

25  Q.    You have informants that were addicts?

146

1  A.    I have interviewed patients that were addicts.

2  Q.    And addicts will do and say extraordinary things to get

3  narcotics?

4  A.    Agreed.

5  Q.    Some of them are good at it?

6  A.    Yes.

7  Q.    They know the right thing to say to a doctor, where the

8  pain is, how much the pain is, correct?

9  A.    It comes down to the doctor's job to look at prior

10 history, to make a phone call.  Yeah, anybody can tell you

11 anything they want.  When you're dealing with the highest

12 dosage of Oxycodone especially for street value, the doctor's

13 job is to make sure that it's valid.  These people didn't have

14 physical injuries.  There were no prior medical records.  There

15 were no phone calls to their previous doctors.

16 Q.    Agent, I asked you a question about addicts being skillful

17 or knowing their business and rehearsing what they tell

18 doctors.  Do you come across that in your investigation?

19 A.    Yes.

20 Q.    Fine.  And manufacturers still make 30 milligram

21 Oxycodone, don't they?

22 A.    Yes, they do.

23 Q.    It's not illegal to prescribe them, is it?

24 A.    Not within the course of professional practice with

25 legitimate medical necessity.

1  Q.    My question I think assumes that.  We know it's illegal

2  outside of medical practice.

3  A.    Right.

4  Q.    That's the issue.  And you also raised a red flag about

5  young people.

6  A.    Yes.

7  Q.    Young people get pain, don't they?

8  A.    Yes.

9  Q.    And pain doesn't always show up on an X-ray or MRI; is

10  that correct?

11  A.    I'm not sure.  I'm not a medical expert.

12  Q.    We know that.  And everyone has pain in their life at some

13  time, correct?

14  A.    Probably.

15  Q.    A lay person can say that?

16  A.    Probably.

17  Q.    And every one of us have a different tolerance for pain,

18  would that be fair to say?

19  A.    Fair.

20  Q.    And every doctor says, what's your pain on a pain scale

21  zero to ten.

22  A.    Yes.

23  Q.    And that's a subjective answer, is it not?

24  A.    Yes.

25  Q.    And if you tell a doctor my pain is ten and I took this

148

1  much of a medication and that much and it's not helping me,

2  what's the doctor not to believe about that?  You're a patient.

3  Can you trust your patient?

4  A.   No.

5  Q.   You trust your informants?

6  A.   No, not a hundred percent.  I verify what they tell me.

7  Q.   Now, as far as you know, you had someone listed in the

8  indictment named Susan Maack?

9  A.   I didn't hear.

10  Q.   A patient of Dr. Li's, Susan Maack?

11  A.   Okay, yes.

12  Q.   And the woman overdosed?

13  A.   Yes.

14  Q.   Is that what happened?

15  A.   Uh-huh.

16  Q.   And I think you allege that it was the prescription that

17  Dr. Li wrote that caused her death; is that correct?

18  A.   You had a medical expert review the records I obtained

19  relative to the death and the overdose, including hospital

20  reports, toxicology tests.  I can't form the opinion.

21  Q.   Were you aware of a state police report that you gave us

22  in discovery regarding her -- regarding her death?

23  A.   Yes.

24  Q.   And the trooper that wrote that report said that the

25  doctor -- I'm sorry -- that the woman's husband made a mistake

149

1  --

2          MS. OLSHEFSKI:  Your Honor, I am going to object.

3  That's hearsay.

4          THE COURT:  It is.  I don't know where you're going

5  with this.

6          MR. RUZZO:  Well, there were certain things said that

7  contradicted the trooper's report.

8          THE COURT:  Well, that's not for him to evaluate.

9          MR. RUZZO:  I am not asking him what.  I'm asking if

10  it contradicted.

11          MS. OLSHEFSKI:  Object, Your Honor.  He's asking this

12  witness to comment on another police officer's report, and

13  that's outside the rules of evidence.

14          THE COURT:  It's outside the scope for sure, but it

15  is cross examination.  I will let you ask the question.

16  BY MR. RUZZO:

17  Q.   Are you aware of a trooper's report that contradicts what

18  you were told?

19  A.   I am aware there was a state police report.  I obtained

20  it.  It's been a couple years since I read it.

21  Q.   You provided us the state police report?

22  A.   Yes.

23  Q.   It contradicts that she OD'd on Dr. Li's prescription?

24          MS. OLSHEFSKI:  Your Honor --

25          THE COURT:  Just a minute.  Just a minute.  The

 1  objection is sustained.  You asked him -- you were going to ask

 2  him if the report contradicts him.  Ask him that.  I am

 3  allowing you to ask that.

 4  BY MR. RUZZO:

 5  Q.    The report contradicts --

 6  A.    Contradicts what?

 7  Q.    It contradicts that -- it contradicts your allegation that

 8  the -- Susan Maack died from Dr. Li's prescription?

 9  A.    No.

10  Q.    You're not aware of that report?

11  A.    I am aware there was a report, but they didn't gather all

12  of the evidence.  They didn't get the hospital reports and go

13  to an expert and toxicologist and have everything reviewed.

14  Q.    I am not asking you about that.  I'm asking you about the

15  husband -- the husband said --

16          MS. OLSHEFSKI:  Objection, Your Honor.

17          THE COURT:  Sustained.

18  BY MR. RUZZO:

19  Q.    You talked about Dr. Li's computer system, the program,

20  that he kept records -- how he kept records?

