# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:16-CR-194 |
| | : | |
| v. | : | (JUDGE CAPUTO) |
| | : | |
| FUHAI LI, | : | (ELECTRONICALLY FILED) |
| Defendant | : | |

## BRIEF OF THE UNITED STATES IN OPPOSITION TO DEFENDANT'S SUPPLEMENTAL MOTION FOR JUDGMENT OF ACQUITTAL

Submitted By:

DAVID J. FREED
United States Attorney

 /s/ Michelle Olshefski
MICHELLE L. OLSHEFSKI
Assistant United States Attorney

# TABLE OF CONTENTS

Table of Authorities.............................................................................ii

Introduction...................................................................................... 1

Procedural Background ..................................................................... 2

Factual Background .......................................................................... 3

Legal Discussion................................................................................ 5

    A. The Rule 29 Standard ............................................................. 5
    B. The Rule 33 Standard ............................................................. 7

Discussion........................................................................................ 8

    1. Trial Evidence Conclusively Proved That the Defendant is Guilty as Charged in Count 24 – Unlawful Distribution Resulting in the Death of SM.......................................... 8

    2. Defendant Erroneously Argues that Evidence in Support of Counts 26-27, Maintaining Drug Involved Premises, was 404(b) Evidence............................................................16

    3. Good Faith Instruction Was Not Warranted ............................ 19

    4. Testimony Regarding Patients' Addictions, Subsequent Symptoms, and Consequences of Withdrawal was Highly Relevant and Not Improper.......................................27

Conclusion ..................................................................................... 32

# TABLE OF AUTHORITIES

## CASES

*Blancha v. Raymark Indus.*, 972 F.2d 507 (3d Cir.1992) ....................... 17

*Burks v. United States*, 437 U.S. 1 (1978) .............................. 6

*Burrage v. United States* ...................................................... 14

*Coleman v. Johnson*, 132 S. Ct. 2060 (2012) ........................... 7

*Government of the Virgin Islands v. Derricks*, 810 F.2d 50 (3d Cir. 1987) .................................................................................. 8

*Hurley v. Atl. City Police Dep't*, 174 F.3d 95 (3d Cir.1999) ................ 17

*Jackson v. Virginia*, 473 U.S. 307 (1979) .............................. 15

*United States v. Applewhaithe*, 195 F.3d 679 (3d Cir. 1999)................. 5

*United States v. Ashfield*, 735 F.2d 101 (3d Cir. 1984)........................... 6

*United States v. August*, 985 F.2d 705 (6th Cir. 1992) ........................ 31

*United States v. Brown*, 3 F.3d 673 (3d Cir. 1993) ................................ 6

*United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013) ... 6, 7

*United States v. Cothran*, 286 F.3d 173 (3d Cir. 2002) .......................... 6

*United States v. Diamond*, 2009 U.S. App. LEXIS 8598, at *3 (3d Cir. Apr. 23, 2009) .................................................................... 23

*United States v. Fernandes*, 272 F.3d 938 (7th Cir. 2001) .................... 5

*United States v. Gross*, 961 F.2d 1097 (3d Cir. 1992) ............. 24, 25, 26

*United States v. Kirk*, 584 F.2d 773 (6th Cir. 1978) ...................... 30, 31

*United States v. Leahy*, 445 F.3d 634 (3d Cir.2006) ...................... 23, 26

*United States v. Leon*, 739 F.2d 885 (3d Cir. 1984) .............................. 6

*United States v. Mariani*, 725 F.2d 862 (2d Cir. 1984) .......................... 6

*United States v. Pungitore*, 910 F.2d 1084 (3d Cir. 1990) ................... 32

*United States v. Scanzello*, 832 F.2d 18 (3d Cir. 1987) ........................... 6

*United States v. Silveus*, 542 F.3d 993 (3d Cir. 2008) ........................... 7

*United States v. Sims-Robertson*, No. 92-1076, 1994 WL 12212, at *2 (6th Cir. Jan. 18, 1994) ........................................................ 31

*United States v. Stewart,* 325 F.Supp.2d 474 (D.Del.2004) ................... 8

*United States v. Volkman*, 797 F.3d 377 (6th Cir. 2015) ...................... 14

## <u>FEDERAL STATUTES</u>

21 U.S.C. §841(a)(1),(b)(1)(C) ................................................ 14

21 U.S.C. § 856(a) .............................................................. 16

## <u>OTHER AUTHORITIES</u>

Federal Rule of Criminal Procedure 29 .................................. 1, 2, 5, 6, 32

Federal Rule of Criminal Procedure 33 ...................................... 1, 3, 7, 8,

Federal Rule of Criminal Procedure 404(b) ........................... 1, 16, 18, 19

## I.   <u>INTRODUCTION</u>

The United States submits this brief in opposition to the defendant's supplemental motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 specifically based on the sufficiency of the evidence regarding Count 24, drug distribution resulting in death, or alternatively, a new trial pursuant to Fed. R. Crim. P. 33 based on a number of legal theories.

