# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

FUHAI LI,

      Defendant.

NO. 3:16-CR-0194

(JUDGE CAPUTO)

## MEMORANDUM

Fuhai Li, a licensed pain management and neurology specialist, was charged in the Superseding Indictment with drug related offenses, money laundering, and tax evasion. Following a month long trial, Dr. Li was found guilty of: (1) twenty-one counts of unlawful distribution and dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1); (2) one count of unlawful distribution and dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose that resulted in serious bodily injury or death in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); (3) one count of unlawful distribution and dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose to a pregnant individual in violation of 21 U.S.C. § 861(f); (4) two counts of maintaining a drug-involved premise in violation of 21 U.S.C. § 856(a)(1); (5) two counts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957; and (6) three counts of tax evasion in violation of 26 U.S.C. § 7201. Dr. Li has now moved for judgment of acquittal. Because the evidence when viewed in the light most favorable to the Government supports the jury's verdict, Dr. Li's motion for judgment of acquittal will be denied.

## I. Background

Dr. Li was a physician licensed by the Commonwealth of Pennsylvania. He held

a Pennsylvania medical license, as well as a Drug Enforcement Administration (DEA) registration number. Dr. Li represented himself to be a specialist in neurology and pain management.

On July 19, 2016, a federal grand jury returned a 24-count Indictment charging Dr. Li with various violations of federal law. Counts 1 through 15 charged violations of 21 U.S.C. § 841(a)(1), for Dr. Li's distribution and dispensing of controlled substances outside the usual course of professional practice and not for a legitimate medical purpose. Count 16 charged a violation of 21 U.S.C. § 841(a)(1), for Dr. Li's distribution and dispensing of a controlled substance resulting in serious bodily injury and death of a person. Count 17 charged a violation of 21 U.S.C. § 861(f), for Dr. Li's distribution and dispensing of a controlled substance to a pregnant individual. Counts 18 and 19 charged violations of 21 U.S.C. § 856(a)(1), for Dr. Li maintaining locations at 104 Bennett Avenue, Suite 1B, Milford, Pennsylvania, and 200 3rd Street, Milford, Pennsylvania, for the purpose of unlawfully distributing controlled substances. Counts 20 and 21 charged violations of 18 U.S.C. § 1957, for Dr. Li engaging in monetary transactions in property derived from specified unlawful activity. Counts 22 through 24 charged violations of 26 U.S.C. § 7201, for tax evasion. The Indictment also included a forfeiture allegation seeking forfeiture of various property and United States currency.

A Superseding Indictment was filed on October 17, 2017. This Indictment expanded the scope of the original Indictment insofar that it charged Dr. Li with an additional eight counts of unlawful distribution and dispensing of a controlled substance in violation of 21 U.S.C. § 841(a)(1) and required forfeiture of Dr. Li's medical license. The Superseding Indictment also narrowed the time periods for conduct alleged in the original Indictment.

Dr. Li subsequently filed pre-trial motions to suppress, for additional discovery, for a bill of particulars, to sever the offenses, and to dismiss certain counts of the Superseding Indictment. The motion to suppress was deemed withdrawn after Dr. Li

failed to file a brief as required, while the remainder of the motions were denied on March 13, 2018.

Dr. Li also filed motions *in limine* to exclude certain evidence, including the testimony of the Government's expert witness, Dr. Stephen Thomas. A *Daubert* hearing was held on May 1, 2018. At the conclusion thereof, I found that Dr. Thomas was qualified to testify at trial.

Trial commenced the next day. The Government during its case-in-chief presented testimony from nineteen of Dr. Li's former patients, three of Dr. Li's former employees, eight pharmacists, three physicians with factual connections to some of the events charged in the Superseding Indictment, DEA officials, an IRS special agent, and Dr. Thomas. Without objection by Dr. Li, the complete medical record of every one of his patients was admitted into evidence by way of a mirror image of Dr. Li's computers. In addition, the complete medical record for each patient identified in the distribution counts was admitted into evidence in printed form at trial.

The nineteen former patients that testified at trial provided similar testimony regarding their visits to Dr. Li. Generally, they described brief initial physical examinations at their first visit with Dr. Li, although some testified that no physical examination was ever conducted. Follow up visits, according to these patients, were typically short and consisted of answering a few basic questions and then having their opioid prescriptions renewed. The patients also testified to inconsistencies or inaccuracies in their medical records. Several patients testified that they utilized Dr. Li as a physician because they thought he would be an easy target to obtain opioid prescriptions.

The Government also presented testimony from eight Milford-area pharmacists. These pharmacists provided testimony regarding concerns with the frequency and strength of the prescriptions for opiods prescribed by Dr. Li. As a result, some of the pharmacists refused to fill controlled substance prescriptions that Dr. Li prescribed, while other pharmacists limited Dr. Li's prescriptions that they were willing to fill.

Reasons these pharmacists rejected prescriptions written by Dr. Li included, *inter alia*, the patients often presented with the same prescription (for Oxycodone), the prescriptions were for the highest maximum dose (30 mg) in large quantities (more than 120 pills a month), and involved patients that had traveled long distances to see Dr. Li.

