UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:16-CR-194 |
| | : | |
| v. | : | (JUDGE CAPUTO) |
| | : | |
| FUHAI LI, | : | (ELECTRONICALLY FILED) |
| Defendant | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

## I.    INTRODUCTION

On October 17, 2017, a federal grand jury returned a 32-count Superseding Indictment that charged the defendant, Fuhai Li, with numerous violations of federal law related to the unlawful prescribing of opioids, including prescribing opioids that resulted in the death of a woman, prescribing opioids to a pregnant woman, and prescribing opioids in return for sexual favors.  *See MDPA 3-cr-16-194, Doc. 47)*.  On June 4, 2018, the jury returned a unanimous verdict finding the

defendant guilty on all counts in the Superseding Indictment.[1] *See MDPA 3-cr-16-194, Doc. 167*).

## II.   FACTUAL BACKGROUND

The defendant's conduct was unlawful, unconscionable, and egregious.  He repeatedly violated his oath and repeatedly violated the law.  He did so not out of "compassion" as he claimed at trial – but out of greed as evidenced by the more than $1 million in cash found by federal agents in his homes that he deliberately concealed and knowingly failed to report to the IRS.  He was the gatekeeper of highly addictive and deadly opioid medications.  His oath was to "DO NO HARM."  By knowingly and intentionally acting outside the scope of his profession, the defendant did immense harm.

Because of his criminal conduct, a wife and mother of three children died.  Another woman gave birth to an opioid dependent baby.

_____

[1]   Prior to resting its case on May 29, 2018, the Government made a motion to withdraw Counts 18 (related to KM) and 21 (related to KP).  The motion was granted by the court.

Another victim came to see the defendant for diabetic leg pain at the age of 18. Four years later, after being prescribed large quantities of Oxycodone 15 mgs every month, she ended up a heroin addict. That woman also suffered the indignity of having to disrobe and expose her breasts to the defendant on multiple occasions when he gave her injections in her lower back. The injections were a guise used by the defendant in order to make his prescriptions for these powerful pain pills seem legitimate. However, these injections given to numerous patients, along with other useless testing, generated a great deal of income for the defendant.

Another young woman became the defendant's sexual object in return for monthly prescriptions of excessive amounts of opioids, including four years of monthly prescriptions for large quantities of Oxycodone 30 mgs. When that woman tried to avoid having sex with the defendant, he threateningly asked her if she wanted another doctor. In other words, no sex - no drugs.

Another victim, after her first round of excessive amounts of Oxycodone prescriptions from the defendant, went to an in-patient rehab

on her own.  When she returned to the defendant's office, she informed the defendant about her addiction, her personal struggles, and her successful completion of rehab.  The same was actually documented in her medical record.    Nevertheless, the defendant put her back on opioids to suffer addiction all over again.  She suffered from the defendant's unlawful conduct for four years.

One man testified at trial that he contemplated suicide after becoming so horribly addicted to opioid pain medications at the hands of the defendant.

Another young man testified that he accompanied his mother every month to the defendant's office where they both received large amounts of various opioid prescriptions.  That young man's life became controlled first by prescription medications, and then by heroin.  He ended up in prison.  His mother subsequently died from a mixed toxicology drug overdose.

Many former patients testified that they legitimately sought medical treatment only to become addicted to prescription medications at the hands of the defendant.  Trial evidence demonstrated that the

defendant prescribed large amounts of highly addictive opioids in the face of circumstances clearly indicative of addiction and diversion. Many professionals, including an ER physician and eight pharmacists, testified about the actions they took with respect to the defendant's practice that reflected their concern about the impropriety of his prescribing. Time and time again, the defendant's response was to ignore or dismiss those concerns. The defendant frequently lied his way out of, or trivialized the concerns of other professionals. Indeed, as the evidence showed in this case, the defendant blatantly falsified his medical records in an effort to camouflage his unlawful prescribing activities.

