BAHURIAK LAW GROUP
David Bahuriak, Esquire
Identification No. 85062
518 South 3rd Street
Philadelphia, PA 19147

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | Docket No. 3:16-CR-194 |
| Vs. | : | |
| | : | The Honorable A. Richard Caputo |
| FUHAI LI | : | United States District Judge |

**DEFENDANT'S SENTENCING MEMORANDUM**

The Defendant, Fuhai Li, who is scheduled to be sentenced on April 3, 2019, respectfully submits this memorandum in support of a sentence below the maximum Federal Sentencing Guideline provision of Life Imprisonment. Although this is the guideline range, the Defendant notes that Count 16 of the superseding indictment (21 U.S.C. § 841(a)(1)) carries a mandatory minimum sentence of twenty years' incarceration. Defendant respectfully submits that a sentence to the twenty-year mandatory period of incarceration would adequately meet the purposes of §3553(a) in that it would provide a just punishment, a general deterrence, a specific deterrence, and be rehabilitative. Not only would this satisfy the intent of §3553 but, as indicated by the Government's brief, this appears to be the normal sentence in equivalent cases. Therefore, a sentence to the mandatory minimum of twenty years not only would meet the intent of §3553, but also would promote sentencing consistency amongst similarly situated persons.

## I. BACKGROUND

Dr. Fuhai Li was the owner and proprietor of The Neurology and Pain Management Center located in Milford, Pennsylvania, which operated from June 2010 until August 2016. Defendant was a physician licensed by the Commonwealth of Pennsylvania, specializing in neurology and pain management. The current convictions arose out of activities alleged in the context of the Defendant's medical practice.

On July 20, 2016, a Federal Grand Jury returned the original indictment. Dr. Li was arrested that same day and appeared before United States Magistrate Judge Joseph F. Saporito, Jr. At that time he plead not guilty to the Indictment and was released on personal recognizances with pretrial supervision. On October 17, 2017, a federal grand jury returned a Superseding Indictment that charged the defendant with thirty-two separate counts.[1] On June 4, 2018, following a jury trial, Defendant was convicted on all counts set forth in the superseding indictment.

Defendant comes before the Court this day for sentencing on that conviction.

## II. BIOGRAPHY

Fuhai Li was born on January 14, 1965 in Sichuan Province, China, as one of five children. Mr. Li's father was an accountant who pushed his children to excel in their studies. In this period of Communist China, distinguishing one's self was no easy task. Nevertheless,

---

[1] Counts 1-23, violations of 21 U.S.C. § 841(a)(1) (Unlawful Distribution and Dispensing of a Controlled Substance); Count 24, 21 U.S.C. § 841(a)(1) (Unlawful Distribution and Dispensing of a Controlled Substance Resulting in Death) Count 25, violation of 21 U.S.C. § 861(f) (Unlawful Distribution and Dispensing of a Controlled Substance Resulting to a Pregnant Individual); Count 26, violation of 21 U.S.C. 856(a)(1) (Maintaining a Drug Involved Premise): Count 27, violation of 21 U.S.C. 856(a)(1) (Maintaining a Drug Involved Premise) Counts 28-29, violations of 21 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity); and Counts 30-32, violations of 26 U.S.C. § 1957 (Tax Evasion).

through hard work and sacrifice, young Fuhai Li began to do exactly that. At an early age, he became a standout student. Defendant's devotion to his studies paid off when he graduated high school and took the exams that, in China, determine whether a student is eligible to progress to higher education. Despite a passage rate of only four percent (4%), Defendant succeeded in attaining a score that earned him acceptance into the Luzhou Medical College, which he began in 1981.

While in college, Defendant continued to diligently apply himself. Again, Defendant excelled in his studies, which was recognized by being bestowed the "excellent student award" for each year of his studies. In 1986, Defendant graduated with a Bachelor's Degree in Medical Science. As a testament to diligent efforts, Defendant graduated second in a class of 360 students.

After graduation, Defendant enrolled in the West China University of Medical Science, in the city of Cheng Do of the Sichuan Province. He eventually graduated in 1989 with a Master's Degree in Diagnostic Radiation. During this time period, Defendant served as a radiology resident at the West China Hospital, Sichuan University. He remained with this institution as an attending radiologist and instructor until 1996.

In 1996, Defendant emigrated to the United States where he eventually received his medical degree through the Educational Commission for Foreign Medical Graduates. From 2002-2003, Defendant worked as a resident of internal medicine at St. Vincent's Medical Center in Bridgeport, Connecticut. Thereafter, he moved to a prestigious neurology residency at the Department of Medicine, Program of Neurology, Duke University Medical Center in Durham, North Carolina from 2003 to 2006. Eventually he attained the position of Chief resident from July 2005 to June 2006.

