# UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Fuhai Li, Movant <br><br> V. <br><br> United States of America, Respondent | Case No.: 3:16-CR-194 <br><br> District Judge: <br> Honorable R. Caputo |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE CONVICTION AND SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. § 2255

Fuhai Li, Pro Se
Reg# 75356-067
FCI McKean
P.O. Box 8000
Bradford, PA 16701

FILED
SCRANTON

FEB 10 2021

PER _____
DEPUTY CLERK

# TABLE OF CONTENTS

I. Introduction·················································································1

II. Factual Background·······································································1

III. Legal Standards··········································································6

  A. Pro se filing standard·································································6

  B. Section 2255 Standard·······························································7

  C. Applicable laws to Probable Cause·············································7

    1. Probable Cause requirement for issuance of a search and seizure warrant by the Fourth Amendment····································7

    2. Probable Cause determination in an affidavit·····················7

    3. False information in an affidavit···································10

    4. Illegally obtained evidence in an affidavit and "fruit of the Poisonous tree" doctrine···············································10

    5. Good faith exception to the exclusionary rule···············11

  D. Applicable laws to ineffective assistance of counsel···········12

    1. A Constitutional right to effective assistance of counsel guaranteed by the Sixth Amendment································12

    2. Determination of ineffective assistance of counsel·········12

IV. Legal Argument·········································································13

  A. Ground one: Conviction was obtained by use of evidence gained pursuant to an unconstitutional search and seizure···········13

    i. There was no substantial basis for concluding the existence of probable cause in Agent Hischar's affidavit···············13

    1. Information provided by an anonymous letter from an addiction treatment facility······································14

    2. Information from Walgreens pharmacy·························16

    3. Information from the PA state's investigation···············17

4. Information from PMP reports and a national mail order pharmacy....17

5. Information from DEA agents' interview with three local pharmacists and their ARCOS data.................................18

6. Information from the CSOS and ARCOS data by Aliton's pharmacy.....20

7. Information from CS#1 about LI's practice.................20

8. Information from Rite Aid Corporation........................43

9. Hospital records of the deceased patients from Pocono Medical Center and Wayne Memorial Hospital, and Dr. Ross's opinion............45

10. Information from CS#2.......................................45

11. Information from Express Scripts..........................45

12. Information from a PA state police trooper...............46

13. Information from DEA investigators' surveillance.........46

14. Information from a complaint summary report from Health Integrity LLC and a CMS pharmacist's opinion........................46

15. Information from Agent Hischar's own investigation and his opinion..47

16. Opinion from DEA's expert, Dr. Stephen Thomas............61

ii. Good faith exception to exclusionary rule did not apply...........63

iii. The superseding indictment and conviction based on unconstitutionally seized evidence must be set aside........................64

B. Ground two: Denial of effective assistance of counsel...........65

i. Counsel was not reasonably competent, prejudicing LI thereupon..66

1. Counsel failed to request exculpatory evidence and failed to introduce such exculpatory evidence to jury during trial..................66

2. Counsel failed to prepare and submit numerous motions and briefs..67

3. Counsel erroneously conceded the relevance and fit prong of the Daubert criteria at Dr. Thomas' Daubert hearing.....................71

4. Counsel failed to cross-examine Dr. Thomas on a patient-by-patient basis in all 35 patients' medical records.....................72

5. Counsel failed to introduce evidence from LI's expert, Dr. Warfield, to counter Dr. Thomas' testimony in 31 of the 35 medical records...77

6. Counsel failed to introduce evidence, especially physical evidence from LI to counter patients' testimony in 16 of the 20 patients...79

7. Counsel failed to defend LI in the death count...79

ii. Counsel's loyalty to LI was undermined because of actual conflict of interest, prejudicing LI thereupon...85,

iii. Conviction must be set aside because of ineffective assistance of counsel...87

V. Conclusion...88

APPENDIX

Exhibit 1······ Application, Search and Seizure Warrant, and affidavit

Exhibit 2······ Supporting evidence

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Fuhai Li,

Movant

V.

United States of America,

Respondent

Case No.: 3:16-CR-194

District Judge:

Honorable R. Caputo

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO VACATE CONVICTION AND SENTENCE
## BY A PERSON IN FEDERAL CUSTODY PURSUANT TO
## 28 U.S.C. § 2255

## I. Introduction

NOW COMES Fuhai Li (hereafter "LI"), a prisoner in federal custody by Pro Se, and respectfully submits a motion to vacate and set aside conviction and sentence pursuant to 28 U.S.C. § 2255. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2255, as LI was tried and sentenced before Honorable Judge Caputo. The filing of this motion is timely as LI's direct appeal was decided on July 9, 2020.

