Feb. 2013, she was given another oral admonition due to the same reason. In June, 2013, she was given a written reprimand due to lack of improvement despite numerous oral admonitions as her own testimony confirmed. Tr on May 7, 2018 at 90-91, Ex 2 at E66-E67. As a full-time employee from April 2, 2012 to April 11, 2014, she NEVER had a single full paycheck (80 hours per paycheck-biweekly) and her average work hour was 30.6 hours per week as her paycheck stubs showed. Ex 2 at E68-E73. On April 14, 2014, CS#1 reduced her work hour to 3 days (24 hours) a week and LI hired Jade Flood to work remaining 2 days a week. Tr on May 7, 2018 at 69-70, Ex 2 at E74 -E75. But she continued to have the same problem and her average work hour was only 13.1 hours per week. Ex 2 at E73. On May 12, 2014, she further reduced her work hour to 2 days (16 hours) a week. Tr on May 7, 2018 at 70, Ex 2 at E75, but she could not even fulfil 2 days a week and her average work hour was only 8.5 hours per week. Ex 2 at E73. On May 28, 2014, CS#1 was no show for work and LI had to call Jade in to fill her absence, which created 2 hours' chaos in LI's medical practice due to her absence as indicated by Jade Flood's handwritten note. Ex 2 at E76. On June 2, 2014 (Monday), CS#1 texted a message to Jade: "… I am going to tell dr to have you been [sic] full time[,] it's not fair for dr if I can't be there on the only 2 days a week …" Ex 2 at E77, indicating she was going to quit her job. However, on June 1, 2014 (Sunday), CS#1 already applied for unemployment compensation benefits. Ex 2 at E78. Please be noted that LI's practice did not fire her due to being kindly considerate of her single motherhood.

   b. CS#1 had record of being dishonest and telling numerous plain lies in her court testimony.

   (1). CS#1 lied about her application for unemployment compensation benefits. On Feb. 23, 2016 when CS#1 was interviewed by IRS agents, she stated "she left the business because she could no longer handle the clientele." Ex 2 at E79.

On May 7, 2018, CS#1 testified she quit her job. Tr on May 7, 2018 at 71. Ex 2 at E80. However, on June 1, 2014 when she applied for unemployment compensation benefits, she claimed the reason for seperation as "Lack of Work". Ex 2 at E78. CS#1 admitted in her testimony that she did not tell unemployment insurance that she quit her job, Tr on May 7, 2018 at 71. Ex 2 at E80, but she still denied lying about her application by stating "I never lied about anything." Id.

(2). CS#1 lied about her grandfather's pain medication in her testimony. CS#1 testified "my grandfather was seen for spinal stenosis and scoliosis of the spine. He does not do pain medicine." Tr on May 7, 2018 at 40. Ex 2 at E81. However, her grandfather was prescribed Vicodin for pain relief by L I as shown by his medical record. Ex 2 at E82-E83.

(3). CS#1 lied about "Scarpa pregnancy incident" in her testimony. CS#1 testified she recalled she saw Rachel Scarpa at her last appointment before CS#1 left LI's practice in April, 2014, because Scarpa looked six months pregnant. Tr on May 7, 2018 at 54 and 96, Ex 2 at E84-E85. She further testified "she came in, we checked her in, she did her urine test, I said she's pregnant. Virginia came up to me and said, I think she's pregnant. We thought she was pregnant." Tr on May 7, 2018 at 54, Ex 2 at E84. However, this was a plain lie and CS#1 fabricated her testimony, because CS#1 was not even in LI's office on the day when "Scarpa pregnancy incident" happened. First, "Scarpa pregnancy incident" happened at her last appointment as CS#1 testified and agreed with. Id. According to Scarpa's medical record, her last appointment was on May 1, 2014 rather than April 4, 2014. Ex 2 at E86-E90, which was consistent with Virginia McCracken's testimony that Scarpa delivered a baby about two weeks after "Scarpa pregnancy incident", Tr on May 4, 2018 at 103, Ex 2 at E91, because Scarpa gave birth of a baby on May 12, 2014 based on Scarpa's testimony. Tr on May 9, 2018 at 211, Ex 2 at E92. Yet CS#1 had already left L I's practice by the end of April, 2014 as she testified on at least six (6) occasions. Tr on May 7, 2018 at 4, 50, 53, 54, 55-56 and 96,

Ex 2 at E64, E84, E85, E93, E94, and E95-E96. Second, on the day of "Scarpa Pregnancy incident" — May 1, 2014, Scarpa did not have urine test as shown by her medical record, Ex 2 at E86-E88, which was contradictory to CS#1's testimony that "she did her urine test". Tr on May 7, 2018 at 54, Ex 2 at E84. Third, Virginia's testimony showed "Scarpa Pregnancy incident" was initiated by Jade Flood when she congratulated Scarpa on her pregnancy, Tr on May 4, 2018 at 103, Ex 2 at E91, clearly indicating that Jade worked on May 1, 2014. As CS#1 testified that CS#1 and Jade shared a job position of 5 days per week as part-time employee (one worked 3 days per week, the other would work the remaining 2 days per week), Tr on May 7, 2018 at 69-70, Ex 2 at E74-E75, thus when Jade was working, CS#1 would be off. Since Jade was working on May 1, 2014 as discussed above, CS#1 would be off on that day even if she still worked in LI's medical practice in May, 2014. Please be noted that it was Virginia's memory error because of the fact discussed above when Virginia stated CS#1 (Samantha) was there while the U.S. prosecutor asked her who else was there on that day (see below). Fourth, the computer user logs in the eClinicalworks on May 1, 2014 showed that CS#1 NEVER used her password to log in to the system on May 1, 2014 for patient's check in she was supposed to do, yet everybody else in LI's medical practice logged in to the system on that day (Jade, LI, Virginia and Hong). Ex 2 at E97.

