Short-acting versus long-acting opioids, or as-needed versus around-the-clock dosing for the treatment of chronic pain based on Opioid Treatment Guidelines. Ex 2 at E144.

It should be noted that the complaint summary report and the CMS pharmacist did not conclude that L I knowingly prescribed controlled substances without a legitimate medical purpose and that the CMS pharmacist's opinion about Aliton's Pharmacy was irrelevant to the issue at hands – whether L I knowingly prescribed controlled substances without a legitimate medical purpose.

15. Information from Agent Hischar's own investigation and his opinion.

Agent Hischar offered his opinion about L I's prescriptions (paragraphs 8 and 10), his corroborated information about the living areas of L I's patient (paragraph 13), his own comparison of prescriptions written by L I with those written by other local physicians (paragraph 15), his contact with New Jersey state police trooper Doug Moraglia and prescription lists of the New Jersey criminal drug ring members (paragraph 18), his opinion about further testing and referring to specialists (paragraph 21), Criminal history inquiry (paragraph 26 and 28), his material omission about Rite Aid's decision to stop filling L I's prescriptions for controlled substances (paragraph 30), his contact with Dr. Patel and material omission and fabrication about patient Dwyer (paragraphs 36 to 38), his contact with Director at Pike County CYS (paragraph 45), his analysis of the PA PMP report (paragraph 47) and his analysis of CVS prescription data (paragraph 48).

a. False impression of L I's "excessive" prescribing of controlled substances created by Agent Hischar in paragraph 15.

Agent Hischar created a false impression that L I prescribed "excessive" amounts of controlled substances when he compared the amounts of controlled substances written by L I with those written by other local physicians, because L I was a pain management specialist (certified in Pain Medicine by American Board of Pain Medicine, see Ex 2 at E51) besides being a general neurologist (certified in

47 of 88

Neurology by American Board of Psychiatry and Neurology, see Ex 2 at E52; LI was also certified in Neuroimaging, see Ex 2 at E53) and about 90% of LI's approximately 2,000 patients were for chronic pain management. Agent Hischar knew or should have known the aforementioned facts through his informant, CS#1, because CS#1 had worked in LI's office for more than 25 months (from April, 2012 to May 2014) and LI's certificate of Pain Medicine along with other certificates was easily recognizable on the wall of LI's office as indicated by DEA agents' own photo taken during the search of LI's office on Jan. 29, 2015. Ex 2 at E276.

b. Agent Hischar's intentional material omission and deliberately or recklessly included false information in his affidavit.

   Agent Hischar knowingly omitted at least 3 material information and deliberately or recklessly included at least 8 false information in his affidavit, which might have misled or deceived the magistrate for concluding that probable cause existed as discussed below.

   (1). Agent Hischar knowingly omitted material information—his contact with many addiction treatment facilities about an anonymous letter in paragraph 5. Agent Hischar testified in front of a federal grand jury that he "called every addiction treatment facility in three counties or four counties and never able to get anyone to tell me it was their facility that wrote the letter". Tr on October 17, 2017 at 45, Ex 2 at E37, but he included five (5) false information given by the anonymous letter in his affidavit anyway without revealing this piece of important information for the magistrate judge's independent decision, which might have misled or deceived the magistrate judge for concluding that probable cause existed.

   (2). Agent Hischar knowingly omitted material information—Rite Aid's internal emails and Janet Hart's work note when he included false information in his affidavit that "by reviewing the ARCOS data, it was apparent these pharmacists

recognized a problem with Dr. LI's prescribing of Oxycodone. The noted decrease in Oxycodone orders reflects the corrective action taken by the pharmacies" in Paragraph 10 and that "after analysis, Rite Aid decided to stop filling controlled substance prescriptions written by Dr. LI" in paragraph 30. The reason that Rite Aid and other local pharmacies decided to stop filling or selectively fill LI's prescriptions for controlled substances was not because of their recognizing a problem with LI's prescribing of Oxycodone, but because of their becoming aware that LI was under the PA state's investigation, which is supported by several evidence. First, the ARCOS data in paragraph 10 show Oxycodone dosages increased yearly from 2010 to 2012 for 3 years in all pharmacies except for Rite Aid in 2012 with slight decrease, indicating no pharmacies recognized a problem with LI's prescription for Oxycodone for these 3 years, because the pharmacists would not be willing to fill more prescriptions if they recognized a problem with LI's prescriptions. Second, the ARCOS data in paragraph 10 also show a dramatic decrease in Oxycodone dosages in all pharmacies (41% to 63% reduction) started in 2013, the same time when the investigation about LI's prescriptions for controlled substances was conducted by the Office of Attorney General and Pike County District Attorney's Office as indicated in the work note of Janet Hart that she became aware that LI was under the PA state's investigation when she was visiting the Rite Aid pharmacy store #3689 on Jan. 9, 2013. Ex 2 at E54. The dramatic decrease in Oxycodone dosages at the same time in all pharmacies reflects the fact that the pharmacists would not be willing to fill LI's prescriptions when they became aware that LI was under investigation (see below). Third, the DEA agents' interview with three local pharmacists in paragraph 10 of Agent Hischar's affidavit showed no pharmacists ever pointed out that they recognized a problem with LI's prescriptions prior to 2013 or prior to the PA state's investigation. Fourth, the Rite Aid internal emails showed Janet Hart increased the Oxycodone quota at local Rite Aid pharmacy (store #3689) on at least two occasions, yet no any concerns about LI's

