did not fit the issue at hands. Thus, counsel's erroneous concession about the relevance and fit prong of the Daubert criteria rendered his skill and knowledge or his legal assistance to "meet the case of the prosecution" to which LI was entitled inadequate. Obviously, the counsel's conceding the relevance and fit prong of the Daubert criteria was not a strategic decision, because it was in LI's best interest to preclude Dr. Thomas' proposed expert testimony that LI prescribed controlled substances without a legitimate medical purpose. Consequently, Counsel deprived LI of the right to effective assistance, because he simply failed to render "adequate legal assistance". Strickland at 686. Had counsel not conceded the relevance and fit prong of the Daubert criteria, there was a fair probability that Dr. Thomas' proposed expert testimony would have been inadmissible at trial. Without Dr. Thomas' testimony, the government would not have proved beyond reasonable doubt that LI knowingly prescribed controlled substances without a legitimate medical purpose.

4. Counsel failed to cross-examine Dr. Thomas on a patient-by-patient basis in all 35 patients' medical records.

    The government's expert, Dr. Thomas, testified 35 patients' medical records and offered his opinion that LI prescribed controlled substances without a legitimate medical purpose in all 35 patients. Tr on May 21, 2018 at 97-200, May 22, 2018 at 3-189 and May 23, 2018 at 3-165. Counsel cross-examined Dr. Thomas in a general way, but failed to cross-examine him on a patient-by-patient basis in all 35 patients' medical records he testified. Tr on May 24, 2018 at 3-49, despite that counsel had evidence in his hands which would prove otherwise, thus leaving Dr. Thomas' blatantly false statements and baseless opinion that LI prescribed controlled substances without a legitimate medical purpose in every case uncontested in the trial records as discussed below.

a. Dr. Thomas' blatantly false statements in example cases uncontested in the trial records due to counsel's failure.

(1). In the case of L. Dwyer (count 1), Dr. Thomas testified that "she presented to a second physician attempting to obtain opioid analgesics for what turned out to be, to your medicalese, a factitious disorder." Tr on May 23, 2018 at 142, Ex 2 at E 381. In fact, Dwyer's medical record from Pocono Medical Center showed she was admitted for asthma exacerbation and abdominal pain, and there was no diagnosis of factitious disorder. Ex 2 at E 255.

(2). In the case of L. Brown (count 6), Dr. Thomas testified "because the patient presented with no medical record ... with an abnormal urine drug screen ..." Tr on May 22, 2018 at 18, Ex 2 at E 382. In fact, patient presented to LI's office with prior medical record from his primary care physician, Dr. Johnson, which was faxed to LI's office from West Orange Medical on March 22, 2012 and was part of his medical record from LI's office, Ex 2 at E383-E385 (only parts of his prior records are include in the Appendix due to volume). The so-called abnormal urine drug screen was actually an expected result, consistent hydrocodone (vicodin) he was taking, because it was well known in the literature that hydrocodone may cross-react with oxycodone, Ex 2 at E 202, and Dr. Thomas admitted it on at least three occasions in his testimony. Tr on May 21, 2018 at 85, May 22, 2018 at 17 and May 24, 2018 at 42, Ex 2 at E386-388. For example, patient Sargent's urine drug screen on Jan. 23, 2014 was oxycodone positive while she was taking hydrocodone (Vicodin), Ex 2 at E389-E390, but her urine confirmatory test confirmed hydrocodone only, no oxycodone, Ex 2 at E391-E392, indicating positive oxycodone in urine drug screen test was due to cross-reaction of hydrocodone with oxycodone. Because of high cost, urine confirmatory test was performed based on individual patient's circumstance and clinical judgment as suggested by Urine Drug Monitoring Recommendations, Ex 2 at E139 and by CDC guideline for prescribing opioids for chronic pain, Ex 2 at E207.

