# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :
                                :     NO. 3: 16-CR-194

     -vs-                             :

                                :     (Judge Brann)

FUAHI LI,                         :

               Defendant.      :     Electronically Filed

                                :

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PETITIONER'S MOTION TO VACATE,
## SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

AND NOW, comes the United States of America, by and through Acting United States Attorney Bruce D. Brandler and Assistant United States Attorney Michelle Olshefski, and answers the Petitioner's Motion to Vacate, Set Aside, or Correct Sentence.

## I.    BACKGROUND

On October 17, 2017, a grand jury in the Middle District of Pennsylvania returned a 32-count Superseding Indictment, charging Fuhai Li with 23 counts of unlawful distribution and dispensing of a controlled substance, in violation of 21 U.S.C. §841(a)(1); one-count of unlawful distribution and dispensing of a controlled substance resulting in death, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); one count of unlawful distribution and dispensing of a controlled substance to a pregnant individual, in violation of 21 U.S.C. §861(f); two counts of maintaining drug-involved premises, in violation of 21 U.S.C. §856(a)(1); two counts of money laundering, in violation of 18 U.S.C. §1957; and three counts of tax evasion, in

violation of 26 U.S.C. §7201. Each count in the Superseding Indictment stemmed from the defendant's practice as a physician beginning in August 2011 through January 2015.[1]

The jury trial commenced on May 2, 2018. At the conclusion of the Government's case-in-chief on May 29, 2018, the defense made an oral Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(a) as to all counts in the Superseding Indictment, asserting that there was insufficient evidence to show that Li committed any of the crimes with which he was charged.[2] The motion was denied.[3] Thereafter, the defense presented its case, which included three days of testimony from Li and a defense pain management expert, Dr. Carol Warfield. On June 4, 2018, the jury returned a unanimous verdict finding Li guilty on all counts in the Superseding Indictment.[4]

On June 18, 2018, Li filed a written post-trial motion for Judgment of Acquittal pursuant to Federal Rules of Criminal Procedure 29 and 33, advancing arguments similar to those orally made at the close of the Government's case-in-

---

[1] (Doc. 47).

[2] (SAppx 2399). The Li trial transcripts encompass thousands of pages of testimony with additional thousands of pages comprising the Government's exhibits. Trial transcripts are bate stamped and are herein provided to the Court by way of a physical CD marked as Government's Attachment "A").

[3] (SAppx 2402).

[4] (Doc. 167). Prior to resting its case on May 29, 2018, the Government made a motion to withdraw Counts 18 (related to Kevin Marek) and 21 (related to Kenneth Phillips). The motion was granted by the court. (SAppx 2398).

chief, as well as those included in Li's direct appeal to the Third Circuit.[5]  On

January 8, 2019, Li supplemented his Rule 29 and 31 motion with additional issues

and briefing.[6]  On March 12, 2019, the Court denied Li's motion in a memorandum

opinion and order.[7]

Li faced a statutory mandatory minimum sentence of 240 months on Count

24. *PSR ¶ 81.*  His advisory sentencing guidelines range was life imprisonment.

*PSR ¶ 82.*  After conducting a sentencing hearing on April 3, 2019, the Court

sentenced Li to serve 330 months' imprisonment.[8]  The Court also imposed a six-

year term of supervised release, $3,000 in special assessments, and $5,177.80 in

restitution.  *Id.*  The Court filed an amended judgment on April 4, 2019 (related to a

forfeiture edit).[9]

Li filed a timely notice of appeal.[10]  On July 9, 2020, the United States Court

of Appeals for the Third Circuit affirmed Li's conviction and sentence in an

unreported opinion.  *See United States v. Fuhai Li, No. 19-1875 (3d Cir. 2020).*  No

petition for a writ of certiorari was filed.[11]

---

[5]    (Doc. 181).

[6]    (Doc. 214).

[7]    (Docs.  225, 226).

[8]    (*See Judgment, Doc.* 239).

[9]    (Doc. 241).

[10]    (Doc 244).

[11]    Li alludes to but does not argue that his counsel was ineffective for not
filing a petition for writ of certiorari.  Indeed, Li has no constitutional right to

3

On February 10, 2021, Li filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence.[12] His motion should be denied in its entirety and no certificate of appealability granted.

## II.   STATEMENT OF FACTS[13]

Li's medical practice, Neurology and Pain Management, was located in Milford, Pennsylvania. Li prescribed large amounts of highly addictive Schedule II narcotics outside the usual scope of professional practice and not for legitimate medical purposes. Many professionals took action with respect to Li's practice and reflected their concerns about the propriety of his prescription practices. *PSR ¶ 7.* These professionals included various doctors, pharmacists, pharmacy chains who refused to fill Li's prescriptions, and social service agencies upon learning about the birth of an opioid dependent baby. *Id.* Li's response to these concerns was to claim that he knew better and trivialized the expressed concerns of professionals. *Id.*

Li came to the attention of law enforcement in or around the Spring of 2013 when one of Li's employees reached out to law enforcement to report her concerns

---

counsel for such action. The Supreme Court in *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982) stated, "Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely." *See also Morrison v. Duckworth*, 898 F.2d 1298, 1300-01 (7th Cir. 1990) ("Before a habeas petitioner can use ineffective assistance of counsel as grounds to establish cause, however, he must first have a right to counsel.").

[12]    (Doc. 258).

[13]    The offense conduct is lengthy but warrants articulation in light of Li's claims.

about things she was witnessing within Li's medical practice.[14]  Preliminary investigation about Li revealed that he was, indeed, one of the highest prescribers of opioids and other controlled substances in the Commonwealth of Pennsylvania at that time, which continued until the time of the initial indictment on July 20, 2016. *Id.*

The evidence presented at trial showed that Li was motivated by greed. *PSR ¶ 9.*  He deliberately cultivated patients similar to how a street-level dealer cultivates a customer base. *Id.*  Li created addicts and fed their addictions with monthly prescriptions for exceedingly high dosages and quantities of Schedule II narcotics. *Id.*  Li's illegal prescribing without a legitimate medical purpose and outside usual scope of professional practice resulted in the death of Suzanne Maack. Li ignored self-reports of addiction concerns, psychiatric histories, urine screens positive for illicit street drugs as well as negative drug screens, which tended to indicate diversion and/or patient selling of their prescription drugs. *PSR ¶ 13.*  Li's unlawful prescribing caused the birth of an opioid dependent baby, as well as significant complications in many individuals' lives. *PSR ¶ 9, 13.*

As word on the street spread about how easy it was to obtain prescriptions for Schedule II narcotics from Li, his patient base grew. *PSR ¶ 10, 13.*  Li required immediate payment of approximately $250 to $350 for a first-time office visit, and approximately $150 for each monthly visit thereafter. *Id.*  Follow-up patient visits

---

[14]    (SAppx 85 – 87, PSR ¶ 8).

occurred monthly and invariably resulted in a prescription for Schedule II narcotics. *Id.* Li also generated significant income by performing unnecessary in-office diagnostic tests that served only to "paper his files" and give an appearance of medical care. *Id.* Li preferred cash payments. *Id.*

Over time, as his patient base continued to grow, greed overcame Li's professional ethics and sense of right and wrong and ultimately became his motive for prescribing. *PSR ¶ 10.* Li's greed is exhibited, in part, by the $1,030,960 in cash that was concealed inside his residences and subsequently seized by law enforcement.[15] Li failed to report this amount of criminally derived income in federal tax filings. *PSR ¶ 10, 27.* Li's desire for financial gain was so great that he intentionally withheld reporting income in order to avoid assessment of taxes on the income. *Id.*

Li's prevailing "fix" to any purported problem was to prescribe an opioid drug and, not coincidentally, many patients became addicted. *PSR ¶ 11.* Li eschewed other available less addictive pain relief drugs and other pain relief options targeted to specific types of pain. *Id.* When patients would report "doubling up" on pills, Li failed to conduct the necessary medical inquiry to determine whether the patient was opioid receptive or whether the patient was abusing the drug. Li's medical files reflected little to no interaction with other doctors, and little to no referrals of patients to other doctors for treatment of underlying medical issues. *Id.* Li treated

---

[15]  (SAppx 173 – 179, PSR ¶ 26).

only symptoms of the underlying issues – pain, and did so predominantly with large doses of opioid medications. *PSR ¶ 12.* It became clear at trial that Li kept everything in house such that only he benefitted from his patients' pain. *Id.* Counts 1 through 23 of the Superseding Indictment charged Li with the unlawful distribution of a controlled substance.[16]

For each unlawful distribution count charged, Li's complete medical record for each particular patient identified in the individual counts was admitted into evidence at trial.[17]

In addition, the Government presented the testimony of nineteen former patients, three of Li's former employees, eight pharmacists, an expert on pain management, three additional physicians factually related to the case, the testimony of federal law enforcement agents and investigators from the Drug Enforcement Administration and its Diversion Division, and an Internal Revenue special agent.

The testimony of the nineteen former patients was offered in support of the individual counts involving the unlawful distribution of a controlled substance, as well as the counts charging Li with maintaining drug-involved premises.[18] Each of

---

[16] (Doc. 47).

[17] (Doc. 178 – *Trial Exhibits 1 – 23, 29 – Sealed*).

[18] (Tamika Davis SAppx 314 – 356; Amber Vanluvender SAppx 524 – 561; Stephanie Abuiso SAppx 561 – 592; Anthony Abuiso SAppx 630 – 671; Christy Vanluvender SAppx 675 – 706; Lucas Brown SAppx 706 – 747 ; Heidi Messer SAppx 747 – 780; Samantha Barnes SAppx 785 – 824; Kenneth Phillips SAppx 840 – 895; Jared Stemetzki SAppx 931 – 973; Rachel Scarpa SAppx 974 – 1004; Dawn Beyers

the nineteen patients provided the jury with a consistent pattern of the illegitimacy of Li's medical practice.

