## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

FUHAI LI,

Defendant.

No. 3:16-CR-00194

(Chief Judge Brann)

## MEMORANDUM OPINION

## MAY 6, 2022

## I.     BACKGROUND

In 2017, Fuhai Li was charged in a superseding indictment with twenty three counts of unlawful distribution and dispensing of a controlled substance, in violation of 21 U.S.C. § 841(a)(1); one count of unlawful distribution and dispensing of a controlled substance resulting in death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C); one count of unlawful distribution and dispensing of a controlled substance to a pregnant individual, in violation of 21 U.S.C. § 861(f); two counts of maintaining drug-involved premises, in violation of 21 U.S.C. § 856(a)(1); two counts of money laundering, in violation of 18 U.S.C. § 1957; and three counts of tax evasion, in violation of 26 U.S.C. § 7201.[1]

Li filed numerous pretrial motions, including motions to suppress evidence and to dismiss some counts of the superseding indictment,[2] but the matter ultimately

---

[1]   Doc. 47.
[2]   Docs. 24, 58, 59, 60 ,61, 62, 63, 97, 101.

proceeded to an approximately one-month jury trial. The United States Court of

Appeals for the Third Circuit summarized the evidence presented at trial as follows:

> Li ran Neurology and Pain Management, a medical practice in Milford, Pennsylvania. He made prescription Schedule II narcotics easily available to those who sought them—persons in severe pain (who ultimately developed addictions), ongoing addicts, and those involved in the illegal resale of the controlled substances. By 2013 Li was one of the highest prescribers of oxycodone and other controlled substances in the Commonwealth.

> Li generally required immediate cash payments for his visits. His patients paid $250 to $350 for an initial visit, and $150 for monthly visits thereafter. These visits were often brief and Li's medical examinations superficial. Some patients testified that they received prescriptions for high dosages of oxycodone or other opioids without sharing their prior medical records or even their medical history. At follow-up visits, Li's patients often simply asked for higher doses of narcotics, and he would write the prescription accordingly. He also continued to write scripts for patients who admitted to taking more pills than prescribed, and increased dosages even though patients reported stable conditions. Li falsified his patients' medical records, including medical exams that were never performed and billing health insurers for these tests.

> Li's conduct ultimately did not go unnoticed. His patients called his practice to complain when pharmacies stopped filling their prescriptions. Li's receptionists directed them to specific pharmacies where Li had pre-existing relationships. At trial, Robert Welsh, a pharmacist, explained that Li's patients exhibited "all the textbook flags that you should not fill the prescription." Thus, abiding by his professional obligation not to fill what appeared to be unlawful prescriptions, he turned Li's patients away. The testimony of other pharmacists corroborated his view. They noted that Li's patients tended to present prescriptions for large quantities of pills at the maximum dosage, were unwilling to present photo identification, often traveled long distances to obtain the drugs, and preferred to pay in cash. Further, when these pharmacists attempted to verify prescriptions with Li's office, they often faced roadblocks, such as the office's refusal to provide a diagnosis for the prescription, reliance on the same diagnosis

for many patients, or even being told "if you don't want to fill it, don't fill it."

Two of Li's patients were key to the charges in this case: Rachel Scarpa and Suzanne Maack. Li began treating Ms. Scarpa for neck pain in January 2013. In March 2014 he wrote her a prescription for 120 30-milligram oxycodone pills after being warned twice by his staff that she was visibly pregnant. Per Li's records, she had gained 40 pounds over eight months. At trial, Li testified that he just thought Ms. Scarpa had gotten fat. Eleven days later, she gave birth to a full-term, opioid-dependent baby.

Li treated Suzanne Maack for the first time two days before she died from an overdose of Oxycodone. Ms. Maack's husband testified that Li's initial exam of his wife was cursory and ignored all signs of her psychiatric disorders, drug addiction, and suicidal history. At the end of the appointment, Li wrote Ms. Maack a prescription for 120 15-milligram oxycodone pills. She overdosed and died after taking approximately 42 pills the next evening.

At trial, the jury also heard from Dr. Stephen Thomas, the Government's expert. He discussed the medical standards for pain management and the evidence of medically illegitimate prescribing practices found in each of the thirty-seven patient files he reviewed. He noted that Li failed to collect adequately new patients' medical history, regularly prescribed the highest dosage of highly addictive opioid medication at the very first visit, failed to establish that there were medically legitimate reasons for those prescriptions, wrote prescriptions when faced with evidence of drug abuse and addiction disorders, and engaged in sexual activity and other sexually inappropriate conduct with at least three patients for whom he wrote prescriptions.

In January 2015 the Government seized approximately $1,030,960 in cash from Li's townhouse in Milford and home in East Stroudsburg, PA, and $1,073,446 from his bank accounts. The IRS determined that his medical practice failed to report $832,980.45 in income between 2011 and 2013. Evidence showed Li, who was responsible for all aspects of his pain management business, provided his accountant with records of his patients' medical histories, lab results, appointments, and payment histories that differed significantly from those in his

"eClinical" software. Further, after the Government conducted search warrants for Li's records, he adjusted his 2014 taxes to reflect this additional income and asked his accountant to amend his returns from prior years.[3]

As a result of this evidence, the jury convicted Li of all charges.[4] Li thereafter filed a motion for judgment of acquittal, arguing that the evidence presented at trial was insufficient to support his conviction;[5] that motion was denied by the late Honorable A. Richard Caputo, who concluded that the evidence, when viewed in the light most favorable to the Government, supported a finding of guilt beyond a reasonable doubt on the necessary elements of the crimes charged.[6] Li was ultimately sentenced to 330 months' imprisonment.[7]

On direct appeal, Li raised five issues: (1) the evidence was insufficient to support his conviction; (2) the court improperly admitted testimony of pharmacists and patients not specifically identified and charged in the superseding indictment; (3) Dr. Thomas' expert testimony was insufficiently reliable; (4) the court erred in declining to instruct the jury that Li could not be convicted if it found that he acted in good faith; and (5) the forfeiture order was improper.[8] The Third Circuit rejected those assertions and affirmed Li's convictions and sentence.[9]

---

[3] *United States v. Li*, 819 F. App'x 111, 114-15 (3d Cir. 2020) (brackets, ellipsis, and internal citations omitted).