21  A.    Yes.

22  Q.    And he had a program that you cut and paste with?

23  A.    I assume he would cut and paste with it, yes.

24  Q.    Anything wrong with that?

25  A.    Well, yeah, it's a medical record.  It has to be accurate.

1  And from my review of it, it appeared he cut and pasted just

2  about everything.

3  Q.   Well, of course.  You can write anything.  You don't have

4  to cut and paste to falsify something, officer.

5  A.   If it's accurate.  There were reports I read that said

6  that said the person had a MRI and the next visit it said the

7  person has no MRI.  So I mean, it's an assumption, but I think

8  he was cutting and pasting things.  The records were --

9  Q.   My question --

10 A.   -- terrible.

11 Q.   Does the very fact you use a cut and paste program

12 indicate anything --

13 A.   No.

14 Q.   -- about the veracity of the report?

15 A.   No, not necessarily until you see all of the

16 inconsistencies in the reports.

17 Q.   Let me ask you that again.  Does the very fact that

18 someone uses cut and paste, is that indicative of the veracity

19 of what they write?

20 A.   Not necessarily.

21 Q.   It doesn't necessarily mean it's false, doesn't

22 necessarily mean it's true, correct?

23 A.   Correct.

24 Q.   It's the person writing it?

25 A.   Yes.

1  Q.    So and you interviewed Dr. Li when you searched -- when

2  you did the search --

3  A.    Yes.

4  Q.    -- of his office.  And he told you that he checks the

5  history and physical?

6  A.    Yes.

7  Q.    Of a patient?

8  A.    Yes.

9  Q.    Did he tell you he takes that at the initial visit or he

10 does it all the time?

11 A.    I don't recall.  I know it definitely applied to the

12 initial visit.

13 Q.    You don't recall.

14 A.    I don't recall if he said if he does it every time, no.

15 Q.    He may have told you he does it on the first visit and

16 doesn't do subsequent?

17 A.    I don't recall.  I know he said he does it.

18 Q.    He told you he did a history and physical?

19 A.    Yes.

20 Q.    He said he orders MRIs?

21 A.    Yes.

22 Q.    Did he --

23 A.    Sometimes.

24 Q.    He didn't say I always --

25 A.    No.

1  Q.    -- order an MRI?

2  A.    No.

3  Q.    And you know that he's served -- board certified in

4  radiology?

5  A.    Well, I heard that.  I think that's why he'd want to order

6  MRIs because he knows how to read them.

7  Q.    He didn't tell you he's just there for the money?

8  A.    I didn't expect him to.

9  Q.    He sees patients, correct?

10  A.    He sees patients?

11  Q.    He sees patients in that office?

12  A.    Yes.

13  Q.    And in your records you have the number of patients he

14  sees a day?

15  A.    There were estimates of about 20 to 30 patients a day.

16  Q.    Okay.  And his pattern is that the first visit reflected

17  by the records -- the first visit is maybe 45 minutes or an

18  hour?

19  A.    I don't remember the exact schedule.  I am not

20  disagreeing, but most of them were 15-minute slots.

21  Q.    Did you notice a distinction between the first visit and

22  the other visits?

23  A.    They are scheduled for 15-minute slots which includes

24  check-in, payment, waiting room.  My interviews showed the

25  actual time spent with the patients was very short.

1  Q.   Would it surprise you if the records reflected most of his

2  patients on -- or a lot of his patients -- probably a majority

3  of his patients on their first visit take 45 minutes to an

4  hour?

5  A.   That would surprise me.

6            THE COURT:  Are you at a good point to stop?  It's

7  4:30.  We have --

8            MR. RUZZO:  If you give me a couple minutes, I think

9  I can finish up.

10           THE COURT:  I will be happy --

11           MR. RUZZO:  We will finish tomorrow.

12           THE COURT:  Pardon?

13           MR. RUZZO:  We will finish tomorrow.

14           THE COURT:  Okay.  Members of the jury, we are going

15  to quit at 4:30 today and 4:30 tomorrow.  But next week we will

16  be going until 5:00 so -- just so you can plan accordingly.  I

17  neglected to tell you yesterday we were only going to 4:30

18  today.  I apologize for that.  I know it's only a half hour.

19  Nevertheless, it's good to know.  We will be back tomorrow --

20  9:30 okay tomorrow?

21           MR. WEINSTEIN:  Yes, sir.

22           THE COURT:  9:30 tomorrow.  We will go until 4:30.

23  Do not discuss the case among yourselves or with anyone else.

24  Don't expose yourself to media, radio, television, newspapers,

25  anything.  Remember you're to decide this case solely on what

1  you see and hear in this courtroom.  Enjoy the rest of your

2  day, and we will see you tomorrow at 9:30.

156

REPORTER'S CERTIFICATE

1
2

3        I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12
13
14                          _____
                            Laura Boyanowski, RMR, CRR
15                          Official Court Reporter

16  REPORTED BY:

17      LAURA BOYANOWSKI, RMR, CRR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      235 N. Washington Avenue
        Scranton, PA  18503
20

21          (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
22  the direct control and/or supervision of the certifying
    reporter.)
23
24
25