This Court should deny the defendant's Rule 29 motion because there was sufficient evidence adduced by the Government to prove beyond a reasonable doubt that the defendant is guilty of unlawfully distributing a controlled substance to SM resulting in death as charged in Count 24 of the Superseding Indictment.  Similarly, the Court should deny the defendant's Rule 33 motion based on alleged improper use of Rule 404(b) evidence; failure to provide a good faith jury instruction; and alleged improper testimony of witnesses concerning withdrawal subsequent to termination of the doctor/patient relationship.  None of these arguments has legal merit and the defendant cannot credibly claim that he did not receive a fair trial or that any of his alleged errors rendered the jury's verdict a "miscarriage of justice."

## II. <u>PROCEDURAL BACKGROUND</u>

On May 2, 2018 the parties commenced jury selection in this case. At the conclusion of the Government's case-in-chief on May 29, 2018, the defense made an oral motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) as to all counts in the Superseding Indictment, asserting that there was insufficient evidence to show that the defendant committed any of the crimes charged.  The defendant's motion was denied.  Thereafter, the defense presented its case, which included testimony from the defendant.  On June 4, 2018, the jury returned a unanimous verdict finding the defendant guilty on all counts in the Superseding Indictment.[1]

On June 18, 2018, the defendant filed a motion for judgment of acquittal and brief in support.  (Docs. 181, 182).  On July 2, 2018, the Government filed its brief in opposition (Doc. 184).   Now pending before the Court is the defendant's supplemental motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a),

---

[1]   Prior to resting its case on May 29, 2018, the Government made a motion to withdraw Counts 18 (related to KM) and 21 (related to KP).  The motion was granted by the court.

challenging the sufficiency of the evidence, and Federal Rule of Criminal Procedure 33, requesting a new trial.

The Government hereby moves to incorporate herein its initial brief in opposition in all respects.  (Doc. 184).  The defendant's supplemental claims lack merit and should be denied.

## III.   <u>FACTUAL BACKGROUND</u>

The trial evidence showed that the defendant ran his medical practice is such a way as to be a beacon for those individuals seeking drugs to feed ongoing addictions; those patients who legitimately sought treatment only to become addicts at the hands of the defendant; and those who were involved in the illegal resale of opioid medications.  The evidence showed that defendant prescribed large amounts of highly addictive Schedule II narcotics under circumstances that showed his prescribing was not for a legitimate medical purpose and was outside usual professional standards.  Many professionals testified at trial about the actions they took with respect to the defendant's practice that reflected their concern about the propriety of his prescribing.  These professionals included various doctors and pharmacists who refused to fill the defendant's prescriptions.

The evidence showed that the defendant's illegal prescribing without a legitimate medical purpose and outside usual professional standards caused the death of SM.  The evidence showed that the defendant ignored self-reports of addiction concerns, psychiatric histories, urine screens positive for illicit street drugs, or negative drug screens which would indicate diversion and patient selling of the drugs. The defendant's illegal prescribing without a legitimate medical purpose and outside usual professional standards caused the birth of an opioid addicted baby, as well as the near destruction of many lives.

The evidence presented at trial showed that the defendant was motivated to violate his sacred oath to do no harm by just one thing – money.   The jury learned that as word on the street spread about the ease at which the defendant wrote prescriptions for Schedule II narcotics, the defendant's patient base grew.  The defendant required immediate payment of approximately $250 to $350 for a first-time office visit, and approximately $150 for each monthly visit thereafter.  The defendant preferred cash payments.  Follow-up patient visits occurred monthly and invariably resulted in a prescription for Schedule II narcotics.

The evidence showed that the defendant's greed overcame his professional ethics and sense of right and wrong and ultimately became his motive.  The defendant's greed was exhibited, in part, in the $1,030,960 in cash that was concealed inside his residences and subsequently seized by law enforcement.  His desire for financial gain was so great that he intentionally withheld reporting income in order to avoid assessment of taxes on the income.