Dr. Thomas also testified as the Government's pain management expert at trial. For the unlawful drug distribution charges in Counts 1-17, 19-20, and 22-25, Dr. Thomas opined that the prescriptions written to each of these individuals by Dr. Li were not written for a medically legitimate purpose in the usual course of professional practice. In reaching that opinion, Dr. Thomas testified regarding the medical records for each of these individuals and identified his reasons for concluding that the prescriptions lacked a legitimate medical purpose and were not prescribed in the usual course of professional practice. On cross-examination, Dr. Thomas acknowledged that he reviewed documents from about 39 patients provided to him by the DEA and/or U.S. Attorney's Office, and in total he reviewed the records of only about 60 of Dr. Li's 1800 patients.

At the close of the Government's case, the Government moved to withdraw Counts 18 and 21 of the Superseding Indictment. That motion was granted. Dr. Li moved for judgment of acquittal at that time, but the motion was denied.

Dr. Li then offered his own evidence. Dr. Li presented testimony from former patients, a Pennsylvania State Police Corporal, and his expert witness Dr. Carol Warfield. Dr. Warfield, an expert in pain management and pain medication, testified that she reviewed the medical records for each of the 24 patients that Dr. Li was charged with individual controlled substance distribution violations. According to Dr. Warfield, the prescriptions to these patients were for a legitimate medical purpose and prescribed in the usual course of a medical practice. Dr. Warfield explained that while Dr. Li was certainly fooled by some patients as to whether they had pain, there was "no question in [her] mind that these were prescribed in the usual course of medical

4

practice." While Dr. Warfield did not discuss each of the patients that the individual controlled substance charges were based on, she testified in detail about the records relating to the patients charged in Counts 5, 8, 17, and 19 of the Superseding Indictment to support her opinion that Dr. Li was legitimately practicing medicine and that his prescriptions were written for a legitimate medical use. Dr. Warfield, on cross-examination, testified that her review of Dr. Li's medical files was limited to the records for the 24 individuals related to the controlled substance distribution charges in the Superseding Indictment.

Dr. Li also testified on his own behalf at trial. Dr. Li testified that he had approximately 2000 patients in his practice between 2010 and 2015 and that ninety percent of those patients were for pain management. During that time, Dr. Li testified that he rejected 98 individuals as patients due to lack of records and that over 200 individuals were rejected after their records were reviewed. Dr. Li also indicated that from review of his records, 458 patients were discharged. And, of his approximate 1700 pain management patients, 204 were not prescribed opioids. Dr. Li emphasized that patients paid for his services, not for pills or prescriptions. On cross-examination, Dr. Li was questioned about the medical records of several of his former patients, including some that were not among the 24 patients he was charged with individual counts of controlled substance distribution violations.

On June 4, 2018, the jury found Dr. Li guilty of unlawful distribution and dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1) (Counts 1-17, 19-20, and 22-23), unlawful distribution and dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose that resulted in serious bodily injury or death in violation of 21 U.S.C. § 841(a)(1) (Count 24), unlawful distribution and dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose to a pregnant individual in violation of 21 U.S.C. § 861(f) (Count

25), maintaining a drug-involved premise in violation of 21 U.S.C. § 856(a)(1) (Counts 26-27), engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 (Counts 28-29), and tax evasion in violation of 26 U.S.C. § 7201 (Counts 30-32).

Dr. Li timely filed a motion for judgment of acquittal and supporting brief on June 18, 2018. Therein, Dr. Li challenges the sufficiency of the evidence on his drug distribution convictions (Counts 1-17, 19-20, and 22-25), drug involved premises convictions, (Counts 26-27), and money laundering convictions (Counts 28-29).[1] The Government filed a timely opposition to Dr. Li's motion. Dr. Li subsequently requested leave to supplement his motion for judgment of acquittal, and that request was granted. Dr. Li filed his supplemental brief in support of his motion on January 21, 2019. The Government timely responded to Dr. Li's supplemental brief. Accordingly, the motion for judgment of acquittal is fully briefed and ripe for disposition.

## II. Legal Standard

Federal Rule of Criminal Procedure 29(c) provides, in pertinent part, that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). "A defendant challenging the sufficiency of the evidence pursuant to Rule 29 bears a heavy burden." *United States v. John-Baptiste*, 747 F.3d 186, 201 (3d Cir. 2014) (citation and internal quotation marks omitted). In reviewing a motion for judgment of acquittal under Rule 29, a court considers "whether the evidence, when viewed in a light most favorable to the government, supports the jury's verdict." *United States v. Fattah*, 902 F.3d 197, 267-68 (3d Cir. 2018) (citing *United States v. Dixon*, 658 F.2d 181, 188 (3d Cir. 1981)). A jury verdict must be upheld "unless no reasonable juror could accept the evidence as

---

[1] Dr. Li's motion and supporting brief provide no argument for judgment of acquittal on the tax evasion convictions (Counts 30-32). Thus, I do not address the sufficiency of the evidence on those Counts.

sufficient to support the defendant's guilt beyond a reasonable doubt." *Id*. at 268 (citing *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)); *see also United States v. Benjamin*, 711 F.3d 371, 376 (3d Cir. 2013) ("When a defendant attacks the sufficiency of the evidence underlying a jury verdict, the court must review the record evidence in a light most favorable to the prosecution and uphold that verdict if any rational trier of fact could find guilt beyond a reasonable doubt.").