Multiple patients testified that they told the defendant that they were addicted to the pills and they wanted to stop taking them. Occasionally, the defendant would prescribe methadone for these patients, thereby acknowledging their addiction, but would invariably return to prescribing Oxycodone for them when withdrawal symptoms kicked in or their accustomed "high" was diminished. Some patients testified that they tried to detox themselves but would almost immediately experience the devastating effects of withdrawal. The

defendant's response to expressed and visible signs and symptoms of withdrawal was to advise the patients that they needed to take their pills and in several cases, he increased their opioid prescriptions.

The defendant's unlawful prescribing of opioids also contributed to the illegal drug trade in Pennsylvania and parts of New Jersey, as evidenced at trial. Over the course of years, the defendant repeatedly prescribed large amounts of opioids to a group of young New Jersey residents who traveled two hours to Pennsylvania, and two hours back to New Jersey on a monthly basis over a period of years to obtain prescriptions from the defendant. These patients testified about how easy it was to obtain dangerous opioids from the defendant, which they then sold for profit on the streets, thereby feeding the addiction of countless others.

Notably, the defendant's criminal activity did not end with the unlawful and unprofessional distribution of drugs that caused a death and the birth of an opioid dependent baby. The defendant was also convicted of additional counts of unlawful and unprofessional distribution of opioids, maintaining drug-involved premises, money

laundering, and willful tax evasion. Indeed, the jury's finding of guilt on Counts 26 and 27 of the Superseding Indictment (Maintaining Drug Involved Premises), evidences beyond a reasonable doubt that unlawful drug distribution was a significant or important part of the defendant's entire medical practice.

The defendant inflicted pain and suffering and endangered his patients, acting entirely out of greed. His practice involved cultivating patients the same way a street dealer cultivates a customer base. His business plan included creating addicts and then feeding the addictions for a profit. As word on the street spread about the ease with which the defendant wrote prescriptions, the defendant's patient base grew, as did his income. He also generated tremendous income by performing unnecessary in-office diagnostic tests that served only to "paper his files" and give an appearance of medical care. The defendant preferred cash for a reason. The defendant failed to report $1,030,960 in cash that was concealed inside his residences as income in federal tax filings. His desire for financial gain was so great that he intentionally withheld reporting income in order to avoid assessment of taxes on the income.

For all of these reasons and more, the defendant is facing a prison sentence under the Sentencing Guideline of life. Under the 18 U.S.C. § 3553 (a) factors, a life sentence is warranted here.

## III. Sentencing Procedure

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

1. Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

2. In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's *pre-Booker* case law, which continues to have advisory force.

3. Finally, they are to exercise their discretion by considering the relevant § 3553 factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (*citing United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006). In calculating the guideline range, this

court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc).

At the third step of the sentencing process, the court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate that trial court gave meaningful consideration to the § 3553(a) factors……" *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

## IV. ANALYSIS OF FACTORS PURSUANT TO 18 U.S.C. § 3553(a)

This Court must consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate

deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). Consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence in this case is one at the advisory Guidelines range of life imprisonment.[2]

---

[2] The Government is unaware of any significant dispute between the parties as to the correctness of the Guideline calculation provided by the Probation Officer in the Presentence Report. The defendant has not challenged the sentencing guideline offense level calculation.

A.    **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**.

It is difficult to overstate the serious nature of the defendant's crimes. The particular drug primarily distributed by the defendant is representative of a class of synthetic drugs that has ushered in a deadly crisis involving prescription drugs and their availability both nationwide and in the Middle District of Pennsylvania. No doubt, the Court is fully aware of the crisis. The numbers are staggering. Nationwide, more than 70,000 Americans died in 2017 from drug overdoses. That is more than all the American casualties during the war in Vietnam. Approximately 180 Americans die each day from a drug overdose. This death toll is equal to the death toll of September 11, 2001, every three weeks. Approximately 5,456 drug-related overdose deaths occurred in Pennsylvania in 2017. This means that approximately 15 people die every day in Pennsylvania from drug related causes. These statistics are not hypothetical; they describe the situation occurring right now in this District. The epidemic is real and being felt every day by families

across Pennsylvania.[3]  These facts are relevant to this case, of course, because the opioids unlawfully prescribed by the defendant fed the epidemic to a great extent and resulted in the death of one of his patients and immense harm to many others.