After the Defendant left Duke, he relocated to Pennsylvania and began working with Northeastern Rehabilitation and Pain Management Center in East Stroudsburg, PA. He remained with them as an attending neurologist and neuroimaging specialist until he left in July 2010 to begin private practice. After leaving, Dr. Li then opened and operated the Neurology and Pain Management Center in Milford, Pennsylvania until August 2016.

During the course of his medical training and residency in China, Defendant met his wife, Hong Hu, and they eventually married in February 1991. Defendant and Mrs. Hu eventually had two children, Cathy Li and Cindy Li. Dr. Li and his wife devoted their lives to nurturing and providing for their children. Despite the difficulties of learning English, working long hours and raising children in an unfamiliar cultural landscape, the product of Dr. Li's sacrifice to his family is evident in the outstanding young women raised by his wife and him. Both of his daughters graduated as class valedictorians from Delaware Valley High School in Milford, PA. Both are National Merit Scholarship winners. Both are now excelling as college students in Ivy League institutions: Dartmouth College and Yale University. His wife continues to do her best to support their children alone as Fuhai is now incarcerated.

Although the crimes for which he has been convicted are inexcusable and serious, it cannot be ignored that Fuhai Li possesses an outstanding work ethic and has been a devoted father to his children. Prior to the charged events here, the Defendant led a law-abiding life, provided a stable and loving home for his children, and built a pristine academic reputation and career, which makes his current circumstances even more devastating. Defendant accepts responsibility for his conduct and understands that his downfall has been orchestrated by his own hand. After having heard first-hand testimony at trial, he understands and regrets the effect his conduct has had on the lives of a number of his patients. Moreover, he acknowledges the severity

of his conduct in light of the trust that has been bestowed upon him by society. The Defendant knows and accepts that this Court must levy upon him harsh punishment for his offenses. However, Defendant respectfully prays that given his prior long history of law abiding conduct and the beneficial attributes of his history, the Court would agree that a twenty-year period of incarceration is more than a sufficient sentence when balanced under the § 3553(a) factors.

### III. ARGUMENT

#### 1. SENTENCING PROCEDURE

In *United States v. Gunter*, 462 F.3d 237 (3d Cir. 2006), the Third Circuit Court of Appeals made explicit the three-step process that District Courts in this Circuit should follow after the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005). First, the Courts must continue to calculate a defendant's Guideline sentence precisely as they would have before *Booker*. Second, in doing so, the sentencing Court must formally rule on the motions of both parties and state on the record whether the Court is granting a departure and how that departure affects the Guidelines calculation and take into account the Third Circuit's Pre-Booker case law, which continues to have advisory force. Third, the sentencing Court is to exercise its discretion by giving full and meaningful consideration to the relevant factors set forth at Title 18 United States Code, Section 3553(a) in setting the sentence it imposes regardless whether it varies from the sentence calculated under the Guidelines. *Id.* at 247 (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006); *United States v. Cooper*, 437 F.3d 324, at 329, 330 (3d Cir. 2006)).

#### 2. GUIDELINE RANGE: PROBATION SET THE OFFENSE LEVEL AT 43, WHICH ESTABLISHES A GUIDELINE HEARTLAND OF LIFE IMPRISONMENT.

Defense notes for the Court that it received the Presentence Report on March 27, 2019, and, thus, has had less than five days at the time of this memorandum to review them. As such, Defense counsel has not had substantial time to review and object to the enhancements set forth therein. Defense, for the record, would raise objection to the timeframe afforded counsel to review the Presentence Report. Notwithstanding, and without waiver of objection, it appears that the Offense Level is 43 with a prior history score of I. Under these parameters, the "Heartland" range is life imprisonment.

### 3. DEFENDANT MOVES FOR A VARIANCE FROM THE GUIDELINE SENTENCE BASED ON THE FACTORS OF 18 U.S.C. § 3553(A).

The Supreme Court in *United States v. Booker*, 125 U.S. 738 (2005), "breathes life into the authority of District Court Judges to engage in individualized sentencing within reason in applying the §3553(a) factors to the criminal defendants that come before them." *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008). This places the District Court in a unique position to assess the individual appearing before it, both in the context of his life and in the community as a whole.