## II. Factual Background

LI was a medical doctor who specialized in pain management (certified in Pain Medicine by American Board of Pain Medicine) and neurology (certified in Neurology by American Board of Psychiatry and Neurology, LI was also certified in Neuroimaging), and practiced both pain management (90%) and neurology (10%) in Milford, PA since 2010 after he left his previous group practice in East

Stroudsburg, PA.

On about April 2, 2012, Samantha Sciutella (Olivier) was hired as a full-time (40 hours per week) office staff in LI's medical office. In October, 2012, she was given an oral admonition at her six-month work evaluation and more oral admonitions were given thereafter due to being absent from work, being tardy or leaving work early. Sometime between the end of 2012 and the begining of 2013, Samantha Sciutella reported LI to the Pike County District Attorney's Office for "prescribing high amounts of narcotics outside the scope of his medical profession".

In about or prior to Jan. 2013 (exact time was unknown to LI), LI was investigated about his "excessive" prescribing of Schedule II controlled substances to patients with chronic pain by the PA Office of Attorney General, Pike County District Attorney's Office and the PA Department of State Bureau of Licensing, which concluded "the PA State Department Bureau of Licensing did not believe they had enough information to take administrative action against LI's medical license at this time."

On Jan. 9, 2013 when Janet Hart, the Director of the Government Affairs at Rite Aid, was visiting a Rite Aid pharmacy store (#3689), she became aware that LI was under the PA state investigation through a pharmacist, Rite Aid then conducted an internal analysis of LI's prescriptions and decided to stop filling LI's prescriptions for controlled substances on Jan. 23, 2013. On Jan. 28, 2013 (monday), a CVS pharmacist, Theresa Talbott, reported LI to CVS Corporation asking for banning LI's prescriptions for controlled substances when she learned through Janet Hart over that weekend that Rite Aid banned LI's prescriptions for controlled substances and that LI was under investigation, but CVS Corporation decided not to block LI's prescriptions for controlled substances. Subsequently, several local pharmacies started to selectively fill or stop filling LI's prescriptions for controlled substances after

they became aware that LI was under investigation and / or was banned by Rite Aid from filling his prescriptions for controlled substances.

Sometime between Jan. and the beginning of March 2013, LI's case along with a Confidential Source (CS#1- Samantha Sciutella) was referred to DEA by a detective of Pike County. On March 5, 2013, DEA Agent Hischar initiated an investigation about LI's "illegal prescribing of controlled substance medication", and gathered information about LI's prescriptions for controlled substances to support probable cause in his affidavit in support of an application for a search and seizure warrant through different sources, including an anonymous letter, prescription monitoring program (PMP) reports, the PA office of Attorney General and Pike County District Attorney's office, several local pharmacies (Rite Aid, Medicine Shoppe and Wal-Mart pharmacy), ARCOS data, CSOS data, a national mail order pharmacy (Express Scripts), Rite Aid Corporation, CVS Corporation, a complaint summary report from Health Integrity LLC and a CMS pharmacist, two local hospitals (Pocono Medical Center and Wayne Memorial Hospital) and Dr. Ross (a forensic pathologist), CS#1, CS#2, his comparison of prescriptions written by Li with those written by other local physicians, his own contact with a New Jersey state police trooper, with Dr. Patel and with Director of the Pike CYS, a PA state police trooper, his analysis result of PA PMP report, his analysis result of CVS prescription data, DEA investigators' surveillance on LI's medical office, and the report of Dr. Thomas, a pain management specialist who was contracted as DEA's expert. Notably, CS#1, a disgruntled employee in LI's practice who was employed from April 2012 to May 2014, reported LI's clinical activity in the office, "provided" patients' medical information to Agent Hischar from March 2013 to May 2014 for more than 14 months, and was the main source of Agent Hischar's information in his affidavit.

On Jan. 22, 2015, Agent Hischar or his associate swore his affidavit in support

Of an application for a search and seizure warrant before a U.S. magistrate judge who then issued a search and seizure warrant based upon Agent Hischar's affidavit. On Jan. 29, 2015, Agent Hischar along with other DEA agents and Law enforcements conducted a search of LI's medical office at 200 Third Street, Milford, PA and two homes located at 146 Rising Meadow Way, East Stroudsburg, PA and at 4005 Milford Landing Drive, Milford, PA, and seized all patients' medical records, carbon copies of all prescriptions written by LI, cash receipt books, patients' billing records, Quickbook records, financial transaction records and other financial records, U.S. currency, and all bank accounts including personal and business accounts in PNC bank and Wells Fargo bank etc. Pursuant to the search and seizure warrant issued on Jan. 22, 2015.