(4). CS#1 lied about asking LI to order a urine pregnancy test for Scarpa in her testimony. CS#1 testified "I asked if we could order a urine test for pregnancy test, if we could add that." Tr on May 7, 2018 at 55, Ex 2 at E95. First, CS#1 was not even in LI's office on the day of "Scarpa pregnancy incident" as discussed above. Second, Scarpa did not have urine drug test on May 1, 2014 as shown by her medical record, Ex 2 at E86-E88. Third, urine drug screen test kit doesn't test pregnancy, and we did not have urine pregnancy test kit. Fourth, any test must be discussed with patient for consent. Fifth, on May 20, 2014, CS#1 called and reported to Pike CYS caseworkers Jessica Lutz and Jessica Wright as documented

in Pike CYS Contact Summary that " S [Samantha – CS#1] called about the release
··· S called the MO [mother – Scarpa] in to do a pregnancy test and MO made
excuses why she couldn't come in," Ex 2 at E98, which contradicted her own
above testimony.

(5). CS#1 lied about LI's response to CS#1's asking for urine pregnancy
test in her testimony. CS#1 testified that LI responded "she had stopped
her adderall and she was just getting fat." Tr on May 7, 2018 at 55, Ex 2 at
E95. First, CS#1 was not even in LI's office on May 1, 2014, the day of "Scarpa
Pregnancy incident" as discussed above. Second, Pike CYS Contact Summary showed
CS#1 called and released information to Pike CYS caseworkers Jessica Lutz and
Jessica Wright that "MO [mother – Scarpa] kept reporting she was gaining weight
due to not taking adrenal [adderall] anymore", Ex 2 at E98, for which CS#1
contradicted herself. Third, Virginia's testimony showed "she [Scarpa] said, I'm
not pregnant, Dr. Li, I stopped taking my Adderall, that's why I gained all that
weight." Tr on May 4, 2018 at 103, Ex 2 at E91.

(6). CS#1 lied about her contact with Pike CYS and Scarpa's denial of being
pregnant in her testimony. CS#1 testified that "I never contacted Children and
Youth" and that she did not ever tell anyone that Rachel Scarpa lied and said
she was not pregnant. Tr on May 7, 2018 at 85–86, Ex 2 at E99-E100. In fact,
on May 20, 2014, CS#1 called and released information to Pike CYS caseworkers
Jessica Lutz and Jessica Wright as documented in Pike CYS Contact Summary that
"MO [mother – Scarpa] was questioned on three occasions if she was pregnant, and
MO denied." Ex 2 at E98.

(7). CS#1 lied about Scarpa's office visit payment in her testimony. CS#1 testified
that she did not tell Agent Hischar that Scarpa paid cash for office visit. Tr on
May 7, 2018 at 86, Ex 2 at E100. In fact, she informed Agent Hischar on May 20,
2014 that "Scarpa was being treated for back pain ··· (paying cash)" as documented
by Agent Hischar in paragraph 44 of his affidavit.

(8). CS#1 lied and contradicted herself about her meeting with DEA agents in her testimony. When CS#1 was asked how many times she met with DEA agents by defense counsel, CS#1 testified "I met with them two times. And then the third time was after they had did [sic] a search warrant," Tr on May 7, 2018, at 87. Ex 2 at E 101. Yet, just short time ago on her direct testimony, she testified she first met with DEA agents next to Milford Park (1st time), Tr on May 7, 2018 at 57, Ex 2 at E 102, then she met with DEA agents in Scranton (2nd time), at a gas station (3rd time), at the McDonald's parking lot (4th time), at the Blooming Grove barracks (5th time), Tr on May 7, 2018 at 58, Ex 2 at E 103, and she met with them again after search warrant (6th time). Tr on May 7, 2018 at 59, Ex 2 at E 104.

(9). CS#1 lied and contradicted herself about LI's Oxycodone prescription in her testimony. CS#1 testified that more than half of LI's patients were getting Oxycodone, Tr on May 7, 2018 at 79, Ex 2 at E105, but just a few minutes later she testified that she told Agent Hischar LI prescribed Oxycodone 30 mg 180 to 240 tablets to every pain patient, Tr on May 7, 2018 at 81-82, Ex 2 at E 106-E107.

(10). CS#1 lied about patients' medical records she looked up in her testimony. CS#1 testified that she did not check or look up a deceased, or an inactive or a discharged patient record" that has nothing to do with the practice now." Tr on May 7, 2018 at 83-84, Ex 2 at E 108-E109. Yet, she "provided" Agent Hischar with several deceased patients' protected health information. For instance, on March 8, 2013, CS#1 "provided" deceased patient Kathy Gilson's protected health information to Agent Hischar who documented in paragraph 23; On March 26, 2013, CS#1 "provided" a deceased patient Judy Santiago's protected health information to Agent Hischar who documented in paragraph 27; and on April 5, 2013, CS#1 "provided" deceased patients Russell Leonard and Suzanne Maack's protected health information to Agent Hischar who documented in

Paragraph 29. It should be noted that some of these patients died even before CS#1 was employeed on April 2, 2012 in LI's practice. Therefore, CS#1 absolutely had no work-related legal access to these patients' protected health information.

(11). CS#1 lied about Mr. Vanduzer's information she "provided" to Agent Hischar in her testimony. CS#1 testified that she did not tell Agent Hischar that a patient by the name of VanDusen [Vanduzer] was from New York City. Tr on May 7, 2018 at 84, Ex 2 at E 109. But information she gave to Agent Hischar clearly showed "(f) Vanduzer - from New York City" as documented in Paragraph 20 by Agent Hischar.