prescriptions were ever raised by the Rite Aid staff pharmacists and pharmacy district manager. Ex 2 at E277. Fifth, Janet Hart's work note showed Rite Aid decided to stop filling LI's prescriptions for controlled substances on Jan. 23, 2013 only after Ms Hart became aware that LI was under the PA state's investigation when she was visiting Store #3689 on Jan. 9, 2013, and then an internal analysis about LI's prescriptions was performed. Ex 2 at E54-E55. Further, when LI finally spoke to her on Feb. 20, 2013 after 3 attempts' phone call, Ms Hart stated "Rite Aid would reconsider" if LI afforded an opportunity to "sit down with the AG/DEA to discuss his prescribing and if they were OK", Ex 2 at E56-E57, clearly indicating the reason Rite Aid decided to stop filling LI's prescriptions was not because of their recognizing a problem with LI's prescriptions, but because of their becoming aware that LI was under the PA state's investigation. Similarly, pharmacists at other local pharmacies started to selectively fill or stop filling LI's prescriptions when they became aware that LI was under investigation and/or that LI's prescription was banned by Rite Aid. For instance, Theresa Talbott, a CVS pharmacist, reported LI to CVS Corporation on Jan. 28, 2013 (Monday) asking for banning LI's prescription when she knew through Ms Hart over that weekend that LI was banned by Rite Aid and that LI was under investigation. Ex 2 at E63. Andrew Dickson, a pharmacist at Medicine Shoppe, started to selectively fill LI's prescriptions when he became aware LI's prescription was banned by Rite Aid through his pharmacy technician. Tr on May 7, 2018 at 128-129. Ex 2 at E61-E62. Had Agent Hischar included the contents of the Rite Aid internal emails and Janet Hart's work note in his affidavit, a reasonably prudent person would have known that the reason that pharmacists decided to stop filling or selectively fill LI's prescriptions was because of their becoming aware that LI was under the PA state's investigation prior to Agent Hischar's investigation. Agent Hischar knowingly omitted these two pieces of material information because he received records from Rite Aid Corporation including "written records"— Janet Hart's work note and "internal

50 of 88

Rite-Aid emails" on May 1, 2013 as he documented in paragraph 30. Agent Hischar's such knowing and intentional omissions undoubtedly would have misled or deceived the magistrate for concluding that probable cause existed.

(3). Agent Hischar knowingly omitted material information — Dwyer's medical record from Pocono Medical Center when he included false statements in his affidavit that "this patient was 26 years old and addicted to Oxycodone" in paragraph 37 and that "Dr. LI wrote those prescriptions for Dwyer after LI was made well aware of Dwyer's addiction to Oxycodone by Dr. Patel" in paragraph 38. First, Dwyer's medical record authored by Dr. Patel did not contain any evidence that Dwyer was addicted to oxycodone. Ex 2 at E255-E258. For instance, there was no substance abuse history documented in her record, there was no urine drug test, there was no any discussion with Dwyer about Oxycodone abuse or addiction, there was no substance abuse consultation, there was no diagnosis of substance (oxycodone) abuse or addiction, and there was no referral to substance abuse program or addiction treatment facility. In fact, Dwyer was advised by Dr. Patel to follow up with LI when she was discharged from hospital. Ex 2 at E257. If Dr. Patel had evidence that Dwyer was addicted to Oxycodone as Agent Hischar asserted in his affidavit, he would advise her to see an addiction specialist or refer her to an addiction treatment facility rather than advised her to follow up with LI who prescribed Oxycodone for her pain relief. Second, Dr. Patel's documentation about his conversation with LI in Dwyer's medical record did not show Dr. Patel and LI ever discussed Oxycodone addiction. Ex 2 at E255 and E257. Third, Dr. Patel's contemporaneous note in ADDENDUM of Dwyer's record right after his conversation with Agent Hischar did not show he ever told Agent Hischar that Dwyer was addicted to Oxycodone and that he and LI ever discussed Dwyer's Oxycodone addiction. Ex 2 at E258. It was inconceivable that Dr. Patel would tell Agent Hischar something which was against his own documentation, because Dr. Patel and LI NEVER talked about Dwyer's addiction to Oxycodone. Fourth, Dr. Patel's

testimony did not reveal any evidence that Dwyer was addicted to Oxycodone and that he told LI Dwyer was addicted to Oxycodone. Tr on May 7, 2018 at 97-118. Finally, Agent Hischar's informant, CS#1, did not report information about Dwyer being addicted to Oxycodone to Agent Hischar when she called him on October 28, 2013 as his own documentation in paragraph 35 showed. If Dr. Patel had informed or discussed with LI about Dwyer's addiction to Oxycodone, CS#1 undoubtedly would have reported it to Agent Hischar, because reporting Dwyer's addiction would be of more value than reporting her MRI report. Agent Hischar knowingly omitted Dwyer's record from Pocono Medical Center and then fabricated the above discussed two false statements in his affidavit, because the government sent a grand jury subpoena to Pocono Medical Center for Dwyer's medical record on November 5, 2013. Consequently, such falsehood in Agent Hischar's affidavit undoubtedly would have misled or deceived magistrate for concluding that probable cause existed.

(4). Agent Hischar knowingly or recklessly disregarded the truth when he included a false statement that "Moraglia (New Jersey state police trooper) said during post arrest interviews, several of the persons arrested told him that Judy Smith was exchanging sex for prescriptions with Dr. LI" in paragraph 18. The New Jersey state police interview reports with Jared Stemetzki, Richard Trembula, Jodi Warner and Dustin Harper did not contain such information. Ex 2 at E278-E289. Further, the report of investigation by DEA agent documented "Smith stated LI did not attempt any further advance or sexual contact". Ex 2 at E290. In fact, New Jersey state police investigation report listed LI as one of the seven physician victims of the New Jersey criminal drug ring. Agent Hischar related in paragraph 18. Ex 2 at E291. It was inconceivable that New Jersey state police trooper Mr. Moraglia would relate such story to Agent Hischar, which was against his own police investigation report. Consequently, inclusion of such false information with reckless disregard for the truth in Agent Hischar's affidavit undoubtedly would

52 of 88

have misled or deceived the magistrate for concluding that probable cause existed.