(3). In the case of A. Abuiso (count 10), Dr. Thomas testified "the drug screen performed on October 8th, 2012, positive for oxycodone and unspecified

Benzodiazepine, which meant the patient was illicitly taking Benzodiazepine for non-medical use." Tr on May 21, 2018 at 176, Ex 2 at E393. In fact, there was a urine confirmatory test in his record showing no Benzodiazepine, Ex 2 at E394, which was knowingly neglected by Dr. Thomas, indicating the positive Benzodiazepine drug screen on October 8, 2012, Ex 2 at E395, was false positive.

(4). In the case of S. Abuiso (count 12), Dr. Thomas testified he did not see any MRI or other structural studies for her and her lumbar MRI result LI reviewed and documented was consistent with Michael Abuiso's lumbar MRI finding. Tr on May 21, 2018 at 139-140, Ex 2 at E396-E397. In fact, her medical record at her initial visit of October 8, 2010 clearly showed "Reviewed imaging study: MRI lumbar spine demonstrates disc herniation at the level of L5-S1 with narrowing of neural foramina on the left side." Ex 2 at E398. Further, Michael Abuiso's lumbar MRI showed "degenerative disk changes but no significant herniations as Dr. Thomas' own testimony indicated, Tr on May 21, 2018 at 139, Ex 2 at E396, which is clearly different from S. Abuiso's lumbar MRI finding.

(5). In the case of A. Vanluvender (count 14), Dr. Thomas testified "... the initial diagnosis Dr. Li offered was fibromyalgia." Tr on May 21, 2018 at 179, Ex 2 at E399. In fact, A. Vanluvender's medical record at her initial visit of August 11, 2011 showed that her initial diagnosis was polyneuropathy in diabetes. Ex 2 at E400-E401.

(6). In case of S. Hicks (count 17), Dr. Thomas testified "Ms. Hicks has gotten opioids from Dr. Li on 11/10/2010." Tr on May 22, 2018 at 135, Ex 2 at E402. In fact, Ms. Hicks' medical record on November 10, 2010 showed LI did not prescribe any opioid to Ms. Hicks on November 10, 2010, and LI just advised her to continue Oxycodone from her previous physician to wean off Oxycodone gradually. Ex 2 at E403-E404.

(7). In the case of H. Messer (count 19), Dr. Thomas testified "A patient that says to me, I went to a detox and detox gave me methadone would mean

that detox was operating outside of their license and that is not a believable statement." Tr on May 22, 2018 at 155, Ex 2 at E405. In fact, the Bon Secours Community Hospital New Directions Detox Program where Ms. Messer was admitted indeed gave methadone to patient for detox treatment. Ex 2 at E406-E407. Further, Ms. Messer testified that she checked into a detox program at Bon Secours in Port Jervis, New York and "they gave me methadone in the hospital to wean me off of oxycodone." Tr on May 8, 2018 at 166-167, Ex 2 at E408-E409.

(8). In the case of K. Koeppel (Count 20), Dr. Thomas testified "In 35 years I've never seen anyone on a high dose opioid for a treatment of carpal tunnel syndrome." Tr on May 22, 2018 at 31, Ex 2 at E410. In fact, the opioids were prescribed for her chronic neck and back pain after surgery as indicated in her initial medical record of September 23, 2010, Ex 2 at E411-E412. The carpal tunnel syndrome was an added-on diagnosis later based on patient's new complaint as documented in her record, Ex 2 at E413-E414, which had nothing to do with opioid prescription.

(9). In the case of S. Watson (Count 22), Dr. Thomas testified "she gave him a history of being prescribed on opiate, hydrocodone, not being prescribed oxycodone, so the oxycodone would be an illicit drug...". Tr on May 22, 2018 at 51, Ex 2 at E415. In fact, the urine drug screen positive for oxycodone was consistent with hydrocodone she was taking due to cross-reaction of hydrocodone with oxycodone, not an illicit drug, because it was well known in the literature that hydrocodone may cross-react with oxycodone, Ex 2 at E202, and Dr. Thomas admitted it in his testimony on at least three occasions. Tr on May 21, 2018 at 85, May 22, 2018 at 17 and May 24, 2018 at 42, Ex 2 at E386-E388. Further, there was a urine confirmatory test in her medical record, which confirmed hydrocodone only, no oxycodone, Ex 2 at E416, indicating positive oxycodone on urine drug screen was due to cross-reaction. Ex 2 at E417.