Patient after patient described initial visits that were brief and physical examinations that could only be described as cursory.[19]   Some patients testified that Li, even at the first visit, never laid hands on them.[20]   Patient after patient testified that follow-up visits with Li lasted only long enough for Li to ask them a few questions about whether they were taking their pills and to write them another prescription for powerful opioids.[21]   Some patients testified that they had visits with Li when he never even made eye contact with them, as he simply wrote

---

SAppx 1023 – 1053; Joseph Beyers SAppx 1053 – 1108; John Rouse SAppx 1108 – 1146; Judith Smith SAppx 1147 – 1194; Richard Trembula SAppx 1195 – 1255; Brian Gilson SAppx 1342 – 1394; Nicole Tintle SAppx 1395 – 1461; Kevin Marek SAppx 1486 – 1569).

[19]   (SAppx (Tamika Davis 327 - 328, 342; (Amber Vanluvender) 531 – 532; (Stephanie Abuiso) 568, 571; (Anthony Abuiso) 636 – 640; (Christy Vanluvender) 682, 685; (Lucas Brown) 714, 716, 719 – 720, 722, 729; (Heidi Messer) 751, 759; (Kenneth Phillips) 853, 857, 866, 871; (Jared Stemetzki) 938 – 941, 955; (Rachel Scarpa) 979, 982, 989; (John Rouse) 1125 – 1126; (Judith Smith) 1155, 1159, 1165; (Richard Trembula) 1201 – 1203, 1209, 1217; (Nicole Tintle) 1403 – 1404, 1432; (Kevin Marek) 1503, 1508).

[20]   (SAppx (Christy Vanluvender) 682, 685; (Lucas Brown) 714, 716, 719 – 720, 722, 729; (Heidi Messer) 751 – 752, 753 – 754, 759; (Jared Stemetzki) 945, 947; (Rachel Scarpa) 982, 989; (John Rouse) 1125 – 1126; (Richard Trembula) 1217).

[21]   (SAppx (Stephanie Abuiso) 568; (Anthony Abuiso) 636 – 640; (Christy Vanluvender) 682, 685; (Lucas Brown) 714, 716, 719 – 720, 722, 729; (Heidi Messer) 751 – 752, 753 – 754, 759; (Jared Stemetzki) 938 – 940; (Rachel Scarpa) 979, 982, 989; (John Rouse) 1125 – 1126; (Judith Smith) 1151 – 1152, 1155, 1159, 1165; (Richard Trembula) 1202 – 1203, 1209, 1217; (Nicole Tintle) 1403 – 1404, 1432; (Kevin Marek) 1503, 1508).

another opioid prescription for the patient.[22]  Some patients described their visits with Li as lasting only a few minutes.[23]  Several patients testified about simply asking Li for more oxycodone pills and receiving them.[24]

Several patients repeatedly told Li they were taking more pills than as prescribed, but Li continued to write prescriptions for them.[25]  Several patients testified that even when they reported a stable condition, Li continued to increase the quantity of oxycodone he prescribed.[26]

---

[22]  (SAppx (Judith Smith) 1165; (Richard Trembula) 1209 – 1210, 1213, 1230)).

[23]  (SAppx (Tamika Davis 330; (Amber Vanluvender) 531 – 532; (Stephanie Abuiso) 568, 571; (Anthony Abuiso) 636 – 640; (Christy Vanluvender) 682, 685; (Lucas Brown) 714, 716, 719 – 720, 722, 729; (Kenneth Phillips) 853, 857, 866, 871; (Jared Stemetzki) 938 – 939, 940 – 941, 955; (Rachel Scarpa) 982, 989; (Judith Smith) 1155, 1159, 1165; (Richard Trembula) 1202 – 1203, 1209).

[24]  (SAppx (Tamika Davis) 330, 333; (Stephanie Abuiso) 571; (Anthony Abuiso) 641, 643 – 644; (Christy Vanluvender) 682, 692; (Lucas Brown) 719 – 720; (Heidi Messer) 754; (Kenneth Phillips) 852, 857; (Jared Stemetzki) 942, 949, 952, 953, 956, 957; (John Rouse) 1119, 1124, 1126, 1128, 1131, 1133; (Judith Smith) 1155 – 1156, 1165 – 1166; (Richard Trembula) 1210, 1211, 1216; (Nicole Tintle) 1412 – 1413, 1414 – 1415, 1417, 1419, 1423, 1425, 1427, 1428, 1433 – 1434, 1436, 1439, 1440; (Kevin Marek) 1516, 1518, 1526.

[25]  (SAppx (Tamika Davis) 329 – 330, 334 – 335; (Amber Vanluvender) 536 – 539; (Anthony Abuiso) 641 – 643; (Christy Vanluvender) 682, 692, 686 – 687; (Lucas Brown) 717 – 718, 720, 721, 722 – 723, 724 – 726, 729; (Heidi Messer) 758 – 759, 762 – 763; (Kenneth Phillips) 860; (Jared Stemetzki) 956; (John Rouse) 1118, 1122, 1123, 1124; (Nicole Tintle) 1415, 1429, 1431 – 1432; (Kevin Marek) 1514 – 1516, 1519).

[26]  (SAppx (Tamika Davis) 333, 336, 340; (Stephanie Abuiso) 571, 579 – 580; (Anthony Abuiso) 652; (Christy Vanluvender) 684, 692; (Heidi Messer) 755, 756, 764, 766, 767 – 768; (Kenneth Phillips) 857, 864; (Jared Stemetzki) 942, 950, 956; (Rachel Scarpa) 981, 987; (John Rouse) 1133, 1134; (Nicole Tintle) 1412, 1419, 1423, 1425, 1436, 1439, 1440; (Kevin Marek) 1525 – 1526).

Some patients continued to complain of pain despite the heavy doses of controlled substances, but Li did nothing more but continue to provide the patient with prescriptions for high doses and quantities of oxycodone.[27] Several patients testified that Li never discussed medical alternatives to the prescription drugs.[28]

Some patients testified that even though Li's patient files documented a diagnosis code of "poisoning by opiates," Li nevertheless continued to prescribe large quantities of opioid pain medications and never discussed the "poisoning" diagnosis with the patients.[29]

One patient testified that he repeatedly told Li that he did not want to continue to take all of the opioids Li was prescribing, but his concerns fell on Li's deaf ears.[30] Most patients testified that regardless of what they described as the lack of a doctor/patient relationship, they usually obtained whatever controlled

---

[27]  (SAppx (Amber Vanluvender) 534, 539, 541, 543 – 544; (Kenneth Phillips) 869; (Rachel Scarpa) 983 – 984, 987, 988; (John Rouse) 1123, 1128, 1130; (Judith Smith) 1154, 1157, 1167, 1168; (Richard Trembula) 1216, 1222, 1223; (Nicole Tintle) 1436).

[28]  (SAppx (Tamika Davis) 331; (Amber Vanluvender) 529 – 530, 535 – 536, 538; (Stephanie Abuiso) 570; (Anthony Abuiso) 639; (Christy Vanluvender) 683 – 684; (Lucas Brown) 718 – 719, 722, 727, 729; (Heidi Messer) 751, 753, 754, 759, 764; (Kenneth Phillips) 858 – 859; (Jared Stemetzki) 944, 947, 951, 959, 960; (John Rouse) 1127; (Judith Smith) 1156, 1158 – 1159, 1170, 1174; (Richard Trembula)1205, 1213, 1216, 1224, 1227, 1230; (Nicole Tintle) 1408, 1443 – 1444; (Kevin Marek) 1504 – 1505, 1506 – 1507, 1512 – 1513).

[29]  (SAppx (Kenneth Phillips) 851, 853, 856, 860, 862, 863, 867, 869, 871, 872, 875; (John Rouse) 1134).

[30]  (SAppx (Kevin Marek) 1516 - 1518, 1519 – 1520, 1524 - 1525).

substance they wanted from Li.

Each of the nineteen patients testified that Li falsified their medical records, especially pertaining to medical examinations the patients said were not performed.[31]

Most of the patients testified that at the first visit, they received a high dosage of oxycodone or another opioid in a large dosage and quantity, despite having no prior medical records or history to support a need for the drugs.[32] Several patients testified that they sought out Li because they knew he was willing to feed their addictions.[33] Some patients testified about traveling a long distance to Li's office and/or in groups, and all obtaining prescriptions for oxycodone from

---

[31] (SAppx (Tamika Davis) 326, 328, 332; (Amber Vanluvender) 528 – 529, 541; (Stephanie Abuiso) 569, 572 – 573; (Anthony Abuiso) 637, 630 – 640; 643, 652; (Christy Vanluvender) 681, 683 – 684, 685, 689, 694 – 696; (Lucas Brown) 712, 716, 718 – 719, 721, 729, 730, 733; (Heidi Messer) 753, 754, 764; (Kenneth Phillips) 851, 853, 856, 860, 871, 873; (Jared Stemetzki) 937 – 939, 941 – 942, 945, 949, 950, 955; (Rachel Scarpa) 981, 983, 986, 991, 992; (John Rouse) 1117, 1126, 1131, 1135; (Judith Smith) 1153 – 1154, 1157, 1159, 1165, 1169 – 1170, 1172, 1173, 1177; (Richard Trembula) 1205 – 1207, 1208, 1212, 1215 – 1216, 1218, 1222 – 1223, 1126 – 1127, 1229; (Nicole Tintle) 1403, 1406, 1412, 1413, 1418, 1425 – 1426, 1428, 1432, 1436; (Kevin Marek)1498 – 1499, 1501, 1503, 1514).

[32] (SAppx (Tamika Davis) 325, 328 – 329, 330; (Amber Vanluvender) 528; (Stephanie Abuiso) 569; (Anthony Abuiso) 636 – 637; (Christy Vanluvender) 680 - 682; (Lucas Brown) 717; (Heidi Messer) 751, 752; (Jared Stemetzki) 940; (Rachel Scarpa) 980; (John Rouse) 1116; (Judith Smith) 1150 – 1153; (Richard Trembula) 1204 – 1205, 1207, 1209 – 1210; (Nicole Tintle) 1404, 1406 – 1407; (Kevin Marek) 1501 – 1503).