[4] Doc. 169. During trial the Government withdrew Counts 18 and 21.

[5] Docs. 181, 182.

[6] Doc. 225.

[7] Doc. 241.

[8] *Li*, 819 F. App'x at 115-18.

[9] *Id.* at 119.

In February 2021, Li filed a timely 28 U.S.C. § 2255 motion challenging his convictions based primarily upon allegations of ineffective assistance of counsel.[10] Li first argues that his conviction was obtained as a result of an unlawful search and seizure, as there was insufficient probable cause to support the search warrant for his medical office, two homes, and two banks.[11]

Li further argues that his trial attorney was ineffective in several ways. First, Li contends that trial counsel was ineffective for failing to introduce evidence at trial that other entities had investigated Li's prescription practices and found insufficient evidence to prosecute or to take action against Li's medical license.[12] Second, Li asserts that counsel failed to prepare or submit numerous motions or briefs, including a motion to suppress evidence seized as a result of the purportedly deficient search warrant.[13] Third, Li's attorney allegedly erroneously conceded the relevance and fit of Dr. Thomas' expert testimony, while challenging only the reliability of the opinion.[14] Li further contends that counsel was deficient in failing to cross-examine Dr. Thomas on a patient by patient basis.[15]

Fifth, Li argues that counsel failed to properly introduce testimony from Li's expert, Carol Warfield M.D., to counter Dr. Thomas' opinion for many of the

---

[10]  Docs. 258, 259.
[11]  Doc. 259 at 11-25; Doc. 259-1 at 1-25; Doc. 259-2 at 1-19.
[12]  Doc. 259-2 at 20-21.
[13]  *Id.* at 21-25.
[14]  *Id.* at 225; Doc. 259-3 at 1.
[15]  Doc. 259-3 at 1-6.

patients at issue in the case.[16] Sixth, counsel allegedly failed to present specific evidence from Li to counter the testimony of 16 of the 20 patients who testified at trial.[17] Seventh, Li argues that trial counsel failed to properly defend against the charge that Li's distribution caused the death of one patient.[18] Finally, Li asserts that his attorney's loyalty was undermined by an actual conflict of interest, since counsel was allegedly friends with the chief detective of the Pike County Sheriff's Office ("PCSO").[19]

The Government has responded to Li's § 2255 motion, and asserts that Li's trial counsel was not ineffective because: (1) ample probable cause supported the search warrant and, therefore, Li's counsel was neither ineffective in failing to challenge it, nor was Li prejudiced by said failure; (2) counsel requested and presented a great deal of exculpatory evidence; (3) counsel filed numerous motions and briefs; (4) Li's attorney did not unreasonably concede the relevance and fit of Dr. Thomas' expert opinion; (5) counsel adequately cross-examined Dr. Thomas during trial, who discussed in detail the relevant patient files; (6) counsel effectively examined Dr. Warfield; and (7) Li's attorney did not perform deficiently in failing to object to certain testimony, as any objection would have been frivolous.[20] This

---

[16]  *Id.* at 6-8.
[17]  *Id.* at 8.
[18]  *Id.* at 8-14.
[19]  *Id.* at 14-16.
[20]  Doc. 270.

matter is now ripe for disposition and, for the reasons discussed below, the Court will deny Li's motion.

## II.    DISCUSSION

"In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court established a two-part test to evaluate ineffective assistance of counsel claims."[21] "The first part of the *Strickland* test requires 'showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"[22] In determining whether an attorney's performance is deficient, courts must "determine whether, in light of all the circumstances, the [attorney's] acts or omissions were outside the wide range of professionally competent assistance."[23] As the United States Supreme Court has emphasized:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.[24]

"The second part [of the *Strickland* test] specifies that the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

---

[21]   *United States v. Bui*, 795 F.3d 363, 366 (3d Cir. 2015).
[22]   *Id.* (quoting *Strickland*, 466 U.S. at 687).
[23]   *Strickland*, 466 U.S. at 690.
[24]   *Id.*

probability is a probability sufficient to undermine confidence in the outcome.'"[25] "This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable."[26] In other words, a movant must establish a "a substantial likelihood" that any errors "changed the outcome of . . . trial."[27]

## A.  Probable Cause in Support of Search Warrant

Li first asserts that his trial counsel was ineffective for failing to file a brief in support of the motion to suppress evidence seized as a result of a search warrant, and for failing to file other motions and briefs.[28] As an initial matter, to the extent that Li seeks to assert a freestanding claim that the search warrant was not supported by probable cause, the Court cannot reach the substance of that claim, as Li failed to raise that claim on direct appeal and has therefore committed procedural default.[29]

The United State Supreme Court has long held that there is a "general rule that claims not raised on direct appeal may not be raised on collateral review unless

---

[25]  *Bui*, 795 F.3d at 366 (quoting *Strickland*, 466 U.S. at 694).
[26]  *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks omitted).
[27]  *Branch v. Sweeney*, 758 F.3d 226, 238 (3d Cir. 2014).
[28]  Doc. 259 at 11-25; 259-1; Doc. 259-2.
[29]  Even if Li could raise such a claim here, as discussed below, it is without merit.

the [movant] shows cause and prejudice"[30] or is able to demonstrate "that he is actually innocent."[31] To show cause for procedural default, "a defendant must show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim."[32] "Examples of external impediments which have been found to constitute cause in the procedural default context include interference by officials, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and ineffective assistance of counsel."[33]

Here, Li's claim as it relates to the validity of the search warrant could have been raised on direct appeal but was not. Li therefore committed procedural default, and this Court may consider that claim only if Li is able to establish cause and prejudice, or actual innocence.[34] The Court concludes that he cannot. First, as to actual innocence, Li presents no new evidence that was not previously available and, as the Third Circuit held on appeal, the evidence presented at trial was sufficient to support the verdict against him;[35] this precludes the possibility that, on the current record, the Court may find that Li is actually innocent of his crimes of conviction. As to whether cause exists to excuse Li's procedural default, the only possible cause

---

[30] *Massaro v. United States*, 538 U.S. 500, 504 (2003). *See also United States v. Travillion*, 759 F.3d 281, 288 n.11 (3d Cir. 2014) (noting that "issues which should have been raised on direct appeal may not be raised with a § 2255 motion").

[31] *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal quotation marks omitted).