## IV.   LEGAL DISCUSSION

### A.   The Rule 29 Standard

Federal Rule of Criminal Procedure 29(a) reads in pertinent part that "[a]fter the Government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  A defendant challenging the sufficiency of the evidence "bears a heavy burden."  *United States v. Applewhaithe*, 195 F.3d 679, 684 (3d Cir. 1999) (citations omitted); *see also United States v. Fernandes*, 272 F.3d 938, 943 (7th Cir. 2001) ("a challenge to the sufficiency of the evidence is an uphill battle").  In reviewing a verdict for sufficiency of the evidence, the trial court "must

consider the evidence in the light most favorable to the Government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993) (internal citations and quotation marks omitted).

Under Rule 29, the Court's inquiry is "limited to determining whether the conclusion chosen by the factfinders was *permissible.*" *United States v. Ashfield,* 735 F.2d 101, 106 (3d Cir. 1984) (emphasis added). The Court must take care not to invade the jury's province, see *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984), by evaluating the credibility of witnesses, see *United States v. Cothran*, 286 F.3d 173, 175 (3d Cir. 2002). In fact, all credibility issues must be resolved in the Government's favor. *United States v. Scanzello*, 832 F.2d 18, 21 (3d Cir. 1987). A finding of insufficiency therefore should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984) (*quoting Burks v. United States*, 437 U.S. 1, 17 (1978)). Stated differently, a district court "must affirm so long as the evidence crosses 'the threshold of bare rationality.'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431

(3d Cir. 2013) (*en banc*) (quoting *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012)).  "A case can be built against the defendant grain-by-grain until the scale finally tips." *Caraballo-Rodriguez*, 726 F.3d at 431.

## B.    The Rule 33 Standard

Federal Rule of Criminal Procedure 33(a) reads in pertinent part that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Rule 33 motions are committed to district courts' discretion. *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008).  In assessing a Rule 33 challenge that a verdict was against the weight of the evidence, the Court must exercise its "own judgment in assessing the Government's case" and does not have to "view the evidence favorably to the Government."  However, the Court may order a new trial under Rule 33 "only if" the Court "believes that there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted." *Silveus*, 542 F.3d at 1004–05 (internal quotation marks omitted).  Such "motions are not favored and should be granted sparingly and only in exceptional cases." *Id.* (internal quotation marks

omitted); *Government of the Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

In considering a Rule 33 motion, the Court "may weigh the evidence, but may set aside the verdict and grant a new trial only if" it determines that the verdict constitutes a miscarriage of justice, or that a trial error had a substantial influence on the verdict. *United States v. Stewart*, 325 F.Supp.2d 474, 485 (D.Del.2004).

## V.   DISCUSSION

### 1.   TRIAL EVIDENCE CONCLUSIVELY PROVED THAT THE DEFENDANT IS GUILTY AS CHARGED IN COUNT 24 - UNLAWFUL DISTRIBUTION RESULTING IN THE DEATH OF SM.

In his supplemental motion, the defendant again argues that there was insufficient evidence to support the jury's verdict of guilty on Count 24 of the Superseding Indictment – the death of SM.  To the contrary, the evidence was more than sufficient for the jury to have concluded beyond a reasonable doubt that the defendant is responsible for the unlawful distribution that resulted in the death of SM.

It is important to note that the defendant adds no new (supplemental) argument on this issue.  His alleged perceived deficiencies in the Government's evidence (*i.e.*, SM had a history of back

and knee pain and had prior knee surgery and had previously been prescribed opioids for pain) were included in his initial motion and responded to by the Government.  Moreover, all of the defendant's alleged deficiencies were brought to light before the trial jury and thoroughly examined through cross-examination of witnesses and argued to the jury through presentation of opening statements and closing arguments.  The defendant, however, continues to ignore the facts brought to light before the jury by the Government that conclusively evidenced that he unlawfully prescribed a Schedule II controlled substance to SM outside the usual course of professional practice and not for a legitimate medical purpose.  The jury heard the defendant's arguments and by their verdict, found the Government's evidence more persuasive and conclusive in terms of the defendant's guilt.  This Court, therefore, should be confident that at the time it rendered its verdict on Count 24, the jury was aware of and had the opportunity to consider all of the arguments now presently before the Court in the defendant's supplemental motion.  The record supports the conclusion that the jury rendered a guilty verdict only after full

consideration of the limitations of the evidence favorable to the prosecution, and that the interests of justice have been served.

Nevertheless, the Government's initial response on this claims bears repeating.  SM died from an overdose of oxycodone less than two days after receiving a prescription from the defendant for 120 oxycodone 15 milligrams pills.  Blood samples obtained the day SM arrived at the emergency room of the Wayne Memorial Hospital confirmed the lethal dose of oxycodone in SM's system at the time of her death.

The Government established that SM had an initial visit with the defendant on October 5, 2011.  On that day, the defendant wrote SM a prescription for 120 Oxycodone 15 milligram pills.  The prescription was filled on October 5, 2011, less than two days prior to SM's death.