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Granting or denying a motion for a new trial "lies within the discretion of the district court." *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006). A court evaluating a Rule 33 motion does not view the evidence favorably to the government but instead must "exercise[ ] its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (citation omitted). Rule 33 motions are disfavored and should be "granted sparingly and only in exceptional cases." *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) ). Exceptional cases include those in which trial errors "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (citation omitted).

### III. Discussion

Dr. Li, as stated, challenges the sufficiency of the evidence to support his convictions on the drug distribution, the drug-involved premise, and the money laundering charges.

**A.      Counts 1-17, 19-20, and 22-23.**

Dr. Li was found guilty of twenty-one counts of unlawful distribution and dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1). As instructed at trial, the jury was required to find that the Government proved the

following four elements beyond a reasonable doubt to find Dr. Li guilty on these Counts: (1) that Dr. Li distributed and dispensed, or caused to be distributed or dispensed, a mixture or substance containing a controlled substance; (2) that he distributed and dispensed, or caused to be distributed or dispensed, the controlled substance outside the usual course of professional practice and not for a legitimate medical purpose; (3) that he distributed and dispensed, or caused to be distributed or dispensed, the controlled substance while knowing or intending that the distribution was outside the usual course of professional practice and not for a legitimate medical purpose; and (4) that the controlled substance was the substance identified in the superseding indictment. *See also United States v. Garrison*, 888 F.3d 1057, 1064 (9th Cir. 2018) (violation of § 841 by physician required proof that "(1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs and with intent to distribute them outside the course of professional practice."); *United States v. Rottschaefer*, 178 F. App'x 145, 147 (3d Cir. 2006) ("To convict [the defendant physician] of violating 21 U.S.C. § 841(a)(1), the government was required to prove (1) that he distributed or dispensed a controlled substance, (2) that he acted knowingly and intentionally, and (3) that he did so other than for a legitimate medical purpose and in the usual course of his professional practice."). The thrust of Dr. Li's argument is that the Government failed to prove beyond a reasonable doubt that he prescribed controlled substances to each patient "knowingly and intentionally not for a legitimate medical purpose (namely not for purpose of controlling pain) and outside the usual course of professional practice (namely outside the usual course of pain management)." (Doc. 183, 6).

Dr. Li's motion for judgment of acquittal on Counts 1-17, 19-20, and 22-23 of the Superseding Indictment will be denied. The Government presented sufficient evidence at trial which, when viewed in a light most favorable to the prosecution,

supports the jury's verdict of guilt beyond a reasonable doubt. The evidence presented in the Government's case-in-chief included, first and foremost, Dr. Li's medical records for each of these twenty-one patients, all of which were admitted into evidence in their entirety without objection by Dr. Li. Moreover, many of these twenty-one patients testified to similar experiences with Dr. Li.[2] These patients generally described, at most, a cursory initial examination with Dr. Li and follow-up visits that were brief and involved only answering a few routine questions. Yet, after each visit, Dr. Li would write these patients prescriptions for opioides. Some of these patients explained that they contacted Dr. Li because they believed he would be an easy target to obtain opioid prescriptions to satisfy their addictions, while others explained that they became addicted to opioids after being treated by Dr. Li.

The Government also offered the expert testimony of Dr. Thomas. Dr. Thomas reviewed the medical records for each of the twenty-one patients Dr. Li was charged with unlawful distribution in Counts 1-17, 19-20, and 22-23 of the Superseding Indictment. Dr. Thomas explained at length at trial why it was his opinion, to a reasonable degree of medical certainty, that the treatment and opioid prescriptions for each of these patients was outside the usual course of professional practice and not for a legitimate medical purpose. Dr. Thomas' opinions made reference to the fact that Dr. Li's practice and the prescriptions he wrote ignored numerous "red flags"[3] about his patients that cast doubt upon the legitimacy of his medical practice.

Dr. Li's former patients also testified about difficulty they had filling

---

[2]     Specifically, the individuals identified in Counts 2-7, 9-10, 12, 14-15, 19, and 23 all testified at trial.

[3]     Dr. Thomas identified "red flags" associated with "pill doctors" or "pill mills" to include: the use of solely opioids for pain treatment; filling specific drug requests, *i.e.*, requests for a single type of medication; trinity prescribing, *i.e.*, an opioid plus a Benzodiazapine plus a muscle relaxer; age of the patients; distance traveled by patients; high dosage amounts; stolen prescriptions; and family members on similar drugs and dosages.

prescriptions he wrote at several pharmacies. This testimony was corroborated by the testimony from several pharmacists that explained that they made the decision to refuse to fill prescriptions by Dr. Li or that they became extremely selective in which of Dr. Li's prescriptions they would fill. Along with this testimony, the jury learned that Dr. Li would direct patients to a different pharmacy willing to fill his prescriptions, typically Alitons in Milford, Pennsylvania.