The nature of the offense in this case is defined by the primary drug unlawfully distributed by the defendant – Oxycodone.  Oxycodone, a close relative of other opium derivatives, has frequently been described as the synthetic version of heroin, "pharmaceutical heroin," or "heroin in a pill" because it creates the same effects on the brain and satisfies the same urge for addicts.[4]  Like other opiates, Oxycodone creates a physical

---

[3]    The opioid crisis in Pennsylvania and across the United States is a public health and safety emergency.  Indeed, on October 26, 2017, the President declared the Opioid Crisis to be a national public health emergency.  The opioid crisis was declared a disaster emergency in Pennsylvania by Governor Wolf in January 2018.

[4]    Mariana van Zeller, *Painkillers are Gateway to Heroin*, CNN, June 23, 2011, *available at* http://www.cnn.com/2011/OPINION/06/23/ zeller.oxycodone.heroin/index.html; Sujata S. Jayawant and Rajesh Balkrishnan, *The Controversy Surrounding OxyContin Abuse: Issues and Solutions*, 1 Therapeutics and Clinical Risk Mgmt. 77, 78 (2005).

dependence in most of its users and a powerful addiction in a large number of them.[5]  Consequently, it can be very difficult for users to stop abusing Oxycodone once they have started.[6]

Like other prescription drug abuse, individuals are oftentimes lulled by Oxycodone-based drugs because of the perception that they are not illegal street drugs, like heroin.[7]  Oxycodone abusers often start on the drug because Oxycodone pills seem relatively innocuous and do not carry the same stigma of use as heroin.  Since the pills are regulated and require a prescription, they seem like simple medicines prescribed by doctors.[8]  The misperception that Oxycodone is not a dangerous, illegal

––––––––––––––––––––

[5]  Paul Tough, *The Alchemey of OxyContin*, N.Y. Times, July 29, 2001, at 32.

[6]  *Id.*

[7]  *See id.* ("Buying pills never seemed illegal . . . It just didn't feel like it was wrong.")

[8]  David Boeri, *OxyContin a Gateway for Young Users in Eastie*, 90.9 WBUR, April 12, 2010, *available at* http://www.wbur.org/ 2010/04/12/east-boston-oxycontin.

street drug is one reason why Oxycodone abuse is a national epidemic killing dozens of users every day.

Furthermore, the fact that Oxycodone-based drugs are legal when taken as directed also means that there is virtually an unlimited supply of the drug for doctors willing to write prescriptions for Oxycodone-based drugs without asking too many questions.[9] As seen in this case, after users become addicted and cannot afford the high cost of Oxycodone, which can range from $20 to $40 per 30 mg pill, they often follow an all too common path and turn to heroin to feed their addiction. Heroin, at $3 to $10 per bag, is much cheaper than Oxycodone.

Such is the nature of the defendant's crimes.

Incredibly, the defendant clearly had more than sufficient opportunity, education and skill to earn an honest and lucrative living through his neurology and pain management practice. His life epitomized the American dream. Rather than appreciate what he had,

---

[9] Paul Tough, *The Alchemy of OxyContin*, N.Y. TIMES, July 29, 2001, at 32.

the defendant chose to abuse the inviolable trust afforded him as a physician only to enrich himself more. His avarice was such that he created and catered to drug addicts and destroyed lives. While the nature of his crimes and the system that exposed them render a true measure of the harm he caused impossible, one need only recall the testimony of witnesses who unsuccessfully tried to stop the defendant from prescribing dangerous opioids to an obviously pregnant woman to appreciate the defendant's callousness. In the face of clear and present danger to an unborn child, the defendant opted to protect and enrich himself rather than "do no harm" to the child and continued to prescribe opioids to the pregnant mother. The predictable birth of an opioid dependent baby who had to spend the first ten days of his life in a neo-natal ICU is unconscionable.[10]