The Supreme Court in *Gall v. United* States points out that District Courts have "two distinct institutional advantages over appellate courts in determining what sentence best achieves the purpose of §3553(a) in a given case: (1) District Courts impose scores of sentences each year, and (2) a District Judge is in a superior position to find facts relevant to sentencing and to determine their import under §3553(a)." 128 S.Ct. 586, 597 (2007). This case further goes on to state the ability of the Court to hear all relevant evidence and interact directly with the defendant in order to have insight into identifying every possible sentencing factor.

The new sentencing framework permits the District Court to "vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007). This further shows the Court's ability to venture from the Guidelines given the findings by the Court that a sentence other than one prescribed in the Guidelines is acceptable and in the best interest of the individual, as well as, the community. Hence, after the case of *Booker*, there is "no limitation....on the information concerning the background, character and conduct of a person convicted of an offense which a Court...may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §3661; see also *Jones*, 531 F.3d at 171-72.

Given the foregoing, the Supreme Court has stated that, after applying the Guidelines, the sentencing court must consider the Guideline Range, along with the other factors listed in 18 U.S.C. § 3553(a) and "make an individualized assessment [of the defendant] based on the facts presented." *U.S. v. Gall*, 128 S.Ct. 589, 596-97 (2007). The facts that the Court considers when making the "individualized assessment," are set forth in 18 U.S.C. § 3553(a), which contains the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--

7

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . .;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## I. The nature and circumstances of the offense and the history and characteristics of the defendant:

Although opiate abuse has created a severe problem in our current society that must be addressed (as the Government points out); sentencing courts also must consider the history and characteristics of a defendant before fashioning an appropriate punishment. Here, the Defendant, age 54, had lived a law-abiding life prior to these events and had never exhibited any behavior remotely akin to what is before the Court. For the entirety of his life, prior to opening up his practice, Fuhai Li was a respected student, resident and practitioner in the medical community. At some point after opening his practice, the Defendant strayed from his calling. However, for many years prior to these events, and even largely during the time of the alleged events, Defendant utilized his skills to alleviate the pain of countless patients. The Government's own trial expert acknowledged that Defendant did have legitimate patients whom he treated within the appropriate manners and procedures. Given the number of legitimate patients treated by Dr. Li, it would be inaccurate and misleading to reduce his entire practice to the caricature of a volume-based pill-mill. Despite his mistakes, Dr. Li diligently provided care for thousands of

8

patients and the patients proffered by the Government represented a minority of those that he treated.

Although the fact that Dr. Li ran a largely legitimate medical practice does not excuse the conduct nor the harm that he caused to the affected patients in this case, it does indicate that the Defendant's conduct here is an aberration from his normal lawful conduct and practice of medicine. This is further supported by the attached letter from Yong Li, a colleague of the Defendant who has known him since the time they attended the Luzhou Medical College in China, and in other letters submitted on Defendant's behalf from close friends and colleagues. (See Exhibit A, Letters from Yong Li and others, attached hereto.)

Defendant's conduct in this case was not malicious. Rather, it appears to have stemmed from his ambitions and his inclination to consciously ignore facts through willful ignorance. The conduct appears to have been economically driven and the product of Defendant's misguided belief that his prescribing practices were appropriate and legal if they followed the Federation of State Medical Board, Pennsylvania Guidelines on the use of Opioids to Treat Noncancer Pain, and the Clinical Guidelines for the use of Chronic Opioid Therapy in Chronic Noncancer Pain from the American Pain Society. However short sighted this approach may have been, it shows his conduct amounts to having substituted common sense with blind adherence to guidelines. This conduct is more akin to recklessness than a malicious intent to cause harm upon another person or a violent offense. Defendant does not diminish the effect of his conduct; however, it equally stands that this is a nonviolent, economically driven crime.[2]

---

[2] As an aside, Defendant takes exception to much of the Government's baseless pontification regarding Defendant's funding a "Lifestyle that was beyond what most honest citizens throughout our communities . . . ." There is not one shred of evidence that indicates Defendant lived extravagantly. This statement by the Government is clearly inflammatory rhetoric that has no purpose other than to attempt to paint a picture of Defendant more akin to a cartel boss. It is completely without foundation.

9

Further, it should be noted, that the guideline range of 43, is partially a function of the fact that Defendant is a physician. Defendant was enhanced two points under the Adjustment for Role in the Offense because of his status as a physician and the public trust innate with such a position. Further, he was assessed another two points for taking advantage of a vulnerable victim.[3] Ironically, if Defendant had been a street-level dealer selling smuggled fentanyl out of the trunk of his car, his guidelines would be four points lower. This means that an individual who is actively making a career from distributing narcotics would face a lower guideline sentence calculation.