On about Feb. 3, 2015, LI retained attorney Michael Weinstein in Milford PA to represent him, and Mr. Weinstein later asked attorney Williams Ruzzo to join him as LI's defense team. Mr. Weinstein represented LI as defense counsel in this case until April 3, 2019, and Mr. Ruzzo represented LI until September 22, 2018 on which he passed away.

On November 17, 2015, Agent Hischar presented his case to a federal grand jury without any indictment. On July 19, 2016, Agent Hischar presented his case again to a federal grand jury which returned a 24-count indictment charging LI with counts 1 through 15 for knowingly dispensing a controlled substance without a legitimate medical purpose in violation of 21 U.S.C. § 841 (a)(1), count 16 for knowingly dispensing a controlled substance without a legitimate medical purpose resulting in serious bodily injury and death of a person in violation of 21 U.S.C. § 841 (a)(1), count 17 for knowingly dispensing a controlled substance without a legitimate medical purpose to a pregnant individual in violation of 21 U.S.C. § 861 (f), counts 18 and 19 for maintaining drug premises in violation of 21 U.S.C. § 856 (a)(1), counts

20 and 21 for monetary transactions in violation of 18 U.S.C. §1957, and Counts 22 through 24 for tax evasion in violation of 26 U.S.C. §7201. On October 17, 2017, Agent Hischar presented his case again to a federal grand jury which returned a 32-count superseding indictment charging LI with Counts 1 through 23 for knowingly dispensing a Controlled Substance without a legitimate medical purpose in violation of 21 U.S.C. §841(a)(1), Count 24 for knowingly dispensing a Controlled Substance without a legitimate medical purpose resulting in serious bodily injury and death of a person in violation of 21 U.S.C. §841 (a)(1), Count 25 for knowingly dispensing a controlled substance without a legitimate medical purpose to a pregnant individual in violation of 21 U.S.C. §861(f), Counts 26 and 27 for maintaining drug premises in violation of 21 U.S.C. §856(a)(1), Counts 28 and 29 for monetary transactions in violation of 18 U.S.C. §1957, and Counts 30 through 32 for tax evasion in violation of 26 U.S.C. §7201. The evidence Agent Hischar presented to the federal grand jury for indictment primarily included the reports of Dr. Thomas, a government expert generated after he reviewed approximately 60 patients' medical records, LI's prescriptions, financial records, U.S. Currency, and all bank accounts etc., which were seized on Jan. 29, 2015, pursuant to the Search and Seizure Warrant.

On May 1, 2018, a Daubert hearing was held before the trial court, and the court denied LI's motion to preclude a proposed expert testimony of Dr. Thomas. From May 2 to June 4, 2018, a jury trial was held before Honorable Judge Caputo. The government called LI's three (3) former employees (including CS#1) as witness, eight (8) pharmacists, three (3) physicians (Dr. Patel, Dr. Decastro and Dr. O'Boyle) and one (1) forensic toxicologist (Dr. Coyer) as factual witness, twenty (20) patients (including husband of the deceased patient) who testified their medical records seized from LI's medical office, and one (1) pain management expert, Dr. Thomas who testified thirty five (35) patients' medical records seized from LI's medical office and offered his opinion about LI's

Prescriptions for controlled substances. The government also presented physical evidence— all medical records, carbon copies of LI's all prescriptions, cash receipt books, patients' billing records, Quickbook records, monetary transaction records and other financial records, U.S. currency and all bank accounts etc. seized from LI's medical office, two homes and two banks pursuant to the search and seizure warrant issued on Jan. 22, 2015. LI called a pain management expert, Dr. Warfield who testified four (4) patients' medical records, and LI testified himself as well. During trial, the government withdrew Count 18 and Count 21. Sometime during trial, Mr. Weinstein informed LI that the chief detective of Pike County presented in the trial court. LI later on became aware that the Pike County chief detective was a friend of Mr. Weinstein. On June 4, 2018, LI was convicted on all remaining thirty (30) counts in the superseding indictment. On July 11, 2018, LI was incarcerated under federal custody in Lackawanna County Prison, PA. On April 3, 2019, LI was sentenced to 330 months' imprisonment by Honorable Judge Caputo.

On September 13, 2019, LI appealed his conviction in the United States Court of Appeals for the Third Circuit. On July 9, 2020, LI's appeal to vacate his conviction was denied by the appellate court. Currently, LI is serving his 330 months' imprisonment at Federal Correctional Institution McKean, PA.

## III. Legal Standards
### A. Pro se filing standard

Pro se filings are to be "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007). See also Higgins v. Beyer, 293 F.3d 683, 688 (3d Cir. 2002).