(12). CS#1 lied and contradicted herself about text message she sent to LI on September 10, 2014 in her testimony. CS#1 testified that she never sent or she did not remember sending that text message to LI on September 10, 2014, but she admitted the cell phone number 570-872-4125 was hers on September 10, 2014. Tr on May 7, 2018 at 92-94, Ex 2 at E 110- E112. Later in LI's testimony, LI then read the following text message off the screen of LI's cell phone, which was sent to his cell phone via CS#1's cell phone number:

"Good morning, Dr. Li. I know this is extremely unprofessional and should be done in person. I was wondering if you would consider hiring me back, maybe even if you have a part-time or per diem. I realize my track record is not so well. However, I'm willing to work for you-- to work for your trust back again. I have fallen on hard times, and by dropping my hours and then leaving was the worst thing for me to do. I was so stressed with the wedding and everything else I made a harsh decision. I am sorry for the position I left you in. I completely understand if you have no need for extra help or hesitation to take me back, but I-- like I said, if you give me a chance I'm willing to gain

27 of 88

Your trust back. Maybe we can have a meeting. Please let me
know either way. Thank you. Sincerely, Samantha."
Tr on May 30, 2018 at 108, 112, Ex 2 at E113-E114. It should be noted
the cell phone number was the same one via which she sent a text message
to Jade on June 2, 2014, Ex 2 at E77.

C. CS#1 stole at least 97 patients' protected health information / medical records
from LI's medical office and handed them to Agent Hischar.

CS#1 testified that she used her own password to the computer, Tr on May
7, 2018 at 75, Ex 2 at E115, looked at each patient's record, Tr on May 7, 2018
at 83, Ex 2 at E108, printed some records out, took them out of the office, and
handed them over. Tr on May 7, 2018 at 75, Ex 2 at E115. CS#1's testimony further
indicated that she was asked to "provide" lots of patients' medical information /
medical records to DEA agent without court order, without patients' consent,
and without knowledge of the entity owner, LI. Tr on May 7, 2018 at 72-
73, Ex 2 at E116-E117. Yet, Agent Hischar accepted these stolen medical information
/ medical records by CS#1, and documented them without revealing how CS#1
obtained these medical information / medical records in his affidavit in six (6)
paragraphs as follows: 24 patients in paragraph 20, 1 patient in paragraph
23, 18 patients in paragraph 26, 1 patient in paragraph 27, 51 patients in
paragraph 28 and 2 patients in paragraph 29. Because CS#1 testified she
did not write anything down and did not take notes when she was looking
at each patient's record, Tr on May 7, 2018 at 83, Ex 2 at E108, the only
way that all these detailed medical information could be stolen was by printing
patients' medical records out and handing them over as CS#1 testified.
Tr on May 7, 2018 at 75, Ex 2 at E115. Furthermore, any disclosure of patients'
protected health information to Agent Hischar by CS#1, including those to which
CS#1 had work-related legal access, was violation of HIPAA law, because CS#1
was not a covered entity or covered health care provider, nor were there specified

28 of 88

conditions for such disclosure based on HIPAA Law.

Third, Agent Hischar did not provide any evidence that CS#1's information was reliable. Despite the fact that Agent Hischar did not trust his informant a hundred percent and that "I verify what they tell me", Tr on May 3, 2018 at 148, Ex 2 at E118, he did not or could not corroborate any significant information provided by CS#1 except for some trivial and innocent information such as some patients' living areas in paragraph 13, One patient's name in paragraph 14, Some patients' prescriptions in paragraphs 14, 20, 23, 38 and 46 by checking PMP report, and some deceased patients in paragraphs 23, 27 and 29. On the contrary, CS#1 provided sixty one (61) false information spreading out in sixteen (16) paragraphs of Agent Hischar's affidavit as discussed below:

(1). False information: "CS#1 had contacted members of the Pike County District Attorney's office to report Dr. LI for prescribing high amounts of narcotics outside the scope of his medical profession" in paragraph 12. Agent Hischar did not provide evidence in his affidavit that an office staff with little training in medical field was qualified to determine whether a physician (pain management specialist) prescribed high amounts of narcotics outside the scope of his medical profession. In fact, the DEA agency issued its own statement about "Dispensing Controlled Substances for the Treatment of Pain" in Federal Register (Vol. 71, No. 172, September 6, 2006 at 52719) that "The responsibility for educating and training physicians so that they make sound medical decisions in treating pain (or any other ailment) lies primarily with medical schools, post-graduate training facilities, state accrediting bodies, and other organizations with medical expertise. Some states also have continuing medical education requirement for licensing. Physicians also keep abreast of the latest findings by reading peer-reviewed articles published in medical and scientific journals...", clearly indicating only a physician is qualified to determine whether a prescription for controlled substance for pain is given outside the scope of medical profession. Ex 2 at E119.

29 of 88

(2). False information: "Dr. LI prescribed heavy doses of narcotics, primarily Oxycodone 30mg, 180-240 tabs, to nearly every patient in his practice." in paragraph 12. Numerous evidence proved this information was false. (a) At least 253 patients with pain in LI's practice were not prescribed any controlled substances (209 patients) or Schedule II controlled substances (44 patients). Ex 2 at E120-E125; (b) Rite Aid's analysis result of LI's prescriptions showed about 36% of LI's prescriptions were not for Schedule II controlled substances as documented in paragraph 30; (c) Agent Hischar's own analysis of the PA PMP report in paragraph 47 showed about 31% of Oxycodone prescriptions were less than 30mg in strength; (d) Agent Hischar's own analysis of prescription data from CVS pharmacy in paragraph 48 showed about 33% of Oxycodone prescriptions were less than 30mg in strength; (e) Express Scripts' analysis in paragraph 49 showed 1 in 4 prescriptions were for Oxycodone 30mg; (f) At least 12 of the 24 patients in the superseding indictment (Counts 1, 2, 6, 7, 10, 12, 14, 15, 16, 17, 19 and 24) were not prescribed Oxycodone 30mg 180-240 tablets; and (g) Agent Hischar's testimony showed that out of 29 patients on November 28, 2011 he randomly pulled out from LI's prescription boxes, only 2 patients (labeled as #1 and #6) were prescribed Oxycodone 30mg 180-240 tablets. Tr on May 3, 2018 at 127-131. Ex 2 at E126-E130. Agent Hischar knowingly asserted CS#1's above false information in his affidavit, because he documented several aforementioned evidence (b, c, d and e) in his affidavit while he asserted CS#1's false information in his affidavit.