(5). Agent Hischar knowingly or recklessly disregarded the truth when he listed many fraudulent prescriptions bearing LI's name by stating "prescribing physician" in paragraph 18, indicating LI prescribed these prescriptions. In fact, many pre-scriptions bearing LI's name were fraudulent as indicated by communication fax between LI and Mr. Moraglia on July 13, 2012, Ex2 at E292-E303, because LI NEVER wrote multiple prescriptions within a month for a single patient. In addition, Mr. Moraglia's investigation report clearly stated "Smith stole a pre-scription pad from Dr. Fuhai Li", Ex2 at E279. "Stemetzki also implicated Jodi Warner (suspect) as stealing prescription blanks from Dr. Li's office", Id. "Warner advised that Judy Smith stole all of the following prescriptions, wrote them out for Oxycodone 30mg tablets and gave them to her to fill in her name …", Ex2 at E284, "He [Harper] described that most of the fraudulent prescriptions were written for 240 30mg Oxycodone tablets in the name of Dr. Li", Ex2 at E287. More importantly, on March 17, 2013, Agent Hischar was informed by Mr. Moraglia that a prescription drug ring in Southern New Jersey "forged prescriptions of 5 or 6 doctors in New Jersey and also obtained prescriptions from Dr. LI in Milford, PA" as documented in paragraph 18. Nonetheless, Agent Hischar listed many fraudulent prescriptions bearing LI's name without revealing the truth. On the contrary, he emphasized "prescribing physician", "the high number of doses and short amount of time between refill" in paragraph 18 of his affidavit. Agent Hischar's such falsities in his affidavit undoubtedly would have misled or deceived magistrate judge for concluding that probable cause existed.

(6). Agent Hischar knowingly or recklessly disregarded truth when he included several false statements about Scarpa given by CS#1 in paragraph 44 as discussed above, because Pike County CYS contact summary authored by Jessica Lutz clearly indicated CS#1 reported completely different stories about Scarpa to Pike County CYS on May 20, 2014, the same day when CS#1 called and reported information

about Scarpa to Agent Hischar. Ex 2 at E98. Agent Hischar testified that he did not trust his informant a hundred percent and that "I verify what they tell me". Tr on May 3, 2018 at 148, Ex 2 at E118. Agent Hischar indeed contacted the Director at Pike County CYS as documented in paragraph 45, but he failed miserably here, because he verified nothing despite many falsities given by his informant, CS#1.

   (7). Agent Hischar knowingly included CS#1's false statement that "Dr. LI prescribed heavy doses of narcotics, primarily Oxycodone 30mg, 180-240 tabs, to nearly every patient in his practice" in paragraph 12, because his own documentation in his affidavit proved the falsity. First, Rite Aid's analysis of LI's prescriptions in paragraph 30 showed about 36% of LI's prescriptions were not even for Schedule II controlled substance. Second, his own analysis of PA PMP report in paragraph 47 showed about 31% of Oxycodone prescriptions were less than 30mg in strength. Third, his own analysis of prescription data from CVS pharmacy in paragraph 48 showed about 33% of Oxycodone prescriptions were less than 30mg in strength. Finally, Express Scripts' analysis in paragraph 49 showed 1 in 4 prescriptions were for Oxycodone 30mg. The inclusion of such falsity in Agent Hischar's affidavit undoubtedly would have misled or deceived the magistrate judge for concluding that probable cause existed.

   (8). Agent Hischar knowingly included CS#1's false statement that "Dr. patel requested LI provided a copy of an MRI report which LI told patel he used to determine the patients [sic] treatment for pain" in paragraph 35, because Dwyer's medical record from Pocono Medical Center showed no evidence that LI told Dr. patel he used MRI report to determine the patient's treatment for pain, Ex 2 at E255-259, and Agent Hischar had Dwyer's medical record from Pocono Medical center well before he generated his affidavit.

   (9). Agent Hischar knowingly or recklessly disregarded the truth when he included CS#1's false statement that "CS#1 stated CVS corporate notified all of its pharmacies

54 of 88

not to fill prescriptions written by Dr. Fuhai LI" in paragraph 39, because CVS Corporate's record in the government's possession did not show CVS Corporate ever notified its pharmacies not to fill prescriptions written by LI. CVS Corporation in fact NEVER did that as Nicole Harrington's testimony confirmed. Tr on May 7, 2018 at 160. Ex 2 at E263.

(10). Agent Hischar knowingly included a false statement by CS #2 that "... that he does not take insurance, only cash ..." in paragraph 42, because his own documentation in paragraph 16 confirmed LI accepted different kinds of insurances.

(11). Agent Hischar knowingly included a false statement by Dr. Thomas that "Dr. Thomas found Dr. LI's 'trinity prescribing' of great interest ... Dr. Thomas described the number of Dr. LI's patients who are prescribed these drugs as 'striking'" in paragraph 62. The patient profile with "trinity prescribing" provided by Rite Aid, Ex 2 at E304-E353, was reviewed by Dr. Thomas and was claimed by Dr. Thomas that "the number of Dr. LI's patients who are prescribed these drugs as 'striking'". However, the Rite Aid prescription data showed only 3 (J. Glatz Sr. S. Lutz and K. Palmieri) of the 29 patients were prescribed the combination-opioid analgesics, benzodiazepine and Carisoprodol (Soma). How could Dr. Thomas claim that the remaining 26 patients without combination of these 3 drugs had "trinity prescribing"? How could Dr. Thomas claim the number was "striking" when only 3 of LI's patients had "trinity prescribing"? Agent Hischar had the Rite Aid prescription data in his hands on May 1, 2013 as documented in paragraph 30, well before he generated his affidavit.