(10). In the case of C. Reinhart (not in the superseding indictment), Dr. Thomas

75 of 88

testified "I have not given any medical records, anyone else was prescribing this to me...". Tr on May 21, 2018 at 98, Ex2 at E418. In fact, there was a prior medical record from her previous physician in Carbon Medical Associates containing opioid prescriptions given to her, which was faxed to LI's office on March 2, 2012 and was part of her medical records from LI's office, Ex2 at E419-E424.

b. Dr. Thomas' baseless opinion in every case uncontested in the trial records due to counsel's failure.

    Dr. Thomas testified on cross-examination that evidence in general he relied upon to render his opinion that LI prescribed controlled substances without a legitimate medical purpose included without benefit of outside medical records, without the benefit of an actual imaging report or study, the fact that Dr. Li accepted the patient's word that he suffered from disc bulging, that physical examinations were normal, that he was given initial daily morphine equivalents of 240 milligrams, that there was an unnecessary EMG, no testing to assess high-dose Oxycodone, no attempt to decrease the dose of the opioid, no apparent medical rationale for the increase, and that the opioid analgesics were upon the patient's request. Tr on May 24, 2018 at 47-48, Ex2 at E425-E426. However, Dr. Thomas further testified that the very same evidence he used as his criteria to form his aforementioned opinion was also used to form his opinion in the case of Mr. Wade Conklin he reviewed on August 31, 2017 where he opined "the treatment of Mr. Wade Conklin by Dr. Fuhai Li may have had a legitimate medical purpose." Id at 48-49, Ex2 at E426-E427. On re-direct examination, Dr. Thomas added "it was, however, substandard in that it ignored some of the basic tenets of controlled substances prescribing." Tr on May 24, 2018 at 63, Ex2 at E485. Thus, it is clear that in all cases where Dr. Thomas opined LI prescribed controlled substances without a legitimate medical purpose, he actually meant that the treatment LI rendered to his patients was substandard rather than without a legitimate medical purpose, which was consistent

76 of 88

with his opinion at Daubert hearing, because the trial court at Daubert hearing concluded Dr. Thomas' expert opinion was based upon his experience and Model Guidelines, Tr on May 1, 2018 at 48-49, Ex 2 at E379-E380. Whenever LI failed to follow the Model Guidelines or failed to follow the standard of care recommended by the Model Guidelines, the treatment LI rendered to his patients became substandard. Otherwise, Dr. Thomas' opinion that LI prescribed controlled substances without a legitimate medical purpose was baseless, because he completely contradicted himself as discussed above.

Counsel failed to cross-examine Dr. Thomas on a patient-by-patient basis in all 35 patients' medical records he testified, Tr on May 24, 2018 at 3-49, thus leaving his baseless opinion uncontested in the trial records. Counsel's such failure "deprive[d] a defendant of the right to effective assistance" as guaranteed in the Sixth Amendment, because he simply "fail[ed] to render adequate legal assistance", Strickland at 686, or he failed to have skill and knowledge "necessary to accord defendant[] the ample opportunity to meet the case of the prosecution to which [LI was] entitled", Id at 685. Obviously, there was no strategic or tactical decision not to cross-examine Dr. Thomas on a patient-by-patient basis, thus leaving Dr. Thomas' false statements and baseless opinion uncontested in all 35 patients' medical records he testified, because his opinion that LI prescribed controlled substances without a legitimate medical purpose in all 35 patients was key evidence for LI's conviction in all drug-related counts as indicated in the trial records. Had counsel challenged Dr. Thomas' false testimony and baseless opinion on a patient-by-patient basis in all 35 cases he testified by utilizing evidence he had in his hands as discussed above, there was a fair probability that the government would not have proved beyond reasonable doubt that LI prescribed controlled substances without a legitimate medical purpose in all drug-related counts (Count 1 through Count 29).