[33] (SAppx (Anthony Abuiso) 634; (Christy Vanluvender) 678; (Lucas Brown) 711; (Kenneth Phillips) 847, 848, 855; (John Rouse) 1114; (Judith Smith) 1149; (Nicole Tintle) 1401).

him.[34]

One patient testified about the multiple times he was approached by other Li patients asking for pills in Li's parking lot and waiting room, as well as in the parking lot of the pharmacy where Li directed the patient to go when he could not find a pharmacy that would fill Li's prescriptions.[35] The patient reported the events to Li who responded that the patient should then find another pharmacy. *Id.* In fact, one of Li's former employees testified that Li's office received a lot phone calls from Aliton's pharmacy and recalled one involving patients who had just left Li's office exchanging prescriptions out in the parking lot.[36] Former employees also testified that when patients called complaining about pharmacies refusing to fill Li's prescriptions, which was a frequent occurrence, the employees were told by Li to direct the patients to Aliton's pharmacy.[37]

Several patients testified that even when their urine tests showed positive for the presence of other controlled substances not prescribed by Li, or other illicit street drugs, Li continued to prescribe for them.[38]

---

[34] (SAppx (Anthony Abuiso) 646 – 650; (Jared Stemetzki) 935, 938, 948; (John Rouse) 1129 – 1130; (Judith Smith) 1160 – 1162, 1170 – 1171, 1175, 1178 – 1179; (Richard Trembula) 1200 – 1204, 1209, 1214 – 1215, 1218, 1224; (Nicole Tintle) 1401, 1405 – 1406, 1418, 1421, 1430, 1435, 1445 – 1446).

[35] (SAppx (Kevin Marek) 1521 – 1523).

[36] (SAppx 206 - 207).

[37] (SAppx (Sandra Foster) 208 – 209; Virginia McCracken) 257 – 258; (Samantha Scicutella) 390 – 391).

[38] (SAppx (Tamika Davis) 336, 338, 340 – 341; (Stephanie Abuiso) 573;

Most patients testified that after a time, they had difficulty finding a pharmacy that would fill Li's prescriptions and were directed by Li to find a different pharmacy, or specifically directed by Li to go to Aliton's in Milford.[39]

All patients testified about the addictions Li created and/or fed, as well as the resulting harm Li's illegitimate and unlawful prescribing caused to their lives, including the birth of an opioid dependent baby. The resulting harm was offered as evidence of Li's unlawful prescribing.[40]

Each of the nineteen patients who testified at trial were subjected to aggressive cross-examination by defense counsel, which included exposing criminal histories, addictions, and lies that addicts tell to seek pleasure and avoid the pain of withdrawal. *Id*. The defense was not limited or corralled in any manner in attacking the credibility of the Government's witnesses. The jury saw and heard it all.

---

(Christy Vanluvender) 696; (Lucas Brown) 716 – 717, 730 – 731; (Jared Stemetzki) 954; (Judith Smith) 1163 – 1164; (Nicole Tintle) 1433, 1443; (Kevin Marek) 1511 – 1512).

[39] (SAppx (Tamika Davis) 338 – 339; (Amber Vanluvender) 540; (Christy Vanluvender) 693 – 694; (John Rouse) 1131 – 1132; (Nicole Tintle) 1421 – 1422, 1425 – 1426; (Kevin Marek) 1514 – 1516).

[40] (SAppx (Tamika Davis) 341, 334 – 335; (Amber Vanluvender) 534 – 535, 538 – 539, 545, 547, 539; (Stephanie Abuiso) 576 – 577, 579 – 581; (Anthony Abuiso) 641 – 642, 644, 651m 653 – 656; (Christy Vanluvender) 687 – 688, 690 – 691, 694 – 697; (Lucas Brown) 720, 732 – 33; (Heidi Messer) 757, 758, 760 – 761, 768 – 771; (Kenneth Phillips) 876 – 877, 878 – 880; (Rachel Scarpa) 992, 993 – 994; (John Rouse) 1120 – 1121, 1137 – 1138; (Judith Smith) 1172 – 1173, 1181 – 1182; (Richard Trembula) 1219, 1233 – 1235; (Nicole Tintle) 1433 – 1444, 1435, 1437 – 1438, 1444, 1147 – 1448; (Kevin Marek) 1506, 1508 – 1509, 1513, 1514 – 1516, 1519, 1527 – 1528 – 1534).

The Government also presented the testimony of eight pharmacists from various pharmacies including Rite Aid, Walgreens, CVS, the Medicine Shop, Walmart, and Alitons.[41] Each pharmacist testified that they either completely refused to fill controlled substance prescriptions written by Li, or became extremely selective in filling any of Li's controlled substance prescriptions. *Id.* The action taken by the pharmacists, as described in their testimony, was compelling for several reasons. First, the testimony of the pharmacists corroborated the testimony of individual patients who testified that they often complained to Li about pharmacies rejecting his prescriptions. *Id.* Rather than be alarmed by this, the jury learned that Li simply directed those patients to another pharmacy, usually Alitons in Milford, Pennsylvania. Second, each pharmacist testified about their own "corresponding responsibility" not to fill what appeared to them to be an unlawful prescription.[42] Thus, the jury was permitted to infer that Li's decision to ignore the warnings of other professionals was indicative of his own knowledge that he was operating outside the scope of professional practice. This evidence further served to rebut Li's assertion that he reasonably believed he was engaged in a proper medical practice, and was also evidence of the defendant's willful blindness.

---

[41]    (Robert Welsh SAppx 266 – 314; Andrew Dickson SAppx 477 – 494; Nicole Harrington SAppx  496 – 523; Robert Fizette SAppx 588 – 613; George Sacchi SAppx 896 – 913; Theresa Talbot SAppx 913 – 931; Janet hart SAppx 1260 – 1293; Marybeth Shea SAppx 1325 – 1336).

[42]    (SAppx (Robert Welsh) 270 - 271; (Andrew Dickson) 482; (Nicole Harrington) 500 – 501; (Robert Fizette) 601; (George Sacchi) 899 – 900; (Theresa Talbot) 917 – 918; (Janet Hart) 1265 – 1266; (Marybeth Shea) 1328 – 1329).

Finally, the jury heard powerful evidence from the pharmacists as they testified about their reasons for rejecting Li's prescriptions. The reasons generally testified to by these professionals included, for example, the majority of patients presented with the same prescription (usually oxycodone); the majority of the patients received the maximum dose and a large quantity of a highly addictive and highly abused controlled substance (usually 120 to 180 oxycodone 30 milligrams); many travelled a long distance to either obtain prescriptions from Li or to have the prescriptions filled; many of the same family members were receiving the same prescription at the same time; several of the younger patients often travelled together in the same vehicle and all had the same prescription; on more than one occasion, a patient was observed sharing the controlled substance after having the prescription filled at a particular pharmacy; some of the patients appeared to be in no physical distress with no physical limitations but were prescribed the largest available dose and quantity of oxycodone; and many of the pharmacists were dissatisfied with Li's response when they called to question Li. As the pharmacists were taking what some of them described as unprecedented actions in this regard, the jury was permitted to infer Li's willful blindness to the concerns of professionals with corresponding legal responsibilities.[43]

---

[43]    (SAppx (Robert Welsh) 266 – 314; (Andrew Dickson) 477 – 494; (Nicole Harrington) 496 – 523; (Robert Fizette) 588 – 613; (George Sacchi) 896 – 913; (Theresa Talbot) 913 – 931; (Janet Hart) 1260 – 1293; (Marybeth Shea) 1325 – 1336).

The Government also called Dr. Stephen Thomas who testified as an expert in the medical discipline of pain management.[44] Dr. Thomas testified for approximately four days about the medical illegitimacy of the prescriptions written by Li, which correspond to the unlawful drug distribution Counts 1 through 17, 19, 20, 22 through 25, and Counts 26 through 27 (maintaining drug-involved premises).

After being qualified as an expert, Dr. Thomas spent the first few hours of his testimony providing the jury with an elementary understanding of pain management and explaining overarching medical standards against which to compare Li's prescribing practices.[45] For example, Dr. Thomas explained that in the practice of pain management, it is imperative that physicians collect a comprehensive medical history from all new patients; that it cannot be medically legitimate for a doctor to provide patients with prescription renewals for opioid medications on their first office visit; and that it is the role of the physician to investigate when patients' urine tests present evidence of abuse or diversion. *Id.* Dr. Thomas discussed societal concerns regarding opioid addiction and death, and testified that a doctor who prescribes these types of controlled substances must be aware of these concerns and take them into consideration when issuing prescriptions. *Id.* Dr. Thomas testified that when prescribing dangerous and highly addictive opioids, the general accepted standard of practice is to start low and go slow. *Id.*

---

[44] (SAppx 1756 – 1766).

[45] (SAppx 1771 – 1816).

In preparation for trial, Dr. Thomas testified that he thoroughly reviewed each of the patient files that included unlawfully prescribed prescriptions corresponding to a charged count in the Superseding Indictment, as well as several additional files corresponding to counts involving maintaining drug-involved premises.[46]  Dr. Thomas ultimately concluded that in each charged patient file he reviewed, he found evidence of medically illegitimate prescribing practices – instances where Li acted in contravention to established standards within the medical community.[47]  To illustrate this assertion, Dr. Thomas spent the better part of four days on the witness stand meticulously analyzing and testifying about the details of thirty-seven patient files, including those individually charged in each specific count of the Superseding Indictment. (SAppx 1771 – 2310).

For each of the thirty-seven patient files, Dr. Thomas addressed the adequacy of the medical history collected at the start of the doctor-patient relationship, the type of pain generally associated with the patient's claimed injury or ailment, the propriety of the prescriptions written by Li, the sufficiency and/or incredibility of Li's charting and notes, any evidence of abuse or diversion, obvious evidence of abuse and/or diversion ignored by Li, and the ways in which Dr. Thomas determined Li's prescribing practices fell below the threshold of medical legitimacy.[48]  Dr. Thomas specifically addressed nearly all diagnostic tests, if any,

---

[46]   (SAppx 1822).

[47]   (SAppx. 1826 – 1845).