[32] *United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005) (quoting *McCleskey v. Zant,* 499 U.S. 467, 493 (1991)).

[33] *Id.* (internal quotation marks omitted).

[34] *Massaro*, 538 U.S. at 504.

[35] *Li*, 819 F. App'x at 115-16.

would be ineffective assistance of counsel but, as discussed below, Li did not receive ineffective assistance of counsel. Consequently, the Court will not consider Li's standalone claim that evidence seized as a result of the search warrant should be suppressed.

Turning to the question of whether counsel was ineffective for failing to seek suppression of the evidence seized as a result of the search warrant, the Court concludes that he was not, primarily because Li cannot demonstrate prejudice resulting from said failure.

Pursuant to the Fourth Amendment's prohibition on "unreasonable searches and seizures,"[36] police must generally obtain a warrant—supported by probable cause—before conducting a search.[37] When a district court determines whether a warrant is supported by probable cause, "[a] reviewing court may not conduct a *de novo* review of a probable cause determination."[38] Rather, "[t]he duty of a reviewing court is 'simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'"[39] "[I]f a substantial basis exists to support the magistrate's probable cause finding, [the district court] must uphold that finding even if a different magistrate judge might have found the affidavit insufficient to

---

[36] U.S. CONST. AMEND. IV.

[37] *See, e.g.*, *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).

[38] *United States v. Golson*, 743 F.3d 44, 53 (3d Cir. 2014) (citing *Illinois v. Gates,* 462 U.S. 213, 236 (1983)).

[39] *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (quoting *Gates,* 462 U.S. at 238 (ellipsis omitted)).

support a warrant."[40] Although courts must "not merely rubber stamp a magistrate's conclusions, [they] must heed the Supreme Court's direction that 'doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'"[41]

"A magistrate may find probable cause when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"[42] The United States Court of Appeals for the Third Circuit has "held that probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules."[43] "The supporting affidavit to a search warrant is to be read in its entirety and in a common sense, nontechnical manner."[44] Courts must "evaluate 'the events which occurred leading up to the search, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'"[45]

When reviewed under this standard, the Court concludes that there is no realistic chance that a motion to suppress would have been granted. The affidavit in

---

[40]  *Id.* (internal quotation marks omitted).
[41]  *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates,* 462 U.S. at 237 n.10 (internal citation omitted)).
[42]  *Miknevich*, 638 F.3d at 182 (quoting *Gates,* 462 U.S. at 238).
[43]  *Id.* (internal quotation marks omitted).
[44]  *Id.*
[45]  *United States v. Donahue*, 764 F.3d 293, 301 (3d Cir. 2014) (quoting *Ornelas v. United States,* 517 U.S. 690, 696 (1996) (ellipses and brackets omitted)).

support of a search warrant contained significant evidence in support of the notion that Li had committed a crime. The affidavit detailed that the investigation into Li was initiated based upon an anonymous letter sent from an addiction treatment facility alleging Li was prescribing medications without a medical reason and requesting cash payments, as well as giving prescriptions without seeing patients.[46]

The affidavit further noted that the Drug Enforcement Agency had received copies of at least forty prescriptions issued by Li that Walgreens pharmacy had refused to fill due to suspicious circumstances surrounding the prescriptions, and that the Pennsylvania Office of Attorney General, Pike County District Attorney's Office, and Pennsylvania Department of State, Bureau of Licensing, had all launched investigations into Li, although the criminal inquiries were eventually closed, and no action was taken against Li's license because the agency did not believe it had sufficient evidence at that time to take such action.[47]

The affidavit also detailed information contained in the Pennsylvania Prescription Drug Monitoring Program (PDMP)[48] and, while the affidavit noted that the PDMP data was not verified, it stated that the data showed that Li wrote thousands of prescriptions for controlled substances and was the second highest prescriber of Schedule II controlled substances in Pennsylvania, and the fifth highest

---

[46] Doc. 258 at 20.
[47] *Id.* at 20-21.
[48] The PDMP collects information on all filled prescriptions for controlled substances; pharmacies are required to report this data to the PDMP.

prescriber in the country.[49] Moreover, the affidavit stated that law enforcement had interviewed pharmacists at Rite-Aid, Medicine Shop, and Wal-Mart and confirmed that Li prescribed significant quantities of Schedule II controlled substances and that all three pharmacies refused to fill some, if not all, prescriptions for Schedule II substances issued by Li.[50] PDMP data also revealed that, for a twelve month period, Li prescribed approximately 75% of Schedule II controlled substances that were distributed by one local pharmacy.[51]

Rite-Aid reported that more than 64% of the prescriptions that it processed for Li were Schedule II substances, and it had noticed a worrying trend of "trinity prescribing," whereby Li prescribed an opioid, a benzodiazepine, and a muscle relaxant, which is a combination sought by drug users due to the enhanced high that this combination provides.[52] Rite-Aid also noted that Li prescribed non-traditional combinations of medications, Schedule II narcotics to multiple members of the same family, and only oxycodone—and no other medications—to many of his patients.[53]

Furthermore, law enforcement had been working with a confidential informant (CI), who had training and experience in the medical field and was Li's former employee, and who provided to law enforcement details regarding Li's

---

[49] *Id.* at 21-22.
[50] *Id.* at 22-23.
[51] *Id.* at 25.
[52] Doc. 258-1 at 10.
[53] *Id.*

medical practice.[54] The CI related that Li prescribed narcotics—primarily high doses of oxycodone—to "nearly every patient in his practice."[55] Li further ignored red flags with his patients, including his patients: testing positive for illicit drugs; "doctor shopping"; diverting their medication to others; being arrested for violations of the Controlled Substances Act; and having concerned family members call Li's office.[56] The CI further suspected that several of Li's patients had died of drug overdoses, and that Li had altered the medical records of at least one of those patients.[57]

The CI informed law enforcement that many of Li's patients traveled significant distances, including from other states such as New York, New Jersey, Maryland, Connecticut, and North Carolina, despite the availability of local doctors for those patients.[58] The CI provided specific examples—including patient names— of what the CI believed were questionable prescription practices, including prescribing: additional narcotic drugs to a patient who had reported complete pain relief with less medication; Tylenol with Codeine to an eleven-year-old for headaches; oxycodone to the heroin-addicted children of Li's office manager; oxycodone to patients with no complaints of pain; oxycodone to entire families; oxycodone to a pregnant woman; narcotics to patients who were diverting their