William Maack's testimony included details about SM's office visit with the defendant on October 5, 2011.  In particular, Mr. Maack described the swiftness and cursory nature of the defendant's interaction with SM during that visit.  Mr. Maack testified that upon leaving the defendant's office that morning, he and SM went directly to Stephen's Pharmacy and had the prescription filled.  He testified that he observed SM immediately consume one of the oxycodone 15 mg pills

from the pill bottle that held the pills provided by the defendant's prescription. Mr. Maack testified that throughout the remainder of the day, October 5, 2011, he observed SM consume two additional oxycodone pills from the prescription provided to her by the defendant.

The testimony of Mr. Maack also detailed the following day, October 6, 2011, including the fact that SM never left the house that day. He described what occurred the last few hours he spent with SM in the evening of October 6, 2011. Mr. Maack testified that SM was full of energy and somewhat euphoric as she performed chores all around the house late into the night. His description was consistent with other patients who described how their abuse of the drugs made them feel, e.g., euphoric. According to Mr. Maack, SM did not get into bed until approximately two o'clock in the morning on October 7, 2011.

Mr. Maack then described the morning of October 7, 2011 when he awoke at approximately 6:15 a.m. and noticed that something was wrong with SM. She was cold and unresponsive. Mr. Maack immediately started to perform CPR. Emergency personnel arrived and transported SM by ambulance to the Wayne Memorial Hospital.

Mr. Maack testified that after SM was taken by ambulance from the home, he grabbed the oxycodone pill bottle prescribed to SM by the defendant and took it with him to the hospital.  Mr. Maack testified that he handed off the oxycodone pill bottle to an emergency room nurse who informed him that 42 pills were missing from the bottle prescribed to SM by the defendant less than two days prior.

The Government presented the testimony of Dr. Louis O'Boyle who testified that the cause of death for SM was from narcotic overdose.

The Government presented the testimony of Forensic Toxicologist, Michael Coyer.  Dr. Coyer testified that the particular opiate and level of opiates in SM's blood (serum) was oxycodone at 215 nanograms per milliliter, as well as 15 nanograms of oxymorphone, a metabolite of oxycodone.  Dr. Coyer opined that SM consumed a fatal dose of oxycodone.

Finally, Dr. Stephen Thomas testified that in forming an opinion regarding the cause of SM's death, he reviewed many sources of information including the medical record for the first and only visit SM had with the defendant on October 5, 2011.  From those records, Dr. Thomas specifically noted that the result of an EMG performed by the

12

defendant on SM was normal, and that the results of an in-house urine screen performed by the defendant for SM was <u>not</u> normal but, in fact, was positive for a narcotic that SM had <u>not</u> been legally prescribed. Dr. Thomas testified that the defendant ignored both a normal EMG and an inconsistent urine test before prescribing 120 oxycodone 15 milligram pills to SM at that first visit.

Dr. Thomas also testified that he reviewed the medical records of SM's primary care physician, Dr. Filomena Lombardi, which had been provided to the defendant prior to SM's office visit and were part of the defendant's patient file for SM. Regarding those records, Dr. Thomas noted that Dr. Lombardi's records evidenced a complicated psychiatric history seemingly disregarded by the defendant at that first visit, including a prior suicide attempt by SM. Dr. Thomas specifically noted various psychiatric medications lawfully prescribed to SM by her psychiatrist who was treating her for chronic bi-polar disorder and severe depression. Also significant to Dr. Thomas was the fact that SM had <u>not</u> been prescribed oxycodone in the past, despite a complicated physical history.

13

Dr. Thomas testified that in forming his opinion regarding the death of SM, he reviewed the Wayne Memorial Hospital records from SM's emergency admission, the Pennsylvania State Police report, the Wayne County coroner's report of Susan Leinert, as well as the prior testimony of William Maack, Dr. Louis O'Boyle, and Dr. Michael Coyer. Dr. Thomas testified that in his expert opinion, the prescription for oxycodone written by the defendant for SM on October 5, 2011 was not for a legitimate medical purpose and was outside the usual course of professional practice, in light of all the unique circumstances that accompanied SM when she presented to the defendant's practice at that initial visit, including her complicated physical and psychiatric history. Regarding SM's death, Dr. Thomas opined that "but for" the unlawful prescription written by the defendant for SM on October 5, 2011, SM would not have died on October 7, 2011.[2]

---

[2]  In *Burrage v. United States,* the Supreme Court held that "but for" causation is necessary to prove a violation of 21 U.S.C. §841(a)(1),(b)(1)(C)(drug delivery resulting in death).  See also, *United States v. Volkman*, 797 F.3d 377, 393 (6th Cir. 2015) (sufficient evidence for jury to conclude drug distribution was "but for" cause where victim already suffered from a number of risk factors including hypertension and obesity).