Given all the evidence presented at trial, the Government provided sufficient support to uphold the jury's findings as to Counts 1-17, 19-20, and 22-23. To be sure, Dr. Li presented evidence supporting his view that the distribution of opioids to these patients was for a legitimate medical purpose and in the usual course of professional practice. For instance, Dr. Warfield testified that Dr. Li's treatment of the respective patients identified in these Counts of the Superseding Indictment were prescribed medicine in good faith and as part of a legitimate medical practice. Testimony at trial also confirmed that many of these patients attempted to deceive Dr. Li as to the legitimacy of their pain and lied to him in order to receive opioid prescriptions. Dr. Li also testified regarding his treatment of several of these individuals, and he discussed his reasoning for his treatment decisions and his view that as a pain management physician he listened and trusted his patients unless there was a reason not to believe them. While Dr. Li's view of the evidence differed from that presented by the Government, in reviewing the sufficiency of the evidence I am required to be "be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [my] judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Because the evidence when viewed in the light most favorable to the Government supports a finding of guilt beyond a reasonable doubt on the necessary elements of the controlled substance distributions charges in Counts 1-17, 19-20, and 22-23 of the Superseding Indictment, the verdict on these Counts will not be altered.

**B.     Count 24.**

The jury convicted Dr. Li of Count 24 of the Superseding Indictment where he was charged with unlawful distribution and dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose that resulted in serious bodily injury or death in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). The jury was instructed at trial that to find Dr. Li guilty of this Count, the Government was required to prove the following beyond a reasonable doubt: (1) that on or about October 5, 2011, Dr. Li distributed and dispensed, or caused to be distributed and dispensed, to Suzanne Maack, Oxycodone, the controlled substance charged in Count 24 of the Superseding Indictment; (2) that he did so knowingly or intentionally; (3) that at the time of the distribution or dispensing, on or about October 5, 2011, the distribution or dispensing of the controlled substance Oxycodone to Ms. Maack was not for a legitimate medical purpose and was outside the usual course of professional medical practice; (4) that Ms. Maack used the Oxycodone which Dr. Li distributed and dispensed, or caused to be distributed or dispensed, to Ms. Maack; and (5) that death or serious bodily injury resulted from the use of the controlled substance. *See also United States v. Bado*, No. 15-37, 2017 WL 2362401, at *2 (E.D. Pa. May 30, 2017) ("Under 21 U.S.C. § 841(a)(1), (b)(1)(C), unlawful distribution resulting in death requires proof of the following four elements: (1) Defendant distributed or dispensed a mixture or substance containing a controlled substance; (2) the distribution was knowing and intentional; (3) Defendant distributed/dispensed the controlled substance outside of the course of professional practice and not for a legitimate medical purpose; and (4) death resulted from the use of the controlled substance."). The jury was instructed that to find that death or serious bodily injury resulted from the use of the substance, the Government was required to prove beyond a reasonable doubt that the use of the substance was a but-for cause of the death or injury, meaning the Government had to establish beyond a reasonable doubt that the death or serious bodily injury would not have resulted had

Ms. Maack not used the controlled substance distributed by Dr. Li. In his challenge to his conviction on Count 24, Dr. Li points to the absence of proof beyond a reasonable doubt that he prescribed Oxycodone to Ms. Maack knowingly and intentionally not for a legitimate medical purpose and outside the usual course of professional practice. Furthermore, Dr. Li contends that the Government failed to prove that Ms. Maack's use of Oxycodone was a but-for-cause of her death. In his supplemental brief, Dr. Li also asserts that the evidence was insufficient on this Count because he saw Ms. Maack only once and the evidence clearly shows that she committed suicide which he cannot be held criminally responsible for.

At trial, the Government introduced Ms. Maack's medical file demonstrating that she was prescribed 120 Oxycodone 15 mg pills on October 5, 2011. The trial evidence demonstrated that the prescription was filled that day. William Maack, Ms. Maack's husband, testified that she took three pills that day. Mr. Maack testified about the following day, October 6, 2011, and how Ms. Maack appeared energetic that evening. Mr. Maack went to bed at about 11:30, and Ms. Maack did not follow to bed until a few hours later. After 4:00 the next morning, Mr. Maack went to the bathroom and noticed his wife was laying on her side and snoring. The alarm went off at 6:15 the morning of October 7, 2011, and Mr. Maack noticed that Ms. Maack was halfway off the bed, clammy and cold, and did not have a pulse. Ms. Maack was rushed to the hospital by ambulance, and before Mr. Maack left he grabbed her bottle of Oxycodone. At the hospital it was discovered that over 40 pills were missing from the bottle. Ms. Maack died the following day.

Dr. Louis O'Boyle, an internist, testified that he first encountered Ms. Maack in the emergency room while working at the Wayne Memorial Hospital on October 7, 2011. Dr. O'Boyle recalled learning that Ms. Maack had a prescription missing 42 pills, which he testified would be a large enough dose to stop an individual from breathing. Dr. O'Boyle evaluated and treated Ms. Maack over the next day, until he pronounced her deceased on October 8, 2011. Dr. O'Boyle opined that the cause of

Ms. Maack's death was respiratory arrest from a narcotic overdose.