_____

[10] Neonatal opioid withdrawal syndrome (NAS) is an expected and treatable condition following repeated substance exposure in utero, which may have long-term health consequences for the infant. *Facing Addition in American: The Surgeon General's Spotlight on Opioids*, September 2018. NAS signs include neurological excitability,

The defendant is also a man who unlawfully used his medical practice to fund a lifestyle that was beyond most honest citizens throughout our communities. It was a lifestyle funded in part at the expense of hardworking individuals who struggle daily to pay taxes pursuant to law. There is no explanation for the defendant's egregious conduct other than pure self-interest and greed. Any personal circumstances argued by the defendant for mitigation before the Court are outweighed by the seriousness and egregiousness of his conduct. See *United States v. Kennedy*, 554 F.3d 415, 425 (3d Cir. 2009) (affirming the district court's refusal to impose a downward variance based on a defendant's familial circumstances because "the hardship claimed by [the defendant] is similar to that experienced by many if not most families of convicted felons").

It is notable and relevant that the defendant has refused to accept responsibility for his conduct. He has never expressed remorse. He has

––––––––––––––––––––

gastrointestinal dysfunction, and autonomic dysfunction. Hudak ML, Tan RC. Neonatal drug withdrawal. *Pediatrics*. 2012;129(2);e540-560.

never expressed sympathy for his victims or apologized for his unlawful actions.

## B. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense, and Deter Others.

The sentence imposes must reflect the seriousness of the offense, promote respect for the law, and protect the public from further crimes by the defendant.

As noted above, the defendant's crimes were very serious. The defendant is responsible beyond a reasonable doubt for the death of a wife and mother of three young children, the birth of an opioid dependent baby, and the sexual abuse of three female patients. He is further responsible beyond a reasonable doubt for immeasurable harm brought upon numerous additional patients whose lives have been irreparably damaged.

A sentence at the Guideline range for this defendant who is responsible for so much harm will send a critically important message of

deterrence, *i.e.*, that the punishment will be so severe that it is not worth committing the crime, regardless of the significant financial benefits.

Moreover, there is a critical need to deter physicians from unprofessionally and unlawfully prescribing deadly opioids and other controlled substances for profit. One of the reasons why prescription drug abuse is so rampant, as noted above, is that these drugs come with the imprimatur of legitimacy. Our society places great trust in physicians. We expect them to act professionally and lawfully. We expect them to honor their professional oath of "do no harm." Physicians play a critical role in combating the opioid epidemic. As gatekeepers, it is a physician's duty to warn patients about the addictive nature of these substances, and prescribe these drugs in limited quantities and only when medically necessary. This defendant abdicated his professional role and unlawfully prescribed these dangerous pills for profit. Instead of helping battle this scourge, as his oath required, the defendant perpetuated the crisis. It is imperative to send a strong, unequivocal message to him, and to other physicians, that such conduct will not be tolerated by this Court. The imposition of the Guideline sentence of life

imprisonment will convey that message clearly and will undoubtedly deter others who may be considering embarking on a similar course for their own personal gain.

## C. The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Crimes.

The Court must also consider the need to avoid unwarranted sentencing disparities among defendants who commit similar offenses. Courts throughout the country have imposed very lengthy prison sentences for defendant doctors and other health care professionals convicted of unlawfully distributing controlled substances resulting in death and other egregious harms. See, *e.g.*, *United States v. David Webb*, 655 F.3d 1238, 1240 (11th Cir. 2011) (affirmed life sentence for defendant doctor convicted of three counts of drug distribution resulting in death, wire and health care fraud); *United States v. Stephen and Linda Schneider*, 704 F.3d 1287 (10th Cir. 2013) (affirmed sentences of 360 months and 396 months respectively for a defendant doctor and his wife, a licensed practical nurse, convicted of one count of drug