Finally, the Defendant's age must be taken into consideration as a characteristic in sentencing. A study commissioned by the Department of Justice's National Institute of Corrections concludes that older first-time offenders "are frequently severely maladjusted and especially at risk for suicide…and other manifestations of mental disorder." See, National Institute of Corrections, U.S. Department of Justice, Correctional Health Care (2004) at 11. Furthermore, "[s]ince their behaviors are not well tolerated by other inmates, their victimization potential is high." Id. Dr. Li comes before this Court a relatively healthy 54-year-old man, slight in size and stature, who had never seen the inside of a jail cell prior to his incarceration in this case. It is doubtful that a lengthy incarceration will make him physically and/or mentally healthier. Instead a lengthy incarceration will cause his well-being to deteriorate while he is locked in an environment where he is vulnerable to abuse and predation. This condition will

---

[3] It should be noted that in some jurisdictions, mere evidence of addiction without more is not sufficient to qualify as a vulnerability. *See United States v. Volkman*, 736 F.3d 1013, 1030 (6th Cir. 2013), cert. granted, judgment vacated, 135 S.Ct. 13 (2014) ("drug addiction, standing alone, cannot serve as the basis for applying the enhancement in cases such as this one")(Defendant, a physician, specifically knew of patients psychological and emotional frailties); *United States v. Amedeo*, 370 F.3d 1305 (11th Cir. 2004) (defendant was an attorney who, through representation of victim, was aware of his clients' mental vulnerability and addiction issues when he sold him cocaine. Here, there is no direct evidence that Defendant was specifically targeting these individuals for their mental emotional states. At best, his conduct shows willful blindness towards any such condition if any existed.

10

worsen as defendant ages even serving a twenty-year term. The imposition of a life term in this case would simply be cruel.

**II.     The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense:**

It is common knowledge that there is an opioid epidemic taking place in this country. Further, as pointed out by the Government, unfortunately, in many instances these cases start at the doctor's office. However, handing down a sentence reflecting the seriousness of the offense is not synonymous with imposing the harshest punishment available. Rather, the punishment imposed should be sufficient to promote respect for the law and provide just punishment.

It cannot be overstated that a sentence to the mandatory minimum incarceration of twenty years is a significant sentence for anyone, let alone a non-violent offender with no record. For all intents and purposes, it is virtually a life sentence which will deprive the Defendant of what should be the best years of his life. Defendant is 54 years old and would not be released until his early seventies. In the event that he survives the prison term, he will be at an age where his quality of life will already have been significantly diminished. His children will be grown and gone and his wife will be of an advanced age, if he is lucky enough for her to still be by his side alive and healthy. Further, twenty years is a long enough sentence to send a message to the medical community that abuse of their authority to distribute these narcotics is a serious offense. Not only will they lose their careers, in which they have invested years of hard work, financial investment and sacrifice to achieve, but they will lose their families and their freedom.

It is true that this is a crime of serious nature; however, a life sentence in this case would allow no distinction between the non-violent offender with no prior criminal history such as

11

Fuhai Li and a career criminal, a racketeering mobster, or a violent predator. With imposition of a life sentence in a case such as this, the punishment begins to bear less of a reflection of the seriousness of the offense and more of a reflection of the inequity of the system. In this case, we have a middle-aged professional who never broke the law or showed a moral blemish in his life until now. Imposition of a life sentence appears more inequitable than reflective of the actual conduct charged. In this case, while the defendant's guideline calculations are driven to astronomical levels by a number of factors such as "money laundering" and "obstruction", meant to address serious criminal enterprises, the defense respectfully asserts that rigid calculation of those guidelines ignores the context that all of the alleged crimes took place within the context of a legitimate professional medical practice, not a violent mafia conspiracy. While Dr. Li's conduct was wrong, and the calculations may legally apply under the guidelines, it pushes the Heartland range in to the disproportionately severe range of life in prison.

A rigid mathematical calculation of guidelines and imposition of a sentence dictated by the guidelines ignores the context of the crimes committed here and deprives this sentencing Court of considering the circumstances and conferring the benefit of its wisdom in establishing an appropriate sentence.

### III. The need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant:

Closely related to the previous section is the need for deterrence and to protect the public from further crimes of the defendant. With regard to deterrence, as indicated above, the difference in a life sentence and a twenty-year sentence is likely de minimis considering the nature of this offense. Both sentences would carry the same deterrent effect and send a message to the medical community. Despite the incarceration portion of the sentence, the conviction

alone, loss of medical license and the surrounding publicity and embarrassment would be enough to deter most medical professionals. The collateral effects of such a conviction are an enormous deterrent let alone any form of incarceration. One day of prison would only add to the already adequate deterrent effect of being decimated by the Federal Government. Imposition of life in prison likely would be viewed as excessive and unjust, and would do the opposite of promoting respect for the law.