B. Section 2255 Standard.

Section 2255 provides in relevant part:

"(a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or Laws of the United States ... (b) unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon... If the Court finds ... that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgement vulnerable to collateral attack, the court shall vacate and set the judgement aside and shall discharge the prisoner or re-sentence him or grant a new trial ..."

28 U.S.C. § 2255.

C. Applicable Laws to Probable cause.

1. Probable cause requirement for issuance of a search and seizure warrant by the Fourth Amendment.

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

2. Probable cause determination in an affidavit.

The United States Supreme Court in the case of Gates reaffirmed the totality-of-the-circumstance's approach that traditionally has informed probable cause determination. Illinois v. Gates, 462 U.S. 213, 238 (1983). The task

of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is fair probability that contraband or evidence of a crime will be found in a particular place. Id. "[A]n informant's 'veracity', 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." Id at 230. It is established law that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter. If an informant's tip is the source of information, the affidavit must recite "some of the underlying circumstances from which the informant concluded that relevant evidence might be discovered" and "some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, ⋯ was 'credible' or his information 'reliable'". Franks v. Delaware, 438 U.S. 154, 165 (1978). In addition, the Supreme Court has recognized there is much value to the corroboration of details of an informant's tip by independent police work. Gates at 238. The duty of a reviewing court is simply to ensure that the magistrate had "substantial basis" for concluding that probable cause existed. Id at 238-239.

"The requirements for a warrant to be properly issued under federal law are that it must have been issued by a neutral and detached magistrate, and it must have been based on probable cause." United States v. Katzin, 94 F. Appx 134, 138 (3d Cir. 2004). To conclude that an application for a search warrant is supported by probable cause, the magistrate must determine that there is a "fair probability that ⋯ evidence of a crime will be found in a particular place." United States v. Zimmerman, 277 F.3d 426, 432 (3d Cir. 2002). Probable cause exists if there is a "fair probability" that the person

committed crime at issue. Dempsey v. Bucknell Univ. 834 F.3d 457, 467 (3d Cir. 2016). "A magistrate may issue a warrant relying primarily or in part upon the statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause." United States v. Stearn, 597 F.3d 540, 555 (3d Cir. 2010). Informants are not presumed to be credible, and the government is generally required to show by the totality of the circumstances either that the informant has provided reliable information in the past or that the information has been corroborated through independent investigation. United States v. Yusuf, 461 F.3d 374 (3d Cir. 2006). See United States v. Ritter 416 F.3d 256, 263 (3d Cir. 2005) ("where corroboration or independent investigation after receipt of an anonymous tip is lacking -- and thus the predictive value of the tip goes untested before a warrant is issued -- courts have found officers' subsequent reliance on the warrant unreasonable.") "[I]ndependent police corroboration of details of an informant's tip is an important method for establishing a tip's reliability." Stearn at 555. Furthermore, "We require more for the tip relied on by law enforcement to justify probable cause, than for reasonable suspicion." United States v. Henley, 941 F.3d 646 (3d Cir. 2019). Also see Alabama v. White, 496 U.S. 325, 330 (1990), and "[P]robable cause which will justify the issuance of a search warrant is less than certainty or proof, but more than suspicion or possibility, the test being whether the allegations of the supporting affidavit warrant a prudent and cautious man in believing that the alleged offense has been committed." United States ex. rel Campbell V. Rundle, 327 F.2d 153, 163 (3d Cir. 1964)

When a magistrate's probable cause determination is challenged, a district court must "determine whether the magistrate who issued the warrant had a 'substantial basis' for determining that probable cause existed," paying "great deference" to the magistrate judge's decision. Zimmerman at 432. This, however, "does not mean that reviewing courts should simply

"rubber stamp a magistrate's conclusion." United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1984). The determinative question is whether "a practical, commonsense decision [was made] whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of crime [would] be found in a particular place." Zimmerman at 432.

3. False information in an affidavit.

The United States Supreme Court in the case of Franks held that "a defendant has a right to challenge the veracity of statements made in an affidavit of probable cause that supported the issuance of a warrant." United States v. Aviles, 938 F.3d 503 (3d Cir. 2019). See Franks v. Delaware, 438 U.S. 154, 167-171 (1978). When the defendant makes a substantial preliminary showing that the affiant knowingly, intentionally or with reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant and that such statements or omissions were material or necessary, to the probable cause determination, the Fourth Amendment requires that a hearing be held at the defendant's request. Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). See Franks at 155-156. In the event that at the hearing, the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. Franks at 156.