(3). False information: "despite patients testing positive for illicit drugs such as heroin and cocaine, Dr. LI continues to prescribe them narcotic pain medication" in paragraph 12. Positive test for illicit drugs does not necessarily indicate substance abuse or addiction, and it may be due to seeking additional pain relief, false positive, lab error, self-medication etc. based on a published authority "urine drug monitoring recommendations" by a panel of experts in the

field of pain and addiction medicine. Ex 2 at E136. The response to such a circumstance "reflects a clinical judgment about its seriousness, its cause or causes, the likelihood that behaviors of this type will recur, and the clinical context" based on Opioid Treatment Guidelines by a multidisciplinary panel of 21 experts, Ex 2 at E146, and the expert panel recognizes "that each patient is unique, and that a great deal of clinical judgment is required to handle discrepancies in a patient's UDT [urine drug test]". Ex 2 at E138. In LI's practice, patients testing positive for illicit drugs such as heroin or cocaine usually were not continued to receive narcotic pain medications except for some special circumstances where patients might give a second chance or might give a small amount of dosage to wean off in order to avoid withdrawal symptoms based on Opioid Treatment Guidelines, Ex 2 at E146-E147, and Urine Drug Monitoring Recommendations, Ex 2 at E138. For instance, patient Jared Stemetzki in count 4 of the superseding indictment was discharged immediately when his urine drug test was positive for cocaine. Ex 2 at E151-E152. Patient Christy Vanluvender in count 15 of the superseding indictment was discharged immediately when her urine confirmatory test was positive for heroin. Ex 2 at E153-E154. There were 458 patients who were discharged from LI's practice due to various reasons including positive illicit drug tests. Ex 2 at E155-E165. There were 212 prospective patients who were not scheduled to be seen by LI ("don't schedule list") due to various reasons including positive illicit drug tests, Ex 2 at E166-E172, as CS#1's testimony confirmed. Tr on May 7, 2018 at 21, Ex 2 at E173. CS#1 could not even give one specific patient who continued to receive narcotic pain medication when there was evidence that he or she abused or was addicted to narcotics.

(4). False information : "LI is made aware of patients who are 'doctor shopping' ..." in paragraph 12. When LI was made aware of any patients who were "doctor shopping", they were discharged immediately. For instance, patient Richard Trembula in count 5 of the superseding indictment was discharged immediately at

31 of 88

his next visit after LI became aware that he was "doctor shopping". Ex 2 at E174-E176. Out of the 458 discharged patients, 100 patients were discharged due to "doctor shopping" (multiple physicians or multiple doctors). Ex 2 at E155-E165. Out of the 212 prospective patients on "don't schedule list", 22 patients were not scheduled due to multiple doctors or "doctor shopping". Ex 2 at E166-E172. CS#1 could not give even one specific patient who continued to receive opioid prescription after LI was made aware of "doctor shopping".

   (5). False information: "Patients who are diverting their medication, calls from concerned family members or patients who are arrested for violations of the controlled substance act. Despite being made of these facts, LI continued to prescribe narcotic to those patients" in paragraph 12. Patients who were diverting medication or arrested for violations of controlled substance act would be discharged immediately when LI was aware. For instance, patient Judy Smith in count 3 of the superseding indictment was discharged immediately when she was found walking and looking around in LI's private office room without permission (due to concerning about potential prescription stealing). Ex 2 at E177. Patient Nicole Tintle in count 9 of the superseding indictment was discharged immediately when LI was aware that she had drug-related charge pending in the court about one week ago. Ex 2 at E178-E181. Patient Stephanie Abuiso in count 12 of the superseding indictment was discharged and referred to detox program immediately when LI became aware that she was altering opioid prescription. Ex 2 at E182-E183. Out of the 458 discharged patients, 11 patients were discharged due to diverting prescription drugs or drug-related charge. Ex 2 at E155-E165. Out of the 212 prospective patients on "don't schedule list", 12 patients were not scheduled due to diverting prescription drugs or drug-related charge. When there were calls from concerned family members, LI would ask the family member to come in with patient together for consultation, then LI would make decision of whether the opioid medication should be discontinued or patient might need more close

32 of 88

monitoring and more frequent follow-up based on opioid treatment guidelines. Ex 2 at E146. For instance, LI asked patient Alkema's parents to come with patient for consultation regarding family member's concern, and patient was then under more close monitoring. Ex 2 at E184-E185 (see History of Present Illness and Treatment Sections). At least one patient (medical record # 517) was discharged due to prescription concern by family member. Ex 2 at E158. Again, CS#1 could not provide even one specific patient who continued to receive opioid prescription after LI was made aware of patient's diversion or drug-related charge.

(6). False information: "Dr. LI might have edited the computerized patient files of patients who died on August 29, 2012" in paragraph 12. LI NEVER edited patients' files after events. The government's "digital evidence examination report" by Digital Forensic Examiner Katie Detmer showed there was no modification of patient files on August 29, 2012. Ex 2 at E186.

(7). False information: "Dr. LI sees patients from New York (including NYC)" in Paragraph 13. Patients' medical records in LI's practice showed no patients were from New York City. CS#1 could not give even one patient who was from NYC.

(8). False information: "CS#1 stated he/she is aware of one patient who told LI he felt significantly better after taking Oxycodone 15mg. LI added a prescription for 8 mg of dilaudid ···" in paragraph 14. Patients' medical records in LI's practice showed that there was no such patient that LI added a prescription for 8mg of dilaudid when patient felt significantly better after taking Oxycodone 15mg. CS#1 could not give such patient's name.

(9). False information: "CS#1 also stated Dr. LI prescribe Tylenol with codeine to an 11 year old boy for headaches. CS#1 did not agree with prescribing codeine to a child when there are many other non-narcotic options available" in paragraph 14. The medical record of the 11 year old boy showed LI indeed tried non-narcotic medications including Amitriptyline 10mg and Tylenol 325 mg for one month from October 16, 2012 to November 14, 2012, but they did not help him. Ex 2 at E187-

33 of 88

E188. Since his father informed LI that he tried Tylenol with Codeine (Tylenol #3) before which worked better for his severe headache (score 7/10), LI prescribed Tylenol #3 30 tablets, one tablet each time for headache on as-needed basis. Ex 2 at E189-E190. Agent Hischar did not provide evidence that CS#1 was a neurologist or even a medical doctor that would render her qualified to make any clinical decision about how to treat severe headache in a paediatric patient.