C. Agent Hischar's three additional false information.

(1). False information: "Dr. Fuhai LI appears to be prescribing excessive amounts of oxycodone absent legitimate medical purpose" in paragraph 8. Agent Hischar did not provide evidence that a DEA agent was qualified to determine whether a physician prescribed controlled substances without a legitimate medical purpose. In fact, the DEA agency issued its own statement about "dispensing controlled

substance for the treatment of pain" in Federal Register (Vol. 71, No. 172, September 6, 2006 at 52719) that "DEA's authority under the CSA is not equivalent to that of a state medical board... physicians also keep abreast of the latest findings by reading peer-reviewed articles published in medical and scientific journals. DEA, however, has neither the legal authority nor the expertise to provide medical training to physicians or issue guidelines that constitute advice on the general practice of medicine", Ex 2 at E119, clearly indicating only a physician is qualified to determine whether a controlled substance is prescribed without a legitimate medical purpose.

(2). False information: "Your affiant reviewed data contained in the PMP report and found this information to be accurate" in paragraph 13. First, because there were no patients from New York City as shown in patients' medical records, how could Agent Hischar find "this information to be accurate"? Second, without giving any contexts, Agent Hischar's information about some of LI's patients' living areas in paragraph 13 at least was misleading. LI's medical office located in Milford, PA, was about 3 to 4 miles away from New Jersey and 7 to 8 miles away from New York. It is thus not surprised that many of LI's patients were from neighboring states, New Jersey and New York. However, LI was not familiar with individual township of New Jersey and New York. For instance, LI did not know Hamilton is in Southern New Jersey. As LI's former office staff, Sandra Foster testified, the office staff scheduled new patients and they did not look at a map to locate where the new patients were from. Tr on May 4, 2018 at 65, Ex 2 at E354. When LI moved his office from East Stroudsburg, PA to Milford, PA in 2010, many of his previous patients from East Stroudsburg and Stroudsburg areas, and some of his previous patients from Allentown area followed him to his new office in Milford, PA. One patient whose home address was in King of Prussia was a student in East Stroudsburg University and his mother wrote LI a letter asking LI to help her son's severe pain. A couple of patients had a couple of follow-up with LI

56 of 88

after they moved to Philadelphia because they could not get on-time appointment with their new pain management specialists there. A few patients from Scranton, PA were referred to LI by Dr. Vandersluis in Scranton, PA for their chronic pain management. One veteran from Scranton who had Tricare insurance found out LI was the only pain management specialist in the area who accepted his Tricare insurance. One patient, an elderly woman working as an office manager in a physician's office in Milford, PA, moved to Maryland due to her husband's job change, but she continued to have follow-up with LI as her pain management doctor once every three months, because she felt more comfortable to have LI as her pain doctor. One patient had one or two follow-up visit with LI after he moved to North Carolina, because he was not able to have an immediate open appointment with his new pain management specialist there. One patient who used to be a patient of LI's previous group practice in East Stroudsburg and had a primary care physician LI knew in East Stroudsburg, moved back to Conneticut due to family business, but her boyfriend lived in East Stroudsburg area and she came back and forth between Conneticut and East Stroudsburg, so she saw LI with her address in Conneticut, because she had to use medicaid insurance in Conneticut to fill her prescriptions. In fact, LI had to enroll in the Conneticut medicaid program in order for her to have her medications covered by Conneticut medicaid program. The aforementioned facts about why some patients travelled a distance to see LI were in patients' medical records (not included in the Appendix due to volume). Third, LI would not be surprised if someone travelled a distance to see him but he did not know it, because he did not look at a map to locate where the patients were from, either. Whenever LI became aware that patients travelled a distance, LI tried to encourage patients to be seen by a local physician. For instance, on September 5, 2012 when LI became aware patient Samantha Barnes travelled a distance, LI advised her to be seen by a local physician. Ex 2 at E355-E356 (see treatment section). In addition, at least 28

57 of 88

prospective patients were not scheduled to be seen by LI due to living too far away as shown on "don't schedule list". Ex 2 at E166-E171. More importantly, Agent Hischar testified that it was OK to prescribe opioids to patients who travelled a distance, Tr on May 3, 2018 at 139, Ex 2 at E361, and Dr. Thomas' testimony also indicated there is nothing that says a clinician cannot treat someone who travels a distance. Tr on May 24, 2018 at 22. Ex 2 at E274.

(3). False information: "Your affiant has learned pain management patients, in most cases, should be sent for further testing and referred to specialists to determine the root cause of the pain and attempt to correct the condition rather than merely treat the symptom" in paragraph 21. As the government expert, Dr. Thomas' testimony indicated, referring patients to diagnostic test is based on medical necessity. Tr on May 24, 2018 at 35, Ex 2 at E236. Agent Hischar did not provide evidence that he was a pain management specialist or even a medical doctor that would render him qualified to determine whether there was a medical necessity to send patients with chronic pain for further testing and to refer them to specialists to determine the root cause of pain. In fact, his above statement is exactly opposite to clinical guideline. For instance, in patients with low back pain, clinical guidelines recommend against routine MRI testing or other diagnostic imaging test, Ex 2 at E237 and E239, because routine imaging testing does more harm than good and diagnostic imaging test is indicated only if patients have severe progressive neurologic deficits or signs or symptoms suggesting a serious or specific underlying condition. Ex 2 at E237. Dr. Thomas also agreed in his testimony that routine imaging testing could do more harm than good and that he would recommend against routine imaging testing as well. Tr on May 24, 2018 at 35 and 37, Ex 2 at E236 and E241. Furthermore, in more than 85% of patients with low back pain, the root cause of the pain is unknown no matter what imaging test or tool you use to determine the root cause. Ex 2 at E240. Finally, because

the root cause of pain in majority of patients is unknown, there was no way to correct the condition as Agent Hischar suggested. Consequently, treating the symptom - pain, is the only way to help patients as indicated by a published authority in Pain Medicine: "In the absence of specific objective findings, the symptoms can, and should be treated". Ex 2 at E357.

d. Agent Hischar's concealing stolen medical records / medical information and HIPAA violation.