5. Counsel failed to introduce evidence from LI's expert, Dr. Warfield, to counter Dr. Thomas' testimony in 31 of the 35 patients' medical records.

Dr. Warfield, the Lowenstein Distinguished Professor at Harvard medical school with an expertise in the field of pain management, testified for LI in a general way and in four (4) specific patients' medical records (S. Hicks, H. Messer, Joel Stemetzki and R. Trembula). Tr on May 29, 2018 at 3-68. But Counsel failed to introduce evidence from Dr. Warfield to counter Dr. Thomas' testimony in the remaining 31 of the 35 patients' medical records he testified, thus leaving Dr. Thomas' baseless opinion in these 31 patients uncontested in the trial records. Counsel's such omissions and failures rendered his legal assistance for LI inadequate, thus depriving LI of the right to effective assistance of counsel. Strickland at 686. Furthermore, there was no sound strategic decision for Dr. Warfield not to offer her opinion to counter Dr. Thomas' testimony in these 31 patients' medical records, because she had reviewed all 24 patients' medical records in the superseding indictment and had generated a thorough report based on Opioid treatment guidelines, Federation of State Medical Boards model policy and other published authorities as she cited in her report. Ex 2 at E428-E449. Dr. Warfield concluded that "In my opinion, having practiced and taught pain medicine for 37 years, the facts in the reviewed records indicate that Dr. Li's practice was <u>absolutely</u> a legitimate medical practice, he prescribed medications in good faith to patients for legitimate medical reasons, and all prescriptions for these 24 patients were for a legitimate medical purpose and within the usual course of professional practice." Ex 2 at E448 (emphasis added). Certainly, she would be able to offer her opinion in the 11 patients' medical records she did not review based on the evidence Dr. Thomas used to draw his opinion. Had counsel introduced evidence from Dr. Warfield to counter Dr. Thomas' opinion on a patient-by-patient basis in all 35 patients' medical records, there was a fair probability that the government would not have proved beyond reasonable doubt that LI prescribed controlled substances without a legitimate medical purpose, because Dr. Thomas' opinion was key evidence

78 of 88

for LI's conviction in all drug-related counts (count 1 through count 29).

6. Counsel failed to introduce evidence, especially physical evidence from LI in LI's testimony to counter patients' testimony in 16 of the 20 patients.

LI testified for himself. Tr on May 30, 2018 at 3-205, May 31, 2018 at 3-194 and June 1, 2018 at 3-83. Counsel introduced some evidence from LI in a general way and in 4 specific patients (Judy Smith, Nicole Tintle, Amber Vanluvender and Rachel Scarpa), but counsel failed to introduce evidence, especially physical evidence such as real time check-in and check-out log in the electronic medical records, from LI to counter patients' false statements such as very brief interaction with patients in the remaining 16 of the 20 patients (including husband of the deceased patient) who testified their medical records, Tr on May 30, 2018 at 3-140 and June 1, 2018 at 64-83, thus leaving these false statements uncontested in the trial records. Counsel's such omissions and failures rendered his legal assistance in LI's case inadequate, thus depriving LI of the right to effective assistance of counsel. Strickland at 686. Further, there was no sound strategy for LI not to counter patients' false statements, because it was in LI's best interest to counter these patients' false statements. Had counsel introduced evidence, especially physical evidence from LI to counter patients' false testimony on a patient-by-patient basis in all 20 patients (including husband of the deceased patient) who testified their medical records, there was a fair probability that the outcome of LI's trial might have been different.

7. Counsel failed to defend LI in the death count.

Counsel completely failed to defend LI in the death count (count 24) which mandated a minimal 20 years' imprisonment as discussed below.