[48]   (SAppx 1771 – 2310).

that were contained in each patient file, what conclusions he drew from the tests or lack of tests, and whether Li's diagnosis supported the prescriptions written by Li. *Id.* Dr. Thomas was repeatedly asked whether specific urine tests performed on specific dates were evidence of drug abuse and/or diversion, to which Dr. Thomas offered an opinion. *Id.*

Dr. Thomas testified that the thirty-seven patient files highlighted common themes of Li's medically illegitimate prescribing practices, and that each of the thirty-seven patient files could be categorized into one or all of various medically deficient prescribing practices. Specifically, Dr. Thomas testified that each patient file contained evidence, inter alia, that: (1) patients were, almost without fail, prescribed the highest dosage of the most highly abused and addictive opioid medication at the initial visit, which was never medically legitimate, (2) Li failed to attempt to establish that there was any medically legitimate reason to prescribe an opioid medication at all to the patients, (3) patients were prescribed opioid medication despite evidence of drug abuse and diagnosed addiction disorders, (4) patients were prescribed opioids despite evidence of drug diversion, (5) patients were issued bridging prescriptions after being discharged for abusing or diverting the drugs the defendant prescribed, (6) Li prescribed dangerous and highly addictive oxycodone in 30 milligram doses to an obviously pregnant patient throughout the last several months of her pregnancy, (7) Li engaged in sexual activity and other sexually inappropriate conduct with patients for whom he was

prescribing controlled substances,[49] PSR ¶ 24, 25, and/or (8) Li repeatedly and consistently increased the quantity of the highest dosage available in the most abused form of diagnosed addiction disorders, (4) patients were prescribed opioids despite evidence of drug diversion, (5) patients were issued bridging prescriptions after being discharged for abusing or diverting the drugs the defendant prescribed, (6) Li prescribed dangerous and highly addictive oxycodone in 30 milligram doses to an obviously pregnant patient throughout the last several months of her pregnancy, (7) Li engaged in sexual activity and other sexually inappropriate conduct with patients for whom he was prescribing controlled substances, PSR ¶ 24, 25, and/or (8) Li repeatedly and consistently increased the quantity of the highest dosage available in the most abused form of oxycodone regardless of whether the patient was stable, worse, or vocalized instances of abuse.[50]

For each of the thirty-seven patient files reviewed by Dr. Thomas, he was specifically asked whether he had an opinion as to the medical legitimacy of the

---

[49] At least three patients testified about inappropriate sexual conduct/contact with Li while he was prescribing controlled substances to them. One patient, NT (Count 9), testified that she was involved in a four-year sexual relationship with Li while she was a patient. NT testified that she engaged in sex with Li because in exchange, she received whatever pills she asked for from him. She testified that Li initiated sexual contact with her at her first visit. (SAppx 1403 − 1404, 1408 − 1410, 1411 − 1412, 1414 − 1415, 1417, 1420, 1421, 1424, 1428, 1431, 1432, 1440). Another patient, JS (Count 3), testified about Li's attempt to initiate sexual contact with her by kissing her on the lips and inserting his tongue into her mouth. (SAppx 1152, 1160 − 1162). Another, AV (Count 14), testified about having to nearly completely undress and expose her breasts behind closed doors with Li while he performed trigger point injections to her lower back. (SAppx 532 − 533).

[50] (SAppx. 1771 − 2310).

prescriptions written by Li for each patient. Dr. Thomas specifically stated that in his opinion, the prescriptions written by Li for all of the thirty-seven patients were not medically legitimate, and were not written in the usual course of professional practice.[51]

With respect to Rachel Scarpa (Count 25 of the Superseding Indictment), the trial testimony unequivocally proved that despite being told by two of his office staff that Rachel was pregnant, one warning occurring a month prior to the final visit, and one occurring on the day of the final visit; despite his own medical record that reflected a more than 40-pound weight gain in about eight months; and despite his own claim that he performed a complete physical and musculoskeletal examination on Rachel just 11 days prior to her giving birth, which included checking her heart with a stethoscope, Li took the position that Rachel was just getting fat.[52] The jury observed and listened to Li's explanation for prescribing 120 oxycodone 30 milligram pills to Rachel when she was just days away from giving birth. The jury observed and heard from Li's two former medical assistants who testified that they asked Li to test Rachel for pregnancy because both testified that it was clearly obvious that Rachel was pregnant.[53] The jury observed that Li's medical file for

---

[51]  (SAppx 1771 – 2310).

[52]  (SAppx 259 – 261, 411 – 413).

[53]  One of Li's former medical assistants testified that shortly after the incident involving Rachel Scarpa on May 1, 2014, she terminated her employment with Li because she was angry and upset. (SAppx 259 -261).

Rachel contained no mention of her pregnancy, despite Li having received warnings about her pregnancy, along with suggestions that he should rethink his oxycodone prescriptions for her.[54]  The jury learned that as was his usual practice, Li ignored the warnings.  Approximately eleven days later on May 12, 2014, Rachel gave birth to a full term opioid dependent baby.[55]

### a.    The death of Suzanne Maack

Count 24 of the Superseding Indictment charged Li with having unlawfully distributed a controlled substance – oxycodone – the use of which resulted in the death of Suzanne Maack.  Suzanne died from an overdose of oxycodone less than two days after receiving a prescription from Li for 120 oxycodone 15 milligrams pills. Blood samples obtained the day Suzanne arrived at the emergency room of the Wayne Memorial Hospital confirmed the lethal dose of oxycodone in Suzanne's system at the time of her death. PSR ¶ 21.

The medical file of Suzanne was introduced into evidence and marked as Government Exhibit 29. (Doc. 178 – Exhibit 29 - Sealed).  The Government established that Suzanne had an initial visit with Li on October 5, 2011.  PSR ¶ 21. On that day, Li wrote Suzanne a prescription for 120 oxycodone 15 milligram pills. *Id.*  The prescription was introduced through William Maack (spouse) and marked as Government Exhibit 93.2.[56]  The Government introduced evidence that the

---

[54]    (Doc. 178, Exhibit #2 – Sealed  SAppx003377).

[55]    (SAppx 992, 993 - 994, PSR ¶ 23).

[56]    (Doc. # 178 - Sealed).

prescription was filled that same day at Stephen's Pharmacy in Hawley, Pennsylvania.[57] The prescription was filled on October 5, 2011, less than two days prior to Suzanne's death. *Id.*

William Maack's testimony included details about the office visit Suzanne had with Li on October 5, 2011.[58] In particular, William Maack described the swiftness and cursory nature of Li's interaction with Suzanne at that visit. *Id.* William Maack testified that upon leaving Li's office that morning, he and Suzanne went directly to Stephen's Pharmacy and filled the prescription written by Li.[59] He testified that he observed Suzanne immediately consume one of the oxycodone 15 milligram pills from the pill bottle that held the pills provided by Li's prescription.[60] Thereafter, William Maack testified that throughout the remainder of the day, October 5, 2011, he observed Suzanne consume two additional oxycodone pills from the prescription provided to her by Li. *Id.*

The testimony of William Maack also included details about the following day, October 6, 2011, including the fact that Suzanne never left the house that day.[61] He described what occurred the last few hours he spent with Suzanne in the

---

[57]   (Doc. # 178 - Exhibit 93.3 – Sealed SAppx003381).

[58]   (SAppx 1570 – 1616, PSR ¶¶ 35, 17 – 20).

[59]   (SAppx. 1596).

[60]   (SAppx. 1597).

[61]   (SAppx. 1597).

evening of October 6, 2011. *Id.* William Maack testified that Suzanne was full of energy and somewhat euphoric as she performed chores all around the house late into the night.[62] According to William Maack, Suzanne did not get into bed until approximately two o-clock in the morning on October 7, 2011.[63]

William Maack then described the morning of October 7, 2011. At approximately 4:30 a.m. as he awoke to go to the bathroom, he noticed that Suzanne was snoring in a different way but did not think much of it.[64] A few hours later at approximately 6:15 a.m., he awoke and quickly noticed that something was wrong with Suzanne. *Id.* Her body was hanging nearly off the bed. She was cold and clammy to the touch and unresponsive. *Id.* William Maack immediately started to perform CPR and directed one of his children to call 911. *Id.* Emergency personnel arrived and took over resuscitation efforts as they transported Suzanne by ambulance to the Wayne Memorial Hospital.[65]

William Maack testified that after Suzanne was taken by ambulance from the home, he grabbed the oxycodone pill bottle and took it with him to the hospital.[66] He stated he did so because it was the only new medication Suzanne was prescribed and he wanted to show hospital personnel what he believed could be

---

[62] (SAppx 1598).

[63] (SAppx 1599).

[64] (SAppx 1599 – 1600).

[65] (SAppx 1601).

[66] (SAppx 1601 – 1602).

the cause of her unresponsive condition. *Id.* William Maack testified that he handed off the oxycodone pill bottle to an emergency room nurse who informed him that 40 pills were missing from the bottle that contained the oxycodone prescribed to Suzanne by Li less than two days prior.[67] The jury also learned that all efforts to resuscitate and save the life of Suzanne Maack failed. *Id.*

The Government presented the testimony of Dr. Louis O'Boyle who stated that Suzanne arrived at Wayne Memorial Hospital in full arrest, meaning that she had no pulse or heartbeat and was still receiving CPR.[68] Suzanne's Wayne Memorial Hospital records were marked as Government Exhibit 27 and introduced through Dr. O'Boyle.[69] Dr. O'Boyle testified that as he worked to assess Suzanne's condition, he became aware of the 42 oxycodone pills missing from the bottle that contained the prescription for oxycodone.[70] Dr. O'Boyle opined that 42 oxycodone pills was enough to make someone stop breathing. *Id.* Dr. O'Boyle explained to the jury how he performed a complete head-to-toe examination of Suzanne as he continued to obtain more information about her condition and assessed her as critically ill from respiratory arrest at that time.[71] Dr. O'Boyle explained to the jury

---

[67]    (SAppx 1601).

[68]    (SAppx 1636 – 1637).

[69]    (SAppx 1635 – 1636, Rec. Doc. 178 – Sealed SAppx003378).

[70]    (SAppx 1637).