---

[54] Doc. 258 at 24.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*

medication; narcotics to patients who tested positive for illicit substances; narcotics to patients who had clean drug tests, meaning they were not taking the prescribed substances; and oxycodone to a patient whom Li knew to be addicted to opioids.[59]

Law enforcement also confirmed that one of Li's patients had given birth to an opioid addicted baby; the CI stated that, after medical staff informed Li that the patient was visibly pregnant and should not be prescribed opioids, Li asserted that the patient was simply gaining weight.[60] The CI also confirmed that many local pharmacies had stopped filing prescriptions issued by Li for Schedule II controlled substances[61] and informed law enforcement that, on one specific day, 29 of the 33 patients that Li saw received prescriptions for oxycodone.[62]

Li's practice mostly took cash from patients, and the CI estimated that Li's business brought in between $1,500 and $2,500 per day.[63] Despite these cash flows, Li made only one cash deposit into his bank accounts between 2012 and 2014.[64] Li also sometimes billed patients for procedures that were never performed, exchanged prescriptions for sex with at least one patient, and issued numerous prescriptions for high quantities of oxycodone to young patients with relatively little time separating the prescriptions.[65]

---

[59] *Id.* at 25; Doc. 258-1 at 4-9, 16-17.
[60] Doc. 258-1 at 18.
[61] Doc. 258 at 25.
[62] Doc. 258-1 at 4.
[63] *Id.* at 1.
[64] *Id.* at 24.
[65] *Id.* at 1-3.

The CI also informed law enforcement that Li rarely referred his patients to specialists, a practice that law enforcement confirmed through available data; the affiant found this unusual because, from his conversations with other doctors, pain management specialists usually refer their patients out to other specialists to uncover the root cause of the patients' pain.[66] The affidavit stated that many of Li's patients who had received prescriptions for oxycodone had died recently, and it was suspected in several of those cases that narcotics played at least a contributing role to the deaths.[67]

Furthermore, Express Scripts, an online pharmacy company, notified law enforcement that Li prescribed a high number of controlled substances, and that more than 60% of prescriptions issued by Li that Express Scripts filled were for Schedule II substances—primarily oxycodone.[68] Moreover, 9 out of 10 of Li's top prescriptions were for controlled substances—mostly the highest strength made— and many online reviews accused Li of creating drug addicts.[69] Express Scripts was concerned about Li's treatment pattern since "utilizing opioid analgesics is a 'last resort' in treating patients" with the diagnoses assigned by Li.[70]

Finally, the affidavit stated that law enforcement had retained Dr. Stephen M. Thomas as an expert in the field of pain management to review Li's prescription

---

[66] *Id.* at 5.
[67] *Id.* at 11-16.
[68] *Id.* at 19-20.
[69] *Id.* at 20.
[70] *Id.*

habits.[71] After briefly setting forth Dr. Thomas' credentials, the affidavit noted that Dr. Thomas found Li's prescribing habits "alarming."[72] These habits included prescribing high levels of oxycodone to start treatment—rather than starting with lower doses—many instances of trinity prescribing, despite trinity prescribing having "virtually no clinical utility," and prescribing inordinate quantities of opioids.[73] Despite these concerns, Dr. Thomas was clear that he would need to review Li's medical records to determine if there was a legitimate medical purpose for those prescriptions.[74]

The Court concludes that the sum of this information was sufficient to establish probable cause to search the identified locations. To conclude that probable cause existed to believe that Li's prescriptions constituted the unlawful distribution of a controlled substance, the magistrate judge must have concluded there was a fair probability:

> (1) that [Li] distributed a mixture or substance containing a controlled substance; (2) that he distributed the controlled substance outside the usual course of professional practice and not for a legitimate medical purpose; [and] (3) that he distributed the controlled substance while knowing or intending that the distribution was outside the usual course of professional practice and not for a legitimate medical purpose . . .[75]

---

[71] *Id.* at 23.
[72] *Id.*
[73] *Id.* at 23-24.
[74] *Id.*
[75] *United States v. Kraynak*, 553 F. Supp. 3d 245, 251 (M.D. Pa. 2021).

The assertions presented in the affidavit in support of the search warrant adequately demonstrate all three requirements. First, the affidavit makes clear—through the CI, interviews with pharmacists, pharmacy information, and PDMP data—that Li was prescribing[76] oxycodone, which is a Schedule II controlled substance.[77]

Second, a magistrate judge could reasonably conclude from the information presented that Li's prescriptions were outside the usual course of professional practice and not for a legitimate medical purpose. The information in the affidavit establishes that Li was prescribing copious amounts of opioids and that, during some of the relevant time frame, Li was the second largest prescriber of Schedule II controlled substances in Pennsylvania, and the fifth highest prescriber in the country.[78] The affidavit also detailed Li's penchant for "trinity prescribing" which had almost no legitimate medical purpose, was dangerous, and generally only served to increase the high provided by opioids.[79]

---

[76] Although Li was issuing medical prescriptions, prescriptions that are issued outside the ordinary course of medical practice constitute the unlawful distribution of a controlled substance. *See* 21 C.F.R. § 1306.04(a) (noting that "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice . . . [and a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances").

[77] 21 U.S.C. § 812.

[78] Doc. 258 at 21-22.

[79] Doc. 258-1 at 10, 23-24.

As this Court has previously held, such evidence "is relevant to the question of whether [a doctor] issued prescriptions outside the usual course of professional practice and not for a legitimate medical purpose" because "'prescriptions of controlled substances in enormous quantities, and in dangerous combinations, support a reasonable inference that the underlying prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose.'"[80] Similarly, pharmacy records confirmed that Li prescribed significant quantities of Schedule II controlled substances, and confirmed that several pharmacies eventually refused to fill such prescriptions if issued by Li;[81] this information likewise permits a "reasonabl[e] infer[ence] 'that the underlying prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose.'"[82]

Such information, along with the fact that Li resorted to prescribing opioids immediately and in large doses, is more than sufficient to establish a likelihood that Li was issuing opioid prescriptions outside the usual course of professional practice and not for a legitimate medical purpose.