All of the above evidence presented by the Government regarding the death of SM was tested by the defense through cross-examination, closing arguments, and the court's jury instructions. The jury was well aware of the same arguments at trial that the defendant now argues again in his supplemental motion, as well as motivations, potential bias, inconsistent testimony, or the lack of evidence.

The jury was permitted to rely on circumstantial evidence based on reasonable inferences drawn from actions, statements, and witness testimony. An inquiry into the legal sufficiency of the evidence presented to the jury "does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 473 U.S. 307, 318-319 (1979).

After full deliberation, the jury found the defendant guilty on Count 24 of the Superseding Indictment. There was ample legally sufficient evidence to support the jury's verdict on this count.

## 2. DEFENDANT ERRONEOUSLY ARGUES THAT EVIDENCE IN SUPPORT OF COUNTS 26 – 27, MAINTAINING DRUG-INVOLVED PREMISES, WAS 404(b) EVIDENCE.

In point two of his motion, the defendant erroneously argues that the testimony of patients not specifically identified in Counts 1 through 25 of the Superseding Indictment was improperly admitted as 404(b) evidence.  In making this argument, the defendant ignores the independent counts of 26 and 27 of the Superseding Indictment and the specific elements of those counts.

Regarding Counts 26 and 27, the jury was instructed that in order to establish a violation of 21 U.S.C. § 856(a), the Government must have proven that the defendant knowingly rented, used, or maintained any place, that is, his medical office(s), for the purpose of distributing a controlled substance.

Under Rule 402 of the Federal Rules of Evidence, relevant evidence is admissible unless the Constitution, a federal statute, the Federal Rules of Evidence, or rules prescribed by the Supreme Court provide otherwise. Fed. R .Evid. 402.

Rule 401 defines relevant evidence as having "any tendency to make the existence of any fact that is of consequence to the

16

determination of the action more probable or less probable than it would be without the evidence."  Fed. Rule Evid. 401. Although evidence must be relevant to be admissible, Rule 401 does not set a high standard for admissibility. *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 109–10 (3d Cir.1999) (citation omitted).  The Third Circuit has explained:

> Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Because the rule makes evidence relevant if it has any tendency to prove a consequential fact, it follows that evidence is irrelevant only when it has no tendency to prove the fact.

*Blancha v. Raymark Indus.*, 972 F.2d 507, 514 (3d Cir.1992) (emphasis in original) (citations and quotations omitted).

The defendant fails to appreciate the fact that he was charged beyond those specific patients charged in Counts 1 through 25.  Counts 26 and 27 of the Superseding Indictment charged that the defendant maintained drug involved premises first at his office located at 104 Bennett Avenue, Suite 1B, Milford, Pike County, Pennsylvania, and then at his office located at 200 3rd Street, Milford, Pike County, Pennsylvania.  In support of those counts, the Government was

required to prove that the drug activity was a significant or important reason why the defendant maintained the places identified. Therefore, the defendant's treatment of all patients, not only the ones specifically identified in Counts 1 through 25, was relevant evidence in addressing the crimes alleged in Counts 26 and 27. As such, any conduct or factor that is relevant to this broader scope of illegal conduct was appropriately admitted as relevant evidence in support of those counts and not 404(b) evidence.

Certainly, the representative sample of individual distribution counts charged in Counts 1 through 25 exemplified the patterns of the defendant's practice that were outside the usual course of professional practice and not for a legitimate medical purpose. But those counts were but a piece of what the Government alleged in Counts 26 and 27; what was alleged throughout the Superseding Indictment; and what the Government's expert reviewed. (MDPA 3:16-cr-194, Doc. 47.)

Thus, the evidence the defendant now characterizes as 404(b) evidence was, in fact, not 404(b) evidence. Testimony of the patients not specifically identified in Counts 1 through 25 was not extraneous by any means. Their testimony was intrinsic and relevant to specific

counts for which the Government bore the burden of proving the

defendant's guilt beyond a reasonable doubt.  The defendant's argument

in this regard is not well founded in law or facts.  His limited

perspective on what was charged and what was relevant is misguided

and does not reflect the more comprehensive illegal conduct that was

charged and brought before the jury.