The Government also presented the testimony of Wayne County Coroner Carol Lienert, who testified that she certified the death certificate for Ms. Maack identifying her cause of death as anoxic brain injury due to cardiac arrest due to drug overdose.

Dr. Michael Coyer, a forensic toxicologist, testified that he prepared a toxicology report analyzing a serum sample from Ms. Maack. Based on his testing, Dr. Coyer found that there were 215 nanograms per milliliter of Oxycodone in her blood, as well as 15 nanograms of oxymorphone, a metabolite of Oxycodone. Dr. Coyer opined that the level of oxycodone in Ms. Maack's blood was consistent with her cause of death.

Lastly, Dr. Thomas testified that the prescription for Oxycodone written by Dr. Li for Ms. Maack on October 5, 2011 was not for a legitimate medical purpose and was outside the scope of professional practice. Specifically, based on his review of medical records, Dr. Thomas concluded that Dr. Li knew Ms. Maack had an inconsistent urine test revealing a narcotic she was not prescribed before writing her a prescription for 120 Oxycodone 15 mg pills. Dr. Thomas also testified that Dr. Li's record revealed that he was aware that Ms. Maack had a complicated psychiatric history, that she had attempted suicide in the past, and that she had not been prescribed Oxycodone before. Moreover, Dr. Thomas opined that but for the prescription for Oxycodone Dr. Li prescribed on October 5, 2011, Ms. Maack would not have died.

During Dr. Li's case-in-chief, he presented testimony from Pennsylvania State Police Corporal James Travis. Corporal Travis testified that following Ms. Maack's death, he spoke with Mr. Maack and was informed that Mr. Maack found the missing pills and burned them.

The evidence, viewed in the light most favorable to the Government, supports the jury's verdict on Count 24 of the Superseding Indictment. Specifically, the Government presented sufficient evidence to establish each of the necessary elements to uphold a conviction for unlawful distribution and dispensing of a controlled

13

substance outside the usual course of professional practice and not for a legitimate medical purpose that resulted in serious bodily injury or death in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). The testimony and exhibits presented at trial, considered in favor of the prosecution, demonstrated that Dr. Li knowingly and intentionally prescribed opioids to Ms. Maack, that she took the opioids, that the prescription was not for a legitimate medical purpose and was outside the usual course of professional practice, and that Ms. Maack died as a result. The Government also presented evidence that Ms. Maack would not have died but for use of the controlled substance prescribed by Dr. Li. The trial record supports the jury's finding with respect to Count 24. Dr. Li's motion for judgment of acquittal as to this charge will be denied.

**C.    Count 25.**

Dr. Li was also found guilty of violating 21 U.S.C. § 861(f). Section 861(f) makes it a violation to knowingly or intentionally provide or distribute a controlled substance to a pregnant individual. *See* 21 U.S.C. § 861(f). Here, the jury was instructed that the Government was required to prove five elements beyond a reasonable doubt: (1) that Dr. Li distributed and dispensed, or caused to be distributed or dispensed, a mixture or substance containing a controlled substance; (2) that Dr. Li distributed and dispensed, or caused to be distributed or dispensed, the controlled substance outside the usual course of professional practice and not for a legitimate medical purpose; (3) that Dr. Li distributed and dispensed, or caused to be distributed or dispensed, the controlled substance while knowing or intending that the distribution was outside the usual course of professional practice and not for a legitimate medical purpose; (4) that the controlled substance was the substance identified in Count 25 of the Superseding Indictment; and (5) that at the time of the distribution of the controlled substance to Rachel Scarpa on or about May 1, 2014, Dr. Li knew or should have known that Ms. Scarpa was a pregnant individual.

At trial, Virginia McCracken, a former employee of Dr. Li, testified that she

recalled Ms. Scarpa as one of Dr. Li's patients. Ms. McCracken testified that she saw Ms. Scarpa at Wal-Mart the day before she had an appointment scheduled with Dr. Li. Based on her observation of Ms. Scarpa, Ms. McCracken was convinced that Ms. Scarpa was pregnant. The next day, Ms. McCracken advised Dr. Li that Ms. Scarpa was pregnant. Dr. Li questioned Ms. Scarpa if she was pregnant, but she denied it, stating that she stopped taking her Adderall which caused her to gain weight. Dr. Li continued to prescribe Ms. Scarpa opioids. Samanth Scicutella, an informing Government witness employed by Dr. Li, similarly testified that Ms. Scarpa looked pregnant and requested that Ms. Scarpa be given a pregnancy test. Dr. Li refused and continued to prescribe opioids to Ms. Scarpa. Ms. Scicutella acknowledged that Ms. Scarpa denied being pregnant to Dr. Li.

Ms. Scarpa also testified on behalf of the Government at trial. Ms. Scarpa began treating with Dr. Li in January 2013. Ms. Scarpa found out that she was pregnant in August 2013, but she did not provide this information to Dr. Li. Ms. Scarpa continued to receive opioid prescriptions from Dr. Li thereafter. At her appointment in March 2014, one of the secretaries in Dr. Li's office congratulated her on being pregnant, but Ms. Scarpa denied that she was pregnant. Ms. Scarpa had an appointment with Dr. Li on May 1, 2014, and by this time she had gained 40 pounds since she found out she was pregnant in August 2013. Dr. Li, though, never asked her about her weight gain. Ms. Scarpa gave birth on May 12, 2014.