distribution resulting in death, health care fraud, and money laundering); *United States v. Jeffrey Bado*, EDPA 17-2373 (not precedential) (Judgment, including 300-month sentence for defendant doctor convicted of one count of drug distribution resulting in death, health care fraud, and maintaining drug-involved premises, upheld); *United States v. Donovan Dixon*, 2018 WL 6015410 (EDNC) (defendant doctor sentenced to 20 years imprisonment for unlawful distribution of controlled substances – no death involved); *United States v. Paul Volkman*, 797 F.3d 377 (6th Cir. 2015) (life sentence affirmed for defendant doctor convicted of drug distribution resulting in four deaths); *United States v. Johnny Clyde Benjamin, Jr.*, SDFL - Docket 9:17-cr-80203 (District Court in Southern District of Florida imposed life sentence on July 6, 2018 for defendant doctor convicted of drug distribution resulting in death and additional unlawful drug distributions); *United States v. Steven Henson*, District of Kansas – Docket 6:16-cr-10018 (District Court in Kansas imposed life sentence on March 12, 2019 for defendant doctor convicted of drug distribution resulting in death, additional unlawful distribution counts, and money

laundering); *United States v. John Patrick Couch*, SDAL – Docket 1:15-cr-88 (District Court for the Southern District of Alabama imposed 240-month sentence on defendant doctor convicted of conspiracy to unlawfully distribute controlled substances and related money laundering, wire and health fraud charges – no death); *United States v. Xiulu Ruan*, SDAL – Docket 1:15-cr-88 (District Court for the Southern District of Alabama imposed 252-month sentence on defendant doctor convicted of conspiracy to unlawfully distribute controlled substances and related money laundering, wire and health fraud charges – no death).

The Government further notes cases in this District where significant sentences were imposed on defendants for street level drug distributions resulting in death, where the scope of the criminal conduct was less than the defendant's criminal conduct. See, *e.g., United States v. Brittany Banscher*, MDPA Docket 3:16-cr-248 (District Court imposed 228-month sentence for street level distribution of heroin resulting in death); *United States v. Alfred Yale*, MDPA 3:15-cr-216-2 (District Court imposed 262-month sentence for street level distribution of fentanyl

laced heroin resulting in death); *United States v. Michelle Beagle*, MDPA 3:15-cr-216-1 (District Court imposed 235-month sentence for street level distribution of fentanyl laced heroin resulting in death).

Accordingly, a sentence at the Guideline range under the facts and circumstances of the instant case will ensure an appropriate and consistently applied level of punishment.

## V.    <u>CONCLUSION</u>

Our Nation is in the midst of an unprecedented opioid epidemic. The opioid crisis has been called the most perilous drug crisis ever.[11]  "No area of the United States is exempt from this epidemic – we all know a friend, family member, or loved one devastated by opioids.   All branches of the federal government are working together to reduce the availability of illicit drugs, prevent deaths from overdoses, treat people with substance-use disorders, and prevent people from starting using drugs in

---

[11]    Deep Dive - *The Opioid Tsunami*, American Osteopathic Society, Aspen Ideas Festival, Spotlight Health 2017.

the first place."[12]  The toll the prescription drug epidemic has taken on communities is "devastating."[13]  "Ending this epidemic requires leadership and commitment from all health care stakeholders, policymakers, law enforcement, the justice system, and local communities."[14]

In October of 2015, President Barack Obama addressed the prescription drug epidemic in Charleston, West Virginia where the opioid crisis was taking a heartbreaking toll on Americans and their families. President Obama highlighted at that time that more Americans were dying every day from drug overdoses than from motor vehicle crashes, and that the majority of those overdoses involved prescription drug

---

[12]     Center for Disease Control (CDC), Principal Deputy Director, Anne Schuchat, M.D., March 2018.