Regarding deterrence of the defendant from continuing the same conduct upon release, there is almost no additional effect. First, sentence aside, Defendant will certainly lose his medical license and his ability to prescribe. Second, the deterrent effect and impact that this prosecution has had on the Defendant and his family cannot be overstated. Defendant was the sole provider for his family who has inspired his children to succeed and held himself out as their role model. Defendant acknowledges that his conduct has shattered that image. Without him, his family has lost not only their sole source of income, but also their role model and source of inspiration. The Government has seized nearly all of the Defendant's assets. The Defendant's wife, Mrs. Hu, has no significant skills and has been working in a factory in Milford, Pennsylvania to provide for herself and their children.

Beyond the financial aspects, the most severe punishment Dr. Li has endured during this ordeal has been the shame and anxiety he feels on a daily basis from having subjected his family to negative scrutiny and embarrassment. Given Defendant's cultural background, this shame is deep-rooted, far-reaching, and has had a more profound effect upon Defendant than many other defendants.

Finally, in addition to the above, even under a twenty-year sentence, Dr. Li wouldn't be released until his early seventies. It is it is highly unlikely that a man at that age, let alone someone with Dr. Li's background, would be a risk to reoffend.

### IV. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct:

A term of life imprisonment falls far outside the scope of any similar case, even cases cited by the Government in their own brief. Despite asking for life in prison, the Government cites numerous cases that are factually similar to the case *sub judicia*—all of which resulted in sentences between twenty and thirty years in length. In fact, the cases that the Government cites in which the Defendant physician was given life involved distributions that are drastically different than the facts of the case at bar.[4]

Further, this case is diverse from *United States v. Bado*, CR 15-37, 2017 WL 167959, at *1 (E.D. Pa. Jan. 17, 2017). In *Bado*, the Defendant, a physician, was indicted upon **322 separate counts**. The breakdown of this indictment included the following:

1. Two counts of maintaining a drug involved premises, in violation of 21 U.S.C. § 856;

2. One count of unlawful distribution of a controlled substance **resulting in death**, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C);

3. **282 counts** of unlawful distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C);

---

[4] *United States v. Webb*, 655 F.3d 1238, 1240 (11th Cir. 2011) (convicted on 127 related counts, three of which were distribution resulting in death); *United States v. Johnny Clyde Benjamin, Jr.,* SDFL - Docket 9:17-cr-80203 (defendant was an M.D. but was actively participating in the manufacturing and distribution of counterfeit oxycodone that contained fentanyl and Benadryl and continued distributing after he was aware is pills killed a woman); *United States v. Steven Henson*, District of Kansas – Docket 6:16-cr-10018 (Physician illegally prescribed over 27,000 oxycodone, 2460 Alprazolam, and 5160 Methadone pills within one year in conspiracy with street dealers through his men's sexual health clinic effectively flooding Wichita street market.)

4. Thirty-three [33] counts of health care fraud, in violation of 18 U.S.C. § 1347; and

5. Four counts of making materially false, fictitious, or fraudulent statements, in violation of 18 U.S.C. § 1001. *United States v. Bado*, CR 15-37, 2017 WL 167959, at *1 (E.D. Pa. Jan. 17, 2017) (emphasis added).

In addition, each count of the 322-count Superseding Indictment stemmed from Defendant's practice as a physician from 2010 through 2013. *Id.* In *Bado*, the defendant was convicted at trial and was sentenced to 300 months—which is 25 years. This case does not hold a candle to the severity of *Bado*. Despite this apparent factual disparity, confusingly, the Government tenders *Bado* as support for a life sentence. Strikingly, *Bado* is also the only Third Circuit case (EDPA) that the Government cites.

Given that *Bado* is significantly more egregious than this case in the size and scope of the illegal conduct, it would not be equitable to sentence Defendant here to life in prison. Rather, given his substantial history of law-abiding conduct, the mandatory minimum of twenty-years is substantial enough to meet all the goals of sentencing. Further it is clearly in line with the sentencing of our sister-districts in Pennsylvania.

## CONCLUSION

For all of the foregoing reasons, the Defendant respectfully requests that the Court impose a sentence significantly below the advisory Guidelines determined by Probation in this case.

BAHURIAK LAW GROUP

/s/ _____
David Bahuriak, Esquire
Attorney for Fuhai Li

16