4. Illegally obtained evidence in an affidavit and "fruit of the poisonous tree" doctrine.

"Illegally obtained evidence cannot serve as the basis for probable

cause." United States v. St. Rose, 189 F. Supp. 3d 528 (District Court of Virgin Islands, 2016), see United States v. Conley, 859 F. Supp. 847, 853 (WD, Pa, 1994).

The United States Supreme Court reaffirmed that "evidence seized during an unlawful search could not constitute proof against the victim of the search", predicating "fruit of the poisonous tree". Wong Sun v. United States, 371 U.S. 471, 484 (1963) (citing Weeks v. United States, 232 U.S. 383 (1914). "[T]he essence of a provison forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source, they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed." Sun at 485. "Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion." Sequra v. United States, 468 U.S. 796, 804 (1984). The Third Circuit also affirmed "exclusion of evidence as 'fruit of poisonous tree' on the existence of a primary constitutional violation" as predicated by the Supreme Court in the case of Wong Sun. United States v. Stearn, 597 F.3d 540 (3d Cir. 2010).

5. Good faith exception to the exclusionary rule.

If law enforcement executed a warrant that the reviewing court later finds was unsupported by probable cause, the court should not suppress evidence seized under that invalid warrant unless "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." United States v. Leon, 468 U.S. 897, 922 n.23 (1984). The Third Circuit has determined that there are four reasons for which an officer's reliance on a warrant would not be reasonable and thus fail the good faith

exception: (1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) when the magistrate abandoned his judicial rule and failed to perform its neutral and detached function; (3) when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. United States v. Hodge, 246 F.3d 301, 308 (3d Cir. 2001).

D. Applicable laws to ineffective assistance of counsel.

1. A constitutional right to effective assistance of counsel guaranteed by the Sixth Amendment.

The Sixth Amendment to the United States Constitution guarantees the right to counsel as part of a defendant's fundamental right to a fair trial. Strickland v. Washington, 466 U.S. 668, 684-685 (1984). The right to counsel is the right to effective assistance of Counsel. Id at 686. The effective assistance of counsel comprises two correlative rights: the right to counsel of reasonable competence and the right to counsel's undivided loyalty. Virgin Islands v. Zepp, 748 F.2d 125, 131 (3d Cir. 1984). See Wood v. Georgia, 450 U.S. 261, 271 (1981). When a counsel's assistance at trial was ineffective, the United States Constitution requires a conviction be set aside. Strickland at 691-692.

2. Determination of ineffective assistance of counsel.

The United States Supreme Court in the case of Strickland has set forth the two-prong standard by which courts must evaluate claims of ineffective assistance of counsel. Id at 687. The first prong (deficiency prong) of the Strickland test requires "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside

of the "wide range of professionally competent assistance" in light of all circumstances. Id at 688, 690. The movant bears the burden of showing that counsel's challenged action was not sound strategic decision. Kimmelman v. Morrison, 477 U.S. 365, 381 (1986).

The second prong (prejudice prong) of the Strickland test requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcomes." Strickland at 694.

## IV. Legal Argument

LI contends his conviction on two grounds: first, the conviction was obtained by use of evidence gained pursuant to an unconstitutional search and seizure, because probable cause did not exist in Agent Hischar's affidavit; second, the right to effective assistance of counsel was denied, because counsel's omissions and acts rendered his performance below the objective standard of reasonableness or outside the wide range of professionally competent assistance, which prejudiced LI thereupon.

A. Ground one: Conviction was obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

i. There was no substantial basis for concluding the existence of probable cause in Agent Hischar's affidavit.

Agent Hischar's application for a search and seizure warrant was related to LI's knowingly dispensing a controlled substance without a legitimate medical purpose in violation of 21 U.S.C. §841(a)(1). Exhibit (Ex) 1 at E1. A search and seizure warrant was issued on Jan. 22, 2015 by a magistrate judge in the United States District Court for the Middle District of Pennsylvania based upon the probable cause set forth in Agent Hischar's affidavit. Ex 1 at E2.