(10). False information: "LI employs an office manager, Sandy Leonard, who has two daughters, Kendra Hanor and Janelle Rude-Burke that are addicted to heroin ..." in paragraph 14. Both Kendra Hanor and Janelle Rude-Burke's urine test results showed there was no evidence of heroin. Ex 2 at E191-E201. It should be noted that positive opiate was due to cross-reaction of Oxycodone with opiate as it was well known in the literature. Ex 2 at E202. For instance, patient Tintle who took Oxycodone and methadone had positive drug screen for Oxycodone, opiate and methadone, Ex 2 at E203-E204, E206, but the confirmatory test confirmed Oxycodone and methadone only, Ex 2 at E205, indicating positive drug screen for opiate was due to cross-reaction of Oxycodone with opiate, because methadone does not cross-react with opiate. Ex 2 at E202. Because of high cost of confirmatory test, it was not practical to confirm every possible cross-reaction of Oxycodone with opiate, and physicians had to make clinical judgment of whether confirmatory test was warranted based on individual patient's clinical circumstance as indicated by Urine Drug Monitoring Recommendations, Ex 2 at E139, and by CDC guideline for prescribing opioids for chronic pain. Ex 2 at E207.

(11). False or misleading information: "CS#1 stated many of the area pharmacies including Blakeslee pharmacy, CVS, Rite-Aid, Price Chopper and Walgreens have refused to fill prescriptions written by LI or limited what patients could get" in paragraph 15. As discussed above, several local pharmacies decided to selectively fill or stop filling LI's prescriptions only after they became aware that LI was under the PA state's investigation and/or that Rite Aid banned LI's prescriptions

34 of 88

for controlled substances. Agent Hischar agreed in his testimony that refusal to fill a physician's prescriptions by pharmacists did not indicate any improper procedure in a physician's office. Tr on May 3, 2018 at 137, Ex 2 at E50.

(12). False information: "In May 2014, CS#1 contacted your affiant and stated that LI's practice is now taking in an average cash amount of $2,500/day" in paragraph 16. The Payments Summary from eClinicalWorks showed daily cash amount received by LI's practice in May 2014 was from $546.00 on May 2, 2014 to $1,602.00 on May 16, 2014, averaging $924.00/day rather than $2,500/day. Ex 2 at E208-E229.

(13). False information: "CS#1 stated there were 33 office visits on March 7, 2013 and 29 of the 33 patients were prescribed oxycodone in high quantities" in paragraph 19. Office visits schedule from eClinicalWorks showed there were 29 office visits and 1 caudal epidural injection on March 7, 2013. Out of the 29 office visits, at least two patients were not even prescribed opioids. Ex 2 at E230-E231.

(14). False information: "CS#1 provided the following names of patients and brief description of suspected diversion or abuse of prescription medication. CS#1 does not believe there is medical necessity for the prescribed controlled substances based on CS#1's training and experience" in paragraph 20. Agent Hischar did not provide any evidence of what kind of training and experience CS#1 had, nor did he provide evidence that an office staff with no training in the field of pain management was qualified to determine whether a physician prescribed controlled substances without medical necessity.

(15). False information: "(a) Olivia Cipollo - in her twenties with no complaint of pain" in paragraph 20. Olivia Cipollo's medical record showed she was treated with opioid analgesics for her chronic severe neck and back pain. Ex 2 at E232.

(16). False information: "(t) Vanduzer — from New York City" in paragraph 20. Vanduzer's medical record showed he was from Dingmans Ferry, PA, just

a few miles away from LI's medical practice. Ex 2 at E233.

(17). False information: "(j) Christy Vanluvender – prescribed 90 MS Contin and 150 Oxycodone on March 7, 2013" in paragraph 20. Christy Vanluvender's medical record on March 7, 2013 showed that she was prescribed 30 MS contin and 45 Oxycodone. Ex 2 at E234–E235.

(18). False information: "(K) Jonathan Fitzmaurice – pharmacist at Medicine Shop[sic] pharmacy saw Fitzmorris [sic] splitting pills with friends" in paragraph 20. There was no any documentation in Fitzmaurice's medical records (not included in the Appendix due to volume) that a pharmacist at Medicine Shoppe saw him splitting pills with friends and that LI was ever aware of such event. Furthermore, Andrew Dickson at Medicine Shoppe did not unfold such event in his testimony. Tr on May 7, 2018 at 119-136.

(19). False information: "CS#1 states Dr. LI rarely refers patients to specialists. According to CS#1, legitimate patients ask LI for a referral to physical therapy and Dr. LI tells them it won't work. CS#1 states only if a patient insists on having an MRI will Dr. LI order it" in paragraph 21. Referring patients to specialists such as MRI testing or physical therapy was based on medical necessity as the government expert, Dr. Thomas' testimony indicated. Tr on May 24, 2018 at 35. Ex 2 at E236. For instance, clinical guidelines recommend against routine diagnostic imaging test for patients with low back pain and diagnostic imaging testing is indicated only if patients have severe progressive neurologic deficits or signs or symptoms that suggest a serious or specific underlying condition based on medical history and physical examination, Ex 2 at E237 and E239, because routine diagnostic imaging testing does more harm than good, Ex 2 at E237, with which the government's expert agreed in his testimony, Tr on May 24, 2018 at 35, Ex 2 at E236, and he "would recommend against it as well". Tr on May 24, 2018 at 37, Ex 2 at E241. Moreover, LI referred about 270 patients for MRI or other diagnostic imaging tests, Ex 2 at E242-

E 248, and about 135 patients for physical therapy or other modality of therapy such as back brace, TENS unit, knee brace, wrist brace and cervical home traction etc. Ex 2 at E249-E252.