As discussed above, CS#1 stole at least 97 medical information / medical records and handed them over to DEA agents, yet Agent Hischar knowingly accepted those medical information / medical records and concealed the fact that those medical information / medical records were stolen when he documented in his affidavit. Agent Hischar did not provide evidence in his affidavit that CS#1 was an honest private citizen who just offered one-time tip to DEA agents or just accidentally conducted one-time illegal activity for DEA agents by her own independent decision. When CS#1 stole those 97 medical information / medical records, she was in fact Agent Hischar's informant as documented in paragraph 12, and was asked to "provide" lots of patients' information without court order, without patients' consent and without knowledge of the entity owner, LI, as CS#1's own testimony indicated. Tr on May 7, 2018 at 72-73, Ex 2 at E116-E117. Indeed, CS#1 repeatedly "provided" many patients' medical information / medical records to Agent Hischar over a period of 14 months (from March 2013 to May 2014) and was paid $3,300 by DEA for her work. Tr on May 3, 2018 at 143-144. Ex 2 at E358-E359. According to DEA's policy, "every confidential source must act under the direction and control of DEA controlling / supervisory personnel when performing an investigative activity". Ex 2 at E360. It is therefore reasonable to conclude that CS#1 was directed by Agent Hischar to repeatedly conduct illegal activities in order to obtain medical information for Agent Hischar's affidavit.

Based on HIPAA law, CS#1 had no any legal authority to disclose patients'

59 of 88

protected health information to law enforcement even though she had work-related legal access, because she was neither the covered entity, nor the covered health care provider, and there were no specified conditions for disclosure. Agent Hischar meticulously documented in paragraph 72 of his affidavit that "Investigators understand and appreciate that some of the records sought to be seized involve privacy interests and protections under 'The Health Insurance Portability and Accountability Act of 1996' (HIPAA)", Ex 1 at E34, but his informant under his watch flagrantly broke HIPAA law and committed crime when she looked at each patient's record, Tr on May 7, 2018 at 83, Ex 2 at E108, printed some records out, took them out of the office and handed them over, Tr on May 7, 2018 at 75, Ex 2 at E115, yet he knowingly accepted those stolen medical information/medical records and concealed the fact that those medical information/medical records were stolen when he documented them in his duly sworn affidavit. Agent Hischar's such egregious conducts must be condemned and sanctioned by the Court. At minimum, all illegally obtained information in Agent Hischar's affidavit must be excised.

e. Some patients' criminal history inquiry by Agent Hischar.

Agent Hischar conducted criminal history inquiries about some of LI's patients in paragraphs 26 and 28, yet the government expert, Dr. Thomas' testimony indicated there was no a mandate or a requirement to check patients' criminal histories by a physician. Tr on May 24, 2018 at 20, Ex 2 at E362.

In Summary, Agent Hischar knowingly omitted material information, knowingly included false information, knowingly directed his informant to violate HIPAA law and to steal protected health information, and knowingly concealed stolen medical information/medical records in his affidavit, which undoubtedly would have misled or deceived the magistrate for concluding that probable cause existed. In fact, Agent Hischar knew that probable cause did not exist in his affidavit,

60 of 88

because his justification for asking for a search warrant was not that his expert determined L I knowingly prescribed controlled substances without a legitimate medical purpose, namely violation of 21 U.S.C. § 841 (a) (1) was committed by L I, but that his expert would need patient files to determine whether L I knowingly prescribed controlled substances without a legitimate medical purpose as indicated in Agent Hischar's grand jury testimony: "but again, he couldn't make the final determination without looking at a patient file to see what the patient was being treated for, which is our justification for asking for a search warrant to obtain those patient files." Tr on October 17, 2017 at 73-74, Ex 2 at E363-E364. It must be pointed out that it is "probable cause which will justify the issuance of a search warrant", Rundle at 163, not DEA expert's need to look at patient files so that he could make final determination about L I's prescriptions for controlled substances.

16. Opinion from DEA's expert, Dr. Stephen Thomas (paragraphs 60 to 63)

Dr. Thomas, a pain management specialist who was contracted by DEA as its expert, generated a report where he offered opinions about L I's prescriptions for controlled substances after he reviewed information contained in Agent Hischar's affidavit along with the supporting documentation as stated by Agent Hischar in paragraph 60. Ex 1 at E32. In his report, Dr. Thomas raised two concerns – starting with Oxycodone 30mg and "striking" number of "trinity prescribing", but both concerns turned out to be false as follows:

(1). False information: " By starting with Oxycodone 30mg, Dr. Thomas opined that all aspects of the prescribing of 30mg Oxycodone were suspected with respect to its medical legitimacy" in paragraph 61. As indicated in patients' medical records, L I NEVER just started with Oxycodone 30mg in opiate naive patients. The initial prescription of Oxycodone 30mg by L I was either continuation from the on-going prescription of patients' previous physicians or slight titration up to 30mg (such as from 20mg to 30mg) from the on-going prescription of patients' previous physicians

based on medical necessity to adequately relieve pain when patients were referred to LI. In fact, Dr. Thomas admitted his such misrepresentation about starting with Oxycodone 30mg in his testimony. Tr on May 24, 2018 at 38-39, Ex 2 at E365-366.