(1). Counsel failed to introduce evidence, especially physical evidence from LI to counter the testimony of Mr. Maack (husband of the deceased patient) that LI did not look at the folder containing medical information, Tr on May 24, 2018 at 124, Ex 2 at E450, LI did not request to see MRI or x-ray, Tr on May 24, 2018 at

126, Ex2 at E451, and LI's interaction with patient was 8 to 10 minutes. Tr on May 24, 2018 at 122-123, Ex2 at E452-E453. First, LI did look at the folder and then gave it back to Mr. Maack, because all medical information in the folder was in patient's prior medical record already, which was faxed to LI's office on September 13, 2011 by her primary care physician, Dr. Lombardi. Ex2 at E454-E457. Second, LI did request MRI or x-ray. In fact, Mr. Maack gave patient's knee x-ray CD from the folder to LI, but LI could not open it. So LI explained to them that he would try to look at it later if LI was able to open it and would give it back to them at her next visit. Because she did not come back for follow-up, LI still had the knee x-ray CD in his office. Ex2 at E458. Third, LI's interaction with patient was about 33 to 38 minutes rather than 8 to 10 minutes, because her total time in the office was 48 minutes based on computer real time log: check-in at 12:23 pm and check-out at 1:11 pm, Ex2 at E459, and her waiting time was 10 to 15 minutes based on Mr. Maack's testimony. Tr on May 24, 2018 at 118, Ex2 at E460.

(2). Counsel failed to introduce evidence to jury from LI that LI had comprehensive history taking and physical examination including reviewing her prior medical record from Dr. Lombardi, asking and documenting her Psychiatric history, her denial of substance abuse and her denial of suicidal ideation as shown in her medical record, Ex2 at E461-E462, that the medical record from Wayne Memorial Hospital about her heroin overdose introduced by Dr. O'Boyle was not part of her prior medical record from Dr. Lombardi, that LI was not aware that patient was heroin overdosed one week prior to her initial visit with LI, because she denied illicit drug abuse as documented in her medical record, Ex2 at E461, that her urine drug screen positive for opiate and oxycodone was an expected result, consistent with hydrocodone (vicodin) she was taking due to cross-reaction of hydrocodone with oxycodone, because it was well known in the literature

that hydrocodone may cross-react with Oxycodone, Ex 2 at E202, and Dr. Thomas admitted it on at least three occasions in his testimony, Tr on May 21, 2018 at 85, May 22, 2018 at 17 and May 24, 2018 at 42, Ex 2 at E386-E388, and that psychiatric history was not a contraindication of Oxycodone prescription for pain relief as indicated in the Opioid Treatment Guidelines, Ex 2 at E146.

(3). Counsel failed to challenge Dr. Thomas' false statements and baseless opinion that LI's Oxycodone prescription for Mrs. Maack was not for a legitimate medical purpose due to a significant psychiatric history, an abnormal urine drug screen and a history of suicidal ideation, Tr on May 23, 2018 at 163-164, Ex 2 at E464-E465. On Dr. Thomas' cross-examination, Counsel did not cross-examine him death count at all, Tr on May 24, 2018 at 3-48, thus leaving Dr. Thomas' false statements and baseless opinion uncontested in the trial records, despite the fact that Counsel had evidence in his hands to challenge Dr. Thomas' false statements and baseless opinion, because (a) the Opioid Treatment Guidelines clearly indicated psychiatric history was not a contraindication for LI to prescribe Oxycodone to Mrs. Maack for pain relief, Ex 2 at E146, and there have been no any guidelines or model policy Dr. Thomas referred to form his opinion indicating patients with psychiatric history should not be prescribed opioid analgesics for pain relief, Tr on May 24, 2018 at 8-10, Ex 2 at E466-E468; (b) positive opiate and oxycodone in a patient who was taking hydrocodone (Vicodin) was not an abnormal drug screen due to cross-reaction of hydrocodone with Oxycodone as it was well known in the literature, Ex 2 at E202, and Dr. Thomas admitted in his testimony on at least three occasions that hydrocodone may cross-react with Oxycodone, Tr on May 21, 2018 at 85, May 22, 2018 at 17 and May 24, 2018 at 42, Ex 2 at E386-E388; and (c) there have been no any opioid treatment guidelines or model policy indicating a history of suicidal ideation was a contraindication of Oxycodone prescription for pain relief, especially she had suicidal ideation