[71]    (SAppx. 1637 – 1638).

that various tests were performed on Suzanne, including a cardiogram, which he reviewed and opined that Suzanne's heart was strong and was found to have no heart abnormalities at all.[72] Dr. O'Boyle testified about the blood drawn from Suzanne immediately upon her arrival at the emergency room, as well as the urine tests performed.[73] He explained that the urine screen showed the presence of high levels of oxycodone. *Id.*

Dr. O'Boyle explained how he continued to perform neurological assessments of Suzanne for a period of approximately 24 hours until his official pronouncement of death on October 8, 2011.[74] Finally, Dr. O'Boyle testified that Suzanne's cause of death was respiratory arrest secondary to a narcotic overdose.[75] Dr. O'Boyle specifically testified that the cause of death for Suzanne was from narcotic overdose. *Id.*

The Government also presented the testimony of Carol Leinert, the Coroner in Wayne County at the time of Suzanne's death. Ms. Leinert prepared the Coroner's report admitted into evidence as Government Exhibit 97.[76] Ms. Leinert first explained her duties and responsibilities as a coroner for Wayne County.[77] She

---

[72] (SAppx 1639 – 1643).

[73] (SAppx 1641).

[74] (SAppx 1639 – 1643).

[75] (SAppx 1643).

[76] (SAppx 1653, Doc. 178 – Sealed SAppx003381).

[77] (SAppx 1649 – 1653).

then specifically testified about the investigation she engaged in to determine the cause of Suzanne's death. She explained that her investigation included speaking to Dr. O'Boyle to obtain a medical opinion as to Suzanne's cause of death, a review of Suzanne's medical records from Wayne Memorial Hospital, conversations with the Pennsylvania State Police Officer who also investigated the incident, as well as conferring with Dr. Gary Ross, the Wayne County pathologist.[78] Ms. Leinert further testified that in furtherance of her investigation, she directed the laboratory at Wayne Memorial Hospital to transfer Suzanne's first drawn blood upon her admission to Wayne Memorial to the Northern Tier Research laboratory for further testing.[79]

The Government then presented the testimony of Forensic Toxicologist, Michael Coyer. Dr. Coyer identified himself as the Director of Northern Tier Research Laboratory located in Dunmore, Pennsylvania, and provided the jury with a summary of his educational and professional background.[80] He explained to the jury the duties and responsibilities he carries out every day, including the analysis of blood and/or urine looking for the presence of controlled substances. *Id.* The toxicology report Dr. Coyer prepared after scientifically analyzing Suzanne's blood

---

[78] (SAppx 1658).

[79] (SAppx 1659 – 1660).

[80] (SAppx 1663 – 1665).

was admitted into evidence and marked as Government Exhibit 95.[81]

Dr. Coyer first explained to the jury the nature of the scientific testing he performed on Suzanne's serum sample and explained the significance of testing serum versus whole blood.[82]  In summary, Dr. Coyer testified that the particular opiate and level of opiates in Suzanne's blood (serum) was oxycodone at 215 nanograms per milliliter, as well as 15 nanograms of oxymorphone, which was explained as a metabolite of oxycodone.[83]  Dr. Coyer went on to explain to the jury that he tested a serum sample from Suzanne's blood. Dr. Coyer opined that Suzanne consumed a fatal dose of oxycodone. *Id.*

Finally, Dr. Thomas testified that in forming an opinion regarding the cause of Suzanne's death, he reviewed many sources of information including Li's medical record for the first and only visit Suzanne had with him on October 5, 2011.[84]  From those records, Dr. Thomas specifically noted that the result of an EMG performed by Li on Suzanne was normal, and that the results of an in-house urine screen performed by Li for Suzanne was not normal but, in fact, was positive for a narcotic that Suzanne had not been legally prescribed.[85]  Dr. Thomas testified that Li ignored both a normal EMG and an inconsistent urine test before prescribing 120

---

[81]  (SAppx 1665, Rec. Doc. # 178 – Sealed SAppx003381).

[82]  (SAppx 1667 – 1669).

[83]  (SAppx 1670 – 1674).

[84]  (SAppx 2299 – 2300).

[85]  (SAppx 2301 – 2308).

oxycodone 15 milligram pills to Suzanne at her first visit. *Id.*

Dr. Thomas also testified that he reviewed the medical records of Suzanne's primary care physician, Dr. Filomena Lombardi, which had been provided to Li prior to Suzanne's office visit and were part of Li's patient file for Suzanne.[86] Regarding those records, Dr. Thomas noted that Dr. Lombardi's records evidenced a complicated psychiatric history seemingly disregarded by Li at that first visit, including a prior suicide attempt by Suzanne. *Id.* Dr. Thomas specifically noted various psychiatric medications lawfully prescribed to Suzanne by her psychiatrist who was treating her for chronic bi-polar disorder and severe depression. *Id.* Also significant to Dr. Thomas was the fact that Suzanne had not been prescribed oxycodone in the past, despite a complicated physical history as well. *Id.*

Dr. Thomas further testified that in forming his opinion regarding the death of Suzanne, he reviewed the Wayne Memorial Hospital records from Suzanne's emergency admission, as well as the prior testimony of William Maack, Dr. Louis O'Boyle, and Dr. Michael Coyer. All of these various sources of information were relied upon by Dr. Thomas.[87]

Dr. Thomas first testified that in his expert opinion, the prescription for oxycodone written by Li for Suzanne on October 5, 2011 was not for a legitimate medical purpose and was outside the scope of professional practice, in light of all the

---

[86]    (SAppx 2302 – 2306).

[87]    (SAppx 2299 – 2300).

unique circumstances that accompanied Suzanne when she presented to L's practice at that initial visit, including her complicated physical and psychiatric history.[88] Regarding Suzanne's death, Dr. Thomas opined that "but for" the unlawful prescription written by Li for Suzanne on October 5, 2011, Suzanne would not have died.[89,90]

All of the above evidence presented by the Government regarding the death of Suzanne Maack was tested by the defense through cross-examination, Li's testimony on direct and cross examination,[91] closing arguments, and the court's jury instructions. Despite Li's claims contained in his § 2255 motion and brief, his dual counsel vigorously and zealously tested and tried the Government's witnesses and exhibits before the jury. The jury was well aware of the same arguments at trial that Li makes herein, as were made in his Rule 29 and Rule 33 motions post-trial, including motivations, potential bias, inconsistent testimony, or the lack of evidence. In denying Li's motion for judgment of acquittal on Count 24, the district court explained:

> Lastly, Dr. Thomas testified that the prescription for Oxycodone written by Dr. Li for Ms. Maack on October 5, 2011 was not for a legitimate medical purpose and was outside the scope of professional practice. Specifically, based on his review of medical records, Dr.

---

[88]  (SAppx 2299 – 2300).

[89]  In *Burrage v. United States*, the Supreme Court held that "but for" causation is necessary to prove a violation of 21 U.S.C. §841(a)(1),(b)(1)(C)(drug delivery resulting in death).

[90]  (SAppx 2308).

[91]  (SAppx 2592 – 3086)

Thomas concluded that Dr. Li knew Ms. Maack had an inconsistent urine test revealing a narcotic she was not prescribed before writing her a prescription for 120 Oxycodone 15 mg pills. Dr. Thomas also testified that Dr. Li's record revealed that he was aware that Ms. Maack had a complicated psychiatric history, that she had attempted suicide in the past, and that she had not been prescribed Oxycodone before. Moreover, Dr. Thomas opined that but for the prescription for Oxycodone Dr. Li prescribed on October 5, 2011, Ms. Maack would not have died.

The evidence, viewed in the light most favorable to the Government, supports the jury's verdict on Count 24 of the Superseding Indictment. Specifically, the Government presented sufficient evidence to establish each of the necessary elements to uphold a conviction for unlawful distribution and dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose that resulted in serious bodily injury or death in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). The testimony and exhibits presented at trial, considered in favor of the prosecution, demonstrated that Dr. Li knowingly and intentionally prescribed opioids to Ms. Maack, that she took the opioids, that the prescription was not for a legitimate medical purpose and was outside the usual course of professional practice, and that Ms. Maack died as a result. The Government also presented evidence that Ms. Maack would not have died but for use of the controlled substance prescribed by Dr. Li. The trial record supports the jury's finding with respect to Count 24. Dr. Li's motion for judgment of acquittal as to this charge will be denied.[92]

## III.  DISCUSSION

### A.  General Principles

Motions filed pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences that are allegedly in violation of the Constitution or laws of the United States or are otherwise subject to collateral attack. *Davis v. United States*, 417 U.S. 333, 343

---

[92]  (Doc. 225).

(1974); *O'Kereke v. United States*, 307 F.3d 117, 122-23 (3d Cir. 2002). Section 2255 does not, however, afford a remedy for all errors that may have been made at trial or sentencing. *United States v. Essig*, 10 F.3d 968, 977 n.25 (3d Cir. 1993). "The alleged error must raise 'a fundamental defect which inherently results in a complete miscarriage of justice.' " *Id.* (quoting *United States v. Hill*, 368 U.S. 424, 428 (1962)). There are four grounds upon which relief may be claimed: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence was in excess of the maximum authorized by law; and (4) the sentence is otherwise subject to collateral attack. *Hill*, 368 U.S. at 426-27 (citing 28 U.S.C. § 2255).

Generally, a habeas petitioner cannot assert a claim under section 2255 that he failed to raise on direct appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982) (explaining that such claims are procedurally defaulted, which can only be overcome if the petitioner shows cause and prejudice); *see also United States v. Iglesias*, 2010 U.S. Dist. LEXIS 136184, *9-10 (E.D. Pa. 2010). However, this rule does not apply to claims of ineffective assistance of counsel. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) ("We hold that ineffective-assistance- of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal."); *United States v. DeRewal*, 10 F.3d 100, 105 (3d Cir. 1993); *United States v. Edwards*, 2000 U.S. Dist. LEXIS 6419, *5 n.4 (E.D. Pa. 2000) (explaining that "[p]art of the rationale behind this holding is that where ... trial counsel also represents a defendant on direct appeal, trial counsel is

unlikely to raise the issue of her own effectiveness on appeal"). Additionally, "[o]nce a legal argument has been litigated and decided adversely to a criminal defendant at his trial and on direct appeal, it is within the discretion of the district court to decline to reconsider those arguments if raised again in collateral proceedings under 28 U.S.C. § 2255." *United States v. Orejuela*, 639 F.2d 1055, 1057 (3d Cir. 1981) (reasoning that there are "strong policies favoring finality in litigation and the conservation of scarce judicial resources"), *citing Kaufman v. United States*, 394 U.S. 217, 227 n.8 (1969) (stating that "where the trial or appellate court has had a 'say' on a federal prisoner's claim, it may be open to the § 2255 court to determine that on the basis of the motion, files, and records, 'the prisoner is entitled to no relief' "); *see also Iglesias*, 2010 U.S. Dist. LEXIS 136184 at *10.