Third, the affidavit contained enough information for a magistrate judge to reasonably conclude that Li knew or intended that his prescriptions were outside the

---

[80] *Kraynak*, 553 F. Supp. 3d at 253 (quoting *United States v. Lague*, 971 F.3d 1032, 1040 (9th Cir. 2020)).

[81] Doc. 258 at 22-23, 25; Doc. 258-1 at 10.

[82] *Kraynak*, 553 F. Supp. 3d at 255 (quoting *Lague*, 971 F.3d at 1040).

usual course of professional practice and not for a legitimate medical purpose. Several pharmacies had refused to fill prescriptions issued by Li,[83] Li often prescribed non-traditional combinations of medications and Schedule II narcotics to multiple members of the same family,[84] and he ignored numerous red flags with his patients.[85] Importantly, several of Li's patients had died of drug overdoses, and Li may have altered the medical records of at least one of those patients.[86] Li also prescribed additional narcotic drugs to a patient who had reported complete pain relief with less medication and oxycodone to patients with no complaints of pain, prescribed opioids to a visibly pregnant patient even after his own staff raised concerns about the prescription, and continued prescribing opioids to his patients despite failed drug tests.[87] This information all raises an inference that Li knew his prescriptions were outside the usual course of professional practice and not for a legitimate medical purpose.

Because the affidavit in support of the search warrant adequately demonstrates the existence of all three elements of the offense of unlawful distribution of a controlled substance, the search warrant was supported by probable cause. In light of the abundance of probable cause that supported the search warrant,

---

[83]   Doc. 258 at 22-23.
[84]   258-1 at 10.
[85]   Doc. 258 at 24.
[86]   *Id.*
[87]   Doc. 258 at 25; Doc. 258-1 at 4-9, 16-18.

there simply is no chance that a motion to suppress would have been granted, and Li cannot establish that he was prejudiced by counsel's failure to pursue such a motion.

Li nevertheless points to several purported flaws in the affidavit in support of a search warrant that he argues would merit suppression of any evidence seized. While Li argues that much of the affidavit was based on hearsay, it is well established that "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily."[88] Accordingly, "probable cause may rest upon hearsay, provided there exists 'a substantial basis for crediting the hearsay.'"[89]

Here, the magistrate judge could reasonably have determined that hearsay from the CI was credible, as the CI had worked directly with Li in his practice, had intimate knowledge of that practice and of standard medical procedures, and had voluntarily contracted law enforcement to report concerns over Li's behavior and to assist any investigation.[90] Moreover, law enforcement verified much of the information provided by the CI, such as the quantities of opioids that Li prescribed, individual anecdotes about Li's patients—including the birth of an opioid dependent

---

[88]   *Franks v. Delaware*, 438 U.S. 154, 171 (1978).
[89]   *Torres v. City of Philadelphia*, 673 F. App'x 233, 236 n.3 (3d Cir. 2016) (quoting *United States v. Ventresca*, 380 U.S. 102 (1965)).
[90]   Doc. 258 at 24.

baby—and prescription habits and practices.[91] Law enforcement was therefore able to corroborate much of the CI's information.

Next, while Li points to numerous statements and assertions in the affidavit that he believes were false, he bases his allegations of falsity on testimony that occurred during his trial, not upon information that was available at the time that the affidavit was drafted and the search warrant issued.[92] Importantly, this Court must "determine whether the proceeding was initiated without probable cause 'based on the information available to officers *at the time the arrest warrant was sought*.'"[93] Because the testimony and evidence to which Li cites was not available at the time that the affidavit was drafted, it cannot undermine the existence of probable cause in support of the search warrant.[94]

Li also makes several references in his motion to the fact that no one in the affidavit—particularly Dr. Thomas—definitively concluded that Li's prescriptions were outside the usual course of professional practice and not for a legitimate medical purpose. However, the affidavit did not need to contain any such assertion. Rather, the information only needed to have been sufficient for the magistrate judge

---

[91] *See id.* at 25; Doc. 258-1 at 1-18.

[92] *See* Doc. 259-1 at 8-22.

[93] *Waters v. Cheltenham Twp.*, 700 F. App'x 149, 153 (3d Cir. 2017) (quoting *Est. of Smith v. Marasco*, 318 F.3d 497, 522 (3d Cir. 2003) (brackets omitted)).

[94] Contrary to Li's contention, the assertions made by the affiant, Drug Enforcement Agency Diversion Investigator James Hischar, do not appear to be false or misleading based on a reading of the record, and any minor inconsistencies are insufficient to undermine probable cause. Doc. 259-2 at 2-13.

to conclude that it was more likely than not that Li's prescriptions were outside the usual course of professional practice and not for a legitimate medical purpose. Here, the information was more than adequate for the magistrate judge to reach such a conclusion, and any motion to suppress would have been futile.

Finally, it is important to note that, even if evidence had been seized in violation of the constitution, suppression of evidence would not have been warranted, pursuant to the good faith exception. "The exclusionary rule is a prudential doctrine that prevents the government from relying at trial on evidence obtained in violation of the Fourth Amendment's strictures."[95] "However, the rule is *not* intended to remedy Fourth Amendment violations, and does not necessarily apply each time a violation occurs."[96]

"Accordingly, in determining whether the exclusionary rule applies, [courts must] engage in a cost-benefit analysis, balancing the deterrence benefits of suppression against its substantial social costs."[97] The United States Supreme Court has made clear that "[s]uppression of evidence . . . has always been our last resort, not our first impulse."[98] Therefore,

> Where the particular facts of a case indicate that law enforcement officers acted with an objectively reasonable good-faith belief that their conduct was lawful, or when their conduct involved only simple, isolated negligence, there is no illicit conduct to deter. In such

---

[95] *United States v. Werdene*, 883 F.3d 204, 215 (3d Cir. 2018) (brackets and internal quotation marks omitted).
[96] *Id.*
[97] *Id.* (brackets and internal quotation marks omitted).
[98] *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

circumstances, the deterrence rationale loses much of its force and exclusion cannot pay its way. Alternatively, where law enforcement conduct is deliberate, reckless, or grossly negligent or involves recurring or systemic negligence, deterrence holds greater value and often outweighs the associated costs.[99]

The existence of a search warrant is usually sufficient to establish that an officer conducted a search in good faith, but there are cases in which an officer's reliance on a warrant is not reasonable and would fail to trigger the good faith exception.[100] In determining whether the good faith exception applies, courts must determine "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."[101] This may occur in the following narrow situations:

(1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;

(3) when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.[102]

---

[99]   *Werdene*, 883 F.3d at 215-16.
[100]  *United States v. Hodge*, 246 F.3d 301, 307-08 (3d Cir. 2001).
[101]  *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984).
[102]  *Hodge*, 246 F.3d at 308 (brackets and internal quotation marks omitted).