### 3.   <u>GOOD FAITH INSTRUCTION WAS NOT WARRANTED</u>.

In point three of the defendant's supplemental motion, he argues

for a new trial because he claims the Court should have instructed the

jury on good faith.  The defendant argues that the Court's failure to do

so, "taints the verdict in this case."  (Doc. 214 at 9).  There is no error on

this issue.  As the Third Circuit has repeatedly explained, such an

instruction is unnecessary and duplicative if the district court properly

charges the jury on knowledge and intent.

On June 4, 2018, the Court charged the jury and defined the

elements of each crime, including the following:

> In order to find [him] guilty of distributing and dispensing or
> causing to be distributed and dispensed a controlled
> substance outside the usual course of professional practice
> and not for a legitimate medical purpose, you must find that
> the government proved each of the following four elements

beyond a reasonable doubt as to Dr. Li:  First, that the defendant distributed and dispensed or caused to be distributed and dispensed a mixture or substance containing a controlled substance; second, that he distributed and dispensed or caused to be distributed or dispensed the controlled substance outside of the usual course of professional practice and not for a legitimate medical purpose; third, that he distributed and dispensed or caused to be distributed or dispensed the controlled substance while know or intending that the distribution was outside of the course of professional practice and not for a legitimate medical purpose; and, fourth, that the controlled substance was the substance identified in the superseding indictment.

(June 4, 2018 Trial Transcript at 23-24) (Attachment A).

The Court further instructed the jury on the "knowing" and "intentional" mental states applicable to the crimes charged:

The following offenses charged in the indictment require that the government prove that Dr. Li acted knowingly and intentionally with respect to certain elements of the offenses. Those are distribution of controlled substances outside the course of professional practice, also maintaining drug involved premises, also engaging in monetary transactions and property derived from specified unlawful activity.

To prove that Dr. Li acted knowingly, the government must prove beyond a reasonable doubt that Dr. Li was conscious and aware of the nature of his actions and of the surrounding facts and circumstances as specified in the definitions of the offenses charged.  To prove that he acted intentionally, the government must prove each beyond a reasonable doubt either, one, First, that Dr. Li – that it was Dr. Li's conscious desire or purpose to act in a certain way or

cause a certain result or, second, that Dr. Li knew that he was acting in that way or would be practically certain to cause that result.  In deciding whether Dr. Li acted knowingly or intentionally, you may consider evidence about what he said, what he did or what he failed to do, how he acted and all of the other facts and circumstances shown by the evidence that may prove what was in Dr. Li's mind at the time.  The government is not required to prove Dr. Li knew his acts were against the law.

Knowingly – mental state – knowingly or intentionally Controlled Substances Act specific.  The phrase knowingly or intentionally as used in counts one through 17, 19, 20, 22, through 25 of the indictment which charge Dr. Li with substance – with distribution of controlled substances outside of the usual course of professional practice and not for a legitimate medical purpose requires the government to prove beyond a reasonable doubt that he distributed or dispenses or caused to be distributed and dispensed a controlled substance and knew or intended that the distribution was outside of the usual course of professional practice and not for a legitimate medical purpose.  In addition, the government must prove beyond a reasonable doubt that the controlled substance was, in fact, a controlled substance charged in the superseding indictment.

(June 4, 2018 Trial Transcript at 35 – 38) (Attachment A).

Regarding the tax evasion counts as charged in Counts 30 through 32, the Court instructed the jury on the "willful" mental state as follows:

Mental state I will instruct you on now.  What does willfully mean.  The offense of tax evasion charge requires the government prove Dr. Li acted willfully with respect to

21

certain elements of the offense.  This means the government
must prove beyond a reasonable doubt that Dr. Li knew his
conduct was unlawful and intended to do something that the
law forbids.  That is, to find that he acted willfully, you must
find the evidence proved beyond a reasonable doubt that Dr.
Li acted with a purpose to disobey or disregard the law.
Willfully does not, however, require proof Dr. Li had any evil
motive or bad purpose other than to disobey or disregard the
law.

(June 4, 2018 Trial Transcript at 43) (Attachment A).

As the above demonstrates, the instructions in this case, "taken as
a whole, adequately define[ ] the elements of the crime, including the
intent requirements, thereby making a good faith instruction
unnecessary and redundant." *United States v. Leahy,* 445 F.3d 634, 651
(3d Cir.2006).   In *Leahy*, the Third Circuit explicitly held that "a
district court does not abuse its discretion in denying a good faith
instruction where the instructions given already contain a specific
statement of the government's burden to prove the elements of a
'knowledge' crime."  445 F.3d at 651.  The Court explained that such an
instruction was "unnecessary and redundant" given the instructions on
the statute's specific intent requirement *Id.* at 651-52.  S*ee also United
States v. Diamond*, 2009 U.S. App. LEXIS 8598, at *3 (3d Cir. Apr. 23,
2009).