Dr. Thomas also opined that Dr. Li's treatment of Ms. Scarpa lacked a legitimate medical purpose and was not within the usual course of professional practice. This, Dr. Thomas explained, was based on the fact that Ms. Scarpa's structural studies were normal and that he prescribed high dosages of opioids when lower dosages were reported to work.

Dr. Li was questioned regarding his treatment of Ms. Scarpa. According to Dr. Li, Ms. McCracken told him of her belief that Ms. Scarpa was pregnant in March or April 2014. Dr. Li testified that he specifically asked Ms. Scarpa if she was pregnant,

and she responded that she gained weight after discontinuing Adderall. Dr. Li explained that as a male physician, it is embarrassing to continue asking a woman if she is pregnant. Thus, because she denied being pregnant, Dr. Li did not note this in Ms. Scarpa's medical records.

Sufficient evidence was presented to the jury to support a guilty verdict on Count 25. The Government provided testimony that Dr. Li was informed that Ms. Scarpa was pregnant and that he nevertheless continued to prescribe her high dosages of opioids. Additionally, despite being informed by two staff members of concerns that she was pregnant, Ms. Scarpa's medical file contains no references to this possibility despite her gaining forty pounds in eight months. Testimony was also presented that Dr. Li's treatment of Ms. Scarpa was outside the usual course of professional practice and was not for a legitimate medical purpose. While Ms. Scarpa denied being pregnant to Dr. Li (as well as his staff), the evidence taken in the light most favorable to the Government was adequate for the jury to find Dr. Li guilty of the crime charged in Count 25 of the Superseding Indictment.

**D.    Counts 26-27.**

Dr. Li was found guilty of maintaining his offices as drug-involved premises in violation of 21 U.S.C. § 856(a)(1) for his practices at the Bennett Avenue and 3rd Street locations in Milford, Pennsylvania. Section 856(a)(1) makes it unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance[.]" 21 U.S.C. § 856(a)(1). To be found guilty under § 856(a)(1), the Government was required to prove beyond a reasonable doubt that Dr. Li: (1) permanently or temporarily maintained or leased or used the place described in the superseding indictment; (2) that he maintained that place for the purpose of distributing or dispensing outside the usual course of professional practice and not for a legitimate medical purpose any controlled substance; and (3) that he acted knowingly. *Cf. United States v. Lang*, 717 F. App'x 523, 545 (6th Cir. 2017). The

jury was instructed as to the second element that the Government was required to prove that the Dr. Li maintained his office for the specific purpose of distributing the controlled substances described in the Superseding Indictment, but, in so doing, it did not need to show that this purpose was the sole purpose for which the place was used, but it must have been one of the primary or principal uses for which the place was used. *See*, e.g., *United States v. Mancuso*, 718 F.3d 780, 794-96 (9th Cir. 2013); *United States v. Verners*, 53 F.3d 291, 296 (10th Cir.1995) ("that the manufacture (or distribution or use) of drugs must be at least one of the primary or principal uses to which the house is put."); *but see United States v. Sadler*, 750 F.3d 585, 592-93 (6th Cir. 2014) ("Drug distribution need not be the *primary* purpose of a premises, so long as it is a 'significant' one."); *United States v. Payton*, 636 F.3d 1027, 1043 (8th Cir. 2011). Dr. Li contends that the jury erred in finding him guilty on Counts 26 and 27 because the Government failed to prove that his offices were maintained for the purpose of prescribing controlled substances without a legitimate medical purpose and outside the usual course of professional practice.

The Government in opposition argues that it presented more than adequate evidence to support the jury's finding on the drug-involved premise charges. This evidence includes the testimony of several former patients, the hard copies of thousands of opioid prescriptions, Prescription and Drug Monitoring Program (PDMP) data, data from the Automatic Reports and Consolidated Ordering System (ARCOS), and the testimony of Dr. Thomas. According to the Government, this evidence established beyond a reasonable doubt that Dr. Li operated his pain management practice as nothing more than a "pill mill."

With respect to the testimony of former patients that testified at trial (as well as patients that did not testify but were discussed by Dr. Thomas), the Government provided detailed evidence of questionable, and at least as to those patients identified in Counts 1-17, 19-20, and 22-25, specific instances of unlawful distribution for which the jury found Dr. Li guilty. However, it was uncontested at trial that Dr. Li

discharged 458 patients and that of his 1700 pain management patients, over 200 of those were not prescribed opiods. In addition, Dr. Li refused to schedule approximately 100 individuals for appointments based on a lack of records, while another 212 individuals were rejected by Dr. Li as patients. Thus, the testimony about the specific unlawful prescription practices testified about by Dr. Li's former patients and Dr. Thomas, by itself, does not show that the primary or principal use of Dr. Li's business facilities was for the unlawful distribution of controlled substances.