[13]     Gil Kerlikowski, President Obama's national drug policy director.  Saundra Young, *White House launches effort to combat souring prescription drug abuse*, CNN, Aug. 19, 2011, http://www.cnn.com/2011/HEALTH/04/19/drug.abuse/index.html.

[14]     James L. Madara, MD, Executive Vice President, CEO, American Medical Association, letter to Congress, Committee on Finance, dated February 16, 2018.

medications.  Despite President Obama's efforts to combat the crisis with an all hands on deck approach that included federal, state, local, and private sector efforts, we have failed.  The death toll has continued to rise.  The 2016 numbers exceed the numbers of 2015.  More Americans died from opioid drug overdoses and more Americans became addicted to prescription or illicit opioids.

In October of 2017, President Donald J. Trump rang the alarm bell again on the crisis by declaring the opioid crisis to be a national public health emergency.  "In 2016, more Americans died of opioid overdoses than were killed in the Vietnam War.  This appalling statistic is a key factor in the recent, shocking decline in U.S. life expectancy.  It's not just the guy who's never worked a day in his life.  It's the airline pilots.  It's the teachers.  It's Joe Citizen that's dying every day."[15]

"Physician heal thyself."[16]

_____

[15]    President Donald J. Trump, Ending America's Opioid Crisis, October, 2017.

[16]    The Bible, *Luke* 4:23 (King James Version).

"We as a profession have caused an epidemic that is bigger than the HIV epidemic. We have more deaths from drug overdoses than occurred at the peak of the HIV/AIDS epidemic in 1995. That's how big this is. It [the opioid crisis] has caused more deaths than motor vehicle accidents. The cause in the opioid epidemic starts with getting a prescription of opioids from physicians."[17]

Dr. Stephen Thomas, a witness for the Government at trial, testified about the practice of medicine, the inherent trust society has in doctors, and the significance of the doctor/patient relationship. "The doctor/patient relationship is really important because we restricted the practice of medicine to folks who demonstrated the knowledge and ability to do so, and it is within the doctor/patient relationship ‑ something that must always happen that is different from every other business relationship that we find – is that the doctor has a duty to act

---

[17] Atul Gawande, MD, MPH. Dr. Gawande is a surgeon, writer, and public health researcher. He practices general and endocrine surgery at Brigham and Women's Hospital in Boston, Massachusetts.

in the best medical interest of the patient, period." (Trial Transcript, Dr. Stephen Thomas, May 21, 2018, p. 23). "In 1927, Sir Francis Peabody wrote that the secret of care for the patient is in caring for the patient. The doctor must act to care for the patient's health, or it's not health care. It's something else." *Id.* at 30.

The evidence in this case clearly showed that this defendant was not engaged in the practice of medicine. What he was engaged in was "something else." The jury determined beyond a reasonable doubt that the "something else" was drug dealing for profit. The resulting harm is immeasurable.

For all of these reason, the Government respectfully urges the Court to impose the Guideline sentence of life imprisonment.

Respectfully submitted,

DAVID J. FREED
United States Attorney

By: /s/ Michelle L. Olshefski
MICHELLE L. OLSHEFSKI
Assistant U.S. Attorney

/s/ Francis P. Sempa
FRANCIS P. SEMPA
Assistant U.S. Attorney

Dated: March 31, 2019

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:16-CR-194 |
| | : | |
| v. | : | (JUDGE CAPUTO) |
| | : | |
| FUHAI LI, | : | (ELECTRONICALLY FILED) |
| Defendant | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 31st day of March, 2019, I caused the foregoing "**Government's Sentencing Memorandum** to be served upon David S. Bahuriak, Esquire, counsel of record for the defendant, and that Attorney Bahuriak is a filing user under the ECF system.

/s/ Michelle L. Olshefski
Michelle L. Olshefski
Assistant U.S. Attorney

/s/ Francis P. Sempa
FRANCIS P. SEMPA
Assistant U.S. Attorney