13 of 88

In order to support probable cause in his affidavit, Agent Hischar gathered information through different sources, including an anonymous letter from an addiction treatment facility, Walgreens pharmacy, the PA state's investigation about LI's "excessive" prescribing of Schedule II controlled substances, PMP reports and a national mail order pharmacy, DEA agents' interview with three (3) pharmacists at Rite Aid, Medicine Shoppe and Wal-Mart pharmacy and ARCOS data by these three (3) pharmacies, CSOS and ARCOS data by Aliton's pharmacy, CS#1, Rite Aid Corporation, CVS Corporation, two local hospitals (Pocono Medical Center and Wayne Memorial Hospital) and Dr. Ross (a forensic pathologist), CS#2, Express Scripts, a PA state police trooper, DEA investigators' surveillance on LI's medical office, a complaint summary report from Health Integrity LLC and a CMS pharmacist, his own contact with a New Jersey state police trooper, with Dr. Patel and with Director of Pike CYS, his own comparison of prescriptions written by LI with those written by other local physicians, his analysis results of PA PMP report and CVS prescription data, and Dr. Thomas, a pain management specialist who was contracted by DEA as its expert. Ex 1 at E 3-36. Notably, CS#1 who worked as an office staff in LI's medical office, was the main source of information and "provided" Agent Hischar with information as his informant from March 2013 to May 2014 for more than 14 months. By using the totality-of-the-circumstance approach, given all the circumstances set forth in Agent Hischar's affidavit including informant's veracity, reliability of information, basis of knowledge and independent police corroboration, there was no substantial basis for the magistrate's concluding that probable cause existed in Agent Hischar's affidavit as discussed below.

1. Information provided by an anonymous letter from an addiction treatment facility (paragraph 5).

An anonymous letter from an addiction treatment facility provided information

about LI's prescriptions gathered by the Staff members from their Clients. The basis of knowledge of the writer was hearsay's hearsay from drug addicts' stories. Agent Hischar did not recite any evidence that the writer along with the Staff members and their clients was a credible informant or their information was reliable. In fact, Agent Hischar could not corroborate any information, because he called "every addiction treatment facility in three counties or four counties and never able to get anyone to tell me it was their facility that wrote the letter." Transcript (Tr) on October 17, 2017 at 45, Ex 2 at E37. Furthermore, the anonymous letter contained at least five (5) false information:

(1). False information: "they are getting medications without a medical reason". LI NEVER prescribed any medications without a medical reason to his approximately 2,000 patients as indicated in patients' medical records which were Seized by the government, and their clients, if any, might deceive LI for pain medication as Agent Hischar testified and agreed that "addicts will do and say extraordinary things to get narcotics". Tr on May 3, 2018 at 146, Ex 2 at E38.

(2). False information: "... pay cash for their visit rather than using insurance." LI accepted almost all insurances – 177 health insurances (medicaid discontinued in about March 2012) as indicated in eClinicalWorks (electronic medical record). Ex 2 at E39-E47. No patients would need to pay cash for their office visit if they presented their insurance to LI's medical office.

(3). False information: "Dr. LI issued several prescriptions at once, including post-dated prescription." As shown by patients' medical records and carbon copies of LI's prescriptions seized by the government, LI NEVER issued several prescriptions at once. Patients were normally seen once a month. Sometimes when patients were seen once every two months, they were given two prescriptions with the second one written "don't fill until xxx date" (30 days from the date prescription was written)

as required by DEA regulation. Physicians are allowed to prescribe Schedule II controlled substances for 90 days' supply (three prescriptions) at each visit per DEA regulation.

(4). False information: "... tell Dr. LI they lost prescriptions and are given a new one without being seen by the doctor." When patients lost prescriptions, LI normally would not give a new one unless they had a police report, the event was confirmed with a family member and the insurance allowed the second one if insurance was involved. For instance, when patient Dwyer lost her prescription on October 23, 2013, it was not replaced. Ex 2 at E48.

(5). False information: "Dr. LI prescribed opiate medication to a seventeen year old patient who overdosed." LI NEVER prescribed opiate medication to a seventeen year old patient who overdosed as patients' medical records showed.

Agent Hischar knowingly inserted these false information in his affidavit, because he knew that he could not verify the writer of this anonymous letter. Ex 2 at E37. Given all above circumstances regarding information from the anonymous letter, including the basis of knowledge, veracity of informant, reliability of information and independent police corroboration, there was no substantial basis for concluding that probable cause existed. The insertion of these false information in Agent Hischar's affidavit might have misled or deceived the magistrate for concluding the existence of probable cause.

2. Information from Walgreens pharmacy (paragraph 6).

Walgreens pharmacies did not fill about 40 prescriptions by LI over three years based on their "'good faith' dispensing policy or other suspicious circumstances" which they used to "cover themselves" per Agent Hischar. Tr on October 17, 2017 at 38, Ex 2 at E49. However, Agent Hischar did not provide specific reasons why these prescriptions were declined, nor did he explain whether the reasons for refusing prescriptions were due to LI or due to patients (such as altered or fraudulent prescriptions, "doctor shopping", no ID presented, refusing to

use insurance etc.). Furthermore, Agent Hischar did not provide evidence that a pharmacist was qualified to determine whether a physician knowingly prescribed controlled substances without a legitimate medical purpose. More importantly, the pharmacists at Walgreens pharmacies did not conclude LI knowingly prescribed controlled substances without a legitimate medical purpose, and Agent Hischar agreed in his testimony that refusal to fill a physician's prescriptions by pharmacists did not indicate any improper procedure in a physician's office. Tr on May 3, 2018 at 137, Ex 2 at E50. Given above all circumstances regarding information from Walgreens pharmacy, there was no substantial basis for the magistrate's concluding that probable cause existed. It is worthwhile to point out that probable cause which will justify issuance of a search warrant requires more than just suspicion as held by the controlling case law. See White at 330 and Rundle at 163.