(20). False information: "CS#1 stated that Andy from the Medicine Shop [sic] Pharmacy called LI's office manager Sandy Leonard to report patient Jonathan Fitzmorris [sic] giving prescription pills to friends in a car after filling the prescription at the Medicine Shop [sic]. CS#1 said Andy asked that LI conduct a pill count on Fitzmorris [sic]. LI refused saying he does not believe the patient would do that" in paragraph 22. As CS#1's own testimony indicated, any call from a physician, a pharmacist, a family member etc. regarding a specific patient, was required to record "a phone encounter in the medical record" and then send to LI for decision-making. Tr on May 7, 2018 at 19-20, Ex2 at E253-E254. Mr. Fitzmaurice's medical records (not included in the Appendix due to volume) contained no documentation about Andy's phone call and such an event by either Sandy Leonard or CS#1. Furthermore, both Sandy Foster (Leonard)'s testimony on May 4, 2018 at 25-78 and Andrew Dickson's testimony on May 7, 2018 at 119-136 did not unfold such an event. Had such an event happened, Mr. Dickson undoubtedly would have reported such a criminal activity to local police as Mr. Dickson was a prudent pharmacist as reflected in his testimony. Tr May 7, 2018 at 119-136. If LI were aware of such an event, LI would not have any problems to conduct a pill count on Mr. Fitzmaurice, because LI's practice had done pill counts on many cases as reflected in patients' medical records.

(21). False information: "when patients have a negative drug screen for prescribed medication (indicating diversion)" in paragraph 25. As indicated by a published authority in Pain Medicine by a panel of 11 experts in the field of pain and addiction medicine — Recommendations for urine drug monitoring as a component of opioid therapy in the treatment of chronic pain, negative drug

37 of 88

Screen for prescribed medication doesn't necessarily indicate diversion, and it may be due to hoarding, not taking the medication, Lab error, self-escalating, binge use, timing of specimen collection in relation to most recent dose, taking the medication on an occasional basis and not as prescribed, rapid metabolism and drug-drug interaction etc. Ex 2 at E136, and "a great deal of clinical judgment is required to handle discrepancies in a patient's UDT [urine drug test]", because "each patient is unique". Ex 2 at E138. In fact, "urine drug screen results usually do not suggest a definitive course of action, but rather should be interpreted in the context of individual patient circumstances" as Opioid Treatment Guidelines so state. Ex 2 at E146. Agent Hischar did not provide evidence that CS#1 was a pain management specialist that would render her qualified to correctly interpret the urine drug screen test result based on specific clinical information of individual patient.

(22). False information: "they are given 3 failures before being considered for discharge" in paragraph 25. There was no such "3 failure" standard before being considered for discharge as reflected in patients' medical records. Patient might be discharged for just one failure or might be given a second chance depending on individual patient's circumstances, as recommended by Opioid Treatment Guidelines, Ex 2 at E146, and Urine Drug Monitoring Recommendations, Ex 2 at E138. Moreover, CS#1 could not give one specific patient who had 3 failures of negative drug screen.

(23). False information: "CS#1 provided the following list of suspected drug seeking active patients ···" in paragraph 26. Agent Hischar failed to provide any evidence that caused CS#1 to suspect that these patients were drug seeking and that CS#1 was qualified to determine aberrant drug-related behaviors V. Pseudo addiction.

(24 to 49). Twenty six (26) false information: "CS#1 also provided the below list of patients and identifying information, that have had positive

drug tests for illicit narcotics and/or have been arrested on drug charges" in paragraph 28. Based on Agent Hischar's affidavit in paragraph 28 and the listed patients' urine drug test results (not included in the Appendix due to Volume), at least twenty six (26) patients (Charles G, Michael G, Stephanie G, Matthew H, Ammany J, Douglas M Jr., Jose M, Sal N, Jewdyer O, Sharon P, Anthony P, Julio R, Jami S, Rachel S, Marie S, Lyon S, Neil S, Joel S, Marlene T, Timothy T, John V, Scott V, Stephen V, Derrick W, Lyndsey W and Ashley G) neither have had positive drug tests for illicit narcotics, nor have been arrested on drug charges.

(50). False information: "Investigators spoke with CS#1 regarding patients who are suspected of abusing narcotics" in paragraph 33. Agent Hischar did not provide evidence that CS#1 was qualified to determine whether a patient was a narcotic abuser, nor did he provide any evidence that caused CS#1 to suspect Dr. Ahmed's patients of abusing narcotics.

(51). False information: "patients from Dr. Moinuddin Ahmed's office in Port Jervis, New York, continue to come to Dr. LI's office after Ahmed was arrested by authorities in New York and his practice was closed" in paragraph 33. As shown in patients' medical records, Dr. Ahmed's patients from Port Jervis, New York were referred to LI by Dr. Ahmed when he stopped prescribing opioid medications to patients with chronic pain, and his practice was still open, not closed.

(52). False information: "At least six new patients from Dr. Ahmed's office have tested positive for narcotics and were subsequently given prescription ..." in paragraph 33. As indicated in patients' medical records, when these new patients' urine drug test results were positive for narcotics, consistent with the narcotic pain medications they were taking, LI would subsequently prescribe opioid medications for their pain relief. CS#1 did not provide a single name of patient whom LI prescribed opioids when their urine drug

tests were positive for illicit narcotics.

(53). False information: "a regular patient of Dr. LI had failed five consecutive drug tests for heroin and is continuing to get prescriptions for Oxycodone" in paragraph 33. As shown by medical records in LI's practice, LI NEVER had any patients who failed five consecutive drug tests for heroin. CS#1 did not or could not even give specific patient name.