(2). False information: "Dr. Thomas found Dr. LI's 'trinity prescribing' of great interest ··· Dr. Thomas described the number of Dr. LI's patients who are prescribed these drugs as 'striking'" in paragraph 62. The 29 "trinity prescribing" patient profiles provided by Rite Aid were reviewed by Dr. Thomas and were claimed by Dr. Thomas as "striking" number of "trinity prescribing" — combination of opioid analgesics, benzodiazepine and carisoprodol (soma), Yet the prescription data from Rite Aid showed only 3 ( J. Glatz Sr., S. Lutz and K. Palmieri) of the 29 patients had combination of these three drugs, Ex 2 at E304-E353, which might be coincidental, because patients might be prescribed opioid analgesics for their pain relief, benzodiazepine for their anxiety or insomnia and carisoprodol for their muscle spasm when they had a few medical conditions together — chronic pain, anxiety, insomnia and muscle spasm. How could Dr. Thomas claim the remaining 26 patients without the combination of opioid analgesics, benzodiazepine and carisoprodol (soma) as "trinity prescribing"? How could Dr. Thomas describe the number of only 3 of LI's patients who had "trinity prescribing" as "striking"?

Dr. Thomas concluded "in order to establish which, if any, prescriptions for controlled substances were medically legitimate, he would have to review the medical records of all patients to whom Dr. LI prescribed controlled substances for medical context" in paragraph 61 and "a review of the medical records would be required to determine if there was a legitimate medical necessity for the prescribed medication" in paragraph 62. However, Dr. Thomas did not conclude that LI knowingly prescribed controlled substances without a legitimate medical purpose. In other words, he did not conclude that violation of 21 U.S.C. §841 (a) (i) was committed by LI. Without a crime being committed, Probable Cause

for a search and seizure warrant did not exist. United States ex. rel Campbell
v. Rundle, 327 F.2d 153, 163 (3d Cir. 1964), Dempsey v. Bucknell Univ.,
834 F.3d 457, 467 (3d Cir. 2016). Because Dr. Thomas opined that "all aspects
of the prescribing of 30mg Oxycodone were suspected with respect to its medical
legitimacy" in paragraph 61, it is worthwhile to emphasize that probable cause
which will justify the issuance of a search warrant requires more than mere
suspicion. Rundle at 163. See Alabama v. White, 496 U.S. 325, 330 (1990).

   In summary, probable cause for a search and seizure warrant did not exist
in Agent Hischar's affidavit, simply because of two undisputed facts that Dr. Thomas
did not conclude that LI prescribed controlled substances without a legitimate medical
purpose and that Agent Hischar's justification for asking for a search warrant
was Dr. Thomas' need to look at patient files, not to mention numerous falsities
and stolen medical information/medical records.

ii. Good faith exception to exclusionary rule did not apply.

   Good faith exception applies unless "a reasonable well trained officer would have
known that the search was illegal despite the magistrate's authorization." United
States v. Leon, 468 U.S. 897, 922 n.23 (1984). In the case at bar, Agent Hischar's
own documentation in paragraph 61 and paragraph 62 clearly indicates that Dr. Thomas
did not conclude that LI knowingly prescribed controlled substances without a legitimate
medical purpose. Furthermore, Agent Hischar knew probable cause did not exist in
his affidavit, because he testified his justification for asking for a search warrant
was that his expert, Dr. Thomas, could not make the final determination about
LI's prescriptions without looking at a patient file, rather than probable cause.
Tr on October 17, 2017 at 73-74. Ex2 at E363-364. Without probable cause,
Agent Hischar should have known the search was illegal despite the magistrate's
authorization. Thus, the good faith exception to exclusionary rule did not apply
in this case. In addition, because the search and seizure warrant issued by the
magistrate was relied upon pervasive deliberate falsities or reckless disregard for

the truth in Agent Hischar's affidavit, the good faith exception did not apply in this case either, based on the four reasons set forth by the Third Circuit. United States v. Hodge, 246 F. 3d 301, 308 (3d Cir. 2001).

iii. The superseding indictment and conviction based on unconstitutionally seized evidence must be set aside.

Because of lack of probable cause in Agent Hischar's affidavit as discussed above, the search and seizure warrant issued on Jan. 22, 2015 by a magistrate was invalid. Consequently, LI's medical office at 200 Third Street, Milford, PA and two homes located at 4005 Milford Landing Drive, Milford, PA and at 146 Rising Meadow Way, East Stroudsburg, PA, were unconstitutionally searched, and all evidence including all patients' medical records, carbon copies of all prescriptions written by LI, cash receipt books, patients' billing records, Quickbook records, financial transaction records and other financial records, U.S. currency, and bank accounts in PNC bank and Wells Fargo bank, etc. was unconstitutionally seized on Jan. 29, 2015 by DEA agents.

As shown in Agent Hischar's grand jury testimony, LI's superseding indictment on October 17, 2017 was primarily based on the aforementioned unconstitutionally seized evidence. Tr on October 17, 2017 at 2-191. Consequently, the superseding indictment against LI on October 17, 2017 must be set aside based on "Fruit of the poisonous tree" doctrine. United States v. Stearn, 597 F. 3d 540 (3d Cir. 2010). Furthermore, during a grand jury indictment proceeding, in response to the U.S. Assistant Attorney's question about consulting with an expert about LI's prescriptions, Agent Hischar testified that "he [expert] couldn't make the final determination without looking at a patient file to see what the patient was being treated for, which is our justification for asking for a search warrant to obtain those patient files", Tr on October 17, 2017 at 73-74, Ex 2 at E363-E364. Clearly indicating that the U.S. Assistant Attorney was informed by Agent Hischar that probable cause did not exist, because it is

"probable cause which will justify the issuance of a search warrant". Rundle at 163. Therefore, the U.S. Assistant Attorney knew that the evidence she was using at that time to secure the superseding indictment against LI was illegally obtained. But she did not pause, did not at least try to find out what was transpired, and she carried on the indictment proceeding to secure an indictment against LI. Tr on October 17, 2017 at 75-141. Indeed, the grand jury returned a 32-count superseding indictment against LI based on the unconstitutionally seized evidence from LI's medical office, two homes and two bank's accounts, despite the fact that the U.S. Assistant Attorney knew the evidence was illegally obtained. This was a miscarriage of justice. The U.S. Assistant Attorney should seek justice in every case as she or he is required to do, but in the current case, she knowingly carried out the miscarriage of justice against an innocent citizen. For this reason, the superseding indictment against LI on October 17, 2017 must be dismissed, too.