81 of 88

once about 10 years ago, Tr on May 24, 2018 at 112-113, Ex 2 at E469-E470, and she denied suicidal ideation when she was seen by LI as documented in her medical record of October 5, 2011, Ex 2 at E462.

(4). Counsel failed to introduce evidence from LI's expert, Dr. Warfield to counter Dr. Thomas' false statements and baseless opinion. On direct examination, counsel did not introduce evidence from Dr. Warfield to help defend death count — Count 24, Tr on May 29, 2018 at 3-68, which was an unprofessional error, because Dr. Warfield would testify (a) a significant psychiatric history was not a contra-indication for a physician to prescribe Oxycodone for pain relief as she clearly stated in her report that "It is not true that patients with a history of substance abuse, psychiatric conditions or aberrant drug-related behaviors should never be prescribed opioids." Ex 2 at E446; (b) positive for opiate and oxycodone urine drug screen in a patient who was taking hydrocodone was a consistent and expected result due to cross-reaction of hydrocodone with Oxycodone as she stated in her report: "For instance, patients who take hydrocodone may be positive for opiate alone, positive for oxycodone alone or positive for both oxycodone and opiate," Ex 2 at E447, and "there is no consensus on whether confirmatory test should always be done due to high cost. Recent recommendations by an expert panel advise that physicians use confirmatory tests with caution because of the high cost." Id; and (c) a remote history of suicidal ideation about 10 years ago was not a contra-indication to prescribe Oxycodone for pain relief as no any opioid treatment guidelines or model policy so stated.

(5). Counsel failed to object a forensic toxicologist, Dr. Coyer's expert opinion in his testimony that the level of oxycodone in Mrs. Maack's blood was consistent with her cause of death, Tr on May 9, 2018 at 206, Ex 2 at E471, because Dr. Coyer was not offered as an expert witness, but a factual witness to testify the blood test result in his own report. Furthermore, Counsel failed to

82 of 88

challenge Dr. Coyer's aforementioned baseless opinion, because Oxycodone level 215 ng/ml in Mrs. Maack's blood was far below lethal (postmortem) level of 400 to 700 ng/ml as he documented in his own Lab report on November 5, 2011. Ex2 at E472-E473.

(6). Counsel failed to challenge Dr. O'Boyle's testimony that the narcotic found in the urine or blood samples was Oxycodone, Tr on May 24, 2018 at 176, Ex2 at E474, that he could not recall heroin in her system, Tr on May 24, 2018 at 179, Ex2 at E476, and that the cause of Mrs. Maack's death was respiratory arrest from Oxycodone overdose, Tr on May 24, 2018 at 176, 178-179, Ex2 at E474-E476, because Mrs. Maack's urine confirmatory test on October 7, 2011 confirmed morphine, Ex2 at E477, a frequently-detected metabolite of heroin as indicated in Dr. Coyer's testimony, Tr on May 9, 2018 at 206, Ex2 at E471, indicating there was evidence of heroin use. In addition, evidence did not support that the cause of death was respiratory arrest from Oxycodone, because her blood Oxycodone level was 215 ng/ml, far below lethal (postmortem) level of 400 to 700 ng/ml based on Dr. Coyer's Lab report, Ex2 at E472-E473, her respiratory arrest occurred 2 to 4 hours after she went to bed based on Mr. Maack's testimony, Tr on May 24, 2018 at 134-135, Ex2 at E478-E479, far later than Oxycodone blood peak time of 0.5 to 1 hour after oral intake, Ex2 at E480-E481, there was evidence of heroin in her system as discussed above, the Zolpidum (sleep pill) level was undetermined due to insufficient blood volume, Ex2 at E472, and other common causes for acute respiratory arrest such as acute onset intracranial hemorrhage could not be ruled out due to no autopsy as indicated in coroner's report, Ex2 at E482.