Thus, "ineffective assistance of counsel claims cannot be used to indirectly challenge prior rulings in this case; such claims must relate to the performance of counsel." *United States v. Zemba*, 2007 U.S. Dist. LEXIS 15305, *8-9 (W.D. Pa. 2007); *see also Burnett v. United States*, 2010 U.S. Dist. LEXIS 110579, *6-7 (D.N.J. 2010) (denying the section 2255 motion, finding that because the Third Circuit Court of Appeals previously denied the petitioner's claim on the merits, he could not demonstrate that appellate counsel was ineffective for failing to raise the claim, and, further, that the petitioner could not relitigate the merits of that claim before this Court.

When a petitioner brings a motion pursuant to section 2255, the district court has discretion whether to conduct a hearing, but is not required to hold an

evidentiary hearing if "the motion and files and records of the case show conclusively that the movant is not entitled to relief." *United States v. Booth*, 432 F.3d 542, 545-46 (3d Cir. 2005); *see also Essig*, 10 F.3d at 976 (stating that only where the petition raises an issue of material fact must the court hold a hearing to determine the truth of the allegations); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 300-02 (3d Cir. 1991) (refusing to hold an evidentiary hearing on the petitioner's section 2255 ineffectiveness claim "absent identification of some facts that support a contention of ineffectiveness, because to do so will encourage meritless petitions burdening judicial resources").  "A hearing is necessary only where the record does not resolve factual allegations, such as in a situation where allegations relate primarily to purported occurrences outside the courtroom upon which the record can shed no real light." *United States v. Jackson*, 2006 U.S. Dist. LEXIS 83163, *18-19 (E.D. Pa. 2006) (concluding that a hearing was not required because the petitioner pointed to no evidence outside of the record that had a bearing upon his claims), *citing Machibroda v. United States*, 368 U.S. 487, 494-95 (1962); *United States v. Campisi*, 583 F.2d 692, 695 (3d Cir. 1978).  In the absence of a hearing, the district judge must accept the movant's allegations as true unless they are clearly frivolous on the basis of the existing record. *Gov't of Virgin Islands v. Bradshaw*, 726 F.2d 115, 117 (3d Cir. 1984).  The Court need not accept as true allegations that are unsupported by specifics [or] wholly incredible in the face of the record." *Patton v. United States*, 2010 U.S. Dist. LEXIS 80913, *4 (W.D. Pa. 2010) (citing *United States v. Estrada*, 849 F.2d 1304, 1307 (10th Cir. 1988)).

To establish counsel's ineffectiveness, a petitioner must show: (1) counsel's performance fell below an objective standard of reasonableness; and (2) the performance was prejudicial to the defense. *Strickland v. Washington*, 466 U.S. 668 (1984). There is a strong presumption that counsel is effective and the courts, guarding against the temptation to engage in hindsight, must be highly deferential" to counsel's reasonable strategic decisions. *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002), *cert. denied*, 538 U.S. 911 (2003). The mere existence of alternative, even more preferable or more effective, strategies does not satisfy the first prong of the *Strickland* test. *Id.* at 86. To establish prejudice under the second prong, the petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000) (quoting *Strickland*, 466 U.S. at 694). It is not necessary for the court to "guarantee each defendant a perfect trial with optimally proficient counsel, but rather to guarantee each defendant a fair trial, with constitutionally competent counsel." *Id.* at 85. The court must consider the totality of the evidence and the burden is on the petitioner. *Strickland*, 466 U.S. at 687, 695.

Against these standards, the United States submits that Li's motion should be denied.

## IV. ARGUMENT

Li seeks to vacate his convictions based generally under an umbrella of ineffective assistance of counsel, but primarily based on allegations that every

Government witness falsely testified. Li writes dozens of pages on his perspective of the Government's witnesses and evidence, seemingly forgetting that each and every witness was exposed to vigorous cross-examination by Li's two privately retained defense attorneys. Also, throughout his litany of accusations and reiteration of his defense at trial, Li ignores the fact that he testified over a period of three days and told a jury what he is now telling this Court.

Also, several of Li's contentions argued under an umbrella of ineffective assistance of counsel are simply incorrect, factually and/or legally, and belied by record.

## Ground One

Although exceedingly unclear, rambling and disjointed, Li's first argument is premised on his perspective on the insufficiency of probable cause contained in the search warrant affidavit. He states, "*There was no substantial basis for concluding the existence of probable cause in Agent Hischar's affidavit.*" (*Li Br. at 13*). Li essentially engages in a rant over a span of approximately fifty pages wherein he attacks every aspect of Agent Hischar's 34-page affidavit as false and/or somehow flawed. While supposedly arguing that the 34-page affidavit lacked probable cause and should have been challenged by counsel, Li essentially retries his defense in his first argument as if to convince this Court of his innocence despite the jury's finding of his guilt beyond a reasonable doubt.

Instantly, and without reciting the numerous allegations made by Li on this issue, it is abundantly clear that the search warrant affidavit in this case contained

overwhelming probable cause to search premises and seize evidence. Any challenge by his counsel would have been an exercise in futility. Since there is no merit to Li's claims, supported only by Li's view of the facts already presented to a jury and rejected beyond a reasonable doubt, his counsel was not ineffective for failing to file a brief in support of his suppression motion.

On January 22, 2015, law enforcement agents of the Drug Enforcement Administration (DEA) applied to U.S. Magistrate Judge Karoline Mehalchick for a warrant to search for and seize medical records from Li's medical office located in Milford, Pennsylvania. The law is well settled in this area. A judicial officer issuing a search warrant must "make a practical common-sense decision whether, given all the facts set forth in the affidavit . . . there is a fair probability that contraband or evidence will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable cause determination is twofold: first, a judge must determine the "historical facts," that is, the events leading up to the search; second, a judge must decide whether these historical facts, viewed from the standpoint of a reasonable police officer," amount to probable cause. *Ornelas v. United States*, 517 U.S. 690, 695 (1996).

The Court of Appeals counsels that "[t]he supporting affidavit must be read in its entirety and in a common sense and nontechnical manner." *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993). "[S]tatements in an affidavit may not be read in isolation – the affidavit itself must be read as a whole." *Id.* at 1208. Here, the affidavit of probable cause, when viewed in its entirety, provided ample grounds

for Magistrate Judge Mehalchick to issue the warrant; a decision subject to great deference. *Ornelas*, 517 U.S. at 698-99; *Gates*, 462 U.S. at 236.

Further, the Supreme Court set forth a good faith exception to the warrant requirement in *United States v. Leon*, 468 U.S. 897 (1984). The Leon good faith exception provides that suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Williams*, 3 F. 3d 69, 74 (3d Cir. 1993). The question before a reviewing court is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999) (quoting *Leon*, 468 U.S. at 922, n. 23). That an officer executes a search pursuant to a search warrant typically "suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001). However, the Third Circuit has recognized four situations, none of which are present here, in which an officer's reliance on a warrant would not be reasonable and would not trigger the exception:

(1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;

(3) when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and*

*Fifty-Seven Cents*, 307 F.3d 137, 145 (3d Cir. 2002). Li has failed to argue credible

or supportable evidence that implicates any of the above situations.

In support of the warrant application, the United States offered an affidavit

of probable cause in this case that included, *inter alia*, the following:

- An introduction including specifics about search locations and the relevant law enforcement experience of the affiant; (*See Li Appx. Ex. 1, ¶s 1,2*)

- The manner in which the case came to the attention of law enforcement and the specifics involved in the initial complaint; *Id.* ¶ 5

- Preliminary information offered by a source of information (CS #1), including information about the background of CS #1, as well as the continuous flow of information over months of observations and interactions with patients, pharmacies, and other medical professionals; (*See Li Appx. Ex. 1*)

- Information already contained in a DEA data base that predated any referrals from other sources and received prior to initiating an official investigation, including multiple rejections of Li's opioid prescriptions by multiple pharmacies and pharmacists, and the reasons for the rejections; *Id.* ¶ 5

- A statement regarding DEA's awareness of a similar investigation untaken by the PA Attorney General and the Pike County District Attorney's Office initiated in part upon a confidential source coming forward; ¶ 7

- Applicable laws pertaining to the Controlled Substances Act, the Code of Federal Regulations, and the Pennsylvania Code of Professional and Vocational Standards, including Li's DEA registration authorizing him to prescribe controlled substances only in accord with federal law and regulations; *Id.* ¶s 6, 8

- Agents relied on and included information throughout the affidavit derived from the Pennsylvania, New York, and New Jersey Prescription Drug Monitoring Programs (PDMP) in the respective states, and included that information about particular patients in the affidavit of probable cause. All states, including the District of Columbia, currently utilize some form of electronic prescription drug monitoring database. The Prescription Drug Monitoring Program (PDMP) collects information on all filled prescriptions

for controlled substances. A prescription drug monitoring report contains prescription data for all Schedule II through Schedule V controlled substances dispensed by pharmacies in the respective states. Pharmacies are required by law to report the patients name, the particular controlled substance and dosage dispensed, quantity dispensed, number of days supplied, prescribing physician's name, DEA registration number, and the dispensing pharmacy's name and DEA registration number. Data from the individual state databases is routinely admitted as evidence in federal court where an individual is charged with prescribing or dispensing controlled substances outside the usual course of professional practice.[93] (*See Li Appx. Ex. 1*)

- Information derived from law enforcement interviews of pharmacists who had been routinely dispensing controlled substances for prescriptions written by Li. The interviews resulted in law enforcement learning these

---

[93] All states, including the District of Columbia, currently utilize some form of electronic prescription drug monitoring database. The Prescription Drug Monitoring Program (PDMP) collects information on all filled prescriptions for controlled substances. A prescription drug monitoring report contains prescription data for all Schedule II through Schedule V controlled substances dispensed by pharmacies in the respective states. Pharmacies are required by law to report the patients name, the particular controlled substance and dosage dispensed, quantity dispensed, number of days supplied, prescribing physician's name, DEA registration number, and the dispensing pharmacy's name and DEA registration number. Data from the individual state databases is routinely admitted as evidence in federal court where an individual is charged with prescribing or dispensing controlled substances outside the usual course of professional practice.