None of these circumstances were present here. As noted above, the affidavit in support of a search warrant was not deliberately or recklessly false, the magistrate judge did not abandon her judicial role, nor did the warrant fail to particularize the place to be searched or the things to be seized. Moreover, as discussed previously, the affidavit was replete with facts supporting a finding of probable cause and certainly was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[103] Because the evidence would not have been suppressed even if counsel had filed a motion to suppress and the Court had determined that the warrant was deficient, Li suffered no prejudice, and the Court cannot conclude that he received ineffective assistance of counsel.

## B.    Distribution Resulting in Death (Count 24)

Next, Li argues that counsel was ineffective for failing to defend against Count 24—alleging that Li's distribution resulted in death—in the manner that Li preferred.[104] Specifically, Li asserts that his attorney failed to: (1) introduce evidence from Li to counter testimony from William Maack, the husband of the decedent; (2) introduce evidence that Li had access to a comprehensive medical history and physical examination of the decedent that was conducted by a different physician; (3) challenge Dr. Thomas' opinion that the prescription issued to the decedent was not for a legitimate medical purpose due to her psychiatric history, abnormal urine

---

[103] *Id.*
[104] Doc. 259-3 at 8-14.

screen results, and history of suicidal ideation; (4) introduce testimony from Dr. Warfield to counter Dr. Thomas' opinion that the prescription was without a legitimate medical purpose and was the but-for cause of the decedent's death; (5) object to Michael Coyer, M.D.'s opinion that oxycodone levels in the decedent's blood were consistent with death from opioid overdose; and (6) challenge Louis O'Boyle, M.D.'s testimony that the substance found in the decedent's blood and urine samples was oxycodone.[105]

The Court finds these issues to be without merit. As to Maack's testimony, although Maack testified that Li did not look at the folder of the decedent's medical information that Maack had provided to Li, he did not testify that Li never looked into it, and he confirmed that Li stated that he would view the information later and that Li carried the folder out of the examination room.[106] And although Li makes much of the fact that Maack testified that Li only spent approximately 10 minutes with the decedent, while the check in/check out log at the clinic noted the decedent being in the office for 48 minutes, Maack testified that he and the decedent went to the clinic, filled out forms, waited approximately 15 minutes to see Li, visited with Li for approximately 10 minutes, then went to the front desk to obtain the prescription and the date for Maack's next appointment.[107] This could easily have accounted for the total time spent in the clinic. Given that these minor

---

[105] *Id.*

[106] Doc. 216 at 122, 124.

[107] *Id.* at 117-18, 123, 125.

discrepancies—if they were discrepancies at all—were trivial, any line of inquiry into those issues would have been fruitless and unlikely to change the outcome of trial.

With respect to Li's complaint about the cross-examination of Dr. Thomas and the direct examination of Dr. Warfield, the Court finds no ineffective assistance of counsel. Dr. Thomas testified that he had examined the decedent's medical file and determined that Li had not reviewed an MRI that had been performed on the decedent.[108] Dr. Thomas opined that the urine screen that was administered to the decedent at her first, and only, appointment with Li contained unexpected results— she tested positive for oxycodone despite having not been prescribed that substance.[109] The decedent's medical records further confirmed that she had a history of mental illness—specifically, bipolar disorder and depression—was prescribed medications for those issues, and had attempted suicide several years prior.[110]

Dr. Thomas concluded that the prescription issued by Li was not "a medically legitimate prescription" because of the decedent's "significant psychiatric history and an abnormal urine drug screen that required clarification . . . as well as additional history that needed to be taken . . . and a history of suicidal ideation. Giving her a

---

[108]  Doc. 218 at 155, 157.
[109]  *Id.* at 157-58.
[110]  *Id.* at 158-62.

large dose of opioids was not indicated."[111] Dr. Thomas further concluded that, given

the levels of oxycodone in the decedent's blood after her death, oxycodone was the

but-for cause of her death.[112]

   While Li asserts that the decedent's positive oxycodone test may have been

the result of a cross-reaction between hydrocodone and oxycodone, this assertion

does nothing to undermine Dr. Thomas' testimony. Dr. Thomas testified that there

is a chance that a cross-reaction would result in a urine test returning positive for

oxycodone when the person in fact used hydrocodone, but Dr. Thomas explained

that the chance of such a cross-reaction is low enough that the test results should still

be believed, although the possibility of a cross-reaction "means that I need more

information."[113] Dr. Thomas offered similar testimony with respect to the decedent;

he testified that the decedent's urine test coming back positive for oxycodone was

unexpected[114] and, therefore, a doctor should "require[] clarification" of that test

before prescribing opioids.[115] Accordingly, Dr. Thomas did not testify that a doctor

may never prescribe opioids to a patient with an unexpected test result—he merely

testified that Li should not have prescribed opioids without further inquiry into the

test results.

---

[111] *Id.* at 163-64.
[112] *Id.* at 164-65.
[113] Doc. 205 at 84-85.
[114] Doc. 218 at 157-58.
[115] *Id.* at 164.

Similarly, while Li points to some literature that states doctors may, under certain circumstances, prescribe opioids to individuals with a history of drug abuse or psychiatric issues, that literature states that opioid prescriptions may be appropriate "only if [the doctor] is able to implement more frequent and stringent monitoring parameters."[116] Such procedures were not put into place before Li issued a prescription to the decedent, and this literature therefore does not contradict Dr. Thomas' expert opinion that the prescription was inappropriate.[117]

Li next asserts that counsel failed to elicit from Li that he did not have information about the decedent's heroin overdose that had occurred one week prior to her visit with Li, and that the decedent's positive urine test was simply the result of a cross-reaction between hydrocodone and oxycodone.[118] First, as discussed above, although it was possible that the presence of oxycodone in the decedent's urine test was essentially a false-positive, it was more likely a correct result, and Li could not discount that test result without further clarification. Second, information about the decedent's prior heroin overdose was not relevant to any of the opinions that Li's prescription was not for a legitimate medical purpose, or that the oxycodone he prescribed was the but-for cause of the decedent's death.[119] Testimony from Li

---

[116] Doc. 258-6 at 21.