Here, the defendant proposed that the Court give a good faith instruction. (Doc. 160). At the charge conference, however, the Court declined that request. The Court explained that the good faith instruction was not warranted in the case. (May 31, 2018 Trial Transcript at 200) (Attachment B). The Court did not abuse its discretion in denying that defendant's request. The Court's clear instructions on the various mental states including knowing, intentional and willful, would have made the good faith instruction superfluous.

In his supplemental motion, the defendant argues that "[T]he defendant's good faith was the heart of the defense," and that the Court's failure to so instruct "taints the verdicts in this case." (Doc. 214 at 9). The Third Circuit disagrees.

It is well-settled in this Circuit that a good faith instruction is not required in a "knowledge crime" where the trial court has otherwise properly instructed the jury on the mens rea element. As stated above, the Court did so here, and thus there was no need to give a good faith instruction, which would have merely repeated what the jury already was told by the defendant and doubtless understood.

23

In *United States v. Gross*, 961 F.2d 1097 (3d Cir. 1992) the defendant was charged with making false statements to the Securities and Exchange Commission and conspiring to violate the securities laws. For the conspiracy count, the Government was required to prove that Gross "agreed to participate in an unlawful scheme with knowledge of its essential nature," and for the false statement counts the Government was required to prove that Gross "acted with knowledge of the wrongfulness of his actions." *Id.* at 1102. Gross argued, as does this defendant, that "his only real defense" to the Government's charges was good faith and that he stressed good faith throughout the presentation of his case and in his closing. He argued that the failure to provide such an instruction therefore deprived him of the defense and constitutes an abuse of discretion. *Id.* at 1101. The Third Circuit disagreed and held that the district court did not abuse its discretion in declining to give the requested good faith instruction:

> The majority of circuits have held that an instruction setting forth all of the elements of a "knowledge" crime is sufficient and, hence, that a district court does not abuse its discretion in refusing to instruct on the good faith defense.... The majority position derives from the theory that the good faith defense instruction is merely surplusage.... We are persuaded by the majority view, and agree that a jury

finding of good faith is inconsistent with a finding that the defendant acted knowingly and willfully.... By giving a detailed instruction on the elements of the crime with which Gross was charged, the court ensured that a jury finding of good faith would lead to an acquittal.

*Gross*, 961 F.2d at 1103.

The Third Circuit reached a similar decision in *United States v. Leahy*, *supra*, where the district court explained to the jury that "[t]he intent element of bank fraud is an intent to deceive the bank in order to obtain from it money or other property." *Id.* at 644. The Third Circuit held, relying on *Gross*, that the district court did not abuse its discretion in denying the requested good faith jury instruction, finding that "the district court's instructions, taken as a whole, adequately defined the elements of the crime, including the intent requirement, thereby making a good faith instruction unnecessary and redundant." *Id.* at 651.

Here, the Court instructed the jury that it was required to find the defendant acted knowingly and intentionally with respect to the controlled substances violations, maintaining drug involved premises, and engaging in monetary transactions with property derived from specified unlawful activity. (June 4, 2018 Trial Transcript at 35 - 38)

(Attachment A).  The Court instructed the jury that it was required to find that the defendant acted willfully with respect to the tax evasion charges.  *Id.* at 43.  All of the above rendered any instruction on good faith superfluous.  No error was committed by the Court and the defendant's argument is without merit.

4.  <u>**TESTIMONY REGARDING PATIENTS' ADDICTIONS, SUBSEQUENT SYMPTOMS, AND CONSEQUENCES OF WITHDRAWAL WAS HIGHLY RELEVANT AND NOT IMPROPER.**</u>

In point four of his supplemental motion, the defendant argues that certain testimony regarding patients' addiction and subsequent symptoms and consequences of withdrawal was improper.  Again, the defendant appears to have a limited perspective on what was charged and what was relevant evidence.  The personal experiences of the patients who testified was particularly relevant and probative evidence of the defendant's treatment of those patients outside the usual course of professional practice and not for legitimate medical purposes.  In other words, had the defendant been operating in a manner consistent with professional practice and for legitimate medical purposes, those patients would not have suffered the devastating impact of drug

withdrawal when the defendant could no longer prescribe large quantities of controlled substances for them.

At trial, the jury learned that despite numerous indicators of addiction, abuse, and diversion, the defendant never deviated from his practice of fostering addiction to a returning clientele.  When the defendant was shut down in January of 2015, many of his former patients found themselves in immediate and severe withdrawal.  This was a predictable outcome of the defendant's overprescribing outside the usual course of professional practice and relevant evidence demonstrating the same.