The Government, though, also presented PDMP and ARCOS data to support the drug-involved premise charges. At trial, James Hischar, a DEA diversion investigator, testified that the PDMP data was a compilation of monitoring programs of Pennsylvania, New York, and New Jersey for all prescriptions written by Dr. Li from January 2011 through January 2015. That data demonstrated that the predominant drug prescribed by Dr. Li was Oxycodone and the predominant dosage of that drug was 30 mg. The Government also presented evidence through the testimony of DEA analyst Erin Radabaugh that for the time charged in the Superseding Indictment, Dr. Li wrote a total of 26,985 prescriptions for Schedule II Controlled Substances, and roughly half of these prescriptions were for Oxycodone 30 mg. And, during Dr. Thomas' examination, he explained that the number of prescriptions Dr. Li wrote for Oxycodone 30 mg was shocking, as Dr. Thomas only had two handfuls of patients at this dosage level during his career.

Nancy Jackson, a DEA diversion investigator and chief of the targeting and analysis unit, testified regarding the ARCOS data, which is used to track Schedule I, Schedule II, and Schedule III sales from distributors to the retail level, *i.e.*, pharmacies, doctors, and researchers. DI Jackson testified that this data is collected to determine quotas and monitor where drugs are being distributed. From this data, DI Jackson reviewed the amount of 30 mg Oxycodone pills distributed by certain Milford area pharmacies between 2011 and 2015. DI Jackson testified, for example, that the Milford area Wal-Mart dispensed 58,600 pills in April to June 2012, but that

number reduced to zero for the quarter ending in March 2013. DI Jackson testified about other pharmacies in the Milford area that also had spikes in dispensing 30 mg Oxycodone pills and then gradual or sudden drops by the end of DI Jackson's report for the quarter ending March 2015. This evidence, says the Government, allowed the jury to infer that Dr. Li's prescribing habits were excessive based on the fact that the amount of pills dispensed by these pharmacies plummeted after Milford area pharmacies began to refuse or reject some or all opioid prescriptions written by Dr. Li.

Finally, Dr. Thomas testified that most of the medical files he reviewed for Dr. Li's patients contained serious deficiencies, such as little evidence of structural imaging and charting that appeared to be inaccurate or copied and pasted from other records. Dr. Thomas also testified to his view that many of the prescriptions written by Dr. Li were not medically legitimate and were outside the usual course of professional practice. But, Dr. Thomas acknowledged that he did not review the entirety of Dr. Li's practice. Rather, he reviewed the individual records of only approximately 60 patients.

Given the evidence presented at trial, Dr. Li's motion for judgment of acquittal on the drug-involved premises charges will be denied. In the present context, the decision of the jury must be upheld "unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." *Fattah*, 902 F.3d at 268. The jury, on the evidence presented in the matter *sub judice*, could reasonably have found that Dr. Li maintained his offices for the primary or principal purpose of distributing or dispensing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose. The jury was presented with testimony from Dr. Thomas that Dr. Li was not engaged in the practice of medicine in prescribing controlled substances to many patients. The jury also saw the amount of Oxycodone pills dispensed at several Milford-area pharmacies during the relevant period and the drastic decrease in their distribution of such narcotics after they refused to fill prescriptions written by Dr. Li. The jury could thus conclude on

the evidence before it that the primary or principal purpose of Dr. Li's practice was to unlawfully distribute opioids. The jury's finding on Counts 26 and 27 will not be disturbed.

**E.     Counts 28-29.**

The jury also convicted Dr. Li of violating 18 U.S.C. § 1957 in Counts 28 and 29 of the Superseding Indictment. Section 1957 prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. §1957(a). The elements of a violation of § 1957 are "(1) the defendant engage[d] or attempt[ed] to engage (2) in a monetary transaction (3) in criminally derived property that is of a value greater than $10,000 (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from specified unlawful activity." *United States v. Sokolow*, 91 F.3d 396, 408 (3d Cir.1996) (quoting *United States v. Johnson*, 971 F.2d 562, 567 n. 3 (10th Cir.1992)). Dr. Li argues that the Government failed to prove beyond a reasonable doubt that he knowingly engaged in a monetary transaction in property derived from specified unlawful activity.

Dr. Li's motion for judgment of acquittal with respect to the money laundering charges will be denied. At trial, the Government demonstrated that Dr. Li received hundreds of thousands of dollars from his medical practice, and that this income flowed through different bank accounts. The Government also established, for reasons previously explained, that Dr. Li engaged in unlawful activity, namely prescribing opioids without a legitimate medical purpose and outside the usual course of the practice of medicine. The Government thus proved that the funds obtained by Dr. Li qualified as "criminally derived property," which is "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). Further, the distribution of controlled substances constitutes "specified unlawful activity." *See id*. at § 1957(f)(3); *see also* 18 U.S.C. § 1956(c)(7)(B)(I). On the

20

evidence presented at trial, a reasonable juror could find Dr. Li guilty of money laundering, so his motion for judgment of acquittal on those charges will be denied.

**F.      Supplemental Challenges.**

In addition to the challenges he raises specific to the Counts he was found guilty, Dr. Li also contends that: (1) improper Rule 404(b) evidence should have been excluded at trial or a limiting instruction should have been given to the jury; (2) the jury should have been charged on good faith; and (3) the extensive use of improper testimony designed to engender sympathy in the jury requires a new trial.  None of these grounds warrant the relief requested by Dr. Li.