3. Information from the PA state's investigation (paragraph 7).

Prior to Agent Hischar's investigation, the PA office of Attorney General, Pike County District Attorney's office and the PA Department of State Bureau of Licensing conducted an investigation about LI's "excessive" prescribing of Schedule II controlled substances to his patients and concluded "the PA state Department Bureau of Licensing did not believe they had enough information to take administrative action against LI's medical license at this time" as documented in paragraph 7 by Agent Hischar, clearly indicating LI did not knowingly prescribe controlled substances without a legitimate medical purpose. Thus, probable cause did not exist.

4. Information from PMP reports and a national mail order pharmacy (paragraph 9).

The PMP reports about LI's prescriptions did not reflect whether prescriptions bearing LI's name were authentically authored by LI or were fraudulent, nor did they reflect whether LI knowingly prescribed controlled substances without a legitimate medical purpose. A national mail order pharmacy (Express Scripts)

Created a false impression that LI prescribed "excessive" amounts of controlled substances when it compared the amounts of prescriptions written by LI with those written by a general neurologist without subspecialty of pain management who rarely prescribed opioid analgesics, because LI was a pain management specialist (certified in Pain Medicine by American Board of Pain Medicine, see Ex 2 at E51) besides being a general neurologist (certified in Neurology by American Board of Psychiatry and Neurology. See Ex 2 at E52. LI was also certified in Neuroimaging, see Ex 2 at E53) and 90% of his approximately 2,000 patients were for chronic pain management as shown in patients' medical records. Moreover, the national mail order pharmacy did not conclude LI knowingly prescribed controlled substances without a legitimate medical purpose.

5. Information from DEA agents' interview with three local pharmacists and their ARCOS data (Paragraph 10).

DEA agents' interview on March 5, 2013 showed that Mr. Barland, a pharmacist at Rite Aid pharmacy (store # 3689) received a policy letter from the Rite Aid corporate office about one month ago which advises Rite Aid pharmacies not to fill narcotic prescriptions written by LI. The policy letter was generated on Jan. 23, 2013 by Janet Hart, Director of the Government Affairs at Rite Aid, only after she became aware that LI was under the PA state investigation when she was visiting Rite Aid pharmacy store # 3689 on Jan. 9, 2013, and then Rite Aid conducted an internal analysis about LI's prescriptions as indicated by her work note. Ex 2 at E54 - E55. According to her work note, LI's office then called Ms Hart on three occasions (Jan. 29, 2013 by Sandy, Feb. 18, 2013 by LI and Feb. 20, 2013 by LI, see Ex 2 at E56-E57), and finally on Feb. 20, 2013 when LI spoke to her, she stated Rite Aid would reconsider if LI afforded an opportunity to "sit down with the AG/DEA to discuss his prescribing and if they were OK" Ex 2 at E57. Clearly indicating the reason Rite Aid decided to stop filling LI's prescriptions was not because of

their recognizing any problems with LI's prescriptions, but because of their becoming aware that LI was under the PA state's investigation. In fact, Ms Hart called local agent Troy Searfoss who was investigating LI's prescriptions for potential meeting when LI responded he would consider, but Mr. Searfoss declined to meet with LI. Ex 2 at E58. Furthermore, Ms Hart testified that prescribing a lot of 30mg Oxycodone is "expected from a pain management physician that... he would prescribe a lot of opioids, and in particular Oxycodone was popular among a lot of pain management specialist" and that "Rite Aid had been happy to service Dr. Li's patients and fill his prescriptions" up until she became aware that LI was under investigation by the AG's Office. Tr on May 11, 2018 at 31-32, Ex 2 at E 59-E60.