(54). False information: "Dr. Patel requested LI provided a copy of an MRI report which LI told Patel he used to determine the patients [sic] treatment for pain" in paragraph 35. As shown in Dwyer's medical record from Pocono Medical Center, there was no evidence indicating that LI told Dr. Patel he used MRI report to determine the patient's treatment for pain. Ex 2 at E255-E259. Dr. Patel's testimony did not unfold that LI told Dr. Patel he used MRI report to determine patient's treatment for pain, either. Tr on May 7, 2018 at 97-118. It is well known in the literature of medical field that normal MRI does not deny pain and abnormal MRI does not confirm pain. For instance, more than 85% of patients' low back pain "cannot reliably be attributed to a specific disease or spinal abnormality", and "[a]ttempts to identify specific anatomical sources of low back pain in such patients have not been validated in rigorous studies" as stated by clinical guidelines. Ex 2 at E240. On the other hand, "many abnormalities detected with advanced imaging are so common in asymptomatic persons...", and "Thus, it is important to understand that the presence of imaging abnormalities need not mean that the abnormalities are responsible for symptoms". Ex 2 at E238. MRI testing is used to identify a specific disorder or underlying serious conditions such as metastatic cancer, spinal infection, cauda equina syndrome, compression fracture or ankylosing spondylitis etc.. Ex 2 at E238 and E240, but not for the purpose of pain treatment. As Dr. Patel's testimony indicated, imaging test or MRI cannot determine pain. Tr on May 7, 2018 at 111-112, Ex 2 at E260-E261, and the government's

expert, Dr. Thomas in his testimony also confirmed that a diagnostic tool can not confirm or deny pain. Tr on May 24, 2018 at 36, Ex 2 at E262. Further, Dr. Thomas testified that an abnormal MRI is not mandated for the prescribing of opioids. Tr on May 24, 2018 at 37, Ex 2 at E241.

(55). False information: "CS#1 stated CVS corporate notified all of its pharmacies not to fill prescriptions written by Dr. Fuhai LI" in paragraph 39. CVS corporate NEVER notified LI that CVS pharmacies would not fill any prescriptions for controlled substances written by LI, nor did it notify its pharmacies not to fill LI's prescriptions, as indicated by the testimony of Nicole Harrington, a CVS corporate Senior Director, "so, in this case we did not put a corporate lock on Dr. Fuhai Li's prescriptions, controlled substance prescriptions." Tr on May 7, 2018 at 160, Ex 2 at E263.

(56). False information: "Dr. Fuhai LI's office was contacted by Pike County Children & Youth Service (CYS) in reference to a baby being born opiate addicted" in paragraph 44. It was Samantha in LI's office (CS#1) who called and released information about MO (mother - Scarpa) to Jessica Lutz and Jessica Wright, Pike County CYS caseworkers on May 20, 2014, rather than that Pike County CYS contacted LI's office, as Pike County CYS contact summary authored by Jessica Lutz indicated that "S [Samantha] called about the release." Ex 2 at E98. In addition, what the baby had was opiate with-drawal or physical dependence, not addiction based on the definition given by the Federation of State Medical Boards Model Policy for the Use of Controlled Substances for the Treatment of Pain which was endorsed by the DEA. Ex 2 at E264-E265.

(57). False information: "The mother, Rachel SCARPA (24 YOA), was obviously pregnant and LI was warned by his office staff that SCARPA was pregnant" in paragraph 44. Pike CYS Contact Summary showed on May 20, 2014, Samantha in Dr. LI's office (CS#1) called and informed Pike CYS caseworkers, Jessica

41 of 88

Lutz and Jessica Wright that "MO [mother - Scarpa] was questioned on three occasions if she was pregnant, and MO denied." Ex 2 at E98. But on the same time, CS#1 contacted Agent Hischar and reported different story as Agent Hischar documented in his affidavit. Furthermore, Virginia McCracken's testimony showed Rachel Scarpa denied being pregnant when she was being congratulated by LI's office staff Jade Flood, and she denied pregnancy again when she was then questioned by LI. Tr on May 4, 2018 at 103, Ex 2 at E91.

(58). False information: "LI was warned ... that LI should not be prescribing opiates" in Paragraph 44. Virginia McCracken's testimony showed that nobody ever warned LI that he should not be prescribing opiates. Id. In fact, opioids are not contraindicated to pregnant women with pain for pain relief based on Opioid Treatment Guidelines. Ex 2 at E150. On the contrary, discontinuing opioids in pregnant women may cause more harm to fetus due to uncontrolled severe pain based on a press release about Opioids in pregnancy by American Society of Anesthesiologists, Ex 2 at E 266-E267, and the government's witness, Dr. DeCastro testified and agreed that "severe pain that goes untreated in a mother could also be harmful to a baby" and that "it's not unusual for a pregnant mom with back pain to take medication for it." Tr on May 10, 2018 at 17, Ex 2 at E268.

(59). False information: "According to CS, LI responded by saying the patient is just gaining weight" in paragraph 44. On May 20, 2014, the same day when CS#1 called and reported the above information to Agent Hischar, CS#1 (Samantha in Dr. LI's office) also called and reported to Pike CYS caseworkers, Jessica Lutz and Jessica Wright that "MO [mother - Scarpa] kept reporting she was gaining weight due to not taking adrenal [adderall] anymore." Ex 2 at E98. Further, Virginia McCracken testified when LI questioned Scarpa about her pregnancy on May 1, 2014, Scarpa said "I'm not pregnant, Dr. Li, I stopped

42 of 88

taking my Adderall, that's why I gained all that weight." Tr on May 4, 2018 at 103, Ex 2 at E91.

(60). False information: "SCARPA was being treated for back pain and being prescribed 120 Oxycodone 30mg/month (paying cash)" in paragraph 44. Scarpa's transaction report from eClinicalWorks showed that she paid her office visit by using her insurance— Highmark Blue Shield, not by paying cash. Ex 2 at E269 (included only part of her transaction report due to volume).

(61). False information: "CYS requested the patient file from LI's office and LI told staff members he would handle it" in paragraph 44. According to Pike CYS Contact Summary authored by Jessica Lutz, CS#1 told Jessica Lutz and Jessica Wright that "S [Samantha] will fax over the MO's entire file". Ex 2 at E98. In addition, the fax log in Scarpa's medical record showed that Virginia McCracken faxed Scarpa's medical record to Jessica at fax number 570-296-3540 on May 20, 2014 at 12:44 pm, Ex 2 at E270-E271, and LI did not handle it, because LI NEVER said that.