As indicated in jury trial records from May 3 to June 4, 2018, LI's jury conviction on June 4, 2018 was primarily based on the aforementioned unconstitutionally seized evidence. Consequently, LI's conviction on June 4, 2018 and LI's sentence on April 3, 2019 must be vacated and set aside based on "fruit of the poisonous tree" doctrine. United States v. Stearn, 597 F.3d 540 (3d Cir. 2010).

B. Ground two: Denial of effective assistance of counsel.

LI contests that counsel's assistance in defending his criminal case was ineffective because counsel's performance fell below an objective standard of reasonableness and such a deficient performance prejudiced LI thereupon. The guarantee of effective assistance of counsel comprises two correlative rights: the right to counsel of reasonable competence and the right to counsel's undivided loyalty. Virgin Islands v. Zepp, 748 F.2d 125, 131 (3d Cir. 1984). See Wood v. Georgia, 450 U.S. 261, 271 (1981). The case at bar involved

Counsel's both reasonable competence and undivided loyalty as discussed below.

i. Counsel was not reasonably competent, prejudicing LI thereupon.

The United States Supreme Court in Strickland case set forth the proper measure or inquiry about Counsel's performance in assisting a criminal defendant. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland at 688. "In any case presenting an ineffective claim, the performance inquiry must be whether Counsel's assistance was reasonable considering all the circumstance." Id. A Counsel in reasonably defending a criminal case must possess basic skill and knowledge, and must then render adequate legal assistance, because "access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." Id at 685. "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Id at 688. "Counsel, however, can also deprive a defendant of the right to effective assistance, simply by failing to render adequate legal assistance." Id at 686. The Third Circuit adopted such standard that "the standard of adequacy of legal service as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place." Moore v. United States, 432 F.2d 730, 736 (3d Cir. 1970)(en banc). In the current case, LI identified the following acts and omissions which clearly reflect that Counsel either lacked of skill and knowledge "necessary to accord defendants the ample opportunity to meet the case of the prosecution" or failed to render "adequate legal assistance" by using his skill and knowledge.

1. Counsel failed to request exculpatory evidence and failed to introduce such exculpatory evidence to jury during trial.

Agent Hischar's affidavit in paragraph 7 shows that prior to his investigation about LI's prescriptions on March 5, 2013, an investigation about LI's "excessive"

prescribing of Schedule II controlled substances to his patients with pain was conducted by the PA office of Attorney General, Pike County District Attorney's office and Department of State Bureau of Licensing, and was concluded that "the PA State Department Bureau of Licensing did not believe they had enough information to take administrative action against LI's medical license at this time." Ex1 at E5. According to Janet Hart's work note from the government discovery, Mr. Troy Searfoss was the local agent who was investigating LI's prescriptions for controlled substances. Ex2 at E54-E55. Despite that LI discussed those with Counsel and asked him to request such exculpatory evidence several times and despite that Counsel stated he would subpoena such exculpatory evidence, nothing happened. Such exculpatory evidence was never available to LI and was never introduced to jury during trial as indicated by the trial records, and Counsel did not even ask Agent Hischar such exculpatory evidence on his cross-examination. Tr on May 3, 2018 at 49-154 and May 4, 2018 at 3-7. Failure to request exculpatory evidence rendered Counsel's legal assistance inadequate and his performance below an objective standard of reasonableness, because "counsel has duty to make reasonable investigations...". Strickland at 691. Furthermore, there was no strategic decision not to obtain such important exculpatory evidence, at least Counsel did not explain such strategic decision to LI, because it was not in LI's interest not to obtain exculpatory evidence and introduce it to jury for his innocence. Consequently, Counsel's such an omission or a failure might have caused different trial outcome because exculpatory evidence would undermine jury's decision or confidence for LI's conviction.

2. Counsel failed to prepare and submit numerous motions and briefs.

   (1). Counsel failed to prepare and submit a brief in support of a crucial motion he submitted— Motion to Suppress (Doc#62).

   On Jan. 2, 2018, Counsel filed Motion to Suppress (Doc#62) on the ground of

Lack of probable cause in Agent Hischar's affidavit without an accompanying supporting brief. Ex 2 at E367-E370. Counsel then filed a motion for an extension of time to file a brief in support of Motion to Suppress on Jan. 16, 2018 and on Feb. 1, 2018, which was granted twice by the trial court (Doc#87). Ex 2 at E371-E372. But counsel eventually failed to file the supporting brief. Consequently, the trial court had to issue an order on Feb. 22, 2018 that Motion to Suppress (Doc#62) was deemed withdrawn due to counsel's failure based on Local Court rule 7.5 (Doc#87). Id. The United States Supreme Court held that counsel's failure to file timely suppression motion rendered counsel's performance "below the level of reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 385-386 (1986). Similarly, counsel's such a failure in the current case undoubtedly rendered his performance "below the level of reasonable professional assistance". Furthermore, there was no any sound strategy not to file a supporting brief for a critical motion, because counsel extended the due date twice and never explained to LI why he would decide not to file the supporting brief for the suppression motion. Counsel has "... the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." Strickland at 688. Had the supporting brief for Motion to Suppress been prepared and submitted to the trial court, the evidence seized from LI's medical office, two homes and two banks would have been supressed, because there was no substantial basis for concluding that probable cause existed in Agent Hischar's affidavit as discussed in Ground One, which was also asserted by counsel in his Motion to Suppress (Doc#62). Ex 2 at E369-E370. Consequently, LI's superseding indictment on October 17, 2017 which was based upon the unconstitutionally searched and seized evidence, would have been dismissed based on "fruit of the poisonous tree" doctrine. Sun at 484, Segura at 804.