(7). Counsel failed to cross-examine and challenge Dr. Thomas' baseless opinion about Mrs. Maack's but-for cause of death when Dr. Thomas testified "the Oxycodone concentration was 215 ng per ML. She also had a therapeutic concentration of clo-

nazepam, which was... and but for the Oxycodone concentration in her blood, she would not have died." Tr on May 23, 2018 at 164, Ex 2 at E465, because the blood Oxycodone level 215 ng/ml, was far below the lethal (postmortem) level of 400 to 700 ng/ml based on Dr. Coyer's Lab report, Ex 2 at E472-E473, her respiratory arrest occurred 2 to 4 hours after she went to bed based on Mr. Maack's testimony, Tr on May 24, 2018 at 134-135, Ex 2 at E478-E479, far later than oxycodone blood peak time of 0.5 to 1 hour after oral ingestion, Ex 2 at E480-E481, there was evidence of heroin use in her system as discussed above, the blood level of zolpidum (sleep pill) was undetermined due to insufficient volume, and other common causes of acute respiratory arrest such as acute onset intracranial hemorrhage could not be ruled out due to no autopsy as indicated in coroner's report. Ex 2 at E482.

 Counsel's above numerous omissions and errors in defending the death count rendered counsel's legal assistance offered to LI inadequate, thus depriving LI of the right to effective assistance of counsel. Furthermore, there was no strategic choice or tactical decision not to cross-examine or challenge the government's witnesses, because counsel had evidence in hands to counter the false statements and baseless opinions of the government's witnesses as discussed above. Had counsel introduced evidence, especially physical evidence from LI, challenged Dr. Thomas' false statements and baseless opinion about LI's Oxycodone prescription in death count, and introduced evidence from the defense expert, Dr. Warfield, to counter Dr. Thomas' baseless opinion as discussed above, there was a fair probability that the government would not have proved beyond reasonable doubt that LI prescribed Oxycodone for Mrs. Maack's pain without a legitimate medical purpose. Had counsel not neglected important evidence in Dr. Coyer's Lab report — lethal (postmortem) level of Oxycodone 400 to 700 ng/ml and in Mrs. Maack's urine confirmatory test — existence of morphine, a metabolite of heroin, and challenged the baseless

opinion of Dr. Coyer, Dr. O'Boyle and Dr. Thomas about the cause of death as discussed above, there was a fair probability that the government would not have proved beyond reasonable doubt that the oxycodone prescribed by LI was the but-for cause of Mrs. Maack's death.

ii. Counsel's loyalty to LI was undermined because of actual conflict of interest, prejudicing LI thereupon.

The American Bar Association (ABA) Standards which provide guidance as to what constitutes "reasonable" professional conduct state:

> "The professional judgement of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client."

ABA Model Code of Professional Responsibility, EC 5-1.

> "A lawyer should not accept proffered employment if his personal interests or desires will, or there is a reasonable probability that they will, affect adversely the advice to be given or services to be rendered the prospective client."

Id, EC 5-2.

It is established law that counsel owes his client a duty of loyalty and should be devoted solely to the interests of his client. "The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client." Von Moltke v. Gillies, 332 U.S. 708, 725 (1948). "Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." Strickland at 688. "Actual conflict of interest adversely affecting lawyer's performance renders assistance ineffective." Id at 686. "[P]rejudice is presumed when counsel

is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." Id at 692.