A search for cases across the nation in which PDMP data was admitted at trial as reliable and relevant evidence yielded the following non-exhaustive list: *United States v. Mirilishvili*, 2016 U.S. Dist. LEXIS 21268, *14–17 (SDNY 2016) (admitting New York PDMP records); *United States v. Lowe*, 14-cr-0055-LGS (SDNY) (admitting New York PDMP records); *United States v. Wiseberg*, 13-cr-00794-AT (SDNY) (admitting New Jersey PDMP records); *United States v. Boccone*, 11-cr-00592 (EDVA) (admitting Virginia PDMP records); *United States v. Kabov*, 15-cr-00511-DMG (CDCA) (admitting California PDMP records); *United States v. Garg*, 15-cr-0007-JAK (CDCA) (admitting California PDMP records); *United States v. Sun*, 14-cr-00157 (CDCA) (admitting California PDMP records); *United States v. Bamdad*, 08-cr-00506-GW (CDCA) (admitting California PDMP records); *United States v. Mikaelian*, 11-cr-00922-DDP (CDCA) (admitting California PDMP records); *United States v. Gabriel-Diaz*, 12-cr-00011-CJC (CDCA) (admitting California PDMP records); *United States v. Couch and Ruan* (admitting Alabama PDMP records; aff'd No. 17-12653, SDAL, 7/10/20).

pharmacists and their respective pharmacies had recognized a problem with Li's prescribing of oxycodone and the affidavit goes on to detail the corrective action taken by the pharmacies; *Id.*

- The affidavit contains explicit information derived from a confidential source of information, as corroborated by witness interviews detailed in the affidavit, and PDMP data. For example, the affidavit contains information that raised multiple red flags for investigators for all of the following reasons:

   o Li was operating his practice in a relatively low populated area of Pike County;

   o Yet, Li's opioid prescriptions in terms of numbers were essentially off the charts;

   o Li preferred cash payments;

   o PDMP data revealed relatively young patients receiving prescriptions from the defendant for high dosages and large quantities of controlled substances;

   o In addition to the above, other red flags were detected in the PDMP data, including patients who received multiple prescriptions from the defendant, on the same date, for the same controlled substances, in the same short acting form, (*i.e.* not an extended release formula with a short acting formula for breakthrough pain – but both short acting), in varying dosages, in large quantities, and in combinations with additional dangerous drugs, such as methadone and benzodiazepines; along with references to criminal histories of patients involving drug offenses/abuse;

   o PDMP data showed the repeated prescribing of dangerous combination of controlled substances over a long period of time;

   o Patient interviews indicating that Li documented and billed for services not performed;

   o Arrest reports from New Jersey law enforcement agencies indicating that multiple arrests were being made of several of Li's patients who were involved in a drug diversion ring in New Jersey;

   o Reports of patients being directed to one particular pharmacy located in Milford after other pharmacies had refused to fill Li's prescriptions for opioids;

o Documented evidence of very young people traveling unreasonably long distances on a monthly basis to obtain high-dose, high-quantity oxycodone pills from Li;

o Documented evidence of several of Li's then current patients who were receiving high-dose, high-quantity oxycodone pills on a monthly basis and sometimes with early refills, having serious and concerning criminal histories involving controlled substance violations;

o Documented evidence of entire families all receiving an array of controlled substances, including high dose oxycodone and benzodiazepines, who all seemingly suffered with the identical diagnosis;

o Evidence regarding the lack of any referrals for alternative treatment by Li;

o Interviews from individuals who actually witnessed drug activity in and around Li's practice;

o Evidence of continued hot urine screens (drug abuse) or negative urine screens (diversion or abuse) but continued prescribing of opioids by Li in ignorance of the hot screens;

o Multiple deaths overdose or drug related deaths coming out of Li's office over a relatively short period of time;

o Documented evidence that the nationwide pharmacy chain, Rite Aid, internally implemented a nationwide "no-fill" directive regarding Li's prescriptions;

o Evidence regarding the birth of an opioid dependent infant, including Li's complete willful blindness to direct warnings from office staff that the particular patient was eight months pregnant; Li's take was that the young patient was only getting fat and he continued to prescribe her large doses of oxycodone 30 mgs; the young woman gave birth only ten days after receiving her last prescription from Li;

o Documented evidence of "doctor shopping" conveyed from other physicians to Li, which was wholly ignored by Li as he continued to prescribe controlled substances to the identified patients;

- Documented evidence that in 2014, Li, operating in the small town of Milford, Pennsylvania, ranked #5 nationally for the highest count of prescribed Schedule II medications, and was ranked #2 in the entire Commonwealth of Pennsylvania;

- Information regarding a preliminary report from Dr. Stephen Thomas, a recognized expert in the field of pain management (credential documented in the affidavit), wherein Dr. Thomas opines that Li's prescribing practices struck him as, "alarming," and in contradiction to the accepted practices of any segment of the medical society;

- Documented information found by Dr. Thomas regarding the alarming number of documented instances of Li's "trinity prescribing," the practice of prescribing an opioid analgesic, a benzodiazepine and a muscle relaxant all together at the same time, a regimen Dr. Thomas noticed as "striking." Such practice is the exception but Li, by all accounts, made it a rule;

- The affidavit also notes follow-up interviews with the confidential informant regarding Li taking in an increase amount of cash on a daily basis, as well as large purchases being made by Li;

- The affidavit notes that despite the evidence indicating that several of Li's pill patients were paying in cash on a monthly basis over a period of years, there was on a sparse amount of cash actually being deposited into any of Li's bank accounts.

(*See, generally, Li Appx. Ex. 1*)

The above recitation is merely a summary of the probable cause set forth in the affidavit supporting the issuance and execution of search warrants in January 2015. Clearly, the probable cause was overwhelming. Indeed,

[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 239-239 (1983) (internal quotations and alterations omitted).

The record makes clear that it would have been a futile endeavor to seek to suppress the evidence seized as a result of any alleged insufficiencies in the affidavit's probable cause. Li's experienced and seasoned defense team had to know the lack of legitimacy in any motion claiming a lack of probable cause in the search warrant affidavit. Strategically, Li's trial team focused on and filed a myriad of more pertinent and worthy pretrial motions.

To establish prejudice under the second *Strickland* prong, Li must show that there is "a reasonable probability that, but for counsel's failure, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687. The Court must consider that totality of the evidence and the burden is on the petitioner. *Id.* at 687, 695. Based upon a review of the affidavit of probable cause and all it contains, and despite Li's attempts to retry the case based upon his view of the facts, it is clear that Li has failed to carry his burden.

Wherefore, Li has failed to establish that the failure by his defense team to file a supporting brief in support of his motion to suppress evidence resulting from the search warrants was prejudicial to him. Based on all of the above, Li's claim is without merit. *See e.g. United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) (holding that "there can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument") (citations omitted); *Jordan v. Warden*, 1998 WL 614694 *9 (M.D. Pa. 1998) (stating, "it is well settled

that a claim of ineffective assistance of counsel cannot be based on the failure to raise baseless or frivolous issues").

**Ground Two**

Li claims that his trial counsels' performance fell below an objective standard of reasonableness and such deficiencies prejudiced him. (See § 2255 motion, p. 65). While it is unclear precisely what Li asserts, he appears to claim the following deficiencies were committed by his counsel:

- Trial counsel was ineffective for failing to request exculpatory evidence;

- Trial counsel failed to prepare and submit numerous motions and briefs;

- Trial counsel failed to submit briefs in opposition to motions in limine filed by the Government;

- Trial counsel "erroneously" conceded the relevance and fit prongs at the Daubert challenge to Dr. Thomas' expert testimony;

- Trial counsel failed to effectively cross-examine Dr. Thomas;

- Trial counsel failed to effectively examine Li's expert, Dr. Carol Warfield;

- Trial counsel failed to object to the testimony of toxicologist, Dr. Michael Coyer;

- Trial counsel failed to object to the testimony of emergency room physician, Dr. Louis O'Boyle;

(See § 2255 motion, pp. 65-88).

As to the issue regarding trial counsel's failure to request exculpatory evidence, in fact, trial counsel filed an extensive 33-page motion for discovery that was far reaching, all-inclusive, and included a request for all *Brady* information.

(Doc. 24). Trial counsel filed a second motion for discovery and again requested, *inter alia*, all exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83, (1963). (Doc. 58). The Government did not fail to abide by its discovery obligations, nor does Li argue such failure by the Government. If *Brady* material existed, it was turned over to Li. The fact that perhaps no *Brady* material existed is not ineffective assistance of counsel. This claim has merit.

As to trial counsels' alleged failure to file pretrial motions and briefs, Li is again incorrect. Trial counsels' pretrial motions included the following:

- Motion for Bill of Particulars and Motion for Discovery; (Doc. 24)
- Second Motion for Discovery; (Doc. 58)
- Second Motion for Bill of Particulars; (Doc. 59)
- First Motion for Separate Trial on Counts 30 -32; (Doc. 60)
- First Motion to Dismiss Counts; (Doc. 61)
- First Motion to Suppress; (Doc. 62)
- Motion for Return of Property; (Doc. 63)
- Brief in Support of Motion to Dismiss Counts; (Doc. 69
- Reply Brief by Li, re: Motion for Return of Property; (Doc. 77)
- Reply Brief by Li, re: Motion for Separate Trials on Counts 30-32; (Doc. 78)
- Reply Brief by Li, re: Motion to Dismiss Counts; (Doc. 79)
- Motion/Brief to Exclude Expert Testimony of Dr. Stephen Thomas; (Doc. 97)
- Motion by Li to Exclude Evidence from Trial, including testimony of pharmacists, rejection of prescriptions by pharmacies, PDMP evidence, Express Script report, CVS pharmacy report, Aliton's Pharmacy ordering report, and ARCOS data; (Doc. 101)
- Brief in Support by Li of Moton to Preclude Testimony; (Doc. 102)
- Reply Brief by Li in Support of Motion to Preclude Expert Testimony; (Doc. 113)

- First Motion for Judgment of Acquittal; (Doc. 181)
- Brief in Support of Motion for Judgment of Acquittal; (Doc. 182)

Thus, there is no merit in Li's claim that counsel failed to file pretrial motions and briefs. Likewise, Li's counsel did not simply respond to the Government's motions in limine regarding PDMP data and testimony from pharmacists, Li's counsel filed a separate motion and brief to preclude such testimony which exceeded the Government's motions in limine. To the extent that Li argues factual reasons why the Court got it wrong in deciding those motions in favor of the Government, Li raised the same issues on direct appeal with the Third Circuit. *See United States v. Fuhai Li, No. 19-1875 (3d Cir. 2020).* Li cannot now, under the guise of alleging ineffective assistance of counsel, revisit the Third Circuit's ruling. "Ineffective assistance of counsel claims cannot be used to indirectly challenge prior rulings in this; such claims must relate to the performance of counsel." *United States v. Zemba*, 2007 WL 709314, *3 (W.D. Pa. 2007).