[117] Li argues that counsel should have elicited testimony from Dr. Warfield that supported these assertions. Doc. 259-3 at 11. However, for the reasons just explained, any such testimony from Dr. Warfield would not have undermined Dr. Thomas' testimony, and counsel was not ineffective for failing to elicit such testimony.

[118] Doc. 259-3 at 9-10.

[119] *See* Doc. 216 at 162-82, 197-213; Doc. 218 at 155-65.

regarding that overdose would not have undermined these opinions, and counsel was not ineffective for failing to elicit such testimony from Li during trial.

As to the testimony of Dr. Coyer, while Li complains that Dr. Coyer offered testimony that the decedent likely died as a result of an oxycodone overdose, despite not being offered as an expert witness, such testimony was not improper. As the Third Circuit has explained, "when a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702."[120] "Thus, as long as the technical components of the testimony are based on the lay witness's personal knowledge, such testimony is usually permissible under Rule 701."[121] Here, Dr. Coyer testified regarding his personal knowledge of the decedent's blood serum test—which Dr. Coyer conducted—that demonstrated the decedent had opioid levels in her blood serum of 215 nanograms per ML[122] which, in Dr. Coyer's experience, was a toxic level.[123] Because this testimony was based on Dr. Coyer's personal experience, it was permissible lay testimony, and counsel was not ineffective for failing to object to such testimony.

---

[120] *United States v. Savage*, 970 F.3d 217, 286 (3d Cir. 2020) (brackets and internal quotation marks omitted), *cert. denied*, 142 S. Ct. 481 (2021).

[121] *Id.* (internal quotation marks omitted).

[122] Because this was a serum test, Dr. Coyer testified that the likely level of oxycodone in the decedent's blood would have been around 300 nanograms per ML. Doc. 216 at 208-09.

[123] *Id.*

With regard to Dr. O'Boyle's testimony, although Li cavils about certain portions of that testimony, he does nothing to undermine the strength of Dr. O'Boyle's testimony. Dr. O'Boyle noted that the decedent had apparently consumed 42 oxycodone pills which, at the prescribed dose, was sufficient "to make you stop breathing."[124] That, together with the very high oxycodone levels in the decedent's blood, led Dr. O'Boyle to believed that the decedent had died of a "respiratory arrest secondary to a narcotic overdose."[125] Although Li asserts that there was evidence that decedent had previously used heroin, and this could have accounted for the morphine in the decedent's system, Li offers nothing more than pure speculation that the decedent may have actually used heroin at the time of her death. Nothing that Li points to would have fundamentally undermined Dr. O'Boyle's testimony and, consequently, counsel was not ineffective for failing to raise those issues at trial.

### C.    Remaining Claims of Ineffective Assistance of Counsel

Li further argues that trial counsel was ineffective for failing to request and introduce exculpatory evidence at trial, specifically, the fact that other agencies had previously looked into Li's prescriptions and had concluded that there was insufficient evidence to prosecute Li or act on his medical license.[126] Contrary to Li's assertion, counsel clearly had this evidence in his possession, as such information was contained in the affidavit in support of the search warrant.

---

[124]  *Id.* at 172.
[125]  *Id.* at 176.
[126]  Doc. 259-2 at 20-21.

Moreover, counsel filed motions for exculpatory evidence,[127] and there is no indication, or even assertion from Li, that the Government breached its obligation to provide any relevant evidence. Counsel therefore did not act deficiently in this respect. Moreover, there would be no prejudice from counsel's decision not to present any such evidence at trial, as evidence of prior investigations would be irrelevant to Li's guilt or innocence.

Li further contends that counsel was ineffective for failing to prepare or file certain briefs or motions.[128] Even if counsel failed to file a particular motion that Li sought, or failed to respond to a Government motion in a manner in which Li deemed best, and even if that failure could be deemed ineffective, there is no indication that Li suffered any resulting prejudice. There is no evidence whatsoever that the motions would have been meritorious or that any response briefs would have been effective or, even if they were successful, that those motions would have changed the outcome of trial—a trial in which the Government presented overwhelming evidence of Li's guilt.

Li next asserts that trial counsel was ineffective for conceding the fit[129] and relevance of Dr. Thomas' expert opinion.[130] Specifically, Li asserts that Dr. Thomas

---

[127] Docs. 24, 58.

[128] Doc. 259-2 at 21-25.

[129] Under the fit prong of expert admissibility, admissibility will depend "on the proffered connection between the scientific research or test result . . . and [the] particular disputed factual issues." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (internal quotation marks omitted).

[130] *Id.* at 25; Doc. 259-3 at 1.

only opined that Li failed to follow the relevant standard of care, not that Li prescribed controlled substances without a legitimate medical purpose, which is the proper criminal standard.[131] Li's assertion is erroneous, however, as Dr. Thomas repeatedly opined, in both his expert report and testimony at the hearing for Li's motion to exclude Dr. Thomas' opinion, that Li's prescriptions were not for a legitimate medical purpose.[132] Dr. Thomas' opinion was thorough, well-reasoned, and specifically geared toward assisting the jury in answering the question of whether Li's prescriptions to the individuals identified in the superseding indictment were for a legitimate medical purpose. The Court therefore cannot conclude that counsel was ineffective in conceding the relevance and fit of Dr. Thomas' opinion, or that Li was prejudiced by said concession, since Dr. Thomas' opinion would have been admitted even if counsel had not made such a concession.

Li also contends that counsel was ineffective in failing to cross-examine Dr. Thomas during trial on a patient-by-patient basis for all thirty-five of the patient records to which Dr. Thomas testified.[133] While Li's attorney did not cross examine Dr. Thomas in the manner that Li preferred, the Court finds that counsel's cross examination of Dr. Thomas was not constitutionally deficient.