Former patients testified that when the defendant was no longer in the position to supply them with their drug of choice after having done so month after month, year after year, they experienced severe physical pain.  This was a predictable outcome of the defendant's overprescribing outside the usual course of professional practice and relevant evidence demonstrating the same.

Former patients testified that within short order, they were on the street seeking either pills (oxycodone) or heroin.  This was a predictable

outcome of the defendant's overprescribing outside the usual course of professional practice and relevant evidence demonstrating the same.

Former patients testified that in order to avoid immediately going to the street to feed their addictions, they tried to find another doctor who would continue to prescribe opioids in the same quantity and dosage they received from the defendant.  Their efforts proved futile. Former patients testified that they could not find any other doctor who was willing to prescribe the drugs the defendant was prescribing.  Many testified that rather than face what they described as the sheer agony of withdrawal, they went to the street.  Many described how deathly ill they became and how they suffered without the pills the defendant prescribed for them.  This was a predictable outcome of the defendant's overprescribing outside the usual course of professional practice and relevant evidence demonstrating the same.

The subsequent consequences of drug addiction experienced by the defendant's former patients were relevant to show that the defendant's treatment of these patients was outside the usual course of professional practice.  The jury learned that such severe withdrawal should not

occur when a doctor acts within the usual course of professional practice.

Likewise, the birth of an opioid dependent baby was relevant to show that the defendant's treatment of the mother was outside the usual course of professional practice. The defendant's medical records indicated that on May 1, 2014, he prescribed #120 oxycodone 30 mg pills to an obviously pregnant person. Witnesses testified that they practically begged the defendant not to write the prescription and repeatedly told him that the woman was pregnant. In fact, she was 37-weeks pregnant. Despite the warnings, the defendant wrote a prescription for a large quantity of opioid medication at the highest dosage. Just eleven days later, RS gave birth to an opioid dependent baby. This was relevant evidence probative of the defendant acting outside the usual course of professional practice. The jury learned that an opioid dependent baby should never be the result of an appropriate prescribing regimen.

In *United States v. Kirk*, 584 F.2d 773,788 (6th Cir. 1978), the defendant physician objected to the relevancy of evidence that his patients sold drugs which they had obtained pursuant to prescriptions

from the defendant. In addition, the defendant argued that witnesses should not have been allowed to testify about getting high and suffering a possible heart attack or death from the drugs. However, the Sixth Circuit held that, because the defendant raised the defense that his prescriptions were issued for a lawful, medical purpose (primarily weight control), the evidence that tended to show that the drugs involved were subject to abuse if their use was not carefully supervised was relevant. *Id.* at 788; *see also United States v. Sims-Robertson*, No. 92-1076, 1994 WL 12212, at *2 (6th Cir. Jan. 18, 1994) (medical expert testimony was relevant and admissible on the subject of whether a the practitioner was acting in the usual course of professional practice). The *Kirk* panel held that the Government's evidence, similar to this case, tended to show that prescriptions for drugs in the quantities involved could not have been intended for a legitimate medical purpose. 584 F.2d at 781; *see also United States v. August*, 985 F.2d 705, 713 (6th Cir. 1992) (high quantities of purchases of drugs can infer an intent to distribute by podiatrist instead of legitimate medical purpose).

While the defendant argues that the above described evidence "completely undermines the trustworthiness of the verdict," his argument is without merit.  (Doc. 214 at 12).

## VI. CONCLUSION

The Government presented the jury with sufficiently ample evidence, viewed in the light most favorable to the Government, to find the defendant guilty on all charges under deliberation.  "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt."  *United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir. 1990). Moreover, any perceived trial errors alleged by the defendant does not equate to manifest injustice.

The Government respectfully requests that the court deny the defendant's supplemental motion for judgment of acquittal.

Respectfully submitted,

DAVID J. FREED
United States Attorney

By:  /s/ Michelle L. Olshefski

MICHELLE L. OLSHEFSKI
Assistant U.S. Attorney

Dated:  February 13, 2019

## Word Count

Counsel for the government hereby certifies that the word count of this brief is 6,209 words.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:16-CR-194 |
| | : | |
| v. | : | (JUDGE CAPUTO) |
| | : | |
| FUHAI LI, | : | (ELECTRONICALLY FILED) |
| Defendant | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 13th day of February, 2019, I caused the foregoing "**Government's Response to Defendant's Supplemental Motion for Judgment of Acquittal**" to be served upon David S. Bahuriak, Esquire, counsel of record for the defendant, and that Attorney Buhuriak is a filing user under the ECF system.

/s/ Michelle L. Olshefski

Michelle L. Olshefski
Assistant U.S. Attorney