First, Dr. Li insists that several witnesses were permitted to testify at his trial as Rule 404(b)[4] witnesses.  Specifically, Dr. Li notes that the Government presented testimony from several of Dr. Li's former patients at trial that he was not charged with individual counts of controlled substance distribution violations.  In opposition, the Government asserts that Dr. Li fails to appreciate that he was charged in Counts 26 and 27 with maintaining drug involved premises.  The Government concludes that the testimony offered by former patients that were not identified in the Superseding Indictment was not in fact Rule 404(b) evidence but was intrinsic and relevant to the drug involved premises charges.  The Government is correct.  Counts 26 and 27, as stated, charged Dr. Li with maintaining drug involved premises at his business offices. To prove that crime, the Government was required to establish, *inter alia*, that Dr. Li maintained those places for the purpose of distributing or dispensing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose.  While several of Dr. Li's former patients testified at trial were not named in individual counts in the Superseding Indictment, that testimony was

---

[4]       Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).

pertinent to establishing that the distribution of controlled substance was one of the primary or principal uses for which Dr. Li's offices were maintained. The testimony from any of Dr. Li's patients, including those not identified in the Superseding Indictment, was relevant to these charges.

Second, Dr. Li asserts that he is entitled to a new trial because the jury was not charged in accordance with his proposed good faith instruction. Dr. Li argues that "good faith was the heart of the defense" he offered at trial, and that the failure to provide the requested charge tainted the verdict. I do not agree.

Although Dr. Li originally requested the good faith instruction before the jury was charged, he withdrew that request during the charge conference. Furthermore, Third Circuit precedent makes clear that "good faith instructions are not required where the *mens rea* elements of a crime are properly set out. Failure to give a good faith instruction is not an abuse of discretion 'where the instructions given already contain a specific statement of the government's burden to prove the elements of a 'knowledge' crime.'" *United States v. James*, 712 F. App'x 154, 157 (3d Cir. 2017) (quoting *United States v. Leahy*, 445 F.3d 634, 651 (3d Cir. 2006) (citing *United States v. Gross*, 961 F.2d 1097, 1102-03 (3d Cir. 1992))). At trial, the jury was instructed on the relevant mental states to the crimes with which Dr. Li was charged, *i.e.*, knowingly, intentionally, and/or wilfully. Thus, the jury instructions, "taken as a whole, adequately defined the elements of the crime, including the intent requirement, thereby making a good faith instruction unnecessary and redundant." *Leahy*, 445 F.3d at 651.

Lastly, Dr. Li maintains that the Government's extensive reliance on testimony from his former patients about their life events that occurred after they stopped treating with him was irrelevant and offered only to engender sympathy in the jury. Dr. Li emphasizes that testimony from his former patients that they sold drugs, went to prison, lost jobs, and/or suffered episodes of drug withdrawal were not germane to the issue of whether he appropriately prescribed pain medication to these individuals.

22

Particularly troublesome was the testimony from Ms. Scarpa that she gave birth to an opioid-dependent baby. All of this testimony, Dr. Li argues, was an effort to prejudice the jury against him. Thus, he concludes that a new trial is warranted on this basis.

In contrast, the Government argues that the personal experiences of the patients was relevant and probative to show that Dr. Li's treatment was outside the usual course of professional practice and not for legitimate medical purposes. In the Government's words, "had [Dr. Li] been operating in a manner consistent with professional practice and for legitimate medical purposes, those patients would not have suffered the devastating impact of drug withdrawal when the defendant could no longer prescribe large quantities of controlled substances for them." (Doc. 224, 26-27).

Dr. Li is not entitled to a new trial on this ground. For the majority of this testimony, no objection was lodged at trial. Thus, he did not satisfy the requirements of Federal Rule of Evidence 103(a)(1). *See* Fed. R. Evid. 103(a) (1) (requiring timely and specific objection to evidence allegedly admitted in error); *United States v. Iglesias*, 535 F.3d 150, 158 (3d Cir. 2008) ("[A] party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection, . . . but also by making the wrong specific objection.") (internal citation omitted). As a result, the admission of such evidence would be subject to plain error review on appeal. *Id.*; *see also United States v. Wiktorchik*, 525 F. App'x 201, 203 (3d Cir. 2013); *United States v. Moore*, 375 F.3d 259, 260 (3d Cir. 2004). Dr. Li has not demonstrated that he can make the necessary showing to prevail on plain error review, so he is not entitled to a new trial on this ground. *See United States v. Hakim*, 344 F.3d 324, 328 (3d Cir. 2003) ("To establish plain error, the defendant must prove that there is (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"); *see also United States v. Adigun*, 998 F. Supp. 2d 356, 365-69

(M.D. Pa. 2014) (denying motion for new trial).

## IV. Conclusion

For the above stated reasons, Dr. Li's post-trial motion will be denied.

An appropriate order follows.

March 12, 2019                           /s/ A. Richard Caputo
Date                                           A. Richard Caputo
                                                     United States District Judge