The interview of Mr. Dickson at Medicine Shoppe showed that "he called LI about two weeks ago to question his prescribing of narcotic... he has been refusing to fill prescriptions for LI's new patients, young patients, patients from the Stroudsburg area and out of state patients". Mr. Dickson's testimony showed he did that after he became aware through his pharmacy technician that Rite Aid banned LI's prescriptions for controlled substances. Tr on May 7, 2018 at 128-129, Ex 2 at E61-E62. When Theresa Talbott, a CVS pharmacist, knew through Ms Hart over the weekend that Rite Aid banned LI's prescriptions for controlled substances and that LI was under investigation, she reported LI to CVS Corporation on Jan. 28, 2013 (Monday) asking for banning LI's prescriptions in CVS pharmacy. Ex 2 at E63.

It should be noted that no pharmacists pointed out they had problems with LI's prescriptions prior to the PA state's investigation and no pharmacists ever concluded that LI knowingly prescribed controlled substances without a legitimate medical purpose. Regarding ARCOS data, there was no evidence that LI was the sole contributor to the Oxycodone dosages in these three pharmacies reflected by the ARCOS data, and the ARCOS data had no bearing on whether LI knowingly

prescribed controlled substances without a legitimate medical purpose.

Given above all circumstances regarding information from local pharmacists and the ARCOS data, there was no substantial basis for concluding that probable cause existed.

6. Information from the CSOS and ARCOS data by Aliton's Pharmacy (paragraph 11)

These data were irrelevant to determining whether LI knowingly prescribed controlled substances without a legitimate medical purpose.

7. Information from CS#1 about LI's practice (paragraph 12 to paragraph 44).

CS#1 "provided" extensive information about LI's practice to Agent Hischar, including her opinion about LI's prescribing of controlled substances, positive illicit drug urine test result, "doctor shopping", family member concern, patients' file editing (paragraph 12), patients' living areas (paragraph 13), prescriptions to some of LI's patients (paragraph 14), local pharmacies' refusal to fill LI's prescriptions (paragraph 15), insurances and cash payment by patients (paragraph 16), suspicious billing practice (paragraph 17), patients' office visit on March 7, 2013 (paragraph 19), suspicion about diversion or abuse of prescription medication (paragraph 20), opinion about referring patients to MRI or physical therapy (paragraph 21), pill count on a patient (paragraph 22), deceased patients' information (paragraphs 23, 27 and 29), patients' vital sign taking and LI's exam note (paragraph 24), negative urine drug test (paragraph 25), suspicion of drug-seeking patients (paragraph 26), patients with positive illicit narcotic drug tests and/or drug charges (paragraph 28), spinal injection in LI's office (paragraph 31), suspicion of abusing narcotic of Dr. Ahmed's patients and 5 consecutive drug test for heroin (paragraph 33), pharmacy's telephone being tapped (paragraph 34), LI's conversation with Dr. Patel over phone about patient Dwyer (paragraph 35), CVS Corporation's notice to its pharmacies (paragraph 39), prescriptions to pregnant patients Scarpa and Sanders (paragraph 44).

It should be noted that information "provided" by CS#1 spread out in 23 Paragraphs of Agent Hischar's affidavit and that information was either false in 13 paragraphs (Paragraphs 12, 13, 14, 15, 16, 19, 21, 22, 25, 33, 35, 39 and 44), or illegally obtained in 6 Paragraphs (Paragraphs 20, 23, 26, 27, 28 and 29), or irrelevant to the issue at hands in the remaining 4 Paragraphs (Paragraph 17, 24, 31 and 34). Of note, 3 paragraphs (Paragraphs 20, 26 and 28) Containing illegally obtained information also had false information. In a word, information supplied by CS#1 in Agent Hischar's affidavit did not constitute substantial basis for concluding that probable cause existed as discussed below.

First, Agent Hischar failed to provide the basis of knowledge of CS#1 in most of her information except for two pieces of information: pharmacy's phone line being tapped which was told to her by a pharmacist, George Sacchi in paragraph 34 and LI's conversation with Dr. Patel which she heard over phone in paragraph 35. For instance, CS#1 "provided" information of two deceased patients in paragraph 29 who died even before CS#1 was employed in April 2012 in LI's medical office, but Agent Hischar did not relate how CS#1 came by such information in his affidavit.

Second, Agent Hischar did not provide any evidence to support that CS#1 was a credible informant. On the contrary, CS#1 in fact was a disgruntled employee, had record of being dishonest and telling numerous plain lies in her court testimony, and stole protected health information/medical records from LI's medical office as shown below.

a. CS#1 was a disgruntled employee.

CS#1 was hired as a full-time (40 hours per week) office staff on about April 2, 2012. Tr on May 7, 2018 at 4 and 68, Ex 2 at E64 and E65, but she was frequently absent from work, tardy or left work early. In about October, 2012 of her 6-month work evaluation, she was given an oral admonition due to her being absent from work, being tardy or leaving work early. In about