Given all aforementioned circumstances regarding information provided by CS#1, including the basis of knowledge, veracity of informant, reliability of information and independent police work, particularly the pervasive false information which should be set aside and stolen medical information/medical records which should be excised, there was no substantial basis for concluding that probable cause existed. The included false information and concealed stolen medical information/medical records in Agent Hischar's affidavit might have misled or deceived the magistrate judge for concluding that probable cause existed.

8. Information from Rite Aid Corporation (Paragraph 30).

As discussed above, Rite Aid conducted an internal analysis and then decided to stop filling LI's prescriptions for controlled substances on Jan. 23, 2013 only after Janet Hart, Director of the Government Affairs at Rite Aid, became

aware that LI was under the PA state's investigation when she was visiting Rite Aid pharmacy store #3689. Ex 2 at E54-E55. When LI finally spoke to her on Feb. 20, 2013 after 3 attempts' phone call, she stated "Rite Aid would reconsider" if LI afforded an opportunity to "sit down with the AG/DEA to discuss his prescribing and if they were OK". Ex 2 at E56-E57. She in fact called local agent Troy Searfoss who was investigating LI's prescriptions when LI stated he would consider, Ex 2 at E57-E58, but Mr. Searfoss declined to meet with LI. Ex 2 at E58. Further, Janet Hart indicated in her testimony "Rite Aid had been happy to service Dr. Li's patients and fill his prescriptions" up until she became aware that LI was under investigation by the Attorney General's office. Tr on May 11, 2018 at 32, Ex 2 at E60. Regarding patients in the same family getting Schedule II controlled substances from LI, Agent Hischar's own testimony indicated that it was OK to prescribe Schedule II controlled substances to the same family member. Tr on May 3, 2018 at 140-141, Ex 2 at E272-E273. Dr. Thomas also testified that nothing in the guidelines says a clinician cannot treat members of the same family. Tr on May 24, 2014 at 22-23, Ex 2 at E274-E275. Furthermore, there was one false statement in Rite Aid's comment on LI's prescriptions as follows:

(1). False information: "(a) a combination of medications that were not within traditional prescribing such as long acting (medication) supplemented by a short acting for breakthrough pain." According to Opioid Treatment Guidelines, there was insufficient evidence to guide recommendation for use of short-acting opioids versus long-acting opioids, and a short-acting opioid may be added for breakthrough pain when a long-acting opioid was used, Ex 2 at E144, E149-E150, clearly indicating that using short-acting opioids only, long-acting opioids only, or a combination of short-acting and long-acting opioids is all an appropriate option for treatment of chronic pain depending on individual patient's clinical situation.

More importantly, Rite Aid did not conclude that LI knowingly prescribed

44 of 88

Controlled Substances without a legitimate medical purpose, and Agent Hischar agreed in his testimony that refusal to fill a physician's prescriptions by pharmacists did not indicate any improper procedure in a physician's office. Tr on May 3, 2018 at 137, Ex 2 at E50.

9. Hospital records of the deceased patients from Pocono Medical Center and Wayne Memorial Hospital, and Dr. Ross's opinion (paragraph 32).

Dr. Ross, a forensic pathologist, reviewed the medical records of the deceased patients and was unable to provide an opinion of whether LI knowingly prescribed controlled substances without a legitimate medical purpose.

10. Information from CS#2 (paragraphs 40 to 42).

The illegal activity of LI's patient provided by CS#2 was irrelevant to the issue at hands — whether LI knowingly prescribed controlled substances without a legitimate medical purpose. The basis of knowledge of CS#2 about his or her suspicion of LI was hearsay from internet. Agent Hischar did not provide evidence that CS#2 was a credible informant or his/her information about LI was reliable. On the contrary, CS#2's information about LI was false as discussed below:

(1). False information: "CS#2 named Doctor Fuhai LI as a suspicious doctor stating that he doesn't take insurance, only cash and that if you can pay cash he will give you pain killers" in paragraph 42. As discussed above, LI took 177 different kinds of insurances and patients would not need to pay cash if they presented their insurances to LI's office. Ex 2 at E39-E47. Further, Agent Hischar's own documentation in paragraph 16 confirmed that LI took many insurances. Agent Hischar knowingly included this false information in his affidavit, which might have misled or deceived the magistrate judge for concluding that probable cause existed.

11. Information from Express Scripts (paragraphs 49 to 53).

Express Scripts created a false impression that LI prescribed "excessive"

45 of 88

amounts of controlled substances when it compared the amounts of controlled sub-
stances written by L I with those written by a general neurologist without
subspecialty of pain management who rarely prescribed opioid analgesics, because
LI was a pain management specialist (certified in Pain Medicine by American
Board of Pain Medicine, see Ex2 at E51) besides being a general neurologist
(certified in Neurology by American Board of Psychiatry and Neurology, see Ex2
at E52. LI was also certified in Neuroimaging, see Ex2 at E53). Nevertheless,
Express Scripts did not conclude that L I knowingly prescribed controlled substances
without a legitimate medical purpose.

12. Information from a PA state police trooper (paragraph 54)

There was no factual evidence that LI knowingly prescribed controlled substances
to his patient— Mr. Lattimore without a legitimate medical purpose and that LI
knew Mr. Lattimore's illegal activity.

13. Information from DEA investigators' surveillance (paragraph 55 to 57).

DEA investigators conducted surveillance on L I's medical office on four
occasions, but there was no observed criminal activity and there was no factual
evidence that LI knowingly prescribed controlled substances without a legitimate
medical purpose. Regarding the investigators' observation about patient Dolores
Cirillo, she was always accompanied by her husband, and sometimes with
addition of her son. It was thus no surprise that "all three occupants entered
LI's practice … " in paragraph 55. Ex1 at E30.

14. Information from a complaint summary report from Health Integrity LLC and
a CMS pharmacist's opinion (paragraphs 58 and 59).

There was one false information given by the CMS pharmacist:

(1). False information: "… LI's prescribing of potent short-acting narcotics
without a baseline long-acting" in paragraph 58. First, LI indeed prescribed
a long-acting opioid to many patients as reflected in patients' medical records.
Second, there was insufficient evidence to guide recommendations for use of