  (2). Counsel failed to prepare pretrial motions (Doc#60, Doc#61 and Doc#95),

Pretrial reply briefs (Doc#78, Doc#79 and Doc#113) and a posttrial motion (Doc#181).

Counsel and LI discussed a few pretrial motions and a posttrial motion indicated above. When the filing due date for each motion or brief was approaching, LI became aware that counsel had not prepared the aforementioned motions or briefs, and LI then gave counsel LI's own drafts to which counsel might refer in order for counsel not to miss the filing due date. However, counsel did not prepare his own motions or briefs and eventually submitted the unedited or almost unedited pretrial motions (Doc#60, Doc#61 and Doc#95) unedited pretrial reply briefs (Doc#78, Doc#79 and Doc#113), and unedited posttrial motion (Doc#181) prepared by LI who was a legal layman, had no training in legal pleading and had no access to legal search. All pretrial and posttrial motions were denied by the trial court. Counsel's numerous failures to prepare pretrial motions, pretrial reply briefs and a posttrial motion rendered his legal skill and knowledge or his legal assistance to "meet the case of the prosecution" to which LI was entitled inadequate. Furthermore, there was no tactical or strategic decision not to prepare these motions and briefs, because counsel filed them prepared by LI (LI had all drafts of the aforementioned motions and briefs in his possession, which are not in the Appendix due to volume). Had counsel prepared these motions and briefs in a professional way that exercises "the customary skill and knowledge which normally prevails at the time and place" as held by the Third Circuit, Moore at 736, there was a fair probability that the results of these motions might have been different.

(3). Counsel failed to prepare and submit three (3) briefs in opposition re three (3) motions in limine submitted by the government.

As indicated in docket sheet, the government filed a motion in limine to admit patient records (Doc#82) on Feb. 21, 2018, a motion in limine to admit prescription data (Doc#84) on Feb. 21, 2018, and a motion in limine to admit

ARCOS data (Doc #88) on Feb. 28, 2018, but counsel never filed briefs in opposition re the three (3) motions in limine submitted by the U.S. government as indicated in the docket sheet. Counsel's failures to prepare and submit these three (3) briefs in opposition rendered his legal skill and knowledge or his legal assistance to "meet the case of the prosecution" to which LI was entitled inadequate. Furthermore, there was no any strategic choice about not filing these briefs in opposition, because it was not in LI's interest when counsel decided not to oppose admission of the patient records, prescription data and ARCOS data to evidence. As the trial record showed, counsel's such failures had dire consequence. On May 21, 2018 at Sidebar, counsel tried to object Dr. Thomas' testimony of medical records of patients who did not testify before the trial court on the ground of without foundation, and the court sustained counsel's objection and rejected reconsidering when the U.S. prosecutor asked the court to reconsider, because the court was troubled by these medical records of patients who did not testify. Tr on May 21, 2018 at 64-69, Ex 2 at E373-E378. However, when the trial court was told by the U.S. prosecutor that all patients' records were in evidence already even before the trial, the court then said to counsel: "Then you shouldn't have agreed to the admission of it. I can't undo it, OK." Id at 69. Ex 2 at E378. Had counsel prepared and submitted a brief in opposition re motion in limine to admit patient records by USA (Doc #82), there was a fair probability that the government's expert would not have been able to testify the medical records of these 19 patients who did not testify before the trial court (C. Reinhart, C. Kelly, M. Abuiso, K. Koeppel, S. Watson, E. Correa, R. Mason, S. Ruffino, C. Roselli, Stephen Vanwhy, Scott Vanwhy, S. Hicks, E. Acevedo, A. Beltran, Joel Stemetzki, D. Clarkson, P. Clarkson, R. Clarkson, and L. Dwyer), and the government would not have proved beyond reasonable doubt that LI prescribed controlled substances without a legitimate medical purpose in these 19 patients without the testimony of the government's

expert, Dr. Thomas.

3. Counsel erroneously conceded the relevance and fit prong of the Daubert criteria at Dr. Thomas' Daubert hearing.

On May 1, 2018, a Daubert hearing was held before the trial court. The government's expert, Dr. Thomas testified about his proposed expert opinion regarding LI's prescriptions for controlled substances. Tr on May 1, 2018 at 3-50. At the oral argument after Dr. Thomas' hearing testimony, counsel conceded the relevance and fit prong of the Daubert criteria without any reasons. Id at 48, Ex 2 at E379. However, counsel's such concession was an unprofessional error, because Dr. Thomas' proposed testimony did not meet the relevance and fit prong of the Daubert criteria. Dr. Thomas' testimony at Daubert hearing showed that his opinion about LI's prescribing of controlled substances to his pain patients was based on his own experience, literature and the model guidelines, as the trial court found that "he relies heavily on his experience". Tr on May 1, 2018 at 48, Ex 2 at E379, and that "[t]he literature and the Model Guidelines and so forth, he has discussed those. [He] [s]aid they've become a part of him in terms of how he analyzes a case." Tr on May 1, 2018 at 49, Ex 2 at E380. Failing to follow model guidelines means failing to follow the standard of care recommended by model guidelines, which was an issue of malpractice due to substandard of care. However, the issue at hands was whether LI knowingly prescribed controlled substances without a legitimate medical purpose, which was an issue of criminal conduct. Here, failing to follow the standard of care did not equate prescribing controlled substances without a legitimate medical purpose, at least Dr. Thomas failed to explain why failing to follow the standard of care equated prescribing controlled substances without a legitimate medical purpose. Without explanation, Dr. Thomas' proposed expert testimony that LI's failing to follow model guidelines when he was prescribing controlled substances to his patients with pain was irrelevant to the issue at hands or