In the case at bar, prior to Agent Hischar's investigation, an investigation about LI's "excessive" prescribing of controlled substances to patients with pain was conducted by the PA office of Attorney General, Pike County District Attorney's office and the PA Department of State Bureau of Licensing, and was concluded without either criminal or civil action as documented in paragraph 7 of Agent Hischar's affidavit. Ex1 at E5. LI's case along with a confidential source (CS#1) was then referred to DEA by "Pike County detectives" as Agent Hischar's testimony indicated. Tr on July 19, 2016 at 19. Ex2 at E483. In fact, Pike County District Attorney's office participated in the search of LI's townhouse at 4005 Milford Landing Drive, Milford, PA. Tr on May 4, 2018 at 14, Ex 2 at E484.

Sometime during trial, LI was informed by counsel that Pike County chief detective presented to the trial court. A few days later, when counsel and LI were on the way to home from the trial court in counsel's vehicle, counsel got a call and was asked to help the caller's son in a case. Counsel responded that he would help, because "you are my friend." After the phone call, counsel told LI that it was Pike County chief detective's son who was in trouble. From that moment, LI became aware that Pike County chief detective was a friend of LI's counsel, which was never disclosed to LI by his counsel. This might explain why counsel did not request the exculpatory evidence from Pike County District Attorney's office, despite the fact that he said he would subpoena it. It was reasonable to presume that Pike County chief detective was seeking LI's conviction by the federal government, because "Pike County detectives" referred LI's case along with CS#1 to DEA when the PA state's investigation was concluded without even a civil action against LI. However, it was also reasonable to

presume that LI was seeking an acquittal, because he was innocent. Obviously, actual conflict of interest existed when counsel was representing LI. Counsel knew or should have known that actual conflict of interest existed, because the fact that he did not request exculpatory evidence from Pike County District Attorney's office reflects that he knew the actual conflict of interest and he intended not to expose it. Furthermore, numerous omissions and acts reflected in the records including failure to request exculpatory evidence, failures to prepare and submit motions and briefs, failure to cross-examine Dr. Thomas on a patient-by-patient basis, failure to introduce evidence from LI's expert to counter Dr. Thomas' false statements and baseless opinion, failure to introduce evidence, especially physical evidence from LI to counter patients' testimony, failure to defend the death count, and erroneous concession of relevance and fit prong of the Daubert criteria at Dr. Thomas' Daubert hearing, clearly indicate that the professional judgement of LI's counsel was not exercised "solely for the benefit of his client" within the bounds of the law, and that his loyalty to LI was undermined. Because Counsel owed LI "a duty to avoid conflict of interest", Strickland at 688, the actual conflict of interest which adversely affected Counsel's performance in defending LI as reflected in the trial records, thus rendered Counsel's assistance in the case of LI's criminal defense ineffective.

iii. Conviction must be set aside because of ineffective assistance of Counsel.

As discussed above, counsel's numerous omissions and acts in defending LI's criminal case were not merely strategic decisions or tactical considerations, but precisely kinds of egregious unprofessional errors a competent counsel should not make, which prejudiced LI thereupon, thus rendering counsel's assistance in LI's defense ineffective. Furthermore, Counsel's loyalty to LI was undermined when Counsel was representing LI in his criminal defense because of actual

87 of 88

conflict of interest, which prejudiced LI thereupon, thus rendering counsel's assistance in LI's defense ineffective, either.

When a counsel's assistance in defending a criminal case was ineffective, the constitution requires a conviction be set aside. Strickland at 691-692. Because counsel's assistance in LI's criminal defense was ineffective, LI's conviction by a jury on June 4, 2018 must be set aside.

## V. Conclusion

For the foregoing reasons, LI respectfully prays that this Honorable Court vacate his conviction and sentence, discharge him from federal custody, and dismiss the superseding indictment against him, or alternatively grant a new trial.

Respectfully submitted,

[signature]

Fuhai Li, Pro Se
Reg# 75356-067
FCI McKean
P.O. Box 8000
Bradford, PA 16701

Date: Jan. 14, 2021