To the extent that Li argues his counsel was ineffective for conceding the relevance and fit of expert testimony at the *Daubert* hearing conducted on May 1, 2018, Li offers no legal or factual basis as to why such concession was legally deficient or strategically erroneous. Again, Li's argument amounts to a disagreement with the fact of the concession, rather than an articulated rationale as to why Dr. Thomas' expert testimony was not legally relevant and an appropriate fit at trial. To be sure, Li's counsel did seek to suppress the expert testimony of Dr.

Thomas and also requested a *Daubert* Hearing, which was held on May 1, 2018. (Docs. 97 and 121). This argument has no merit.

The remaining of Li's argument regarding trial counsels' failure to effectively engage in cross-examination of Government witnesses, or effectively conduct direct examination of his expert witness, are likewise without merit and are belief by the entirety of the trial record.

The first *Strickland* prong requires a defendant to "establish . . . that counsel's performance was deficient." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). Proving such a deficiency "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment." *Id.* (quoting *Strickland*, 466 U.S. at 687).

"In assessing counsel's performance, 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Id.* "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is to say, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. It is well-settled that the benchmark for judging any claim of ineffectiveness of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*

The second prong of *Strickland* requires a defendant to show that counsel's performance unfairly prejudiced the defendant, meaning that counsel's errors were so serious as to deprive the defendant of a trial the result of which is reliable. *Strickland*, 466 U.S. at 687. It is not enough to show that the error had some conceivable effect on the outcome of the proceeding, for virtually every act or omission would meet such a test. *Id.* at 693. Rather, the defendant must show there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is sufficient to undermine confidence in the outcome of the trial. *Id.*

The Supreme Court has noted that application of the *Strickland* standard does not require that the performance prong be addressed first. Rather,

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Strickland*, 466 U.S. at 697.

Li claims that trial counsel should have more aggressively cross-examined witnesses regarding various aspects of their testimony. Li's allegations do not meet the first prong of *Strickland*. In fact, trial counsel vigorously cross-examined

Government witnesses regarding their motivations, addictions, biases, prejudices, their own incompetence, their criminal histories, *etc.*

Moreover, while Li focuses on specific items included in each patient's medical chart as evidence of his counsels' ineffectiveness, presumably believing that each medical file presented fodder for cross-examination, (*Li Br.* at 72-88), he ignores the fact that every patient file was admitted into evidence in its entirety, and each file was meticulously and methodically testified about by both Dr. Thomas and Li.[94]

Notably, Li took the stand in his own defense and testified over the course of three days on direct examination and cross examination.[95] He had a full and fair opportunity to advance his defense with his version of the facts without limitation. On cross-examination, Li spoke at length about each and every patient about which he was questioned, and did so with the benefit of the particular patient's medical file directly in front of him. He rejected each and every assertion by the Government and offered to the jury what he now offers to this Court in his § 2255 motion. It is worth reiterating that absolutely no limits were place on Li during direct and cross-examination and the record supports this fact. The jury heard it all and saw it all and simply rejected Li's version of the facts.

Nevertheless, cross-examination is meant to develop a factual record for the jury, and is not an appropriate time to make arguments regarding how the evidence

---

[94] (*See Government's Attachment "A"*).

[95] (SAppx2592 - 3087).

should be interpreted. (See, e.g., "Differences Between Opening Statements and Closing Arguments, United States Courts, available at

http://www.uscourts.gov/about-federal-courts/educational-resources/about-educational-outreach/activity-resources/differences ("Only after the jury has seen and heard the factual evidence of the case are the parties allowed to try to persuade them about its overall significance. Closing arguments are the opportunity for each party to remind jurors about key evidence presented and to persuade them to adopt an interpretation favorable to their position.")). Here, Li's counsel appropriately drove home all of the Li's defenses during closing argument, during which he referred back to specific witnesses and reminded the jury about all their perceived flaws.[96]

Moreover, while Li complains about his counsel's failure to object to the testimony of toxicologist Dr. Michael Coyer and emergency room physician Dr. Louis O'Boyle, his claims are frivolous and without merit. There was no legal or factual basis for his counsel to object to the testimony of either Dr. Coyer or Dr. O'Boyle, nor does Li offer a credible basis.[97] Li's counsel had no apparent basis for making any objection with regard to this testimony. Rather, Li's counsel

---

[96]   (SAppx. 3156 - 3181).

[97]   It is well-settled that conclusory allegations are insufficient to entitle a petitioner to vacation of his conviction pursuant to Section 2255. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *United States v. Machibroda*, 368 F.2d 487, 495-496 (1962). *See also Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991) (bald assertions and conclusory allegations do not provide sufficient grounds to require an evidentiary hearing).

appropriately relied on the well-established truth-telling vehicle of cross-examination to highlight any perceived falsehoods or inconsistencies.

Based on the statement of facts set forth herein, as supported by the thousands of pages of transcripts and exhibited evidence, the criminal case against Li was overwhelming. Evidence of his unlawful prescribing practices, including the devasting and deadly results of his unlawful conduct, came before the jury from literally all fronts. The jury heard evidence on nearly every allegation contained in the affidavit of probable cause. All of the evidence was zealously challenged as was each witness on cross-examination. While Li now focuses on one source of information as a disgruntled employee, he and his defense team had the opportunity and seized that opportunity to vigorously attack that particular source on the witness stand.[98] The jury found the source credible despite Li's efforts, as evidence by their guilty verdicts.

Moreover, the jury heard, *inter alia*, from eyewitnesses, numerous of Li's former patients, three of his own employees who also served as eyewitnesses, physical evidence including approximately $1.2 million dollars in cash seized from his residence concealed in shoe boxes beneath his bed, testimony from IRS and DEA agents, thousands of pages of documentary evidence which served to support the testimony of witnesses, expert testimony from medical professionals, pharmacists' testimony, and multiple other professionals who had the misfortune of either encountering Li's patients engaged in "doctor shopping," those who took care of the

---

[98]   (SAppx418 – 452).

infant born opioid dependent, the pathologist who performed the autopsy on Suzanne Maack, and the toxicologist who analyzed her blood for the deadly dosage of oxycodone unlawfully prescribed to her by Li. The evidence was simply overwhelming.

Based on all of the above, Li's arguments should be denied in their entirety.

## V.   <u>CONCLUSION</u>

All grounds alleged by Li in his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence are without merit. There has been no showing by Li that his allegations involve a "fundamental defect that results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346 (1974). There is no indication from the record that his counsel was anything other than constitutionally effective. Moreover, a defendant is not prejudiced by counsel's performance where, as here, the relevant, probative and admissible evidence of Li's guilt was overwhelming. *See Singleton v. Lockhart*, 871 F.2d 1395, 1400-01 (8th Cir 1989).

The Government further submits that the defendant's allegations are "contradicted conclusively by the record." In *Solis v. United States*, 252 F.3d 289 (3d Cir. 2001), the Third Circuit stated that "a defendant would not be entitled to a hearing if his allegations were contradicted conclusively by the record, or if the allegations were patently frivolous." *Solis* at 295. Here, all of Li's claims are contradicted by the record and/or are "patently frivolous." Therefore, this Court should dismiss the motion without a hearing.

## Certificate of Appealability

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253 (c)(2). In order to establish the denial of a constitutional right, the mere allegation of a constitutional wrong, such as deprivation of the right to effective counsel, is insufficient; the petitioner must make a substantial showing of such an error in order to present an appeal. *Santana v. United States*, 98 F.3d 752, 757 (3d Cir. 1996). "Where a district court has rejected the constitutional claim on the merits, the showing required to satisfy § 2253 (c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). *See also Harper v. United States*, 2012 WL 32920 *6 (M.D. Pa. 2012). Here, in accordance with the above standards, the Government asserts there is no basis for the issuance of a certificate of appealability in this matter. *See also United States v. Watson*, 2010 WL 3239210, *6 (E.D. Pa. 2010) (finding "that reasonable jurists could not find the resolution of Petitioner's *Strickland* claim debatable or wrong," and therefore refusing to issue "a certificate of appealability with respect to his ineffective assistance of counsel claims").

For all of the reasons set forth herein, Li's motion under Section 2255 should be denied, without further hearing, and no certificate of appealability should issue.

Respectfully submitted,

BRUCE D. BRANDKLER
Acting United States Attorney


/s/ Michelle Olshefski

Dated: May 21, 2021

Michelle Olshefski
Assistant U.S. Attorney
Atty ID 79643
235 North Washington Avenue
Scranton, PA 18503
(570) 348-2800 telephone

## WORD COUNT

The undersigned hereby certifies that this brief contains no more than 20,000 words. Specifically, the body of the Government's brief contains 14,071 words.

/s/ Michelle Olshefski
Michelle Olshefski
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on May 21, 2021, she served a copy of the attached

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PETITIONER'S MOTION TO VACATE,
## SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

by U.S. Mail to the below address:

Fuhai Li
75356—067
FCI McKean
P.O. Box 8000
Bradford, PA 16701

/s/ Michelle Olshefski
Michelle Olshefski
Assistant U.S. Attorney