Counsel subjected Dr. Thomas to vigorous cross examination and attacked his opinion in several ways, including by: noting that Dr. Thomas had only reviewed a

---

[131] *Id.*
[132] *See* Doc. 95 at 32-60; Doc. 126 at 18-33.
[133] Doc. 259-3 at 1-6.

small number of Li's patient files; questioning the type of medical literature and medical guidelines that Dr. Thomas referenced and whether they were applicable to Li; questioning whether many of the red flags that concerned Dr. Thomas actually should prevent a doctor from prescribing an individual opioids or raise concerns among physicians; challenging whether the tests that Dr. Thomas advocated for were actually required to determine whether a patient needed prescription painkillers; and questioning whether Li's prescription practices were actually inappropriate.[134]

Trial counsel's strategy—eschewing an attempt to attack Dr. Thomas' opinion individually as to every relevant patient in favor of attacking Dr. Thomas' opinion as a whole—cannot be said to have been unreasonable. Attacking each opinion individually ran the significant risk that counsel would have failed to undermine Dr. Thomas' opinion with respect to one or more of the victims, and such a strategy may have confused the jury and resulted in them focusing on the proverbial trees rather than the forest. Counsel instead chose to focus on the forest, thereby attempting to undermine Dr. Thomas' entire opinion and the Government's entire case. Of course, counsel's strategy ultimately failed, and it is tempting to conclude that a sounder strategy would have been to challenge Dr. Thomas' opinion as to each individual victim. Nevertheless, this Court is mindful that it must take great pains "to eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's

---

[134]  Doc. 219 at 3-49.

perspective at the time" of the trial.[135] Given the information available at trial, counsel's decision to focus the jury on Dr. Thomas' opinion as a whole was reasonable, particularly in light of counsel's relatively strong cross-examination.

Moreover, even if counsel's performance were somehow deficient in the chosen form of cross-examination, the Court is unable to discern any resulting prejudice. Dr. Thomas testified in detail for four days, and his testimony was thorough, well-grounded, and convincing. Li does not show how any different manner of cross-examination would have undermined Dr. Thomas' opinion as to every victim in this case or would have changed the outcome of trial. Consequently, the Court concludes that Li did not receive ineffective assistance of counsel in the manner of cross-examining Dr. Thomas.

Next, Li asserts that counsel was ineffective in failing to introduce evidence from Li's expert, Dr. Warfield, that would directly counter Dr. Thomas' opinion for thirty-one of the thirty-five medical records to which Dr. Thomas testified,[136] and was ineffective in failing to elicit testimony from Li himself that could counter the evidence presented with respect to sixteen of Li's former patients.[137] Not only did counsel elicit significant testimony from both Li and Dr. Warfield,[138] indicating that his performance was not deficient, but Li was convicted of *every* count charged,[139]

---

[135] *Strickland*, 466 U.S. at 689.
[136] Doc. 259-3 at 6-8.
[137] *Id.* at 8.
[138] *See* Docs. 207, 208, 221, Government Appendix at 2422-2562, 2569-2581.
[139] Doc. 167.

meaning that, even for those victims whom Dr. Warfield and/or Li discussed, the jury found such testimony unconvincing and believed the Government's version of events instead. In light of that, Li cannot show prejudice resulting from the failure of counsel to elicit specific testimony as to other individual victims or patients.

### D.    Purported Conflict of Interest

Lastly, Li asserts that counsel was operating under an actual conflict of interest because he was personal friends with PCSO's chief detective, and the Pike County District Attorney's Office participated in the search of Li's office and residences.[140] It is beyond peradventure that "[t]he Sixth Amendment guarantees a criminal defendant counsel's undivided loyalty free of conflict of interest."[141] "This requirement is an essential foundation of our adversarial system of justice, providing the minimum necessary to ensure that criminal defendants receive representation that puts the government to its proofs in an adversarial manner."[142] "When an attorney's representation is corrupted by conflicting interests, he or she 'breaches the duty of loyalty, perhaps the most basic of counsel's duties.'"[143]

Under such circumstances, "counsel is ineffective if he or she 'actively represented conflicting interests', and an actual conflict of interest adversely affected the lawyer's performance."[144] If a movant "shows that an actual conflict of interest

---

[140] Doc. 259-3 at 14-16.
[141] *Hess v. Mazurkiewicz,* 135 F.3d 905, 910 (3d Cir. 1998) (internal quotation marks omitted).
[142] *Id.* (internal quotation marks omitted).
[143] *Id.* (quoting *Strickland,* 466 U.S. at 692).
[144] *Id.* (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350 (1980)).

tainted counsel's performance, [courts must] presume prejudice" but, if a movant "can establish only a potential conflict of interest, prejudice must be proved."[145] To prove the existence of a conflict of interest, a movant must demonstrate that "counsel's interests diverged with respect to a material factual or legal issue or to a course of action such that the attorney finds himself in the untenable position of serving two clients with incompatible needs."[146] "To do so, [Li] must identify a plausible defense strategy that could have been pursued, and show that this alternative strategy inherently conflicted with, or was rejected due to, [counsel's] other loyalties or interests."[147]

Applying that law here, Li cannot demonstrate ineffective assistance of counsel. Even if Li's attorney were friends with a detective from the PCSO, this does not mean that counsel was operating under a conflict of interests, particularly since the Pike County District Attorney's Office did not prosecute Li. There is no indication that counsel had conflicting interests due to his alleged friendship with a detective from the PCSO, or that this friendship somehow resulted in counsel attempting to serve incompatible needs. Nor has Li demonstrated that counsel rejected an alternative defense strategy or that, due to counsel's alleged friendship with the PCSO detective, counsel's chosen defense strategy conflicted with one proposed by Li. Consequently, the Court concludes that Li has not demonstrated that

---

[145] *Id.*

[146] *Id.* (brackets and internal quotation marks omitted).

[147] *Id.*

he received ineffective assistance of counsel based on counsel's alleged friendship with the PCSO detective, and this claim will be denied.

### E.    Certificate of Appealability

Because this Court will deny Li's § 2255 motion, this decision will not be appealable unless this Court or a circuit justice issues a certificate of appealability.[148] A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."[149] To satisfy this standard Li must demonstrate that reasonable jurists would find that the Court's assessment of the constitutional claims is debatable or wrong.[150] This Court finds that Li has not met this burden, and the Court therefore declines to issue a certificate of appealability.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that Li did not receive ineffective assistance of counsel, and his 28 U.S.C. § 2255 motion will be denied. The Court will also deny a certificate of appealability.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[148]  28 U.S.C. § 2253(c)(1)(B).

[149]  *Id.* § 2253(c)(2).

[150]  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).